**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JOSEPH JADCZAK AND | ) | |
| CATHERINE JADCZAK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 07-0431GMS |
| v. | ) | |
| | ) | |
| HOMESITE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**JADCZAK PLAINTIFFS' OPENING BRIEF IN
SUPPORT OF THEIR MOTION FOR PARTIAL
SUMMARY JUDGMENT ON THE "DWELLING" ISSUE**

John S. Spadaro, No. 3155
John Sheehan Spadaro, LLC
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
(302)235-7745

Michael L. Sensor, No. 3541
Perry & Sensor
One Customs House, Suite 560
P.O. Box 1568
Wilmington, DE 19899-1568
(302)655-4482

Attorneys for Plaintiffs
Joseph Jadczak and Catherine Jadczak

March 14, 2008

1746

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ...................................................1

SUMMARY OF ARGUMENT ..............................................................................2

STATEMENT OF FACTS ...................................................................................3

    A.  The Parties...........................................................................................3

    B.  The Insurance Contract .........................................................................3

    1.  The Insuring Agreement and Other Basic Terms ....................................3

    2.  The Policy Form .................................................................................5

    C.  The Examination Under Oath ................................................................5

    D.  The May 29, 2006 Fire.........................................................................5

    E.  The Nature and Uniqueness of the Jadczaks' Residential Hangar.................6

    F.  Homesite's Handling of the Hangar Claim ..............................................8

ARGUMENT ...................................................................................................9

I.  AMBIGUITY FAVORS THE INSURED .............................................................9

II.  THE RESIDENTIAL HANGAR QUALIFIES AS A "DWELLING" ........................11

    A.  The Plain Meaning of "Dwelling" Confirms the Hangar's Status.................11

    B.  *Howard* Confirms the Hangar's Status ..................................................11

    C.  The Installation of a Mobile Home Confirms the Hangar's Status ...............13

    D.  Homesite's "Description of Dwelling" May Reasonably Be Applied to the Hangar..........14

    E.  Homesite is Responsible for the Latent Ambiguity ..................................15

III.  HOMESITE'S "OTHER STRUCTURES" ARGUMENT FAILS .........................16

CONCLUSION................................................................................................18

# TABLE OF AUTHORITIES

*Easton v. Washington County Ins. Co.*, 137 A.2d 332 (Pa. 1957)................................................10

*Fedorich v. Zoning Board of Appeals*, 424 A.2d 289 (Conn. 1979)..............................................13

*Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993)...............................................................5

*Hercules Inc. v. AIU Ins. Co.*, 784 A.2d 481 (Del. 2001)................................................................9

*Howard v. H. Robert Anderson & Assoc., Inc.*, No. MC03-20345, 2004 WL 3371968
(Minn. Dist. Ct. Sept. 28, 2004)..............................................................................................11, 12

*IKO Monroe, Inc. v. Royal & Sun Alliance Ins. Co. of Canada, Inc.*,
C.A. No. 00-834GMS, 2001 WL 1568674 (D. Del. Dec. 7, 2001)...............................................10

*Metzger v. Clifford Realty Corp.*, 476 A.2d 1 (Pa. Super. Ct. 1984)............................................10

*Nabors v. South Carolina Farm Bureau Mut. Ins. Co.*, 255 S.E.2d 337 (S.C. 1979)....................13

*O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281 (Del. 2001) ...........................................9

*Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146 (Del. 1997)................................................9, 10

*Reed v. Tennessee Farmers Mut. Ins. Co.*, 483 S.W.2d 721 (Tenn. Ct. App. 1972) .............. 13-14

*Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d
1192 (Del. 1992) ............................................................................................................................9

*State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*, 343 F.3d 249
(4th Cir. 2003)..................................................................................................................................5

*Steuart v. McChesney*, 444 A.2d 659 (Pa. 1982) ........................................................................10

*Twin City Fire Ins. Co. v. Delaware Racing Assn.*, 840 A.2d 624 (Del. 2003).............................. 9

*Woodward v. Farm Family Cas. Ins. Co.*, 796 A.2d 638 (Del. 2002)............................................9

*Yeager v. Cassidy*, 253 N.E.2d 320 (Ohio Ct. Comm. Pleas 1969)..............................................13

## <u>Other Authorities</u>

Fed. R. Civ. P. 56 ............................................................................................................1

MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993) .......................................11

SHORTER OXFORD ENGLISH DICTIONARY (6th ed. 2007) .......................................................13

## <u>NATURE AND STAGE OF THE PROCEEDINGS</u>

This consumer coverage case was filed in the Superior Court of the State of Delaware in and for Sussex County on May 25, 2007, and later removed to this Court.  Plaintiffs Catherine and Joseph Jadczak proceed under a policy of homeowners insurance sold to them by AIG Insurance Company under its "AIG Homeowners Insurance Program," which was later sold by AIG to Defendant Homesite Insurance Company.  The Jadczaks seek, among other relief, a declaration that Homesite must cover the fire-related loss of their residential airplane hangar under the policy's "Coverage A" (titled "Dwelling").

The Jadczaks now move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on the "dwelling" issue.  Specifically, they ask this Court to hold that:

• There is no genuine issue of material fact with respect to the unique nature of the Jadczaks' airpark residence: it consists of not one but two dwelling units, one of which is the residential hangar.

• Though the insured property indisputably houses two dwelling units (one being the residential hangar), "Coverage A" speaks only in terms of "[t]he dwelling" in the singular.  This is a latent ambiguity, and must be construed against Homesite as the policy's drafter.

• The loss of the residential hangar must therefore be covered under "Coverage A," and subject to the policy limits thereunder.

This is the Jadczaks' opening brief in support of their motion for partial summary judgment on the "dwelling" issue.

## SUMMARY OF ARGUMENT

1.  Latent ambiguity exists when policy language, though clear on its face, is rendered unclear by reference to external objects or circumstances.

2.  Mr. Jadczak's sworn testimony shows that under any reasonable conception of the term "dwelling," the Jadczaks' residential hangar is a dwelling; meaning that, along with their more conventional dwelling, the Jadczaks' property has two dwelling units.

3.  Homesite knowingly insured a residence within a residential airpark -- a residence that conspicuously includes a residential hangar.  It thus insured a property containing two dwelling units.  Yet its "Coverage A" refers to "dwelling" in the singular.  This is a classic case of latent ambiguity.

4.   The Homesite policy is a standard form adhesion contract, copyrighted by the Insurance Services Office (an industry drafting body).  Because Homesite is the policy's drafter, the latent ambiguity within "Coverage A" must be construed against Homesite; and fire damage to the hangar must be covered under "Coverage A."

## STATEMENT OF FACTS

### A.  The Parties

Plaintiffs Catherine and Joseph Jadczak are natural persons and husband and wife, residing at 29555 Eagles Crest Drive, Milton, Delaware 19968.  Defendant Homesite Insurance Company is a Massachusetts corporation that is authorized to transact insurance in Delaware. Homesite assumed policies written by AIG Insurance Company under its so-called "AIG Homeowners Insurance Program."  At all times relevant to this case, Homesite served as the Jadczaks' homeowners insurer.

### B.  The Insurance Contract

The Jadczaks' residence was insured under Homesite policy no. 30318013, effective for the period August 16, 2005 to August 16, 2006.  It was thus in effect on May 29, 2006, when the Jadczaks' residential hangar was destroyed by fire.  A copy of the policy is reproduced in the accompanying appendix at pages A1-42.[1]

The policy's declarations identify the Jadczaks' residence, at 29555 Eagles Crest Road in Milton, Delaware, as the "Insured Location."  A1.  The  declarations  also  set  forth  a "Description of Dwelling."  This provision describes the Jadczaks' "dwelling" to include their "Clapboard structure, Single family home, Primary residence . . . ."  Finally, the declarations identify the limit of liability applicable to "Coverage A - Dwelling" as $622,000.  *Id.*

### 1.  The Insuring Agreement and Other Basic Terms

The policy sets forth an insuring agreement, requiring Homesite to "provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy."  A7.  Within the policy's definitions section, the term "insured" is defined to

---

[1]  References to the alphanumeric sequence beginning with "A" are to pages of this appendix.

mean "you and residents of your household . . . ."  *Id*.  The term "residence premises" is defined

as:

> a.  The one family dwelling, other structures and grounds; or
>
> b.  That part of any other building;
>
> where you reside and which is shown as the "residence premises"
> in the Declarations.

*Id*.  There is no dispute that Mr. and Mrs. Jadczak are insureds under the policy, or that their

family home on Eagles Crest Drive is the "residence premises."

Section I of the policy is titled "Property Coverages."  That section sets forth a

specification of coverage under the heading "Coverage A - Dwelling."  It provides in part:

> We cover:
>
> 1.  The dwelling on the "residence premises" shown in the
> Declarations, including structures attached to the dwelling;
>
> 2.  Materials and supplies located on or next to the "residence
> premises" used to construct, alter or repair the dwelling or other
> structures on the "residence premises."

A8.  The issue here is the application of this language to a "residence premises" that contains not

one dwelling unit, but two.

The policy also sets forth, within this same Section I, a specification of the "Perils

Insured Against."  With respect to the Jadczaks' "dwelling", this specification requires Homesite

to "insure against risk of direct loss to property described in Coverages A and B only if that loss

is a physical loss to the property."  A12.  Accidental fire damage to the Jadczaks' dwelling is

covered through this grant of coverage.

### 2. **The Policy Form**

The policy's text consists of a standardized form identified as form "HO 00 03 04 91." This form designation appears in the bottom lefthand corner of each page of the policy text.  A7-24.  Centered at the bottom of each page are the words "Copyright, Insurance Services Office, Inc., 1990" -- an inscription that confirms the ISO's role in drafting the policy form.[2]  There is thus no dispute that, as between Homesite and the Jadczaks, Homesite is the drafter of form HO 00 03 04 91.

### C. **The Examination Under Oath**

As part of its investigation of the claim, Homesite subjected Mr. Jadczak to a lengthy and painstaking examination under oath (or "EUO") on October 3, 2006.  Mr. Jadczak's sworn testimony at the EUO was transcribed by a certified Delaware court reporter.  A copy of the resulting transcript, nearly 200 pages long, is excerpted in the appendix at pages A53-76.

Much of the undisputed facts on which this motion relies are established and supported by Mr. Jadczak's sworn testimony at the EUO.

### D. **The May 29, 2006 Fire**

On May 29, 2006 the Jadczaks' residential hangar was destroyed by fire.  A54, A61.  The fire spread rapidly through the hangar, causing extensive damage and a total loss.  A62, A67.  The Fire Marshal has indicated that an electrical fire may have been the cause.  A65-66.

Homesite does not contest the existence of coverage for the fire, or for the particular damage sustained by the hangar.  *See* A77-78 (setting forth Homesite's "offer of payment" for the

---

[2]  The Insurance Services Office (or ISO) is "a national insurance policy drafting organization." *State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*, 343 F.3d 249, 255 n.9 (4th Cir. 2003).  As such, "ISO develops standard policy forms and files or lodges them with each State's insurance regulators . . . ." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 772 (1993). Much of the insurance written in the United States today is written on ISO forms.  *Id.*

hangar and other items of damage).  But as will be seen, Homesite refuses to cover the residential hangar under "Coverage A."

**E.  The Nature and Uniqueness of the Jadczaks' Residential Hangar**

The Eagles Crest subdivision is a residential airpark.  Residents of Eagles Crest are pilots and airplane owners who may, if they choose, build residential hangars in which to house their personal aircraft.  Mr. Jadczak described the concept thus:

> There is a bunch of homes that are built on this air park.  It's a concept where you keep your airplane at home.  It's part of your home, is your hangar.  So you get to sleep with your airplane.
>
> ***
>
> Q:  What does air park mean to you?
>
> A:  Air park means a community of homes that have their airplanes at home with them, and they share the taxiway and runway.

A56-57, A58.

As a residential hangar, the Jadczaks' hangar was much more than a mere storage space for their aircraft.  Not only is it possible to live in the hangar, the Jadczaks actually ***did*** live in it continuously for a period of nine months while their "house proper" was under construction.  A59, A64.  The hangar was thus equipped with all the essentials for a usable dwelling:

> Q:  So it sounds like the hangar was equipped with electricity and water at least.  Is that right?
>
> A:  Everything.
>
> Q:  Everything.  What does everything mean to you, sir?
>
> A:  Water, sewer, electric, cable, phone, heat, washer, dryer, utility sink.

A59.

Among the most important features, in terms of making the hangar habitable, was the mobile home that the Jadczaks kept within the hangar. This mobile home could sleep seven at a time, and was used as a guest quarters for visitors, including the Jadczaks' adult children. A63, A75. Indeed, the mobile home's real purpose was to augment the habitability of the hangar: it was not registered as a motor vehicle, and not used as such. A55 (Mr. Jadczak confirms that "[t]here was no registration on the RV.") It served instead as a semi-permanent set of fixtures, precisely as though the Jadczaks had installed a bedroom set and kitchen in the hangar.

The hangar was thus a dwelling place in its own right; but it was also a dwelling by virtue of its containing the mobile home. For example, the Jadczaks furnished the hangar with desks and chairs. A69-70. They kept two television sets in the mobile home, and one on the hangar desk. A71. They kept an operating VCR in the hangar, and watched television and video there on a daily basis. A60, A69, A72. They kept a filing cabinet in the hangar, where Mr. Jadczak stored his important papers. A68. They likewise kept a microwave in the hangar, and mounted wall clocks in both the hangar and the mobile home. A74, A76. They also kept a vacuum cleaner in the hangar, and made use of it often. A73. They even maintained an intercom connection between the hangar and their main house. A60.

Not surprisingly, the Jadczaks spent much of their time living in the hangar:

> Q: Would you say you spend a considerable amount of time in the hangar?
>
> A: Quite a bit. My wife does wash out there, too, because we had a washer and dryer out there.

A59.

In short, the Jadczaks' residence has *two* dwelling units: the main house and the residential hangar.

**F. Homesite's Handling of the Hangar Claim**

The Jadczaks notified Homesite of the fire loss on May 30, 2006, the day after it occurred. A43. Yet Homesite made no offer of payment on the claim for a full ten months. A77-81 (letter from Homesite's attorneys, confirming "offer of payment" for the hangar and other items of damage). In light of that offer (late and inadequate though it was) there is no dispute that the Jadczaks' fire loss is covered under the Homesite policy.

Unfortunately, Homesite has taken the position that the hangar, though covered, is not covered under "Coverage A - Dwelling." Rather, Homesite says that the hangar can only be covered under "Coverage B - Other Structures" -- a determination that, not incidentally, operates to limit the Jadczaks' recovery dramatically: whereas "Coverage A" is subject to a $622,000 limit of liability, the limits for "Coverage B" are just $62,200. A1. Homesite thus seeks to pay far less than is needed to restore the hangar to its pre-fire condition. In fact, the Jadczaks have to date spent $210,000 in out-of-pocket costs to repair and restore the hangar. A84.

# ARGUMENT

## I.  AMBIGUITY FAVORS THE INSURED

Under Delaware law, contract construction is a pure question of law.  *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 286 (Del. 2001); *Hercules Inc. v. AIU Ins. Co.*, 784 A.2d 481, 489 (Del. 2001); *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).  The Delaware approach to contract construction is objective and textual, the goal being to "determine the intent of the parties from the language of the contract." *Twin City Fire Ins. Co. v. Delaware Racing Assn.*, 840 A.2d 624, 628 (Del. 2003). *Accord, Hercules*, 784 A.2d at 489-90 (to same effect).  Unilateral intent is thus irrelevant:

> The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

*Rhone-Poulenc*, 616 A.2d at 1196.

A contract term is ambiguous when it can be assigned more than one reasonable meaning.  *Twin City*, 840 A.2d at 628; *Woodward v. Farm Family Cas. Ins. Co.*, 796 A.2d 638, 642 (Del. 2002); *Hercules*, 784 A.2d at 490.  Where one party to a contract acts as the agreement's drafter, Delaware law applies the doctrine of *contra proferentem*.  Thus, ambiguities in an insurance contract "will be construed 'most strongly against the insurance company that drafted it.'"  *Woodward*, 796 A.2d at 642 (quoting *Rhone-Poulenc*, 616 A.2d at 1196).  *Accord*, *O'Brien*, 785 A.2d at 288 (noting the insurer's obligation "to state clearly the terms of the policy"); *Hercules*, 784 A.2d at 492 (same).  The Delaware Supreme Court offered a thoughtful explanation of the doctrine of *contra proferentem* in *Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146 (Del. 1997):

> The starting point is the approach to interpreting insurance contracts. They must be interpreted in a common sense manner, giving effect to all provisions so that a reasonable policyholder can understand the scope and limitation of coverage. It is the obligation of the insurer to state clearly the terms of the policy, just as it is the obligation of the issuer of securities to make the terms of the operative document understandable to a reasonable investor whose rights are affected by the document. Thus, if the contract in such a setting is ambiguous, the principle of *contra proferentem* dictates that the contract must be construed against the drafter.
>
> The policy behind this principle is that the insurer or the issuer, as the case may be, is the entity in control of the process of articulating the terms. The other party, whether it be the ordinary insured or the investor, usually has very little say about those terms except to take them or leave them or to select from limited options offered by the insurer or issuer. Therefore, it is incumbent upon the dominant party to make the terms clear. Convoluted or confusing terms are the problem of the insurer or issuer -- not the insured or investor.

*Oglesby*, 695 A.2d at 1149-50 (footnotes omitted).

Ambiguity may, of course, be patent or latent. Latent ambiguity exists when policy language, though clear on its face, is rendered unclear by reference to external objects or circumstances. *IKO Monroe, Inc. v. Royal & Sun Alliance Ins. Co. of Canada, Inc.*, C.A. No. 00-834GMS, 2001 WL 1568674, slip op. at *6 (D. Del. Dec. 7, 2001) (Ex. A); *Metzger v. Clifford Realty Corp.*, 476 A.2d 1, 5 (Pa. Super. Ct. 1984). A latent ambiguity typically arises where "'a writing refers to a particular person or thing and is thus apparently clear on its face, but upon application to external objects is found to fit two or more of them equally.'" *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982) (quoting *Easton v. Washington County Ins. Co.*, 137 A.2d 332, 336 (Pa. 1957)). The circumstances here -- where the policy refers to "the dwelling" in the singular while the insured property contains two dwelling units -- thus make a classic case of latent ambiguity. Consistent with black-letter law, that ambiguity must properly be construed against Homesite.

## II.  THE RESIDENTIAL HANGAR QUALIFIES AS A "DWELLING"

### A.  The Plain Meaning of "Dwelling" Confirms the Hangar's Status

English is nothing if not versatile.  It can be wielded with fineness and precision, so that the speaker (or writer) can convey simplicity or nuance as the case requires.

"Dwelling," meanwhile, is among the language's simpler terms.  It means a place where people live.  Dictionary.com thus offers, as a primary definition of the term, "a building or place of shelter to live in . . . ."  A88.  A respected collegiate dictionary likewise sets forth just a single entry for "dwelling," to the same effect: "a shelter (as a house) in which people live."  MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 361 (10th ed. 1993).

There can be no genuine dispute that the Jadczaks' residential hangar meets this (universal) definition of "dwelling."  As Mr. Jadczak's sworn testimony shows, the couple lived in the hangar in every meaningful sense.  They and their guests slept in the hangar; they cooked, ate, bathed and worked in the hangar; they did laundry and watched TV there.  Mr. Jadczak's affidavit confirms, meanwhile, that the hangar was heated and insulated to render it habitable as a dwelling.  A92, ¶4.  And so the Jadczak's residential hangar was just that: residential.

### B.  *Howard* Confirms the Hangar's Status

The hangar's status as a dwelling is underscored by *Howard v. H. Robert Anderson & Assoc., Inc.*, No. MC03-20345, 2004 WL 3371968 (Minn. Dist. Ct. Sept. 28, 2004).  In *Howard* the homeowner owned a primary residence in Excelsior, Minnesota and a second property in Shevlin, Minnesota.  He obtained homeowners coverage through an insurance agent, who placed the business with Lumbermens.  But the Lumbermens policy set forth an endorsement that barred coverage for structures "located away from the residence premises" where those structures were "used as a dwelling."  *Howard*, slip op. at *2 (Ex. B).

When the Shevlin property was destroyed by fire, Lumbermens denied coverage, and the homeowner sued the agent. The agent then impled Lumbermens, who moved for summary judgment on the basis of its endorsement -- arguing that a cabin located on the Shevlin property qualified as a dwelling. The court's analysis mirrors the issue here:

> Lumbermens asserts that Defendant [insurance agent] . . . negligently issued the Policy and its accompanying endorsement even though the endorsement unambiguously excluded coverage of the Shevlin Property because it was being used as a "dwelling."
>
> ***
>
> The word "dwelling-house" is defined as "[t]he house or other structure in which a person lives; a residence or abode." "Dwelling" is also defined as "a shelter (as a house) in which people live." The court finds that given these definitions and the usual and accepted meaning applied to the word "dwelling," the structure that Plaintiff [homeowner] referred to as his cabin on the Shevlin Property was indeed a dwelling. Plaintiff admitted that he lived in the structure 18 to 20 weekends per year, including stays of a week or more, and slept and cooked meals there while pursuing recreation. A picture of the structure confirms this court's conclusion for the structure had a stone chimney, a door, several windows, and contained a stove and oven for cooking, as well as a wood-burning stove for heat and a propane-powered lighting system.

*Howard*, slip op. at *2, *5 (citations omitted) (Ex. B).

*Howard* recognizes that even a primitive structure -- here, a cabin with neither an electrical supply nor running water -- can qualify as a dwelling if people choose to live in it. The plain meaning of "dwelling" is thus controlling; and there can be no genuine dispute that the Jadczak's hangar squarely fits that meaning.

### C.  **The Installation of a Mobile Home Confirms the Hangar's Status**

The fact that the Jadczaks installed their unregistered mobile home in the hangar, for no other purpose than to render the hangar habitable, further cements the hangar's status as a genuine dwelling.  The very definition of "mobile home" makes this clear:

> **mobile home**  a large transportable structure, as a large caravan, set up permanently and used as living accommodation.

SHORTER OXFORD ENGLISH DICTIONARY 1809 (6th ed. 2007).  Or consider these alternative definitions, once again from Dictionary.com:

> **mobile home**  a large house trailer, designed for year-round living in one place.
>
> ***
>
> A large trailer, fitted with parts for connection to utilities, that can be installed on a relatively permanent site and that is used as a residence.

A86.

Case law likewise confirms that the Jadczaks' obvious purpose in installing the mobile home within the hangar was to make the latter a dwelling:

> *A mobile home indisputably is within the meaning of dwelling* which is defined in Webster's Seventh New Collegiate Dictionary as "a building or other shelter in which people live."

*Yeager v. Cassidy*, 253 N.E.2d 320, 322-23 (Ohio Ct. Comm. Pleas 1969).  *See also Fedorich v. Zoning Board of Appeals*, 424 A.2d 289, 292 (Conn. 1979) (Connecticut Supreme Court recognizes that mobile homes "are considered permanent dwellings when placed upon concrete foundations"); *Nabors v. South Carolina Farm Bureau Mut. Ins. Co.*, 255 S.E.2d 337, 338 (S.C. 1979) (South Carolina Supreme Court refers to insureds' mobile home as "the dwelling").  In fact, property insurers themselves often issue standard form homeowners policies -- complete with the usual references to "dwelling" -- to mobile home owners.  *See Reed v. Tennessee*

*Farmers Mut. Ins. Co.*, 483 S.W.2d 721, 724 (Tenn. Ct. App. 1972) (describing the mobile home owner's policy as "the regular printed form and . . . the same form used generally to cover building[s] and dwellings and . . . not a special policy specifically designed for the coverage of mobile homes or house trailers.")

The Jadczaks thus installed a semi-permanent dwelling within the hangar itself, while simultaneously outfitting the hangar with a washer and dryer, a TV and VCR, and other necessaries. They made the hangar not just a dwelling, but a comfortable dwelling at that.

### D.  Homesite's "Description of Dwelling" May Reasonably Be Applied to the Hangar

As noted above, the policy's declarations set forth a "Description of Dwelling." It identifies a "Clapboard structure, Single family home, Primary residence . . . ." A1. But while this description cannot logically apply to the main house, it can reasonably apply to the Jadczak's residential hangar.

Specifically, both the main house and the hangar are indisputably part of the Jadczak's single-family home and primary residence. There is thus no principled basis on which to exclude either structure from these categories. But the term "clapboard structure" is another matter. As Mr. Jadczak's affidavit makes clear, the main house has, and has ***always*** had, a Dryvit exterior. A92, ¶2.

Dryvit is somewhat like stucco or cement in appearance. It does not remotely resemble a board exterior (like clapboard).[3] But the hangar, by contrast, has a Hardie board exterior. A92, ¶3. At the risk of stating the obvious, a Hardie board exterior is by definition a ***board exterior***. To the layman's eye, in fact, it looks identical to clapboard siding. *See* jameshardie.com

---

[3] For an illustration of Dryvit's appearance, which is nothing like clapboard's, *see* http://www.dryvit.com/products.asp?country_id=1 (last visted March 13, 2008).

(collecting images of residential homes with Hardie board siding).  Homesite's Description of Dwelling, with its reference to a "clapboard structure," thus makes sense only as applied to the residential hangar.

### E.  Homesite is Responsible for the Latent Ambiguity

As Mr. Jadczak testified, he and his wife outfitted the residential hangar as a dwelling and used it for that purpose for nearly a full year prior to the construction of their main house:

> Q:  You said earlier that you lived in the RV actually *inside the hangar* for a period of nine months.  Is that right, sir?
>
> A:  That's right.

A64 (emphasis added).  As a property insurer, Homesite had the right and opportunity to inspect the property carefully before insuring it.  It is clear that, with the Jadczaks actually living in the hangar for months prior to the main house's completion, any reasonably diligent inspection would have alerted Homesite's underwriter to the presence of *two dwellings* on the property -- and, by extension, the presence of a latent ambiguity in the policy itself.

But no diligent inspection was made.  Instead, Homesite did what property insurers generally do: it issued the policy, collected the premium, and moved on to the next sale.  The result is a policy that refers to "dwelling" in the singular when the facts on the ground reveal "dwellings" in the plural.

The Jadczaks' property thus has two dwellings.  The resulting latent ambiguity must be construed against Homesite, which failed to tailor its policy language to the property it insured.  The residential hangar is a "dwelling," and should therefore be covered under "Coverage A."

### III.  HOMESITE'S "OTHER STRUCTURES" ARGUMENT FAILS

Homesite argues that fire damage to the residential hangar should be covered under "Coverage B," and therefore subject to that coverage part's dramatically lower limit of liability. Specifically, Homesite says:

> Coverage A does not include the hanger (*sic*) which I note is set apart from the dwelling by clear space.  Moreover, Mr. Jadczak testified that the hangar is set apart from the actual house.  Fire damage to the hanger (*sic*) is therefore appropriately valuated under Coverage B - Other Structures of the Homesite policy which says:
>
> *We cover other structures on the "residence premises" set apart from the dwelling by clear space.* ***

A78.

But this argument presupposes the conclusion it seeks to prove.  That is, to say that the hangar is "set apart from the dwelling" is to assume, against all evidence, that the hangar is not itself "the dwelling."  One might just as easily conclude that the main house is an "other structure" by virtue of being set apart from the residential hangar.

The same flawed logic attaches to Homesite's fuzzy reference to the "actual house."  Is not the hangar every bit as "actual" a dwelling as the main house?  After all, what is it that "actualizes" the house's status as a dwelling?  The fact that it is fully furnished with the staples and accessories of residential living?  Or the fact that the Jadczaks actually do their "living" there?  For these features apply equally to the residential hangar, where the Jadczaks "actually" read, work, eat, bathe, sleep and watch TV.

Homesite's argument is thus a circular one: *The house (and not the hangar) is the dwelling because the dwelling is the house.*  But in fact, both structures are dwellings -- a conclusion compelled by the plain and universal definition of "dwelling," as understood by

ordinary speakers of standard English.  Fire damage to the Jadczaks' residential hangar should thus be covered under "Coverage A."

## <u>CONCLUSION</u>

For the reasons set forth above, plaintiffs Catherine and Joseph Jadczak respectfully request the entry of summary judgment in their favor on the "dwelling" issue.

Respectfully submitted,

<u>/s/ John S. Spadaro</u>
John S. Spadaro, No. 3155
John Sheehan Spadaro, LLC
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
(302)235-7745

Michael L. Sensor, No. 3541
Perry & Sensor
One Customs House, Suite 560
P.O. Box 1568
Wilmington, DE 19899-1568
(302)655-4482

Attorneys for Plaintiffs
Joseph Jadczak and Catherine Jadczak

March 14, 2008

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Iko Monroe, Inc. v. Royal & Sun Alliance Ins. Co.
of Canada, Inc.
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
IKO MONROE, INC. Plaintiff,
v.
ROYAL & SUN ALLIANCE INSURANCE COM-
PANY OF CANADA, INC., Hartford Insurance
Company of Canada, Inc., HIH Cotesworth Canada
Limited, Defendants.
**No. CIV.A. 00-834 GMS.**

Dec. 7, 2001.

MEMORANDUM AND ORDER

SLEET, District J.

I. INTRODUCTION

    *1 In September 2000, IKO Monroe ("IKO")
filed a declaratory judgment action against Royal &
Sun Alliance Insurance Company of Canada, Inc.
("Royal Sun"), Hartford Insurance Company of
Canada, Inc. ("Hartford"), and HIH Cotesworth
Canada Limited ("HIH"). IKO seeks a declaratory
judgment stating that the defendants had a duty to
defend IKO Monroe against certain lawsuits
pending in Michigan. After IKO amended its com-
plaint, each of the defendants submitted a revised
answer. In its amended answer, Hartford added a
counterclaim for reformation of its insurance con-
tract with IKO.

    Presently before the court are two motions-
IKO's motion for a more definite statement from
Hartford on its counterclaim and Royal Sun's mo-
tion for summary judgment against IKO.[FN1] After
reviewing the briefs and hearing oral argument, the
court will deny IKO's motion for a more definite
statement and grant Royal Sun's motion for sum-
mary judgment.

    FN1. By order of the court, HIH's motion
    for summary judgment was stricken and
    HIH was instructed to join in Royal Sun's
    motion. (D.I.59.) The parties agree that the
    Royal Sun-IKO and HIH-IKO contracts
    contain very similar language. For simpli-
    city, the court will refer only to Royal Sun.
    However, the same reasoning that applies
    to Royal Sun applies to HIH. By contrast,
    the language in the Hartford-IKO contract
    differs from the others, and therefore Hart-
    ford is not a party to this summary judg-
    ment motion.

II. BACKGROUND

A. Factual Background

    IKO Monroe, a subsidiary of IKO Industries
Ltd., is a Delaware corporation with its principal
place of business in Monroe, Michigan. IKO manu-
factures paper for use in roofing products. Asphalt
is used in the manufacturing process. Both the as-
phalt and the paper production process cause IKO's
plants emit disagreeable odors.

    IKO entered into insurance contracts with Ca-
nadian based insurance providers Royal Sun, HIH,
and Hartford. In the IKO-Royal Sun insurance con-
tract, Royal Sun agreed to defend IKO against
claims for "bodily injury, personal injury, [or]
property damage."(D.I. 46 at 5.) The policy also
limited the duty to defend in significant ways. Most
important for the present discussion, the policy con-
tained an "absolute pollution exclusion" clause. The
absolute pollution exclusion clause stated that the
policy's coverage did not extend to "claims arising
out of the actual, alleged, potential or threatened
spill, discharge, emission, dispersal, seepage, leak-
age, migration, release or escape of pollut-
ants."(D.I. 46 at 5.) The contract defines the term
pollutant as "any solid, liquid, gaseous, or thermal
irritant or contaminant, including smoke, *odour,* va-
pour, soot, fumes, acids, chemicals, and
waste."(D.I. 46 at 5) (emphasis added).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

In July 2000, the *Compora v. IKO Monroe* case was filed in Michigan state court. The *Compora* plaintiffs alleged that IKO's plant had caused "noxious odors ... accumulated and controlled by Defendant [IKO], to physically invade Plaintiff's person and property, [thereby] substantially and unreasonably interfer[ing] with Plaintiffs use and enjoyment of their property."(D.I. 46 at 7 .) In October 2000, the city of Monroe, Michigan also filed suit against IKO in Michigan state court. In the *City of Monroe v. IKO Monroe* complaint, the City of Monroe charged that IKO "had been for some months prior to the date of this Complaint emitting or causing foul, offensive, noxious, and/or disagreeable odors or stenches which are extremely repulsive to the physical senses of persons in the general vicinity of the Defendant's premises."(D.I. 46 at 8.)

*2 Following the filing of these lawsuits, IKO asked Royal Sun to defend it against the claims. After reviewing the *Compora* and *City of Monroe* complaints, Royal Sun determined that both plaintiffs sought damages based on IKO's emission of "noxious odors ." Royal Sun then notified IKO that under the terms of the absolute pollution exclusion, it had no duty to defend either lawsuit.

B. IKO's Motion for a More Definite Statement

After Royal Sun refused to defend IKO, IKO filed suit in this court asking the court to declare that the defendants had a duty to defend the Michigan lawsuits. After each of the defendants answered, IKO requested and was given permission to amend its complaint. Subsequently, each of the defendants submitted a revised answer. In its second answer, Hartford included a counterclaim against IKO for reformation of contract. In particular, paragraph 13 of the answer and counterclaim asserts that:

To the extent the definition of personal injury in the Hartford Canada policy is interpreted to encompass claims arising out of or related to pollution, the definitional language permitting such interpretation was excluded solely because of mutual

mistake on the part of both IKO and Hartford Canada ...

(D.I. 44, Exh. 1 at 16.)

In response to the counterclaim, IKO filed a motion for more definite statement pursuant to Rule 12(e). In the motion, IKO asserts that Hartford failed to plead its allegations of mutual mistake with sufficient particularity as required by Rule 9(b). Hartford responds by asserting that it should be permitted to clarify its pleadings through discovery. Furthermore, Hartford argues that it cannot plead with more particularity because the relevant facts are solely in IKO's possession. Hartford states:

The facts within the possession of Hartford-Canada are that the parties to this insurance policy agreed to a contract that excluded coverage for pollution related claims and that, despite that intent and understanding, the written instrument as drafted by IKO or its insurance broker included language that IKO Monroe now alleges provides such coverage.

(D.I. 50 at 7.) In its reply, IKO cites several cases for the proposition that Hartford must plead with more specificity. Although IKO acknowledges that it is possible to clarify pleadings through subsequent pleadings or discovery, it denies that Hartford's pleadings sufficiently elucidate its claim.

C. Royal Sun's Motion for Summary Judgment

On the same day that IKO filed its motion for a more definite statement, Royal Sun filed a motion for summary judgment asserting that it had no duty to defend the *Compora* or *City of Monroe* actions. Royal Sun argues that since the definition of "pollution" in the policy includes "odours," there is no duty to defend against lawsuits based on noxious odors. Based on this interpretation of the clause and the fact that both of the underlying Michigan lawsuits seek damages for IKO's emission of noxious odors, Royal Sun maintains that it has no duty to defend either lawsuit.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

*3 IKO makes four basic arguments in its response brief. First, IKO asserts that the term "odours" was intended to mean only toxic odors. Second, IKO claims that the term "pollution" was intended to mean only "true pollution." Third, IKO alleges that it had a "reasonable expectation" of coverage because both IKO and Royal Sun knew or should have known that IKO's plants would produce some disagreeable odors in the normal course of business. Finally, IKO claims that it needs discovery from Royal Sun before it can demonstrate that the term "odour" is ambiguous.

In rebuttal, Royal Sun states that the absolute pollution exclusion does not limit the definition of odors to "toxic" odors. Royal Sun further contends that the clause is not limited to "true pollution." Royal Sun also states that IKO is not entitled to the benefit of the reasonable expectations doctrine because, under Michigan law, the reasonable expectations doctrine does not apply where the contract language is unambiguous. Finally, at oral argument, Royal Sun insisted that further discovery was unnecessary in this case because the contract language is unambiguous, and therefore extrinsic evidence is impermissible.

## III. DISCUSSION

Since the summary judgment motion and the motion for a more definite statement require separate standards of review, the court will address each motion in turn. First, however, the court will address the choice of law issues involved in this case.

## A. Choice of Law

The court accepts the view of both parties that Michigan law applies to this dispute. A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits to determine which state's law governs the controversy before it. *Hionis Int'l Enterprises, Inc. v. Tandy Corp.*, 867 F.Supp. 268, 271 (D.Del.1994) (citing *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4 (1975); *Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S. 487, 496

(1941)). Therefore, the court will apply Delaware's choice of law rules.

In Delaware, "the subject matter of the contract is a factor to be considered as 'the state where the thing or risk is located will have a natural interest in the transactions affecting it.' ' *See Liggett Group, Inc. v. Affiliated FM Ins. Co.*, No.CIV.A.00C-01-207, 2001 WL 589041, at *6 (Del.Super.Ct. May 15, 2001) (citations omitted). Delaware courts have held that in environmental insurance coverage cases, "the location of the subject matter is the location of the sites where the environmental damage or injury occurred." *See id.* In this case, Michigan is the site of the alleged environmental injury. Therefore, the court concludes that Michigan law will govern its analysis of the contract language at issue.

## B. Royal Sun's Motion for Summary Judgment

### 1. The Summary Judgment Standard

Summary judgment is appropriate only if the record shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).*See also 2-J Corp. v. Tice*, 126 F.3d 539, 540 (3d Cir.1997). The moving party bears the burden of proving that there are no genuine issues of material fact in dispute. *See Carter v. Exxon Co .*, 177 F.3d 197, 202 (3d Cir.1999); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir.1996). In deciding a motion for summary judgment, all inferences should be drawn in the light most favorable to the non-moving party. *See Carter v. Exxon Co.*, 177 F.3d at 202. In determining if summary judgment is appropriate, the court's "function is not to weigh the evidence and determine the truth of the matter," but to determine whether there are genuine issues of material fact in dispute. *Id.* (citation omitted)."Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."*Ideal Dairy Farms*, 90 F.3d at 743 (citation omitted).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*4 In particular, in a breach of contract action, the court can grant summary judgment only when "the contract is unambiguous and the moving party is entitled to judgment as a matter of law."*Newport Assocs. Indem. Co. v. Traveler's Indemnity Co.,* 162 F.3d 789, 791 (3d Cir.1999) (citing *Tamarind Resort Assocs. v. Government of Virgin Islands,* 138 F.3d 107, 111 (3d Cir.1998)).

2. The Contract Language Is Unambiguous

    The court finds that the contract is unambiguous and that Royal Sun is entitled to judgment as a matter of law based on the four corners of the contract. The court will now explain why IKO's arguments to the contrary are unavailing.

a. The term "odour"

    IKO maintains that the term "odour" was intended to apply to "toxic odours" only. Under Michigan law, contract terms are given their plain meaning. *See Datron, Inc. v. CRA Holdings, Inc.,* 42 F.Supp.2d 736, 742 (W.D.Mich.1999) ( "The court should accord the words and phrases of the contract their plain meaning..."); *McKusick v. Travelers Indemn. Co.,* No.CIV.A.221171, 2001 WL 637676, at *4 (Mich.App. June 8, 2001) ("This court must enforce the insurance policy in accordance with its terms that are interpreted in light of their commonly used, ordinary, and plain meanings."). A contract term is ambiguous where it is susceptible to more than one valid interpretation. *See Society of St. Vincent DePaul in Archdiocese of Detroit v. Mt. Hawley Ins. Co.,* 49 F.Supp.2d 1011, 1016 (E.D.Mich.1999); *Cole v. Ladbroke Racing Michigan, Inc.,* 614 N.W.2d 169, 176 (Mich.App.2000). If the court finds that the term is ambiguous, extrinsic evidence may be admitted to explain the ambiguity. *See New Amsterdam Cas. Co. v. Sokolowski,* 132 N.W.2d 66, 68 (Mich.1965) ("[If a contract] is ambiguous, testimony may be taken to explain the ambiguity."). If, however, the court finds that the term is unambiguous, no extrinsic evidence will be allowed to interpret the term. *See City of Kalamazoo v. Michigan Disposal*

*Service Corp.,* 125 F.Supp.2d 219, 243 (W.D.Mich.2000) ("When words of written contract are clear and unambiguous ... the court has no right to look to extrinsic evidence to determine their intent."); *Commercial Union Ins. Co. v. Cannelton Industries,* 938 F.Supp. 458, 461 (W.D.Mich.1996) ("Under Michigan law, when insurance policy is clear and unambiguous, there is no need for the court to resort to extrinsic evidence.").

    The term "odour" as used in the contract at issue is not ambiguous. Its meaning is plain. Webster's Third New International Dictionary defines an "odour" as "a quality of something that affects the sense of smell ... a scent, fragrance, or aroma."WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1565 (1993). In other words, colloquially speaking, an odor is a smell. Although an odor can be disagreeable, *see id.,* the court has found no evidence-and IKO has presented none-that an odor must be toxic or that the term as normally understood encompasses toxic materials at all. The plain meaning of the word "odour," therefore, does not lend itself to the interpretation suggested by IKO.

    *5 IKO further suggests that plain meaning notwithstanding, the parties to the contract understood "odours" to mean only "toxic odours." However the record does not support this contention. It is clear that the insurance clause does not include any reference to "toxic odours" or "noxious odours" or "polluting odours"only "odours." The term is left unmodified. The parties here appear to be very sophisticated, of equal bargaining strength, and to have negotiated this contract at arm's length. Since "odours" as normally understood does not by definition include "toxic odors," if IKO intended only toxic odors to be exempted from coverage, it could have and should have negotiated to have this included in the contract. The court will not re-write the contract now to produce the result that IKO seeks.

b. The term "pollution"

    IKO also contends that the entire pollution ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

clusion clause, not just the language dealing with odors, is directed only at "true environmental pollution" that is, the release of hazardous substances into the environment. In support of this contention, IKO cites numerous cases from various jurisdictions wherein courts held that insurance clauses such as the one here are only applicable to cases involving major environmental harm. This court, however, is applying Michigan law. In *McKusick v. Travelers Indemn. Co.,* the Michigan Court of Appeals expressly rejected IKO's argument, stating that where the pollution exclusion clause at issue does not specifically require that the insured cause traditional environmental pollution before triggering the exclusion, the court will not judicially engraft such a limitation. *See McKusick,* 2001 WL 637676, at *4. The plain language of the pollution exclusion clause at issue does not specifically state that the insured must cause "traditional" or "true" environmental pollution. Therefore, under Michigan law, this court cannot interpret the clause as requiring traditional environmental pollution, and will not do so.

c. Reasonable expectation of coverage

IKO's third argument is that it had a reasonable expectation of coverage based on the parties' understanding that IKO's plants would normally generate disagreeable smells. IKO cites various cases from other jurisdictions in support of this position. However, as Royal Sun has pointed out, no *Michigan* court has held that the "reasonable expectations" doctrine applies where the contract language is unambiguous. Michigan courts have consistently stated, and recently reaffirmed, that the "reasonable expectations" doctrine applies only where the contract language at issue is ambiguous.FN2As explained earlier, the contract provisions at issue here are unambiguous regarding the scope of coverage. Therefore, under Michigan law, IKO is not entitled to the benefit of the reasonable expectations doctrine, and the court will not apply that doctrine in this case.

> FN2.*See Farm Bureau Mut. Ins. Co. of*

*Mich. v. Nikkel,* 596 N.W.2d 915, 921 (Mich.1999) ("[T]he rule of reasonable expectations has no applicability here because no ambiguity exists in the [insurance] clause and the insured could have discovered the clause on examination of the contract.") citing *Vanguard Ins. Co. v. Clarke,* 475 N.W.2d 48, 52 n. 7 (Mich.1991) ("Factors to consider in determining the legitimate existence of reasonable consumer expectation include 'whether an insurance policy includes a provision that unambiguously limits or excludes coverage and whether a policyholder could have ... discover[ed] a relevant clause that limits coverage." '); *McKusick,* 2001 WL 637676, at *4 (holding reasonable expectations doctrine did not apply because "the pollution exclusion clause was "clear[ ] and unambiguous[ ]").

d. Discovery

Finally, since the court finds that the contract is unambiguous, it will reject IKO's final argument that it should be allowed discovery on this issue. Under Michigan law, extrinsic evidence is admissible to interpret a contract only where the terms are ambiguous. *See New Amsterdam,* 132 N.W.2d at 68,*Commercial Union,* 938 F.Supp. at 461. (W.D.Mich.1996). Since the court finds that the terms are unambiguous, however, there is no need for discovery.

*6 IKO further argues that discovery should be permitted because the ambiguity is latent. Although Michigan courts permit extrinsic evidence to resolve latent ambiguities, *see McCarty v. Mercury Metalcraft Co.,* 127 N.W.2d 340, 344 (Mich.1964), IKO has not sufficiently demonstrated the presence of a latent ambiguity. A latent ambiguity arises "where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation..."*See id.*As indicated at oral argument, the ·typical latent ambiguity situation involves two items, only one of which is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

named in the contract. *See e.g., Raffles v. Wichel-haus,* 159 Eng. Rep. 375 (Ex. 1864) (two ships named 'Peerless').

IKO's discovery request is not directed at the facts surrounding contract formation, but rather at information regarding Royal Sun's interpretation of the contract terms. However, a party's interpretation of contract terms is not actually a fact because one party's understanding of the contract terms is not binding on the other party. *See Turner Holdings, Inc. v. Howard Miller Clock Co.,* 657 F.Supp. 1370, 1380 (W.D.Mich.1987). Thus, even if IKO could prove that Royal Sun had another understanding of the contract terms, this different understanding or interpretation is not sufficient to create a **latent ambiguity**. *See id.*(refusing to find **latent ambiguity** based on defendant's "uncommunicated belief" about the meaning of contract terms). Therefore, the court is not compelled to find a **latent ambiguity** here.

e. Judgment as a matter of law

Having found that the pollution exclusion clause is unambiguous, the court further finds that Royal Sun is entitled to judgment as a matter of law based on the unambiguous wording of the contract. Absent fraud, duress, unconscionability, or other such factors, a court is bound to give full effect to a valid contract between two parties. *See Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir.1980). First, the court finds that there was a valid contract here-the parties do not dispute this fact. Second, the court does not find any impediment to the enforceability of this contract. There are no indicia of fraud, duress, or the like. Since there was a valid and unambiguous contract with no impediments to enforceability, the court must give full effect to the words of that contract. Under that contract, Royal Sun is not required to defend actions arising from the "discharge, emission, dispersal, seepage, leakage, migration, release, or escape" of pollutants. Pollutants includes "odours." "Odour" is not limited to toxic odors. Since the underlying lawsuits both involve claims

against IKO for the discharge of odors, and the discharge of odor is explicitly exempted from coverage by the policy in question, Royal Sun has no contractual duty to defend either lawsuit. Given the court's ruling, it will not reach the arguments regarding the timing of the Michigan lawsuits or the distinction between damages and injunctive relief.

*C. IKO's Motion for More Definite Statement*

*\*7* A motion for a more definite statement should be granted only where the pleading is so "vague or ambiguous" that the opponent cannot draft a responsive pleading. *See*FED. R. CIV. P. 12(e).*See also Schaedler v. Reading Eagle Publication,* 370 F.2d 795, 798 (3d Cir.1967) (same). Courts have interpreted this language to mean that the motion should only be granted where the pleading is unintelligible, *see CFMT, Inc. v. Yieldup International Corp.,* No.CIV.A.95-549, 1996 WL 33140642, at \*1 (D.Del.Apr.5, 1996); *United States v. Board of Harbor Commissioners,* 73 F.R.D. 460, 462 (D.Del.1977), or the issues cannot be determined. *See Fischer & Porter Co. v. Sheffield Corp.,* 31 F.R.D. 534, 536 (D.Del.1962); *Container Co. v. Carpenter Container Corp.,* 8 F.R.D. 208, 210 (D.Del.1948).

IKO's motion for a more definite statement under Rule 12(e) must be denied. First, after reviewing the pleadings, the court finds that Hartford's pleading is far from unintelligible. It is clear on the face of the complaint that Hartford is alleging "mutual mistake ." Furthermore, nothing in the briefs or at argument indicates that IKO was or is unable to determine that mutual mistake is the issue. Since IKO is able to discern the issues, it is also able to respond to them.

Second, to the extent that IKO's motion rests on the contention that Hartford has not pleaded mistake with sufficient particularity under Rule 9(b), this argument must also fail. While Rule 9(b) requires that fraud and mistake be pleaded with particularity, *see*FED. R. CIV. P. 9(b), this rule must be read in conjunction with Rule 8 which outlines the liberal standard of pleading favored by the Fed-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

eral Rules of Civil Procedure. *See* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1298 ("Rule 9(b)... does not render the general principles set forth in Rule 8 entirely inapplicable to pleadings alleging fraud; rather the two rules must be read in conjunction with each other."). The federal rules contemplate notice rather than fact pleading. This standard applies to Rule 9(b) as well. *See id.* ("[N]either Rule 8 nor Rule 9(b) requires fact pleading."). Thus, even under Rule 9(b), the circumstances, rather than the specific facts of the claim, are essential. *See id.* ("Although circumstances may consist of facts, the obligation to plead circumstances need not be treated as requiring allegations of facts in the pleading."). By notifying IKO that mutual mistake is the issue, Hartford has provided IKO with the general circumstances involving its claim.

Further, where an issue is not pleaded with particularity, a party can clarify its claims through its subsequent pleadings and briefs. *See Union Carbide v. Shell Oil Co.,* No.99-CV-274, 2000 WL 1481015, at *2 (D.Del. Sept. 29, 2000) ("Here the defendant's pleadings appear to be 'bare-boned' on their face. However, its brief submitted in opposition to the present motion sufficiently clarified its pleadings to overcome Rule 9(b)'s requirements."); *Scripps Clinic and Research Foundation v. Baxter Travenol Laboratories,* Civ.A.No. 87-140, 1988 WL 22602, at *3 (D.Del. Mar. 9, 1988) (noting that defendant clarified its pleading in response to plaintiff's interrogatories). In its Opposition to IKO Monroe's Motion for a More Definite Statement, Hartford stated:

*8 The facts within the possession of Hartford-Canada are that the parties to this insurance policy agreed to a contract that excluded coverage for pollution related claims and that, despite that intent and understanding, the written instrument as drafted by IKO or its insurance broker included language that IKO Monroe now alleges provides such coverage.

Through this paragraph, Hartford has managed to add more detail to what it meant by "mutual mis-

take." These details appear to focus on the intent and understanding of the parties at the time of drafting. Hartford can either admit that the inclusion of the clause was the intent of the parties, deny that it was the intent of the parties, or state that it lacks sufficient information at this time to admit or deny that it was the intent of the parties. Therefore, the court finds that there is sufficient particularity.FN3 Consequently, a more definite statement of the claim is unnecessary.FN4

> FN3. Although IKO offers several cases supporting its argument that Rule 9(b) requires Hartford to be more specific, *see Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96 (3d Cir.1983); *SEC v. Saltzman,* 127 F.Supp.2d 660 (E.D. Pa 2001); *United States v. Kensington Hospital,* 760 F.Supp.1120 (E.D.Pa.1991), all of the cited cases involve fraud. The same considerations that make it necessary to plead fraud with specificity-namely damage to reputation-do not arise in the mistake context. *See Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992) ("Accusations of fraud do serious damage to the goodwill of a business firm or professional person .... Why, if this is the true rationale of Rule 9(b), allegations of mere mistake should have to be particularized is a mystery.").

> FN4. The court finds that the "motion to strike" issue is rendered moot by the court's ruling on IKO's motion for a more definite statement.

IV. CONCLUSION

For the foregoing reasons, the court concludes that Royal Sun has no duty to defend the Michigan lawsuits. Therefore, the court grants Royal Sun's motion for summary judgment. The court further concludes that IKO is able to form a responsive pleading. Therefore, IKO's motion for a more definite statement is denied.

For these reasons, IT IS HEREBY ORDERED

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 8
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

that:
    1. Royal & Sun Alliance Insurance Company
of Canada, Inc.'s Motion for Summary Judgment
(D.I.45) is GRANTED.
    2. Summary Judgment be and hereby is
ENTERED in favor of Royal & Sun Alliance Insur-
ance Company of Canada, Inc. and HIH Cotesworth
Canada Limited and against IKO, Monroe on all
claims in the complaint.
    3. IKO Monroe's Motion for a More Definite
Statement (D.I.44) is DENIED.

D.Del.,2001.
Iko Monroe, Inc. v. Royal & Sun Alliance Ins. Co.
of Canada, Inc.
Not Reported in F.Supp.2d, 2001 WL 1568674
(D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Date of Printing: JAN 31,2008

### KEYCITE

**C** Iko Monroe, Inc. v. Royal & Sun Alliance Ins. Co. of Canada, Inc., 2001 WL 1568674 (D.Del., Dec 07, 2001) (NO. CIV.A. 00-834 GMS)

#### History

=>    1 Iko Monroe, Inc. v. Royal & Sun Alliance Ins. Co. of Canada, Inc., 2001 WL 1568674
      (D.Del. Dec 07, 2001) (NO. CIV.A. 00-834 GMS)

#### Court Documents

#### Dockets (U.S.A.)

**D.Del.**

      2 IKO MONROE, INC. v. ROYAL & SUN ALLIANCE, ET AL, NO. 1:00CV00834 (Docket)
      (D.Del. Sep. 14, 2000)

© Copyright 2008 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

# EXHIBIT B

Westlaw.

Not Reported in N.W.2d                                                                                                                          Page 1
Not Reported in N.W.2d, 2004 WL 3371968 (Minn.Dist.Ct.)
(Cite as: Not Reported in N.W.2d)

**H**
Howard v. H. Robert Anderson & Associates, Inc.
Minn.Dist.Ct.,2004.
Only the Westlaw citation is currently available.
District Court of Minnesota, Fourth Judicial District, Hennepin County..
Charles R. HOWARD, Plaintiff,
v.
H. ROBERT ANDERSON & ASSOCIATES, INCORPORATED, Defendant and Third-Party Plaintiff,
v.
LUMBERMENS MUTUAL CASUALTY COMPANY, Third-Party Defendant.
**No. MC 03-20345.**

Sept. 28, 2004.

Peter Lind, Waldeck & Lind, P.A., Minneapolis, MN, for H. Robert Anderson & Associates, Incorporated.
Teri Ellen Bentson, McCollum, Crowley, Moschet & Miller, Ltd., Minneapolis, MN, for Lumbermens Mutual Casualty Company.

AMENDED ORDER GRANTING THIRD PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DUFRESNE, J.
*1 The above-entitled matter came duly on for hearing before Judge Mary Steenson DuFresne on August 19, 2004.

Based upon the evidence adduced, the argument of counsel, and all of the files, records, and proceedings herein,

THE COURT FINDS:

1. Let the attached Memorandum of Law be incorporated by reference herein.
2. Third-Party Defendant brings this motion for summary judgment asserting that it should not be liable to Defendant for contribution or indemnifica-

tion because it was not negligent. Third-Party Defendant asserts that Defendant, through its agent, negligently issued the insurance policy and endorsement at issue even though the endorsement unambiguously excluded coverage of Plaintiff's Shevlin, Minnesota property because it was being used as a "**dwelling**." Further, the insurance policy only covered Plaintiff's **residence premises**, his Excelsior, Minnesota home, because the Shevlin property was not used in connection with the Excelsior home. Third-Party Defendant also asserts that coverage under the insurance policy was not illusory and that the doctrine of reasonable expectations should not apply to it because Defendant, not Third-Party Defendant, created an expectation of coverage.

3. Defendant opposes Third-Party Defendant's motion for summary judgment and asserts that Third-Party Defendant is liable for indemnity or contribution because the insurance policy's language was ambiguous. Defendant alleges that the word "**dwelling**" and the phrase "capable of being used as a **dwelling**" are susceptible of more than one interpretation and, therefore, ambiguous. Defendant also asserts that coverage under the insurance policy is necessary pursuant to the doctrine of illusory coverage because Plaintiff paid a $160 premium and was denied coverage upon being victimized by arson. Lastly, Defendant asserts that Third-Party Defendant should cover the Shevlin property's loss because Plaintiff had a reasonable expectation of coverage.

IT IS ORDERED:

1. Third-Party Defendant's motion for summary judgment is GRANTED.
LET JUDGMENT BE ENTERED ACCORDINGLY.

MEMORANDUM OF LAW

I. FACTS

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                                    Page 2
Not Reported in N.W.2d, 2004 WL 3371968 (Minn.Dist.Ct.)
(Cite as: Not Reported in N.W.2d)

Plaintiff has as his primary residence a home located at 22740 Galpin Lane in Excelsior, Minnesota (the "Excelsior Home") and he also owns property located in Shevlin, Minnesota (the "Shevlin Property"). The Shevlin Property consisted of a structure that Plaintiff referred to as a cabin,[FN1] a woodshed, and an outhouse. In his deposition, Plaintiff attested that he used the cabin 18 to 20 weekends throughout each year, including winter, for hunting, fishing, and other recreation. Plaintiff indicated that he "existed [at the cabin] for a week at a time without any difficulty" and that it was "very homey."

> FN1. The only photograph of the structure at issue indicates that it had a stone chimney, several windows, and a roof. The structure was situated near, and overlooked, a lake, and contained a propane stove for cooking and a wood-burning stove that provided heat. Although the structure was illuminated by a 100-pound exterior propane tank, it did not have running water.

Plaintiff obtained the Shevlin Property from his mother in 2001 and it was, at the time, covered by a MetLife Auto and Home insurance policy through sometime in 2002. In 2002, Plaintiff approached Reid Connly ("Connly"), an insurance agent for Defendant and Third-Party Plaintiff H. Robert Anderson & Associates ("Defendant"), to procure new insurance coverage for the Excelsior Home, and after discussions with Connly, for the Shevlin Property as well. Plaintiff alleges, and Connly admits, that during his conversations with Connly he described the structure on the Shevlin Property that he wished to insure as a cabin; however, Connly believed that the so called cabin was not habitable and was more akin to a barn or shed given its rustic nature and lack of plumbing even though Connly was aware of the fact that Plaintiff spent a considerable portion of each year there in pursuit of recreation. Further, Connly never asked for, nor received, pictures or further descriptions of the structures on the Shevlin Property.

*2 Kemper Insurance Companies insurance policy RB 198827 (the "Policy") issued by Third-Party Defendant Lumbermens Mutual Casualty Company ("Lumbermens") to Plaintiff in the fall of 2002 insured Plaintiff's "residence premises" and his automobile. According to the Policy, Plaintiff's "residence premises" was his Excelsior Home. Section I of the Policy, under the heading "Property Coverages," indicates that the Policy covers "[t]he dwelling on the 'residence premises' shown in the Declarations, including structures attached to the dwelling[.]" The Policy indicates further that it does not cover "[s]tructures used in whole or in part for 'business purposes[.]' " The Policy also contained an endorsement entitled "Specific Structures Away From the Residence Premises" and indicated that the structure to be insured was a "barn" on the Shevlin Property. The endorsement stated that "[f]or an additional premium, we cover each structure described below which is owned by you and located away from the 'residence premises,' if used by you in connection with the 'residence premises." " The endorsement specifically stated that it did "not cover a structure: a. Being used as a dwelling; b. Capable of being used as a dwelling; c. Used in whole or in part for 'business;' or d. Rented or held for rental to any person not a tenant of the dwelling."

Lumbermens' underwriting guidelines directed Connly to "[u]se Endorsement HO 04 92 Specific Structures Away From Residence Premises" in order to determine what structures would qualify for coverage under the endorsement. Although Connly had never used this endorsement "in all the years [he had been an insurance agent]," he neither read the endorsement nor contacted Lumbermens for guidance to determine whether structures on the Shevlin Property would qualify for coverage.

In a Property Loss Notice dated January 27, 2003, Plaintiff reported that the Shevlin Property's "shed," outhouse, woodshed, as well as some personal items, had suffered severe fire damage on January 18, 2003. It was later determined that the cause of the fire was arson. In a letter dated February 20, 2003, Kemper Insurance Companies noti-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fied Plaintiff that it had completed its investigation of the fire and concluded that the Policy did not cover the Shevlin Property's loss because the Policy covered Plaintiff's "**residence premises**," the Excelsior Home, the damaged structures were not used in connection with the "**residence premises**," and the Shevlin Property's "structures are considered to be used as a **dwelling**."

Upon being denied coverage, Plaintiff brought an action against Defendant alleging fraud and misrepresentation, breach of fiduciary duty, and negligence. As a third-party plaintiff, Defendant later brought an action against Lumbermens for indemnity or contribution.

## II. STATEMENT OF CLAIMS

Lumbermens brings this motion for summary judgment asserting that it should not be liable to Defendant for contribution or indemnification because it was not negligent. Lumbermens asserts that Defendant, through Connly, negligently issued the Policy and its accompanying endorsement even though the endorsement unambiguously excluded coverage of the Shevlin Property because it was being used as a "**dwelling**." Further, the Policy only covered Plaintiff's **residence premises**, the Excelsior Home, because the Shevlin Property was not used in connection with the Excelsior Home. Lumbermens also asserts that coverage under the Policy was not illusory and that the doctrine of reasonable expectations should not apply to it because Defendant, not Lumbermens, created an expectation of coverage.

*3 Defendant opposes Lumbermens' motion for summary judgment and asserts that Lumbermens is liable for indemnity or contribution because the Policy's language was ambiguous. Defendant alleges that the word "**dwelling**" and the phrase "capable of being used as a **dwelling**" are susceptible of more than one interpretation and, therefore, ambiguous. Defendant also asserts that coverage under the Policy is necessary pursuant to the doctrine of illusory coverage because Plaintiff paid a $160 premium and was denied coverage upon being

victimized by arson. Lastly, Defendant asserts that Lumbermens should cover the Shevlin Property's loss because Plaintiff had a reasonable expectation of coverage.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings ... answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law."Minn. R. Civ. P. 56.03. The party moving for summary judgment "has the burden of proof and ... the nonmoving party has the benefit of that view of the evidence which is most favorable to him."*Sauter v. Sauter,* 70 N.W.2d 351, 353 (Minn.1955). There is no genuine issue of material fact " '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." ' *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986)). The nonmoving party must " 'do more than simply show that there is some metaphysical doubt as to the material facts." ' *Id.* at 70 (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 586). Lumbermens is "entitled to summary judgment as a matter of law when the record reflects a complete lack of proof on an essential element of ... [Defendant's] claim." *Lubbers v. Anderson,* 539 N.W.2d 398, 401 (Minn.1995). A district court's "function on a motion for summary judgment is not to decide issues of fact, but solely to determine whether genuine factual issues exist." *DLH,* 566 N.W.2d at 70. This court cannot "weigh the evidence on a motion for summary judgment;" however, "when determining whether a genuine issue of material fact for trial exists, th[is] court is not required to ignore its conclusion that a particular piece of evidence may have no probative value, such that reasonable persons could not draw different conclusions from the evidence presented." *Id.*

## IV. LEGAL ANALYSIS

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A. DEFENDANT IS NOT ENTITLED TO CONTRIBUTION FROM LUMBERMENS BECAUSE LUMBERMENS IS NOT LIABLE FOR ANY INJURY SUFFERED BY PLAINTIFF; WHEN TERMS IN THE POLICY AND ITS ENDORSEMENT ARE GIVEN THEIR USUAL AND ACCEPTED MEANING, THE POLICY AND ITS ENDORSEMENT UNAMBIGUOUSLY EXCLUDE COVERAGE OF THE SHEVLIN PROPERTY.

In its Third Party Complaint Defendant alleges that it is entitled to indemnity [FN2] or contribution from Lumbermens "on account of [Lumbermens'] liability to [P]laintiff" and "on account of [Lumbermens'] contractual obligations and duties to the parties[.]" Contribution is not justified " 'from parties who are not liable to the injured party' " because the " 'very essence of the action of contribution is common liability." ' *Engvall v. Soo Line R.R. Co.,* 632 N.W.2d 560, 569 (Minn.2001) (quoting *Horton by Horton v. Orbeth, Inc.,* 342 N.W.2d 112, 114 (Minn.1984)). Based upon the evidence proffered by the parties, the court concludes that Defendant is not entitled to contribution from Lumbermens because Lumbermens is not liable to any injury suffered by Plaintiff. The undisputed facts indicate that Connly recommended the endorsement at issue despite his unfamiliarity with, and failure to read, the endorsement. Despite his apparent inexperience with the endorsement, Connly did not even contact a Lumbermens representative to explain the endorsement's provisions and exclusions. Further, Lumbermens is not liable for any injury suffered by Plaintiff because the language of the Policy and its endorsement unambiguously exclude from coverage the structures destroyed on the Shevlin Property.

> FN2. In its motion papers, Defendant asserts that it is entitled to indemnification from Lumbermens should Plaintiff successfully recover from Defendant. Defendant has not, however, cited any contractual or statutory authority requiring Lumbermens to indemnify Defendant in such an event, and, given the undisputed material

facts, the court concludes that Lumbermens is not liable to Defendant for indemnification.

*\*4* When courts interpret insurance policies, general principles of contract interpretation apply. *Lobeck v. State Farm Mutual Auto. Ins. Co.,* 582 N.W.2d 246, 249 (Minn.1998) (citing *St. Paul School Dist. No. 625 v. Columbia Transit Corp.,* 321 N.W.2d 41, 45 (Minn.1982)). The interpretation of an insurance policy is a question of law. *Wanzek Construction, Inc. v. Employers Ins. of Wausau,* 679 N.W.2d 322, 324 (Minn.2004) (citing *American Family Ins. Co. v. Walser,* 628 N.W.2d 605, 609 (Minn.2001)). "When insurance policy language is clear and unambiguous, 'the language used must be given its usual and accepted meaning." ' *Lobeck,* 582 N.W.2d at 249 (quoting *Bobich v. Oja,* 104 N.W.2d 19, 24 (Minn.1960)) (holding that "[w]here there is no ambiguity there is no room for construction. In such cases, the parties being free to contract, the language used must be given its usual and accepted meaning"); *See also Canadian Universal Ins. Co. v. Fire Watch, Inc.,* 258 N.W.2d 570, 572 (Minn.1977) (stating that "[t]he provisions of an insurance policy are to be interpreted according to plain, ordinary sense so as to effectuate the intention of the parties"). If, however, policy language is ambiguous, the language must be interpreted in favor of coverage. *Wanzek Construction,* 679 N.W.2d at 325 (citing *Nordby v. Atlantic Mutual Ins. Co.,* 329 N.W.2d 820, 822 (Minn.1983)); *See also Hubred v. Control Data Corp.,* 442 N.W.2d 308, 310 (Minn.1989) (holding that "[w]here clauses are irreconcilably inconsistent or susceptible of two meanings the policy will be construed against the insurer"); *But see Bobich,* 104 N.W.2d at 24 (stating that "the court has no right to read an ambiguity into plain language of an insurance policy in order to construe it against the one who prepared the contract"). Further, any endorsements attached to an insurance contract are part of the contract and "exclusions ... are as much a part of the policy as the coverage and must be read as part of coverage[.]" *Wyatt v. Wyatt,* 58 N.W.2d 873, 875 (Minn.1953). Exclusions in coverage are, however, narrowly construed against the insurer.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Atwater Creamery Co. v. Western National Mutual Ins. Co.,* 366 N.W.2d 271, 276 (Minn.1985).

Defendant asserts that the Policy should be construed in its favor because the endorsement, entitled Specific Structures Away From the **Residence Premises**, contains ambiguous language, including the word **"dwelling"** and the phrases "used by you in connection with the **'residence premises"** ' and "capable of being used as a **dwelling**." Defendant cites various reference materials in an effort to show that the word **"dwelling"** is capable of more than one meaning and alludes to the fact that the Policy did not specify whether a **dwelling** referred to a permanent home or a temporary shelter. Even assuming *arguendo* that Plaintiff "used" the Shevlin Property "in connection with the **'residence premises,"** ' the Excelsior Home, the court finds that the word **"dwelling"** and the phrase "capable of being used as a **dwelling**" are not ambiguous; therefore, the Policy and its endorsement exclude coverage for the loss of the Shevlin Property.[FN3]

> FN3. Defendant asserts in its motion papers that the cabin, woodshed, and outhouse were not **dwellings**. The court finds that the woodshed and outhouse were most likely not **dwellings**; however, it appears that when Plaintiff sought to insure the Shevlin Property via the Specific Structures Away From the Residence endorsement, he only intended to insure the structure that he referred to as a cabin and Connly listed as a barn. The woodshed and outhouse are not identified in the endorsement, or anywhere in the Policy, and are, therefore, not insured.

*5 The word **"dwelling-house"** is defined as "[t]he house or other structure in which a person lives; a residence or abode."BLACK'S LAW DICTIONARY 524 (7th ed.1999).[FN4] **"Dwelling"** is also defined as "a shelter (as a house) in which people live."MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 361 (10th ed.1993). The court finds that given these definitions and the usual and accepted meaning applied to the word **"dwelling,"** the structure that Plaintiff referred to as his cabin on the Shevlin Property was indeed a **dwelling**. Plaintiff admitted that he lived in the structure 18 to 20 weekends per year, including stays of a week or more, and slept and cooked meals there while pursuing recreation. A picture of the structure confirms this court's conclusion for the structure had a stone chimmey, a door, several windows, and contained a stove and oven for cooking, as well as a wood-burning stove for heat and a propane-powered lighting system. Further, the court finds that the phrase "capable of being used as a **dwelling**" is of no moment here because the structure was not only *capable* of being used as a **dwelling** but actually *was* being used as a **dwelling** by Plaintiff 18 to 20 weekends per year.

> FN4. The court notes that in the criminal law context, **"dwelling-house"** is defined as "[a] building, a part of a building, a tent, a **mobile home**, *or another enclosed space that is used or intended for use as a human habitation.*"BLACK'S LAW DICTIONARY 524 (7th ed.1999) (emphasis added).

**B. THE POLICY'S COVERAGE WAS NOT ILLUSORY BECAUSE COVERAGE WOULD HAVE BEEN TRIGGERED IF THE SHEVLIN PROPERTY HAD CONSISTED OF A BARN USED IN CONNECTION WITH THE EXCELSIOR HOME.**

Defendant asserts that the doctrine of illusory coverage should apply so as to avoid the exclusion of the Shevlin Property from coverage. Pursuant to the doctrine of illusory coverage, " 'insurance contracts should, if possible, be construed so as not to be a delusion to' the insured."*Jostens, Inc. v. Northfield Ins. Co.,* 527 N.W.2d 116, 118 (Minn.Ct.App.1995) (quoting *Motor Vehicle Casualty Co. v. Smith,* 76 N.W.2d 486, 490-91 (Minn.1956)). The doctrine of illusory coverage is to be applied "where part of the [insurance] premium is specifically allocated to a particular type or period of coverage and that coverage turns out to be functionally nonexistent."*Jostens,* 527 N.W.2d at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
Not Reported in N.W.2d, 2004 WL 3371968 (Minn.Dist.Ct.)
(Cite as: Not Reported in N.W.2d)

119;*See also Glarner v. Time Ins.,* 465 N.W.2d 591, 595 (Minn.Ct.App.1991) (finding coverage illusory where the insurer received a premium for a period without incurring any risk for that period); *Sawyer v. Midland Ins. Co.,* 383 N.W.2d 691, 695-696 (Minn.Ct.App.1986) (refusing to construe an automobile insurance definition of "uninsured motor vehicle" in such a way as to eliminate its usefulness because such an interpretation would render coverage illusory).

The court finds that the facts of this matter are inapposite to the cases above wherein the doctrine of illusory coverage was implemented because if the Shevlin Property had actually consisted of a barn that was used "in connection with the **residence premises**" coverage would have applied; however, Plaintiff, via Defendant's guidance, or lack thereof, attempted to insure his cabin, a **dwelling,** which was unambiguously excluded from coverage under the Policy and its endorsement.

C. THE DOCTRINE OF REASONABLE EXPECTATIONS IS INAPPLICABLE HERE BECAUSE THE POLICY AND ITS ENDORSEMENT WERE UNAMBIGUOUS AND DID NOT CONTAIN ANY MAJOR HIDDEN EXCLUSIONS; LUMBERMENS DID NOT FRUSTRATE PLAINTIFF'S REASONABLE EXPECTATION OF COVERAGE.

*6 Defendant asserts that given the disparity of bargaining power between insurance companies and Plaintiff and the ambiguity of the Policy and its endorsement, the doctrine of reasonable expectations should be implemented here to provide coverage for Plaintiff's loss. Pursuant to this doctrine, " '[t]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations .' " *Atwater Creamery Co.,* 366 N.W.2d at 277 (quoting Keeton, *Insurance Law Rights at Variance with Policy Provisions,* 83 Harv .L.Rev. 961, 967 (1970)). The doctrine of reasonable expectations does not, however,

relieve Plaintiff of his responsibility to read the Policy. *National Indemnity Co. of Minnesota v. Ness,* 457 N.W .2d 755, 757 (Minn.Ct.App.1990). The doctrine of reasonable expectations "has generally been limited to those cases in which the policy, while purporting to provide a specific coverage, so limited the coverage as to amount to a hidden exclusion." *Id.* To determine whether the doctrine of reasonable expectations should apply, courts generally consider four factors: (1) the presence of ambiguity, (2) language operating as a hidden major exclusion, (3) whether the insurer communicated important and obscure conditions or exclusions, and (4) whether the substance of the particular provisions at issue in the contract are generally known by the public. *Atwater Creamery Co.,* 366 N.W.2d at 278.

The court concludes that implementation of the doctrine of reasonable expectations is not appropriate here for, as concluded above, the Policy and its endorsement unambiguously excluded coverage of the cabin on the Shevlin Property. Further, the court finds that the Policy did not contain any major hidden exclusions, and, to the extent that Plaintiff's reasonable expectations of coverage were frustrated, if at all, the evidence indicates that Defendant, not Lumbermens, fomented that frustration.

V. CONCLUSION

The court grants Lumbermens' motion for summary judgment because it finds that Lumbermens is not liable to Defendant for contribution or indemnity given that the Policy and its endorsement unambiguously excluded coverage of the Shevlin Property's cabin. Further, given the undisputed material facts of this case coupled with Lumbermens' lack of liability, use of the illusory coverage and reasonable expectations doctrines is not appropriate.

Minn.Dist.Ct.,2004.
Howard v. H. Robert Anderson & Associates, Inc.
Not Reported in N.W.2d, 2004 WL 3371968 (Minn.Dist.Ct.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                    Page 7
Not Reported in N.W.2d, 2004 WL 3371968 (Minn.Dist.Ct.)
**(Cite as: Not Reported in N.W.2d)**


END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in N.W.2d                                                                                    Page 8
Not Reported in N.W.2d, 2004 WL 3371968 (Minn.Dist.Ct.)
**(Cite as: Not Reported in N.W.2d)**

**Westlaw Delivery Summary Report for SPADARO,JOHN 5989548**

| | |
|---|---|
| Date/Time of Request: | Friday, February 8, 2008 09:48 Central |
| Client Identifier: | JADCZAK/HOMESITE 071003 |
| Database: | KEYCITE-HIST |
| Citation Text: | 2004 WL 3371968 |
| Service: | KeyCite |
| Lines: | 30 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

Date of Printing: FEB 08,2008

## KEYCITE

**H**Howard v. H. Robert Anderson & Associates, Inc., 2004 WL 3371968 (Minn.Dist.Ct., Sep 28, 2004) (NO. MC 03-20345)

### History

### Direct History

=>      1 Howard v. H. Robert Anderson & Associates, Inc., 2004 WL 3371968 (Minn.Dist.Ct. Sep 28, 2004) (NO. MC 03-20345)

### Related References (U.S.A.)

**H**      2 Howard v. H. Robert Anderson & Associates, Inc., 2005 WL 1353345 (Minn.Dist.Ct. Mar 11, 2005) (NO. MC 03-020345)

**H**      3 Howard v. H. Robert Anderson & Associates, Inc., 2005 WL 2757239 (Minn.Dist.Ct. Jun 08, 2005) (NO. MC 03-20345)

### Court Documents

### Verdict and Settlement Summaries (U.S.A.)

Minn.Dist.Ct.

4 Insurance Agent's Negligent Underwriting Ends in $56K Award, 2005 WL 1676734 (Verdict and Settlement Summary) (Minn.Dist.Ct. Mar. 9, 2005) (NO. /03-20345)

© Copyright 2008 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.