## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOSEPH JADCZAK AND CATHERINE JADCZAK, | ) ) ) |
| Plaintiffs, | ) ) ) C.A. No. 07-0431GMS |
| v. | ) ) |
| HOMESITE INSURANCE COMPANY, | ) ) |
| Defendant. | ) |

**APPENDIX TO JADCZAK PLAINTIFFS' OPENING BRIEF
IN SUPPORT OF THEIR MOTION FOR PARTIAL
SUMMARY JUDGMENT ON THE "DWELLING" ISSUE**

John S. Spadaro, No. 3155
John Sheehan Spadaro, LLC
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
(302)235-7745

Michael L. Sensor, No. 3541
Perry & Sensor
One Customs House, Suite 560
P.O. Box 1568
Wilmington, DE 19899-1568
(302)655-4482

Attorneys for Plaintiffs
Joseph Jadczak and Catherine Jadczak

March 14, 2008

# **TABLE OF CONTENTS**

| **Document** | **Page** |
| --- | --- |
| Homesite policy no. 30318013 | A1-42 |
| June 27, 2006 letter from M. Loffredo to J. and C. Jadczak | A43-52 |
| Examination under oath of J. Jadczak (excerpts) | A53-76 |
| March 27, 2007 letter from J. Smythe to M. Sensor | A77-81 |
| Plaintiffs' Initial Disclosures | A82-85 |
| Dictionary.com entry | A86-87 |
| Dictionary.com entry | A88-91 |
| Affidavit of Joseph Jadczak | A92-93 |

**AIG Homeowners Insurance Program**

99 Bedford Street
Boston, MA 02111-2217
Tel. 1-(866) 342-2045 Fax 1-(866) 360-3202

**New Business Declarations
For Policy Number 30318013**

**Policy Period** This policy covers the listed location(s)
From 12:01 AM August 16, 2005
Through 12:01 AM August 16, 2006 (local time)

JOSEPH W JADCZAK JR.
CATHERINE JADCZAK
29555 EAGLES CREST RD
MILTON DE 19968

*Issued by Homesite Insurance Company*

## Tier 001

**Insured Location**

29555 EAGLES CREST RD MILTON DE 19968-3621

**Description of Dwelling**

2000 Clapboard structure, Single family home, Primary residence, Partially Protected, territory code 0002, over 1000ft. from hydrant, within 5 miles from fire station.

**Deductible $250**
**Windstorm or Hail Deductible $500**

In case of loss under Section I, we cover only that part of the loss over the deductible stated. For Wind or Hail deductible, see endorsement HH 80 06.



| Coverage | Limit | Premium |
|---|---|---|
| **Section I - Property** | | |
| Coverage A - Dwelling | $622,000 | $1,527.00 |
| Coverage B - Other Structures | $62,200 | Included |
| Coverage C - Personal Property | $435,200 | Included |
| Coverage D - Loss Of Use | $124,400 | Included |
| **Section II - Liability** | | |
| Coverage E - Personal Liability | $300,000 | $16.00 |
| Coverage F - Medical Payments To Others | $3,000 | $2.00 |
| **Additional Coverages** See **Additional Coverages** on reverse side for details | | $258.00 |
| **Surcharges** See **Surcharges** on reverse side for details | | $0.00 |
| **Discounts** See **Discounts** on reverse side for details | | $140.00 |

| **Total** | | $1,663.00 |
|---|---|---|

Countersigned_____ Date_____ Authorized Representative _____

## Additional Coverages

                                                                    **$258.00**

|  | | Limit | Premium |
|---|---|---|---|
| HO 04 20 0694 | Specified Additional Amount Insurance for Cov A | | $90.00 |
| HO 04 90 0491 | Personal Property Replacement Cost | | $168.00 |

## Surcharges

                                                                    **$0.00**

|  | | | Premium |
|---|---|---|---|

## Discounts

                                                                    **-$140.00**

|  | | | Premium |
|---|---|---|---|
| HD-016 1298 | New Home Credit | | -$94.00 |
| HO 04 16 0491 | Premises Alarm or Fire Protection System | | -$46.00 |

## Contracts and Amendments

| HO 00 03 0491 | Special Form (HO 00 03 0491) |
|---|---|
| HH 80 06 1101 | Windstorm or Hail Fixed-Dollar Deductible |
| HO 01 07 1298 | Special Provisions - Delaware |
| HO 04 32 0502 | Limited Fungi, Wet or Dry Rot, or Bacteria Coverage |
| HO 04 96 0491 | No Section II Coverage - Home Day Care Business |
| HO 04 98 0491 | Refrigerated Property Coverage |

A2

## AIG Homeowners Insurance Program

99 Bedford Street
Boston, MA 02111-2217
Tel. 1-(866) 342-2045 Fax 1-(866) 360-3202

JOSEPH W JADCZAK JR.
CATHERINE JADCZAK
29555 EAGLES CREST RD
MILTON DE 19968

June 14, 2005

## Property Loss Report

The premium for your policy was based in part on a property loss report provided by A-PLUS.

Under Section 612 of the Fair Credit Reporting Act, you have the right to obtain a free copy of this report within 60 days by request to:

A-PLUS Consumer Inquiry Center
545 Washington Boulevard Loc. 22-6
Jersey City, NJ 07302

Telephone: 1-800-709-8842

Under Section 611 of the Fair Credit Reporting Act you also have the right to dispute the accuracy or completeness of any information A-PLUS furnished in this report, by notifying them directly of the dispute.

Please note that A-PLUS does not participate in determining your premium, and cannot give the specific information on our rates.

Sincerely,

Underwriting Department
Homesite Insurance Company

## Property Inspection

As a reminder, a contracted property inspector may be out to complete an inspection of the property. A property inspection is extremely important to our underwriting process and will help us verify the information on your policy. If an appointment is necessary due to an interior inspection or woodstove supplement, our inspection company will contact you prior to an inspection.

This insurance policy may be cancelled within *60* days of the effective date for any reason that is not unfairly discriminatory or prohibited by law, if the property is determined to be an unacceptable risk to the insurer.

A3

**AIG Homeowners Insurance Program**

99 Bedford Street
Boston, MA 02111-2217
Tel. 1-(866) 342-2045  Fax 1-(866) 360-3202

*Notice of Insurance Information Practices*

*Issued by Homesite Insurance Company*

The Homesite Insurance Companies ("Homesite") uses information from many sources. This assists us to fairly determine eligibility for our programs and ensure accurate rates for all policies. Using this information also speeds the application process.

How we may collect, use and disclose this information is regulated by law, and we would like you to be aware of our practices and how they may affect your privacy.

Following is a description of the kinds of information we may collect, how we may collect it, and what is done with the information once it has been collected. We also describe how you can find out what information we have about you in our records or files, and how you can correct inaccurate information. We follow these practices with your information whether you are a policyholder, claimant, former policyholder, or just an inquiring consumer.

### What kind of information do we collect about you?

Most of our information comes directly from you. The information you provide when you call us, complete an application, make a policy change or report a claim gives us most of the information we need to know. This information, of course, includes identifying information such as name and address, as well as your type of home and claims history.

We may also obtain information such as credit reports, claims history, and investigative reports from other sources. We may send someone to inspect your property and verify information about the value and condition of the property.

The information we obtain about you may come from other insurance companies, insurance support organizations, or sources such as credit bureaus and property data collection services.

### What do we do with the information collected about you?

We may, as permitted by law, disclose information about you in our records or files to certain persons or organizations without your prior permission. These include:

* Other insurance institutions, financial institutions, agents, or insurance support organizations.
* Persons who perform a business, professional, or insurance function for us.
* Businesses that conduct actuarial or research studies.
* Insurance regulatory authorities
* Law enforcement or other governmental authorities.
* Our affiliated companies who assist our insurance business activities.

*Contd. on reverse.*

A5

Your information may be provided to others in the following circumstances, as permitted by law, for them to:

* Perform a business, professional, or insurance function for us.
* Provide information to us in order to
  a. Determine your eligibility for an insurance benefit or payment, or
  b. Detect or prevent criminal activity, fraud, material misrepresentation or material nondisclosure in connection with an insurance transaction.
* Perform a function in connection with an insurance transaction involving you.
* Conduct an audit of our operations or services.
* Conduct a joint marketing program with Homesite pursuant to a joint marketing agreement.

The information we obtain about you from a report prepared by an insurance support organization may be retained by the insurance support organization and disclosed to other sources.

## How confidential and secure is the information we have about you?

Homesite protects the confidentiality of the information that we have about you by restricting access to those employees who need to know that information to provide our products and services to you. We maintain physical electronic and procedural safeguards that comply with federal and state regulations to guard your information.

## How can you find out what information we have about you?

You have the right to know what information we have about you in our insurance records or files. To obtain this information, provide to us in writing an identification of yourself and a reasonable explanation of the information you desire. If the information can be reasonably located and obtained, we will inform you of its nature and substance within thirty (30) business days from the day we receive the request. You may personally see and obtain the information, or if you prefer, we will mail the information to you. We will also inform you who has received this information within the last two (2) years, or, if not recorded, to whom such information is normally disclosed.

## What can you do if you disagree with the information we have about you?

You have the right to make a written request that we correct, delete, or change any recorded information we have about you in our records or files.

If we agree to comply with your request, we will notify you within thirty (30) business days of receiving your request. We will then furnish the amended information to any person you designate, who may have received the information within the past two (2) years, as well as to any person or organization who either supplied us with the information or to whom we disclosed it.

If we are unable to comply with your request, we will notify you within thirty (30) business days of receiving your written request with the reasons for our decision. If you disagree with the reasons for our decision, you have the right to file a concise statement of what you think is correct, relevant or fair information. Your statement will be filed with the disputed information and will be furnished to any person, insurance institution, agent or insurance support organization who either supplied us with information or to whom we disclosed it. Your statement will also be furnished to anyone reviewing the disputed information.

A6

# HOMEOWNERS 3
# SPECIAL FORM

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We," "us" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined as follows:

1. "Bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.

2. "Business" includes trade, profession or occupation.

3. "Insured" means you and residents of your household who are:

   a. Your relatives; or

   b. Other persons under the age of 21 and in the care of any person named above.

   Under Section II, "insured" also means:

   c. With respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in **3.a.** or **3.b.** above. A person or organization using or having custody of these animals or watercraft in the course of any "business" or without consent of the owner is not an "insured";

   d. With respect to any vehicle to which this policy applies:

      (1) Persons while engaged in your employ or that of any person included in **3.a.** or **3.b.** above; or

      (2) Other persons using the vehicle on an "insured location" with your consent.

4. "Insured location" means:

   a. The "residence premises";

   b. The part of other premises, other structures and grounds used by you as a residence and:

      (1) Which is shown in the Declarations; or

      (2) Which is acquired by you during the policy period for your use as a residence;

   c. Any premises used by you in connection with a premises in **4.a.** and **4.b.** above;

   d. Any part of a premises:

      (1) Not owned by an "insured"; and

      (2) Where an "insured" is temporarily residing;

   e. Vacant land, other than farm land, owned by or rented to an "insured";

   f. Land owned by or rented to an "insured" on which a one or two family dwelling is being built as a residence for an "insured";

   g. Individual or family cemetery plots or burial vaults of an "insured"; or

   h. Any part of a premises occasionally rented to an "insured" for other than "business" use.

5. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

   a. "Bodily injury"; or

   b. "Property damage."

6. "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

7. "Residence employee" means:

   a. An employee of an "insured" whose duties are related to the maintenance or use of the "residence premises," including household or domestic services; or

   b. One who performs similar duties elsewhere not related to the "business" of an "insured."

8. "Residence premises" means:

   a. The one family dwelling, other structures, and grounds; or

   b. That part of any other building;

   where you reside and which is shown as the "residence premises" in the Declarations.

   "Residence premises" also means a two family dwelling where you reside in at least one of the family units and which is shown as the "residence premises" in the Declarations.

A7

Copyright, Insurance Services Office, Inc., 1990

## SECTION I – PROPERTY COVERAGES

### COVERAGE A – Dwelling

We cover:

1. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

2. Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises."

This coverage does not apply to land, including land on which the dwelling is located.

### COVERAGE B – Other Structures

We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

This coverage does not apply to land, including land on which the other structures are located.

We do not cover other structures:

1. Used in whole or in part for "business"; or

2. Rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A. Use of this coverage does not reduce the Coverage A limit of liability.

### COVERAGE C – Personal Property

We cover personal property owned or used by an "insured" while it is anywhere in the world. At your request, we will cover personal property owned by:

1. Others while the property is on the part of the "residence premises" occupied by an "insured";

2. A guest or a "residence employee," while the property is in any residence occupied by an "insured."

Our limit of liability for personal property usually located at an "insured's" residence, other than the "residence premises," is 10% of the limit of liability for Coverage C, or $1000, whichever is greater. Personal property in a newly acquired principal residence is not subject to this limitation for the 30 days from the time you begin to move the property there.

**Special Limits of Liability.** These limits do not increase the Coverage C limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category.

1. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum, coins and medals.

2. $1000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

   This limit includes the cost to research, replace or restore the information from the lost or damaged material.

3. $1000 on watercraft, including their trailers, furnishings, equipment and outboard engines or motors.

4. $1000 on trailers not used with watercraft.

5. $1000 for loss by theft of jewelry, watches, furs, precious and semi-precious stones.

6. $2000 for loss by theft of firearms.

7. $2500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.

8. $2500 on property, on the "residence premises," used at any time or in any manner for any "business" purpose.

9. $250 on property, away from the "residence premises," used at any time or in any manner for any "business" purpose. However, this limit does not apply to loss to adaptable electronic apparatus as described in Special Limits 10. and 11. below.

10. $1000 for loss to electronic apparatus, while in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power. Electronic apparatus includes:

    a. Accessories or antennas; or

    b. Tapes, wires, records, discs or other media;

    for use with any electronic apparatus.

A8

Copyright, Insurance Services Office, Inc., 1990

HO 00 03 04 91
27 21711 bpplprdirsio 6/14 9:48  007

11. $1000 for loss to electronic apparatus, while not in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus:

   a. Is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power;

   b. Is away from the "residence premises"; and

   c. Is used at any time or in any manner for any "business" purpose.

   Electronic apparatus includes:

   a. Accessories and antennas; or

   b. Tapes, wires, records, discs or other media;

   for use with any electronic apparatus.

**Property Not Covered.** We do not cover:

1. Articles separately described and specifically insured in this or other insurance;

2. Animals, birds or fish;

3. Motor vehicles or all other motorized land conveyances. This includes:

   a. Their equipment and accessories; or

   b. Electronic apparatus that is designed to be operated solely by use of the power from the electrical system of motor vehicles or all other motorized land conveyances. Electronic apparatus includes:

      (1) Accessories or antennas; or

      (2) Tapes, wires, records, discs or other media;

      for use with any electronic apparatus.

      The exclusion of property described in 3.a. and 3.b. above applies only while the property is in or upon the vehicle or conveyance.

   We do cover vehicles or conveyances not subject to motor vehicle registration which are:

   a. Used to service an "insured's" residence; or

   b. Designed for assisting the handicapped;

4. Aircraft and parts. Aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

5. Property of roomers, boarders and other tenants, except property of roomers and boarders related to an "insured";

6. Property in an apartment regularly rented or held for rental to others by an "insured," except as provided in Additional Coverages 10.;

7. Property rented or held for rental to others off the "residence premises";

8. "Business" data, including such data stored in:

   a. Books of account, drawings or other paper records; or

   b. Electronic data processing tapes, wires, records, discs or other software media;

   However, we do cover the cost of blank recording or storage media, and of pre-recorded computer programs available on the retail market; or

9. Credit cards or fund transfer cards except as provided in Additional Coverages 6.

**COVERAGE D – Loss Of Use**

The limit of liability for Coverage D is the total limit for all the coverages that follow.

1. If a loss covered under this Section makes that part of the "residence premises" where you reside not fit to live in, we cover, at your choice, either of the following. However, if the "residence premises" is not your principal place of residence, we will not provide the option under paragraph b. below.

   a. **Additional Living Expense,** meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or

   b. **Fair Rental Value,** meaning the fair rental value of that part of the "residence premises" where you reside less any expenses that do not continue while the premises is not fit to live in.

   Payment under a. or b. will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

2. If a loss covered under this Section makes that part of the "residence premises" rented to others or held for rental by you not fit to live in, we cover the:

   **Fair Rental Value,** meaning the fair rental value of that part of the "residence premises" rented to others or held for rental by you less any expenses that do not continue while the premises is not fit to live in.

   Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3. If a civil authority prohibits you from use of the "residence premises" as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense and Fair Rental Value loss as provided under 1. and 2. above for no more than two weeks.



HO 00 03 04 91
Policy Number 30318013          Copyright, Insurance Services Office, Inc., 1990          Page 3 of 18
28.21712.hpolprdraig.6/14.9:48 007

The periods of time under 1., 2. and 3. above are not limited by expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

ADDITIONAL COVERAGES

1. **Debris Removal.** We will pay your reasonable expense for the removal of:

   a. Debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or

   b. Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

   This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

   We will also pay your reasonable expense, up to $500, for the removal from the "residence premises" of:

   a. Your tree(s) felled by the peril of Windstorm or Hail;

   b. Your tree(s) felled by the peril of Weight of Ice, Snow or Sleet; or

   c. A neighbor's tree(s) felled by a Peril Insured Against under Coverage C;

   provided the tree(s) damages a covered structure. The $500 limit is the most we will pay in any one loss regardless of the number of fallen trees.

2. **Reasonable Repairs.** In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage. If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by an applicable Peril Insured Against.

   This coverage:

   a. Does not increase the limit of liability that applies to the covered property;

   b. Does not relieve you of your duties, in case of a loss to covered property, as set forth in SECTION I – CONDITION 2.d.

3. **Trees, Shrubs and Other Plants.** We cover trees, shrubs, plants or lawns, on the "residence premises," for loss caused by the following Perils Insured Against: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles not owned or operated by a resident of the "residence premises," Vandalism or malicious mischief or Theft.

   We will pay up to 5% of the limit of liability that applies to the dwelling for all trees, shrubs, plants or lawns. No more than $500 of this limit will be available for any one tree, shrub or plant. We do not cover property grown for "business" purposes.

   This coverage is additional insurance.

4. **Fire Department Service Charge.** We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

   This coverage is additional insurance. No deductible applies to this coverage.

5. **Property Removed.** We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed. This coverage does not change the limit of liability that applies to the property being removed.

6. **Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.**

   We will pay up to $500 for:

   a. The legal obligation of an "insured" to pay because of the theft or unauthorized use of credit cards issued to or registered in an "insured's" name;

   b. Loss resulting from theft or unauthorized use of a fund transfer card used for deposit, withdrawal or transfer of funds, issued to or registered in an "insured's" name;

   c. Loss to an "insured" caused by forgery or alteration of any check or negotiable instrument; and

   d. Loss to an "insured" through acceptance in good faith of counterfeit United States or Canadian paper currency.

A10

Copyright, Insurance Services Office, Inc., 1990

HO 00 03 04 91

29.21713.hpolprdirain 6/14 9:48  007

We do not cover use of a credit card or fund transfer card:

a. By a resident of your household;

b. By a person who has been entrusted with either type of card; or

c. If an "insured" has not complied with all terms and conditions under which the cards are issued.

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

We do not cover loss arising out of "business" use or dishonesty of an "insured."

This coverage is additional insurance. No deductible applies to this coverage.

Defense:

a. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

b. If a suit is brought against an "insured" for liability under the Credit Card or Fund Transfer Card coverage, we will provide a defense at our expense by counsel of our choice.

c. We have the option to defend at our expense an "insured" or an "insured's" bank against any suit for the enforcement of payment under the Forgery coverage.

7. **Loss Assessment.** We will pay up to $1000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under COVERAGE A – DWELLING, other than earthquake or land shock waves or tremors before, during or after a volcanic eruption.

This coverage applies only to loss assessments charged against you as owner or tenant of the "residence premises."

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

The limit of $1000 is the most we will pay with respect to any one loss, regardless of the number of assessments.

Condition 1. Policy Period, under SECTIONS I AND II CONDITIONS, does not apply to this coverage.

8. **Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

a. Perils Insured Against in COVERAGE C – PERSONAL PROPERTY. These perils apply to covered buildings and personal property for loss insured by this additional coverage;

b. Hidden decay;

c. Hidden insect or vermin damage;

d. Weight of contents, equipment, animals or people;

e. Weight of rain which collects on a roof; or

f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e., and f. unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

This coverage does not increase the limit of liability applying to the damaged covered property.

9. **Glass or Safety Glazing Material.**

We cover:

a. The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window; and

b. Damage to covered property by glass or safety glazing material which is part of a building, storm door or storm window.

This coverage does not include loss on the "residence premises" if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant.

Loss for damage to glass will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

This coverage does not increase the limit of liability that applies to the damaged property.

A11

Copyright, Insurance Services Office, Inc., 1990

10. **Landlord's Furnishings.** We will pay up to $2500 for your appliances, carpeting and other household furnishings, in an apartment on the "residence premises" regularly rented or held for rental to others by an "insured," for loss caused only by the following Perils Insured Against:

a. **Fire or lightning.**

b. **Windstorm or hail.**

   This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

   This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.

c. **Explosion.**

d. **Riot or civil commotion.**

e. **Aircraft,** including self-propelled missiles and spacecraft.

f. **Vehicles.**

g. **Smoke,** meaning sudden and accidental damage from smoke.

   This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

h. **Vandalism or malicious mischief.**

i. **Falling objects.**

   This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

j. **Weight of ice, snow or sleet** which causes damage to property contained in a building.

k. **Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

This peril does not include loss:

(1) To the system or appliance from which the water or steam escaped;

(2) Caused by or resulting from freezing except as provided in the peril of freezing below; or

(3) On the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises."

In this peril, a plumbing system does not include a sump, sump pump or related equipment.

l. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

   We do not cover loss caused by or resulting from freezing under this peril.

m. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

   This peril does not include loss on the "residence premises" while the dwelling is unoccupied, unless you have used reasonable care to:

(1) Maintain heat in the building; or

(2) Shut off the water supply and drain the system and appliances of water.

n. **Sudden and accidental damage from artificially generated electrical current.**

   This peril does not include loss to a tube, transistor or similar electronic component.

o. **Volcanic eruption** other than loss caused by earthquake, land shock waves or tremors.

The $2500 limit is the most we will pay in any one loss regardless of the number of appliances, carpeting or other household furnishings involved in the loss.

---

## SECTION I – PERILS INSURED AGAINST

### COVERAGE A – DWELLING and COVERAGE B – OTHER STRUCTURES

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property. We do not insure, however, for loss:

1. Involving collapse, other than as provided in Additional Coverage 8.;

2. Caused by:

A12

Copyright, Insurance Services Office, Inc., 1990

a. Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the dwelling is vacant, unoccupied or being constructed, unless you have used reasonable care to:

(1) Maintain heat in the building; or

(2) Shut off the water supply and drain the system and appliances of water;

b. Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

(1) Fence, pavement, patio or swimming pool;

(2) Foundation, retaining wall, or bulkhead; or

(3) Pier, wharf or dock;

c. Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

d. Vandalism and malicious mischief if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

e. Any of the following:

(1) Wear and tear, marring, deterioration;

(2) Inherent vice, latent defect, mechanical breakdown;

(3) Smog, rust or other corrosion, mold, wet or dry rot;

(4) Smoke from agricultural smudging or industrial operations;

(5) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C of this policy.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

(6) Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings;

(7) Birds, vermin, rodents, or insects; or

(8) Animals owned or kept by an "insured."

If any of these cause water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

3. Excluded under Section I – Exclusions.

Under items 1. and 2., any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

## COVERAGE C – PERSONAL PROPERTY

We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in SECTION I – EXCLUSIONS.

1. **Fire or lightning.**

2. **Windstorm or hail.**

   This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

   This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft,** including self-propelled missiles and spacecraft.

6. **Vehicles.**

7. **Smoke,** meaning sudden and accidental damage from smoke.

   This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. **Vandalism or malicious mischief.**

9. **Theft,** including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

   This peril does not include loss caused by theft:

   a. Committed by an "insured";

   b. In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied; or

A13

c. From that part of a "residence premises" rented by an "insured" to other than an "insured."

This peril does not include loss caused by theft that occurs off the "residence premises" of:

a. Property while at any other residence owned by, rented to, or occupied by an "insured," except while an "insured" is temporarily living there. Property of a student who is an "insured" is covered while at a residence away from home if the student has been there at any time during the 45 days immediately before the loss;

b. Watercraft, and their furnishings, equipment and outboard engines or motors; or

c. Trailers and campers.

10. **Falling objects.**

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

11. **Weight of ice, snow or sleet** which causes damage to property contained in a building.

12. **Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

This peril does not include loss:

a. To the system or appliance from which the water or steam escaped;

b. Caused by or resulting from freezing except as provided in the peril of freezing below; or

c. On the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises."

In this peril, a plumbing system does not include a sump, sump pump or related equipment.

13. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

14. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

This peril does not include loss on the "residence premises" while the dwelling is unoccupied, unless you have used reasonable care to:

a. Maintain heat in the building; or

b. Shut off the water supply and drain the system and appliances of water.

15. **Sudden and accidental damage from artificially generated electrical current.**

This peril does not include loss to a tube, transistor or similar electronic component.

16. **Volcanic eruption** other than loss caused by earthquake, land shock waves or tremors.

## SECTION I – EXCLUSIONS

1. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

a. **Ordinance or Law,** meaning enforcement of any ordinance or law regulating the construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

b. **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption; landslide; mine subsidence; mudflow; earth sinking, rising or shifting; unless direct loss by:

(1) Fire;

(2) Explosion; or

(3) Breakage of glass or safety glazing material which is part of a building, storm door or storm window;

ensues and then we will pay only for the ensuing loss.

This exclusion does not apply to loss by theft.

c. **Water Damage,** meaning:

(1) Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

(2) Water which backs up through sewers or drains or which overflows from a sump; or

A14

Copyright, Insurance Services Office, Inc., 1990

(3) Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

Direct loss by fire, explosion or theft resulting from water damage is covered.

**d. Power Failure,** meaning the failure of power or other utility service if the failure takes place off the "residence premises." But, if a Peril Insured Against ensues on the "residence premises," we will pay only for that ensuing loss.

**e. Neglect,** meaning neglect of the "insured" to use all reasonable means to save and preserve property at and after the time of a loss.

**f. War,** including the following and any consequence of any of the following:

(1) Undeclared war, civil war, insurrection, rebellion or revolution;

(2) Warlike act by a military force or military personnel; or

(3) Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

**g. Nuclear Hazard,** to the extent set forth in the Nuclear Hazard Clause of SECTION I – CONDITIONS.

**h. Intentional Loss,** meaning any loss arising out of any act committed:

(1) By or at the direction of an "insured"; and

(2) With the intent to cause a loss.

2. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

**a. Weather conditions.** However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph **1.** above to produce the loss;

**b. Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body;

**c. Faulty, inadequate or defective:**

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property whether on or off the "residence premises."

## SECTION I – CONDITIONS

1. **Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

   **a.** To the "insured" for more than the amount of the "insured's" interest at the time of loss; or

   **b.** For more than the applicable limit of liability.

2. **Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done:

   **a.** Give prompt notice to us or our agent;

   **b.** Notify the police in case of loss by theft;

   **c.** Notify the credit card or fund transfer card company in case of loss under Credit Card or Fund Transfer Card coverage;

   **d.** Protect the property from further damage. If repairs to the property are required, you must:

   (1) Make reasonable and necessary repairs to protect the property; and

   (2) Keep an accurate record of repair expenses;

   **e.** Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

   **f.** As often as we reasonably require:

   (1) Show the damaged property;

   (2) Provide us with records and documents we request and permit us to make copies; and

   (3) Submit to examination under oath, while not in the presence of any other "insured," and sign the same;

A15

g. Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

(1) The time and cause of loss;

(2) The interest of the "insured" and all others in the property involved and all liens on the property;

(3) Other insurance which may cover the loss;

(4) Changes in title or occupancy of the property during the term of the policy;

(5) Specifications of damaged buildings and detailed repair estimates;

(6) The inventory of damaged personal property described in 2.e. above;

(7) Receipts for additional living expenses incurred and records that support the fair rental value loss; and

(8) Evidence or affidavit that supports a claim under the Credit Card, Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

3. **Loss Settlement.** Covered property losses are settled as follows:

a. Property of the following types:

(1) Personal property;

(2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and

(3) Structures that are not buildings;

at actual cash value at the time of loss but not more than the amount required to repair or replace.

b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

(a) The limit of liability under this policy that applies to the building;

(b) The replacement cost of that part of the building damaged for like construction and use on the same premises; or

(c) The necessary amount actually spent to repair or replace the damaged building.

(2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

(a) The actual cash value of that part of the building damaged; or

(b) That proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

(3) To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

(a) Excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

(b) Those supports in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

(c) Underground flues, pipes, wiring and drains.

(4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b.(2) above.

However, if the cost to repair or replace the damage is both:

(a) Less than 5% of the amount of insurance in this policy on the building; and

(b) Less than $2500;

we will settle the loss according to the provisions of b.(1) and b.(2) above whether or not actual repair or replacement is complete.

A16

Copyright, Insurance Services Office, Inc., 1990

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability according to the provisions of this Condition 3. Loss Settlement.

**4. Loss to a Pair or Set.** In case of loss to a pair or set we may elect to:

a. Repair or replace any part to restore the pair or set to its value before the loss; or

b. Pay the difference between actual cash value of the property before and after the loss.

**5. Glass Replacement.** Loss for damage to glass caused by a Peril Insured Against will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

**6. Appraisal.** If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

a. Pay its own appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

**7. Other Insurance.** If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

**8. Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

**9. Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with like property.

**10. Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

a. Reach an agreement with you;

b. There is an entry of a final judgment; or

c. There is a filing of an appraisal award with us.

**11. Abandonment of Property.** We need not accept any property abandoned by an "insured."

**12. Mortgage Clause.**

The word "mortgagee" includes trustee.

If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

a. Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

b. Pays any premium due under this policy on demand if you have neglected to pay the premium; and

c. Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

If we decide to cancel or not to renew this policy, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

If we pay the mortgagee for any loss and deny payment to you:

a. We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

b. At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

A17

13. **No Benefit to Bailee.** We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

14. **Nuclear Hazard Clause.**

   a. "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

   b. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against in Section I.

   c. This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

15. **Recovered Property.** If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

16. **Volcanic Eruption Period.** One or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

## SECTION II – LIABILITY COVERAGES

**COVERAGE E – Personal Liability**

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which the "insured" is legally liable. Damages include prejudgment interest awarded against the "insured"; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the "occurrence" equals our limit of liability.

**COVERAGE F – Medical Payments To Others**

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing "bodily injury." Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except "residence employees." As to others, this coverage applies only:

1. To a person on the "insured location" with the permission of an "insured"; or

2. To a person off the "insured location," if the "bodily injury":

   a. Arises out of a condition on the "insured location" or the ways immediately adjoining;

   b. Is caused by the activities of an "insured";

   c. Is caused by a "residence employee" in the course of the "residence employee's" employment by an "insured"; or

   d. Is caused by an animal owned by or in the care of an "insured."

## SECTION II – EXCLUSIONS

1. **Coverage E – Personal Liability** and **Coverage F – Medical Payments to Others** do not apply to "bodily injury" or "property damage":

   a. Which is expected or intended by the "insured";

   b. Arising out of or in connection with a "business" engaged in by an "insured." This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business";

A18

Copyright, Insurance Services Office, Inc., 1990

c. Arising out of the rental or holding for rental of any part of any premises by an "insured." This exclusion does not apply to the rental or holding for rental of an "insured location":

   (1) On an occasional basis if used only as a residence;

   (2) In part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

   (3) In part, as an office, school, studio or private garage;

d. Arising out of the rendering of or failure to render professional services;

e. Arising out of a premises:

   (1) Owned by an "insured";

   (2) Rented to an "insured"; or

   (3) Rented to others by an "insured";

   that is not an "insured location";

f. Arising out of:

   (1) The ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an "insured";

   (2) The entrustment by an "insured" of a motor vehicle or any other motorized land conveyance to any person; or

   (3) Vicarious liability, whether or not statutorily imposed, for the actions of a child or minor using a conveyance excluded in paragraph (1) or (2) above.

This exclusion does not apply to:

   (1) A trailer not towed by or carried on a motorized land conveyance.

   (2) A motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and:

     (a) Not owned by an "insured"; or

     (b) Owned by an "insured" and on an "insured location";

   (3) A motorized golf cart when used to play golf on a golf course;

   (4) A vehicle or conveyance not subject to motor vehicle registration which is:

     (a) Used to service an "insured's" residence;

     (b) Designed for assisting the handicapped; or

     (c) In dead storage on an "insured location";

g. Arising out of:

   (1) The ownership, maintenance, use, loading or unloading of an excluded watercraft described below;

   (2) The entrustment by an "insured" of an excluded watercraft described below to any person; or

   (3) Vicarious liability, whether or not statutorily imposed, for the actions of a child or minor using an excluded watercraft described below.

Excluded watercraft are those that are principally designed to be propelled by engine power or electric motor, or are sailing vessels, whether owned by or rented to an "insured." This exclusion does not apply to watercraft:

   (1) That are not sailing vessels and are powered by:

     (a) Inboard or inboard-outdrive engine or motor power of 50 horsepower or less not owned by an "insured";

     (b) Inboard or inboard-outdrive engine or motor power of more than 50 horsepower not owned by or rented to an "insured";

     (c) One or more outboard engines or motors with 25 total horsepower or less;

     (d) One or more outboard engines or motors with more than 25 total horsepower if the outboard engine or motor is not owned by an "insured";

     (e) Outboard engines or motors of more than 25 total horsepower owned by an "insured" if:

       (i) You acquire them prior to the policy period; and

         (a) You declare them at policy inception; or

         (b) Your intention to insure is reported to us in writing within 45 days after you acquire the outboard engines or motors.

       (ii) You acquire them during the policy period.

      This coverage applies for the policy period.

   (2) That are sailing vessels, with or without auxiliary power:

     (a) Less than 26 feet in overall length;

     (b) 26 feet or more in overall length, not owned by or rented to an "insured."

A19

(3) That are stored;

h. Arising out of:

  (1) The ownership, maintenance, use, loading or unloading of an aircraft;

  (2) The entrustment by an "insured" of an aircraft to any person; or

  (3) Vicarious liability, whether or not statutorily imposed, for the actions of a child or minor using an aircraft.

An aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

i. Caused directly or indirectly by war, including the following and any consequence of any of the following:

  (1) Undeclared war, civil war, insurrection, rebellion or revolution;

  (2) Warlike act by a military force or military personnel; or

  (3) Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental;

j. Which arises out of the transmission of a communicable disease by an "insured";

k. Arising out of sexual molestation, corporal punishment or physical or mental abuse; or

l. Arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance(s) as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed physician.

Exclusions e., f., g., and h. do not apply to "bodily injury" to a "residence employee" arising out of and in the course of the "residence employee's" employment by an "insured."

2. **Coverage E – Personal Liability**, does not apply to:

a. Liability:

  (1) For any loss assessment charged against you as a member of an association, corporation or community of property owners;

  (2) Under any contract or agreement. However, this exclusion does not apply to written contracts:

    (a) That directly relate to the ownership, maintenance or use of an "insured location"; or

    (b) Where the liability of others is assumed by the "insured" prior to an "occurrence";

    unless excluded in (1) above or elsewhere in this policy;

b. "Property damage" to property owned by the "insured";

c. "Property damage" to property rented to, occupied or used by or in the care of the "insured." This exclusion does not apply to "property damage" caused by fire, smoke or explosion;

d. "Bodily injury" to any person eligible to receive any benefits:

  (1) Voluntarily provided; or

  (2) Required to be provided;

by the "insured" under any:

  (1) Workers' compensation law;

  (2) Non-occupational disability law; or

  (3) Occupational disease law;

e. "Bodily injury" or "property damage" for which an "insured" under this policy:

  (1) Is also an insured under a nuclear energy liability policy; or

  (2) Would be an insured under that policy but for the exhaustion of its limit of liability.

A nuclear energy liability policy is one issued by:

  (1) American Nuclear Insurers;

  (2) Mutual Atomic Energy Liability Underwriters;

  (3) Nuclear Insurance Association of Canada;

or any of their successors; or

f. "Bodily injury" to you or an "insured" within the meaning of part a. or b. of "insured" as defined.

3. **Coverage F – Medical Payments to Others,** does not apply to "bodily injury":

a. To a "residence employee" if the "bodily injury":

  (1) Occurs off the "insured location"; and

  (2) Does not arise out of or in the course of the "residence employee's" employment by an "insured";

A20

Copyright, Insurance Services Office, Inc., 1990

b. To any person eligible to receive benefits:

   (1) Voluntarily provided; or

   (2) Required to be provided;

  under any:

   (1) Workers' compensation law;

   (2) Non-occupational disability law; or

   (3) Occupational disease law;

c. From any:

   (1) Nuclear reaction;

   (2) Nuclear radiation; or

   (3) Radioactive contamination;

  all whether controlled or uncontrolled or however caused; or

   (4) Any consequence of any of these; or

d. To any person, other than a "residence employee" of an "insured," regularly residing on any part of the "insured location."

---

## SECTION II – ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses.** We pay:

  a. Expenses we incur and costs taxed against an "insured" in any suit we defend;

  b. Premiums on bonds required in a suit we defend, but not for bond amounts more than the limit of liability for Coverage E. We need not apply for or furnish any bond;

  c. Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) up to $50 per day, for assisting us in the investigation or defense of a claim or suit; and

  d. Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

2. **First Aid Expenses.** We will pay expenses for first aid to others incurred by an "insured" for "bodily injury" covered under this policy. We will not pay for first aid to you or any other "insured."

3. **Damage to Property of Others.** We will pay, at replacement cost, up to $500 per "occurrence" for "property damage" to property of others caused by an "insured."

We will not pay for "property damage":

  a. To the extent of any amount recoverable under Section I of this policy;

  b. Caused intentionally by an "insured" who is 13 years of age or older;

  c. To property owned by an "insured";

  d. To property owned by or rented to a tenant of an "insured" or a resident in your household; or

  e. Arising out of:

   (1) A "business" engaged in by an "insured";

   (2) Any act or omission in connection with a premises owned, rented or controlled by an "insured," other than the "insured location"; or

   (3) The ownership, maintenance, or use of aircraft, watercraft or motor vehicles or all other motorized land conveyances.

    This exclusion does not apply to a motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and not owned by an "insured."

4. **Loss Assessment.** We will pay up to $1000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of:

  a. "Bodily injury" or "property damage" not excluded under Section II of this policy; or

  b. Liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided:

   (1) The director, officer or trustee is elected by the members of a corporation or association of property owners; and

   (2) The director, officer or trustee serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

This coverage applies only to loss assessments charged against you as owner or tenant of the "residence premises."



A21

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

Regardless of the number of assessments, the limit of $1000 is the most we will pay for loss arising out of:

a. One accident, including continuous or repeated exposure to substantially the same general harmful condition; or

b. A covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

The following do not apply to this coverage:

1. Section II – Coverage E – Personal Liability Exclusion 2.a.(1);

2. Condition 1. Policy Period, under SECTIONS I AND II – CONDITIONS.

## SECTION II – CONDITIONS

1. **Limit of Liability.** Our total liability under Coverage E for all damages resulting from any one "occurrence" will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of "insureds," claims made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence."

   Our total liability under Coverage F for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the limit of liability for Coverage F as shown in the Declarations.

2. **Severability of Insurance.** This insurance applies separately to each "insured." This condition will not increase our limit of liability for any one "occurrence."

3. **Duties After Loss.** In case of an accident or "occurrence," the "insured" will perform the following duties that apply. You will help us by seeing that these duties are performed:

   a. Give written notice to us or our agent as soon as is practical, which sets forth:

   (1) The identity of the policy and "insured";

   (2) Reasonably available information on the time, place and circumstances of the accident or "occurrence"; and

   (3) Names and addresses of any claimants and witnesses;

   b. Promptly forward to us every notice, demand, summons or other process relating to the accident or "occurrence";

   c. At our request, help us:

   (1) To make settlement;

   (2) To enforce any right of contribution or indemnity against any person or organization who may be liable to an "insured";

   (3) With the conduct of suits and attend hearings and trials; and

   (4) To secure and give evidence and obtain the attendance of witnesses;

   d. Under the coverage – Damage to Property of Others – submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in the "insured's" control;

   e. The "insured" will not, except at the "insured's" own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the "bodily injury."

4. **Duties of an Injured Person – Coverage F – Medical Payments to Others.**

   The injured person or someone acting for the injured person will:

   a. Give us written proof of claim, under oath if required, as soon as is practical; and

   b. Authorize us to obtain copies of medical reports and records.

   The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

5. **Payment of Claim – Coverage F – Medical Payments to Others.** Payment under this coverage is not an admission of liability by an "insured" or us.

A22

Copyright, Insurance Services Office, Inc., 1990

HO 00 03 04 91
41.21725.hpolprdirain 6/14 9:48 .007

**6. Suit Against Us.** No action can be brought against us unless there has been compliance with the policy provisions.

No one will have the right to join us as a party to any action against an "insured." Also, no action with respect to Coverage E can be brought against us until the obligation of the "insured" has been determined by final judgment or agreement signed by us.

**7. Bankruptcy of an Insured.** Bankruptcy or insolvency of an "insured" will not relieve us of our obligations under this policy.

**8. Other Insurance – Coverage E – Personal Liability.** This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

## SECTIONS I AND II – CONDITIONS

**1. Policy Period.** This policy applies only to loss in Section I or "bodily injury" or "property damage" in Section II, which occurs during the policy period.

**2. Concealment or Fraud.** The entire policy will be void if, whether before or after a loss, an "insured" has:

    **a.** Intentionally concealed or misrepresented any material fact or circumstance;

    **b.** Engaged in fraudulent conduct; or

    **c.** Made false statements;

relating to this insurance.

**3. Liberalization Clause.** If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

This Liberalization Clause does not apply to changes implemented through introduction of a subsequent edition of our policy.

**4. Waiver or Change of Policy Provisions.**

A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

**5. Cancellation.**

    **a.** You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

    **b.** We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations.

    Proof of mailing will be sufficient proof of notice.

    **(1)** When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

    **(2)** When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

    **(3)** When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

        **(a)** If there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

        **(b)** If the risk has changed substantially since the policy was issued.

        This can be done by letting you know at least 30 days before the date cancellation takes effect.

    **(4)** When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 30 days before the date cancellation takes effect.

    **c.** When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

    **d.** If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

**6. Nonrenewal.** We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

**7. Assignment.** Assignment of this policy will not be valid unless we give our written consent.

A23

8. **Subrogation.** An "insured" may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an "insured" must sign and deliver all related papers and cooperate with us.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death.** If any person named in the Declarations or the spouse, if a resident of the same household, dies:

a. We insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

b. "Insured" includes:

(1) Any member of your household who is an "insured" at the time of your death, but only while a resident of the "residence premises"; and

(2) With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

A24

Copyright, Insurance Services Office, Inc., 1990

HO 00 03 04 91
43.21727.hpolprdiraig.6/14.9:48  007

## Mortgagees

CITI MORTGAGE INC
PO BOX 7706
SPRINGFIELD, OH 45501
0017656901

CITI MORTGAGE INC
PO BOX 7706
SPRINGFIELD, OH 45501
002001066049

## Important Messages

These Declarations are not the entire insurance policy. All information contained in the Declarations regarding the insured, covered property, coverage limits, deductibles, and premium charges is subject to the specific terms and conditions of the policy contract. Please read your policy contract and amendments carefully.



A25

**AIG Homeowners Insurance Program**
99 Bedford Street
Boston, MA 02111-2217
Tel. 1-(866) 342-2076  Fax 1-(866) 360-3202

## Payment Plan Options

Below are the payment plan options offered and payment methods that are available.

### Option 1: Full Pay

Total policy premium to be paid in full.  You do not have to pay any installment fees.

You may use one of the following payment methods to pay your policy premium in full:

- Pay By Credit Card
  - VISA
  - MasterCard
  - American Express
  - Discover
- Pay By Check
- Pay By Autocheck (one time premium deduction from your checking account)

### Option 2: 10 Pay Plan

Total policy premium to be paid in installments.  A down payment of 25% is required with 9 equal installments.   Depending on your state, there may be a fee applied to the monthly installments. *

You may use one of the following payment methods to make your 25% initial premium payment:

- Pay By Credit Card
  - VISA
  - MasterCard
  - American Express
  - Discover
- Pay By Check
- Pay By AutoCheck (one time premium deduction from your checking account)
- Pay By Recurring AutoCheck (premium payments are withdrawn automatically from your checking account each month beginning with your first payment)**

*Please consult your bill notice for your state specific fee assessment.
**Sign the AutoCheck Authorization form and return with a voided check to start automatic deductions.  There may be a service fee applied.

### Option 3: Mortgage Company Payments

Total policy premium to be paid in full by your mortgage company. *  You do not have to pay any installment fees.

*Your mortgage company must collect a portion of your homeowner's premium each month as part of your mortgage payment.

### Choose Your Payment Plan (Indicate desired payment schedule)

- ☐ One Pay – Full Payment
- ☐ Ten Pay – 25% down plus 9 installments (installment fees may apply)
- ☐ One Pay – Full Payment By Your Mortgage Company

A26

# Payment Method

Please check the appropriate box to indicate the payment method being used to make your first premium payment.  If you have elected the one payment plan, you will be required to make a full premium payment.

☐ Charge my Visa, MasterCard, American Express or Discover (circle one)

Credit Card # _____

Expiration Date _____

Signature _____     Date _____

*Required on all credit card payments*

Charge my card (circle one):  25% down payment or full payment

☐ Check or money order payable to *Homesite Insurance*

☐ AutoCheck (One time deduction from your checking account for the first payment required)

Bank Name _____

Bank Routing Number _____

Bank Account Number _____

Deduct from my checking account (circle one): 25% down payment or full payment

☐ Recurring AutoCheck (Premium payments are withdrawn automatically from your checking account)*
*To start, sign the enclosed AutoCheck authorization form and return with a voided check.
There may a service fee applied.*

*\*Enroll only if you selected the ten payment plan.*

☐ Bill My Mortgage Company

Company Name _____

Company Address _____

State _____     Zip Code _____

Loan Number _____
*Required*

A27

AIG Homeowners Insurance Program

99 Bedford Street
Boston, MA 02111-2217
Tel. 1-(866) 342-2045 Fax 1-(866) 360-3202

*Policy Contract Pack*

*Important information about your AIG Policy*



# Thank You for choosing AIG Homeowners Insurance Program

### You have selected Special Form (HO 00 03 0491).

**The following State Amendatory Endorsements may modify your contract.
Please review the information in this package carefully.**

**If you have any questions regarding the information contained in this package, please
call us at 1-(866) 342-2045.**

A28

A29

HOMEOWNERS
HO 04 90 04 91

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PERSONAL PROPERTY REPLACEMENT COST

### SECTION I

For an additional premium, covered losses to the following property are settled at replacement cost at the time of loss:

a. Coverage C – Personal Property;

b. If covered in this policy, awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings.

Personal Property Replacement Cost coverage will also apply to the following articles or classes of property if they are separately described and specifically insured in this policy:

a. Jewelry;

b. Furs and garments trimmed with fur or consisting principally of fur;

c. Cameras, projection machines, films and related articles of equipment;

d. Musical equipment and related articles of equipment;

e. Silverware, silver-plated ware, goldware, gold-plated ware and pewterware, but excluding pens, pencils, flasks, smoking implements or jewelry; and

f. Golfer's equipment meaning golf clubs, golf clothing and golf equipment.

Personal Property Replacement Cost coverage will not apply to other classes of property separately described and specifically insured.

### 1. PROPERTY NOT ELIGIBLE

Property listed below is not eligible for replacement cost settlement. Any loss will be settled at actual cash value at the time of loss but not more than the amount required to repair or replace.

a. Antiques, fine arts, paintings and similar articles of rarity or antiquity which cannot be replaced.

b. Memorabilia, souvenirs, collectors items and similar articles whose age or history contribute to their value.

c. Articles not maintained in good or workable condition.

d. Articles that are outdated or obsolete and are stored or not being used.

### 2. REPLACEMENT COST

The following loss settlement procedure applies to all property insured under this endorsement:

a. We will pay no more than the least of the following amounts:

(1) Replacement cost at the time of loss without deduction for depreciation;

(2) The full cost of repair at the time of loss;

(3) The limit of liability that applies to Coverage C, if applicable;

(4) Any applicable special limits of liability stated in this policy; or

(5) For loss to any item separately described and specifically insured in this policy, the limit of liability that applies to the item.

b. When the replacement cost for the entire loss under this endorsement is more than $500, we will pay no more than the actual cash value for the loss or damage until the actual repair or replacement is complete.

c. You may make a claim for loss on an actual cash value basis and then make claim within 180 days after the loss for any additional liability in accordance with this endorsement.

All other provisions of this policy apply.



A30

HOMEOWNERS
HO 04 20 06 94

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SPECIFIED ADDITIONAL AMOUNT OF INSURANCE FOR
# COVERAGE A - DWELLING

### Forms HO 00 02 and HO 00 03 Only

**(Applies only when loss to dwelling building exceeds the
Coverage A Limit of Liability shown in the Declarations)**

To the extent that coverage is provided, we agree to provide an additional amount of insurance in accordance with the following provisions:

A. If you have:

1. Allowed us to adjust the Coverage A limit of liability and the premium in accordance with:
   a. The property evaluations we make; and
   b. Any increases in inflation; and
2. Notified us, within 30 days of completion, of any improvements, alterations or additions to the dwelling building which increase the replacement cost of the dwelling building by 5% or more;

the provisions of this endorsement will apply after a loss, provided you elect to repair or replace the damaged or destroyed dwelling building.

B. If there is a loss to the dwelling building that exceeds the Coverage A limit of liability shown in the Declarations, for the purpose of settling that loss only:

1. We will provide an additional amount of insurance, up to 25%* of the Coverage A limit of liability; and
2. The Section I Condition 3. Loss Settlement paragraph **b.** is deleted and replaced by paragraphs **b., c.,** and **d.** as follows:

b. The dwelling building under Coverage A at replacement cost without deduction for depreciation. We will pay no more than the smallest of the following amounts for like construction and use on the same premises:

(1) The replacement cost of that part of the dwelling building damaged or destroyed;

(2) The necessary amount actually spent to repair or replace the damaged or destroyed dwelling building; or

(3) The limit of liability under this policy that applies to the dwelling building, plus any additional amount provided by this endorsement.

c. We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.

d. You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to the dwelling building on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability on a replacement cost basis.

* Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

A31

HO 04 20 06 94
Policy Number 30318013

Copyright, Insurance Services Office, Inc., 1994

Page 1 of 1
55.21739.hpolprdiraig.6/14.9:48 007

HOMEOWNERS
HO 04 16 04 91

# PREMISES ALARM OR
# FIRE PROTECTION SYSTEM

For a premium credit, we acknowledge the installation of an alarm system or automatic sprinkler system approved by us on the "residence premises."  You agree to maintain this system in working order and to let us know promptly of any change made to the system or if it is removed.



A32

HOMEOWNERS
HO 04 98 04 91

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## REFRIGERATED PROPERTY COVERAGE

For an additional premium, we insure, up to $500, covered property stored in freezers or refrigerators on the "residence premises" for direct loss caused by:

1. Interruption of electrical service to the refrigeration unit. The interruption must be caused by damage to the generating or transmitting equipment; or

2. Mechanical failure of the unit storing the property.

Coverage will apply only if you have maintained the refrigeration unit in proper working condition immediately prior to the loss.

This endorsement does not increase the limit of liability for Coverage C — Personal Property.

The Section I — Power Failure exclusion does not apply to this coverage.

**Special Deductible**

The following deductible applies to covered loss to refrigerated property:

We will pay only that part of the loss that exceeds $100.  No other deductible applies to this coverage.

All other provisions of this policy apply.



A33

HOMEOWNERS
HO 04 96 04 91

## <u>NO</u> SECTION II – LIABILITY COVERAGES FOR HOME DAY CARE BUSINESS
## <u>LIMITED</u> SECTION I – PROPERTY COVERAGES FOR HOME DAY CARE BUSINESS

If an "insured" regularly provides home day care services to a person or persons other than "insureds" and receives monetary or other compensation for such services, that enterprise is a "business." Mutual exchange of home day care services, however, is not considered compensation. The rendering of home day care services by an "insured" to a relative of an "insured" is not considered a "business."

Therefore, with respect to a home day care enterprise which is considered to be a "business," this policy:

1. Does not provide Section II – Liability Coverages because a "business" of an "insured" is excluded under exclusion **1.b.** of Section II – Exclusions;

2. Does not provide Section I – Coverage B coverage where other structures are used in whole or in part for "business";

3. Limits coverage for property used on the "residence premises" for the home day care enterprise to $2,500, because Coverage C – Special Limits of Liability – item **8.** imposes that limit on "business" property on the "residence premises." (Item **8.** corresponds to item **5.** in Form **HO 00 08.**);

4. Limits coverage for property used away from the "residence premises" for the home day care enterprise to $250, because Coverage C – Special Limits of Liability – item **9.** imposes that limit on "business" property away from the "residence premises." Special Limit of Liability item **9.** does not apply to adaptable electronic apparatus as described in Special Limit of Liability items **10.** and **11.** (Items **9., 10.** and **11.** correspond to items **6., 7.** and **8.** respectively in Form **HO 00 08.**)

THIS ENDORSEMENT DOES **NOT** CONSTITUTE A REDUCTION OF COVERAGE.



381 25173

A34

c.  Number of persons whose property is damaged;

d.  Number of "insureds"; or

e.  Number of "occurrences" or claims-made

This sublimit is within, but does not increase, the Coverage E limit of liability. It applies separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations.

With respect to damages arising out of "fungi", wet or dry rot, or bacteria described in **1.** Limit Of Liability of this endorsement, Condition **2. Severability Of Insurance** is deleted and replaced by the following:

**2.  Severability Of Insurance**

This insurance applies separately to each "insured" except with respect to the Aggregate Sublimit of Liability described in this endorsement under Section II - Conditions **1.** Limit Of Liability. This condition will not increase the limit of liability for this coverage.

**SECTION I AND II CONDITIONS**

Condition 1. Policy Period is deleted and replaced by the following:

**1.  Policy Period**

This policy applies only to loss or costs in Section I or "bodily injury" or "property damage" in Section II, which occurs during the policy period.

All other provisions of the policy apply.



**HO 04 32 05 02**
Policy Number 30318013

Copyright, Insurance Services Office, Inc., 2002

**Page 3 of 3**
51.21735.hpolprdiraig.6/14.9:48 007.

HOMEOWNERS
HO 04 32 05 02

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LIMITED FUNGI, WET OR DRY ROT, OR BACTERIA COVERAGE

### FOR USE WITH FORM HO 00 03

### SCHEDULE*

| | These limits of liability apply to the total of all loss or costs payable under this endorsement, regardless of the number of "occurrences", the number of claims-made, or the number of locations insured under this endorsement and listed in this Schedule. | |
|---|---|---|
| 1. | Section I - Property Coverage Limit Of Liability for the Additional Coverage "Fungi", Wet Or Dry Rot, Or Bacteria | $2,500 |
| 2. | Section II - Coverage E Aggregate Sublimit Of Liability for "Fungi", Wet Or Dry Rot, Or Bacteria | $25,000 |

*Entries may be left blank if shown elsewhere in this policy for this coverage.

## DEFINITIONS

The following definition is added:

**"Fungi"**

**a.** "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**b.** Under Section II, this does not include any fungi that are, are on, or are contained in, a good or product intended for consumption.

## SECTION I - PROPERTY COVERAGES

## ADDITIONAL COVERAGES

The following Additional Coverage is added:

**12. "Fungi", Wet Or Dry Rot, Or Bacteria**

**a.** The amount shown in the Schedule above is the most we will pay for:

(1) The total of all loss payable under Section I - Property Coverages caused by "fungi", wet or dry rot, or bacteria;

(2) The cost to remove "fungi", wet or dry rot, or bacteria from property covered under Section I - Property Coverages;

(3) The cost to tear out and replace any part of the building or other covered property as needed to gain access to the "fungi", wet or dry rot, or bacteria; and

(4) The cost of testing of air or property to confirm the absence, presence or level of "fungi", wet or dry rot, or bacteria, whether performed prior to, during or after removal, repair, restoration or replacement. The cost of such testing will be provided only to the extent that there is a reason to believe that there is the presence of fungi, wet or dry rot, or bacteria.

**b.** The coverage described in **12.a.** only applies when such loss or costs are a result of a Peril Insured Against that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at and after the time the Peril Insured Against occurred.

A36

Copyright, Insurance Services Office, Inc., 2002

c. The amount shown in the Schedule for this coverage is the most we will pay for the total of all loss or costs payable under this Additional Coverage regardless of the:

(1) Number of locations insured under this endorsement; or

(2) Number of claims-made.

d. If there is covered loss or damage to covered property, not caused, in whole or in part, by "fungi", wet or dry rot, or bacteria, loss payment will not be limited by the terms of this Additional Coverage, except to the extent that "fungi", wet or dry rot, or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Additional Coverage.

This coverage does not increase the limit of liability applying to the damaged covered property.

## SECTION I - PERILS INSURED AGAINST

## COVERAGE A - DWELLING AND COVERAGE B - OTHER STRUCTURES

Paragraph **2.e.(3)** is deleted and replaced by the following:

(3) Smog, rust or other corrosion;

Paragraph **2.e.(9)** is added:

(9) Constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, and the resulting damage is unknown to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

## COVERAGE C - PERSONAL PROPERTY

Paragraph **12.d** is added:

d. Caused by constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

## SECTION I - EXCLUSIONS

Exclusion **1.i.** is added.

i. **"Fungi", Wet Or Dry Rot, Or Bacteria**

"Fungi", Wet Or Dry Rot, Or Bacteria meaning the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot, or bacteria.

This exclusion does not apply:

(1) When "fungi", wet or dry rot, or bacteria results from fire or lightning; or

(2) To the extent coverage is provided for in the "Fungi", Wet Or Dry Rot, Or Bacteria Additional Coverage under Section I - Property Coverages with respect to loss caused by a Peril Insured Against other than fire or lightning.

Direct loss by a Peril Insured Against resulting from "fungi", wet or dry rot, or bacteria is covered.

## SECTION II - CONDITIONS

Condition **1. Limit Of Liability** is deleted and replaced by the following:

1. **Limit Of Liability**

Our total liability under Coverage E for all damages resulting from any one "occurrence" will not be more than the Coverage E limit of liability shown in the Declarations. This limit is the same regardless of the number of "insureds", claims-made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions will be considered to be the result of one "occurrence".

Our total liability under Coverage F for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the Coverage F limit of liability shown in the Declarations.

However, our total liability under Coverage E for the total of all damages arising directly or indirectly, in whole or in part, out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi", wet or dry rot, or bacteria will not be more than the Section II - Coverage E Aggregate Sublimit Of Liability for "Fungi", Wet Or Dry Rot, Or Bacteria. That sublimit is the amount shown in the Schedule. This is the most we will pay regardless of the:

a. Number of locations insured under the policy to which this endorsement is attached;

b. Number of persons injured;

b. The requirements of which result in a loss in value to property; or

c. Requiring any "insured" or others to test for, monitor, clean up, remove, contain, treat, de-toxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This exclusion applies whether or not the property has been physically damaged.

(This is Exclusion 1.a. in Form HO 00 03.)

2. **Earth Movement** is deleted and replaced by the following:

2. Earth Movement, meaning earthquake, including land shock waves or tremors before, during or af-ter a volcanic eruption; landslide; mine subsidence; mudflow; earth sinking, rising or shifting; unless di-rect loss by:

a. Fire; or

b. Explosion;

ensues and then we will pay only for the ensuing loss.

(This is Exclusion 1.b. in Form HO 00 03.)

4. **Power Failure** is deleted and replaced by the following:

4. Power Failure, meaning the failure of power or other utility service if the failure takes place off the "residence premises". But if the failure of power or other utility service results in a loss, from a Peril Insured Against on the "residence premises", we will pay for the loss or damage caused by that Peril Insured Against.

(This is Exclusion 1.d. in Form HO 00 03.)

## SECTION I – CONDITIONS

3. **Loss Settlement**

Under Form HO 00 06, Item b.(2) is deleted and replaced by the following:

(2) If the damage is not repaired or replaced within a reasonable time, at actual cash value but not more than the amount re-quired to repair or replace.

## SECTION II – LIABILITY COVERAGES

**Under Coverage E – Personal Liability, Item 2.** is deleted and replaced by the following:

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the "occurrence" has been exhausted by payment of judgments or settlements.

(This paragraph also replaces Paragraph **2.** in Farmers Personal Liability Endorsement HO 24 73 and Paragraph **D.3.b.** in Property Remediation For Escaped Liquid Fuel And Limited Lead And Es-caped Liquid Fuel Liability Coverages Endorse-ments HO 05 80, HO 05 81, and HO 05 82 when such endorsements are made part of this policy.)

## SECTION II – EXCLUSIONS

Under **1. Coverage E – Personal Liability** and **Cov-erage F – Medical Payments To Others,** Item **a.** is deleted and replaced by the following:

a. Which is expected or intended by one or more "insureds";

## SECTIONS I AND II – CONDITIONS

2. **Concealment or Fraud** is deleted and replaced by the following:

2. **Concealment Or Fraud**

a. Under Section I – Property Coverages, with respect to all "insureds" covered under this pol-icy, we provide no coverage for loss under Sec-tion I – Property Coverages if, whether before or after a loss, one or more "insureds" have:

(1) Intentionally concealed or misrepresented any material fact or circumstance;

(2) Engaged in fraudulent conduct; or

(3) Made false statements;

relating to this insurance.

b. Under Section II – Liability Coverages, we do not provide coverage to one or more "insureds" who, whether before or after a loss, have:

(1) Intentionally concealed or misrepresented any material fact or circumstance;

(2) Engaged in fraudulent conduct; or

(3) Made false statements;

relating to this insurance.



A38

**5. Cancellation**

The first two paragraphs of Item **b.** and Item **b.**(3) are deleted and replaced by the following:

**b.** We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you or mailed to you at your last known address.

Proof of mailing will be sufficient proof of notice.

**(3)** When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

**(a)** If there has been a material misrepresentation of fact, made by or with the knowledge of the named insured, which if known to us would have caused us not to issue the policy; or

**(b)** If the risk has changed substantially since the policy was issued.

This can be done by letting you know at least 30 days before the date cancellation takes effect.

The following is added to Paragraphs **b.**(2), (3) and (4):

However, if any one of the following conditions exist at any building that is covered in this policy, we may cancel this policy by letting you know at least 5 days before the date cancellation takes effect.

**(a)** The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

**(i)** Seasonal unoccupancy; or

**(ii)** Buildings in the course of construction, renovation or addition.

Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

**(b)** After damage by a covered peril, permanent repairs to the building:

**(i)** Have not started; and

**(ii)** Have not been contracted for;

within 30 days of payment of loss.

**(c)** The building has:

**(i)** An outstanding order to vacate;

**(ii)** An outstanding demolition order; or

**(iii)** Been declared unsafe by governmental authority.

**(d)** Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to removal that is necessary or incidental to any renovation or remodeling.

**(e)** Failure to:

**(i)** Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

**(ii)** Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

**6. Nonrenewal** is deleted and replaced by the following:

**6. Nonrenewal**

We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your last known address, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

All other provisions of this policy apply.

A39

Copyright, Insurance Services Office, Inc., 1998

HOMEOWNERS
HO 01 07 12 98

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SPECIAL PROVISIONS – DELAWARE

**SECTION I – PROPERTY COVERAGES**

**COVERAGE C – PERSONAL PROPERTY**

**SPECIAL LIMITS OF LIABILITY**

Items **10.** and **11.** are deleted and replaced by the following:

10. $1,000 for loss to electronic apparatus, while in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power. Electronic apparatus includes:

   a. Accessories or antennas; or

   b. Tapes, wires, records, discs or other media;

   for use with any electronic apparatus described in this Item **10.**

11. $1,000 for loss to electronic apparatus, while not in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus:

   a. Is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power;

   b. Is away from the "residence premises"; and

   c. Is used at any time or in any manner for any "business" purpose.

   Electronic apparatus includes:

   a. Accessories and antennas; or

   b. Tapes, wires, records, discs or other media;

   for use with any electronic apparatus described in this Item **11.**

**PROPERTY NOT COVERED**

Item **3.b.** is deleted and replaced by the following:

3. Motor vehicles or all other motorized land conveyances. This includes:

   b. Electronic apparatus that is designed to be operated solely by use of the power from the electrical system of motor vehicles or all other motorized land conveyances. Electronic apparatus includes:

      (1) Accessories or antennas; or

      (2) Tapes, wires, records, discs or other media;

      for use with any electronic apparatus described in this Item **3.b.**

      The exclusion of property described in **3.a.** and **3.b.** above applies only while the property is in or upon the vehicle or conveyance.

   We do cover vehicles or conveyances not subject to motor vehicle registration which are:

   a. Used to service an "insured's" residence; or

   b. Designed for assisting the handicapped;

**COVERAGE D – LOSS OF USE**

Item **1.** is deleted and replaced by the following:

1. If a loss covered under this Section makes that part of the "residence premises" where you reside not fit to live in, we cover the Additional Living Expense, meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

   Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

**ADDITIONAL COVERAGES**

9. **Glass or Safety Glazing Material** is deleted and replaced by the following:

9. **Glass Or Safety Glazing Material**

   a. We cover:

      (1) The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window;

      (2) The breakage, caused directly by Earth Movement, of glass or safety glazing material which is part of a covered building, storm door or storm window; and

      (3) The direct physical loss to covered property caused solely by the pieces, fragments or splinters of broken glass or safety glazing material which is part of a building, storm door or storm window.



A40

b. This coverage does not include loss:

(1) To covered property which results because the glass or safety glazing material has been broken, except as provided in a.(3) above; or

(2) On the "residence premises" if the dwelling has been vacant for more than 30 consecutive days immediately before the loss, except when the breakage results directly from Earth Movement as provided for in a.(2) above. A dwelling being constructed is not considered vacant.

Loss to glass covered under this Additional Coverage 9. will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

For Forms HO 00 01 and HO 00 08, we will pay up to $100 for loss under this coverage.

This coverage does not increase the limit of liability that applies to the damaged property.

(This is Additional Coverage 8. in Forms HO 00 01 and HO 00 08.)

The following Additional Coverage is added to all forms except HO 00 08. With respect to Form HO 00 04, the words 'covered building' used below, refer to property covered under Additional Coverage 10. Building Additions And Alterations.

11. Ordinance Or Law

a. You may use up to 10% of the limit of liability that applies to Coverage A (or for Form HO 00 04, you may use up to 10% of the limit of liability that applies to Building Additions And Alterations) for the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:

(1) The construction, demolition, remodeling, renovation or repair of that part of a covered building or other structure damaged by a Peril Insured Against;

(2) The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a Peril Insured Against to another part of that covered building or other structure; or

(3) The remodeling, removal or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a Peril Insured Against.

b. You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in a. above.

c. We do not cover:

(1) The loss in value to any covered building or other structure due to the requirements of any ordinance or law; or

(2) The costs to comply with any ordinance or law which requires any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants on any covered building or other structure.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This coverage is additional insurance.

(This is Additional Coverage 10. in Forms HO 00 01 and HO 00 06.)

SECTION I – EXCLUSIONS

1. Ordinance or Law is deleted and replaced by the following:

1. Ordinance Or Law, meaning any ordinance or law:

a. Requiring or regulating the construction, demolition, remodeling, renovation or repair of property, including removal of any resulting debris. This Exclusion 1.a. does not apply to the amount of coverage that may be provided for under Additional Coverages, Glass Or Safety Glazing Material or Ordinance Or Law;

A41

Copyright, Insurance Services Office, Inc., 1998

Homesite Insurance Company                                    HOMEOWNERS
                                                              HH 80 06 11 01

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### WINDSTORM OR HAIL FIXED-DOLLAR DEDUCTIBLE

**Windstorm or Hail
Deductible Amount***
$  500

For the premium charged, we will pay only that part of the total of the loss for all Section I Property Coverages that exceeds the windstorm or hail deductible stated in this endorsement. This deductible applies in the event of direct physical loss to property covered under this policy caused directly or indirectly by windstorm or hail. Such deductible applies regardless of any other cause or event contributing concurrently or in any sequence to the loss. No other deductible provision in the policy applies to direct physical loss caused by windstorm or hail.

*Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.



381  25163

A42

HH 80 06 11 01          Includes copyrighted material of Insurance Services Office, Inc.
                                    with its permission.
                        Copyright, Insurance Services Office, Inc., 1996          **Page 1 of 1.**

Policy Number 30318013                                   44.21728.hpolprdiraig.6/14.9:48 007



# RESERVATION-OF-RIGHTS LETTER

June 27, 2006

Joseph and Catherine Jadczak
29555 Eagles Crest Drive
Milton, Delaware 19968-3621

      **Re:**  **Claim of Joseph and Catherine Jadczak**
           CLAIM No. 1038220
           POLICY No. 30318013
           D/Loss: 5/29/2006

Dear Mr. and Mrs. Jadczak:

    We have identified several issues during our investigation of this claim which may preclude some or all insurance coverage for this loss. We therefore write now to bring these issues to your attention.

    We write to you now to specifically reserve our right to raise any and all policy terms, conditions, and exclusions to contest coverage for insurance proceeds you request for this claim. We do not intend the coverage issues and potential defenses identified in this letter to be exhaustive or exclusive. You should not construe anything that either does, or does not, appear in this letter as a waiver by Homesite of any of its rights to contest coverage for this matter. Homesite will provide you with a coverage determination upon completion of our investigation.

    Please allow me to explain the basis for this Reservation-of-Rights letter.

## THE MAY 29, 2006 LOSS

    This claim arises from an alleged fire which occurred in a hangar located on your property on 5/29/06. The fire allegedly damaged the hangar and property contained inside the structure. Your house and driveway may have also been damaged as a result of the fire. You reported this loss to us on 5/30/06.

    We have been advised that a recreational vehicle and a small aircraft were inside the hangar. We understand that you removed the aircraft from the hangar, but the recreational vehicle was allegedly damaged by the fire.

Reservation-of-Rights Letter
Claim No. 1038220
June 27, 2006
Page 2 of 10

_____

The cause of the fire is unknown at this point.  We have been advised that local and state fire marshals are currently involved in an investigation surrounding the circumstances of the fire.  We understand, however, that an old battery charger was plugged into the recreational vehicle at the time of the fire.  We also understand that the battery charger may have been plugged into the recreational vehicle for at least three (3) years.

## THE HOMESITE POLICY

### A.    Exclusions.

As you know, we insured you under a standard homeowner's policy (HO-3), being policy number 30318013.  Although this is a so-called all-risk policy, there are certain exclusions to coverage.  These exclusions begin on page 6 of your policy.  These exclusions say, in relevant part, that we insure against risk of direct loss to property described in **Coverages A** and **B** only if that loss is a physical loss to property.  We do not insure for loss involving collapse caused by:

    **e.**  Any of the following:

        **(1)**  Wear and tear, marring, deterioration;

        **(2)**  Inherent vice, latent defect, mechanical breakdown;

See **SECTION I – PERILS INSURED AGAINST, COVERAGE A – DWELLING and COVERAGE B – OTHER STRUCTURES, ¶ 2.e.(1)-(2)**, p. 7 of policy.

We must reserve the right to rely upon these exclusions in response to your request for coverage for this claim.

We must now direct your attention to the exclusions that begin on p. 8 of your policy.  These exclusions say, in relevant part, that we do not insure against loss caused directly or indirectly by any of the following.  Such loss is excluded, regardless of any other cause or event contributing concurrently or in any sequence to the loss:

        **e.**  **Neglect,** meaning neglect of the 'insured' to use all reasonable means to save and preserve property at and after the time of a loss.

Reservation-of-Rights Letter
Claim No. 1038220
June 27, 2006
Page 3 of 10

---

See **SECTION I – EXCLUSIONS, ¶ 1.e.,** p. 9 of policy.

If we find that your neglect caused a loss either directly or indirectly, we will deny all coverage for this claim under every section of the insurance policy. We must therefore reserve our right to raise this exclusion in response to your request for coverage for this claim.

Similar to the neglect exclusion, the intentional loss exclusion bars coverage for an intentional act committed by an insured with the intent to cause a loss. The exclusions say that we do not insure for:

> **h. Intentional Loss,** meaning any loss arising out of any act committed:
>
> **(1)** By or at the direction of an 'insured'; and
>
> **(2)** With the intent to cause a loss.

See **SECTION I – EXCLUSIONS, ¶ 1.h.,** p. 9 of policy.

If we discover that you played a role in the intentional destruction of the insured property, we will, pursuant to this provision, deny all insurance coverage for this claim under every section of the insurance policy. We must therefore specifically reserve the right to raise these policy exclusions in response to your request for coverage for this claim.

We are also reserving our right to deny coverage for this loss pursuant to the faulty, inadequate, or defective-maintenance exclusion found on page 9 of your policy. This exclusion says:

> **c. Faulty, inadequate or defective:**
>
> **(1)** Planning, zoning, development, surveying, siting;
>
> **(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
>
> **(3)** Materials used in repair, construction, renovation or remodeling; or
>
> **(4)** Maintenance;
>
> Of part or all of any property whether on or off the

Reservation-of-Rights Letter
Claim No. 1038220
June 27, 2006
Page 4 of 10

_____

'residence premises.'

See **SECTION I – EXCLUSIONS, ¶ 2.c.,** p. 9 of policy.

If we discover that the property losses claimed under **COVERAGES A** or **B** were caused by poor maintenance by you, or faulty materials in repair or construction of the property, coverage will be denied.

### B.  Other Structures – Coverage B.

We must now advise you of our property coverage under **Coverage B** of the policy.  The policy says:

> We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

> This coverage does not apply to land, including land on which the other structures are located.

> We do not cover other structures:

> 1.  Used in whole or in part for "business"; or

> 2.  Rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

> This limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A.  Use of this coverage does not reduce the Coverage A limit of liability.

See **SECTION I – Property Coverages – COVERAGE B – Other Structures,** p 2 of policy.

The facts indicate that on 5/29/06, a fire allegedly occurred in a hangar located on your property.  The fire allegedly caused damage to the hangar and other property.  It is unclear at this time whether the hangar is used in whole or in part for "business".  Your policy defines "Business" as including trade, profession or occupation.  See **DEFINITIONS, ¶2,** pg. 1 of policy.

**Reservation-of-Rights Letter**
Claim No. 1038220
June 27, 2006
Page 5 of 10

It is also unclear at this time whether the hangar is rented or held for rental to any person not a tenant of the dwelling. We must therefore reserve our right to raise these policy provisions in response to your request for coverage for this claim.

### C.   Personal Property Loss.

We must now advise you of our personal property coverages. Your policy contains special limits of liability under **Coverage C** which begin on page 2 of your policy. The policy says that these limits do not increase the **Coverage C** limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category:

> **8.** $2500 on property, on the "residence premises," used at any time or in any manner for any "business" purpose.

**See SECTION I – PROPERTY COVERAGES, COVERAGE C, Special Limits of Liability, ¶8**, pg. 2 of policy.

Because it is unclear at this time whether any of the allegedly-damaged property is used for a business purpose, we must reserve the right to raise this policy provision in response to your request for coverage for this claim.

The policy also provides a special limit of liability for the following personal property:

> **10.** $1000 for loss to electronic apparatus, while in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power. Electronic apparatus includes:
>
> **a.** Accessories or antennas; or
>
> **b.** Tapes, wires, records, discs or other media

A47

**Reservation-of-Rights Letter**

Claim No. 1038220
June 27, 2006
Page 6 of 10

---

for use with any electronic apparatus described in this item **10**.

See **SECTION I – PROPERTY COVERAGES, COVERAGE C, Special Limits of Liability,** ¶10., pg. 1 of Special Provisions, Delaware.

We understand that a recreational vehicle was allegedly damaged by the 5/29/06 fire which occurred in a hangar located on your property. The recreational vehicle was allegedly inside the hangar at the time of the alleged fire. We must reserve our right to raise this policy provision in response to your request for coverage for this claim.

Your Homesite policy does not cover articles separately described and specifically insured in this or other insurance. See **SECTION I – PROPERTY COVERAGES, COVERAGE C, Property Not Covered,** ¶**1**, pg. 3 of policy. We reserve our right to raise this exclusion in response to your request for coverage for this claim.

Your policy also does not cover the following personal property:

**3.**    Motor vehicles or all other motorized land conveyances. This includes:

**a.** Their equipment and accessories; or

**b.** Electronic apparatus that is designed to be operated solely by use of the power from the electrical system of motor vehicles or all other motorized land conveyances. Electronic apparatus includes:

(1) Accessories or antennas; or

(2) Tapes, wires, records, discs or other media;

for use with any electronic apparatus.

The exclusion of property described in **3.a.** and **3.b.** above applies only while the

**Reservation-of-Rights Letter**
Claim No. 1038220
June 27, 2006
Page 7 of 10

property is in or upon the vehicle or conveyance.

See **SECTION I – PROPERTY COVERAGES, COVERAGE C, Property Not Covered, ¶3**, pg. 3 of policy.

Because a recreational vehicle was allegedly damaged by the fire on 5/29/06, we must therefore reserve our right to raise this exclusion in response to your request for coverage for this claim.

Your policy also does not cover aircraft and parts. Aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo. See **SECTION I – PROPERTY COVERAGES, COVERAGE C, Property Not Covered, ¶4**, pg. 3 of policy.

We understand that you own an aircraft which you store in a hangar located on your property. It is unclear at this time if the aircraft was damaged by the alleged fire. It is also unclear at this time if any aircraft parts were damaged by the alleged fire. We must therefore reserve the right to raise this exclusion in response to your request for coverage for this claim.

Finally, your policy does not cover "Business" data, including such data stored in books of account, drawings or other paper records, or electronic data processing tapes, wires, records, discs or other software media. See **SECTION I – PROPERTY COVERAGES, COVERAGE C, Property Not Covered, ¶8**, pg. 3 of policy.

It is unclear at this time if any of the allegedly-damaged property is "Business" data. We must therefore reserve our right raise this exclusion in response to your request for coverage for this claim.

**C.    Policy Conditions.**

Your policy also contains conditions that apply to this claim. These conditions set forth the duties after a loss and say in relevant part:

    **2.  Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done:

        **a.**  Give prompt notice to us or our agent;

**Reservation-of-Rights Letter**
Claim No. 1038220
June 27, 2006
Page 8 of 10

---

    **b.**    Notify the police in case of loss by theft;

    **c.**    Notify the credit card or fund transfer card company in case of loss under Credit Card or Fund Transfer Card coverage;

    **d.**    Protect the property from further damage.  If repairs to the property are required, you must:

        **(1)**  Make reasonable and necessary repairs to protect property; and

        **(2)**  Keep an accurate record of repair expenses;

    **e.**    Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss.  Attach all bills, receipts and related documents that justify the figures in the inventory;

    **f.**    As often as we reasonably require:

        **(1)**  Show the damaged property;

        **(2)**  Provide us with records and documents we request and permit us to make copies; and

        **(3)**  Submit to examination under oath, while not in the presence of any other 'insured,' and sign the same.

See **SECTION I – CONDITIONS, ¶ 2, Your Duties After Loss, ¶ 2.a.-f.,** p. 9 of policy.

    We cite these provisions to kindly remind you of your duties under the policy and also to request your compliance with them.

    Pursuant to these policy conditions, we respectfully request at this time that you provide proof of ownership of all allegedly-damaged personal property in the form of receipts, statements, invoices, certificates of title, or warranty information.  Please also provide any photographs relating to the allegedly-damaged property either before or after the alleged loss.

A50

**Reservation-of-Rights Letter**

Claim No. 1038220
June 27, 2006
Page 9 of 10

---

Pursuant to these policy conditions, we also now request your examinations under oath. Our attorney will contact you shortly to schedule the exams. Please cooperate with him. We include with this Reservation-of-Rights letter a document entitled "The Rights of An Insured When Providing an Examination under Oath". Please review this document so that you understand your rights prior to providing your examinations under oath.

We must now direct your attention to the conditions found at the end of your policy. The conditions say that the entire policy will be void if:

    **2.    Concealment or Fraud**

        **a.**    Under Section **I** – Property Coverages, with respect to all "insureds" covered under this policy, we provide no coverage for loss under Section **I** – Property Coverages if, whether before or after a loss, one or more "insureds" have:

            (1)  Intentionally concealed or misrepresented any material fact or circumstance;

            (2)  Engaged in fraudulent conduct; or

            (3) Made false statements;

        relating to this insurance.

See **SECTION I AND II CONDITIONS, ¶ 2 – Concealment or Fraud**, pg. 3, Special Provisions, Delaware.

If Homesite discovers at any time either before or after this loss that you have violated this condition, the Company very well may deny all insurance coverage in this case. If we discover that you engaged in any fraudulent conduct during the application process, during the policy period, or at the time of or after the loss, we may rely upon these conditions to deny all insurance coverage for this claim.

All coverage may also be denied if Homesite discovers that you made false statements or intentionally concealed or misrepresented any material

**Reservation-of-Rights Letter**

Claim No. 1038220
June 27, 2006
Page 10 of 10

---

fact or circumstance relating to this insurance. We must also now reserve the right to rescind the insurance policy and grant you a full premium refund.

* * *

In light of the above, we must respectfully reserve our right to raise all policy terms, conditions, exclusions and defenses mentioned in this letter in response to your request for insurance coverage in this case. We must also specifically reserve the right to raise any additional policy terms, conditions, defenses and exclusions, the applicability of which are unknown to us at the present time and which we may discover after additional investigation. We do not waive the right to rely on any such exclusions, terms, conditions, etc. by virtue of this letter, nor do we intend the coverage defenses set forth in this letter to be exclusive or exhaustive.

Because we only recently received first notice of this loss, we must request an additional 60 days in which to investigate this matter. We reiterate our earlier request pursuant to the policy conditions for proof of ownership regarding the damaged property and also respectfully ask that you forward to us any additional documentation, including paperwork, pictures, etc. that you have in your possession that pertain in any way to this loss.

Thank you for your anticipated cooperation in this matter.

Sincerely,

Maria Loffredo
Large Loss Specialist
1-800-550-6375 ext. 1465

A52

Joseph Jadczak
October 3, 2006

NOV - 1 2006

Page 1

```
 1    IN RE:  INSURANCE CLAIM OF JOSEPH and CATHERINE JADCZAK

 2

 3    Policy No. 30318013

 4    Claim No. 1038220

 5    Date of Loss:  5/29/06

 6

 7         Examination under oath, taken pursuant to notice at

 8    the law offices of Perry & Sensor, 704 N. King Street,

 9    First Federal Plaza, Suite 560, Wilmington, Delaware,

10    beginning at 2:12 p.m., on Tuesday, October 3, 2006,

11    before Debra A. Donnelly, Registered Professional

12    Reporter and Notary Public.

13

14    APPEARANCES:

15

          MICHAEL L. SENSOR, ESQUIRE
16        PERRY & SENSOR
              First Federal Plaza, Suite 560
17            704 N. King Street
              Wilmington, DE  19801
18            for Joseph Jadczak

19        JEFFREY M. SMYTHE, ESQUIRE
          MERRY, FARNEN & RYAN, P.C.
20            27739 Jefferson Avenue
              St. Clair Shores, MI  48081
21            for Homesite Insurance Company

22

      - - - - - - - - - - - - - - - - - - - - - - - - -

23                  CORBETT & WILCOX
              REGISTERED PROFESSIONAL REPORTERS

24      230 N. MARKET  STREET    WILMINGTON, DELAWARE  19801
```

Hanson Renaissance Court Reporting & Video
(313) 567 - 8100   www.hansonreporting.com

A53

Joseph Jadczak
October 3, 2006

Page 27

1        Q.    Did any other neighbors take photographs?

2        A.    Diane Morgan.

3        Q.    Do you know her phone number, sir?

4        A.    I'm sorry, I don't.

5        Q.    Does she live nearby you?

6        A.    She does.   Two properties over.

7        Q.    Thank you.

8        A.    And there was a third neighbor.   All I know is

9    her first name is Betty.   I don't know her last name.

10   And she lives across the street.

11       Q.    These neighbors that you mentioned,

12   Mr. Calafano, Diane Morgan, and Betty, they, as far as

13   you know, witnessed the fire?

14       A.    They did.

15       Q.    And what was the date of the fire again, sir?

16       A.    May 29th, 2006.

17       Q.    Was that a Tuesday?

18       A.    It was Memorial Day.   It was on a Monday.

19              MR. SENSOR:   Did you want to mark those

20   photos?

21              MR. SMYTHE:   Yes, I'm going to mark

22   these photos as Exhibit 3.

23              (Jadczak Deposition Exhibit No. 3 was

24   marked for identification.)

Joseph Jadczak
October 3, 2006

Page 39

1    remember.

2         Q.    I guess I'm a little confused, because the

3    Tom's Motor Sales, it appears that they sent a bill for

4    work on the recreational vehicle, but the name,

5    presumably, of the customer is Pratt Auto Repair?

6         A.    Yes.

7         Q.    Could you explain that for me, sir?

8         A.    Well, he did that because the owner's card

9    that I had for the tag had Pratt Auto Repair on it.

10        Q.    The owner's tag?

11        A.    The registration card.  When I had to put the

12   RT tag on the vehicle to move it, I left it with him.  So

13   instead of using my name, he just put that on the bill.

14        Q.    Are you saying that the registration on the RV

15   says Pratt Auto Repair?

16        A.    No.  There was no registration on the RV.  The

17   registration for that tag, which can be moved from

18   vehicle to vehicle, was Pratt Auto Repair.

19        Q.    Thank you.

20        A.    Mm-hmm.  I mean, you're welcome.

21        Q.    Mr. Jadczak, I have a document in front of me

22   from Delaware Camping Center.  There is some handwriting

23   on it.  I'm going to give it to you.

24              Please tell me if you recognize this

Joseph Jadczak
October 3, 2006

Page 51

1          A.    1997.

2          Q.    1997.

3                   As I understand it, you were living in

4    the RV at the time, and you built the hangar first.  Is

5    that right, sir?

6          A.    That's right.

7          Q.    Then you built the dwelling?

8          A.    Yes.

9          Q.    Now, let's say I'm driving in a car and I'm

10   coming to your home and I turn left onto the driveway.

11   What am I going to see?  To the best of your ability, if

12   you could explain, what does your property look like?

13         A.    Well, there is a rancher.  It's 4400 square

14   feet, counting the garage.  And the hangar is right next

15   to it, 50 feet, which is 1936 square feet.

16         Q.    1900 what?

17         A.    1936 square feet.

18         Q.    Thank you.

19         A.    Behind the house is the taxiway.

20         Q.    For the airplane?

21         A.    For the air park.

22         Q.    The air park?

23         A.    Yes.  There is a bunch of homes that are built

24   on this air park.  It's a concept where you keep your

Joseph Jadczak
October 3, 2006

Page 52

1   airplane at home.  It's part of your home, is your

2   hangar.  So you get to sleep with your airplane.

3        Q.   That's in the back of the property?

4        A.   The taxiway is in the back of the property.

5   The hangar and the home are evenly across the front of

6   the property.

7        Q.   Okay.

8        A.   The driveway is splitting the house and the

9   hangar.  It's in the pictures.

10            MR. SENSOR:  There is a plat here, if

11   that would help you.

12            MR. SMYTHE:  It would help.

13   BY MR. SMYTHE:

14        Q.   I'm looking at Exhibit 1, which is the deed to

15   the property, and I'm at the page of "Lands of

16   Joseph R. Hudson."

17            Is that the person that you purchased

18   this land from?

19        A.   Yes.

20        Q.   Okay.  Could you review this document, sir,

21   and tell me if that's an accurate drawing or description

22   of the property you currently own?

23        A.   Yes, it is.

24        Q.   So in back of the -- it says proposed

Joseph Jadczak
October 3, 2006

Page 54

1      Q.    So you have an asphalt driveway that goes all

2  the way back to the taxiway.  Is that right?

3      A.    The asphalt driveway stops about where the

4  hangar ends.

5      Q.    Okay.

6      A.    And where the house ends, like on an angle

7  like that.

8              And then there is a cement apron behind

9  the hangar where the door opens up for the plane to go in

10  and out.  And behind the cement apron is blacktop, which

11  kind of S's out like this around the utility shed and

12  onto the taxiway.

13             And there is a 12-by-12 door there on

14  the hangar where the RV goes in that way.

15     Q.    And your garage is connected to your

16  residence.  Is that right?

17     A.    Yes.

18     Q.    You said the taxiway for the air park earlier.

19  Is that right?

20     A.    Yes.

21     Q.    What does air park mean to you?

22     A.    Air park means a community of homes that have

23  their airplanes at home with them, and they share the

24  taxiway and runway.

Joseph Jadczak
October 3, 2006

Page 56

1      A.   Yes.

2      Q.   Would you say you spend a considerable amount

3   of time in the hangar?

4      A.   Quite a bit.  My wife does wash out there,

5   too, because we had a washer and dryer out there.

6      Q.   So it sounds like the hangar was equipped with

7   electricity and water at least.  Is that right?

8      A.   Everything.

9      Q.   Everything.

10            What does everything mean to you, sir?

11      A.   Water, sewer, electric, cable, phone, heat,

12   washer, dryer, utility sink.

13      Q.   So someone could live in there?

14      A.   We did.

15      Q.   You did live in there?

16      A.   We did.

17      Q.   While you were building the dwelling.  Right?

18      A.   Yes.

19      Q.   So you didn't necessarily live in the RV, you

20   lived in that hangar as well?

21      A.   In the RV, which was inside the hangar.

22      Q.   And you had a television and cable in there at

23   the time?

24      A.   Yes.

Joseph Jadczak
October 3, 2006

Page 57

1       Q.    At the time of the fire?

2       A.    Yes.

3       Q.    And you used that television?

4       A.    Yes.  Oh, yeah.  Check the weather every

5   morning.

6       Q.    You said plumbing, too?

7       A.    Yes.

8       Q.    There is a bathroom in the hangar?

9       A.    In the RV, not in the hangar.

10      Q.    So you would have --

11      A.    Intercom and all that stuff.

12      Q.    Pardon me?

13      A.    We had an intercom in there which also was

14   connected with the house.

15      Q.    So because you had plumbing in the RV;

16   therefore, you would have pipes in the hangar, too?

17      A.    I had a setup next to the RV for dumping for

18   the sewer, which the hose went into the sewer.  I had the

19   water, hookup for the water next to it.  Electric hookup.

20   Cable, phone, they were all plugged into the RV.

21   Actually, it was set up for full use where it was sitting

22   at, the RV.

23      Q.    Did other people store items of personal

24   property in your hangar?

Joseph Jadczak
October 3, 2006

Page 58

1           MR. SENSOR:  Other than him and his

2    wife?

3           MR. SMYTHE:  Yes, sir.  Thank you.

4           THE WITNESS:  No.  I was going to store

5    my daughter's crib, but no.

6    BY MR. SMYTHE:

7        Q.   So you never rented out any space in your

8    hangar to anyone else?

9        A.   Oh, no.  It was personal use.

10       Q.   You said your property is about four,

11   four-and-a-half acres.  Is that accurate?

12       A.   No, no, no.  One-and-three-quarter acres.

13   Just shy of two acres.

14       Q.   Okay.  Now I would like to take you through

15   the chronology of the date of the loss, if I could,

16   Mr. Jadczak.

17           This fire loss occurred on Memorial Day,

18   which is May 29th, 2006.  Is that right, sir?

19       A.   That's right.

20       Q.   That was a Monday.  Is that right?

21       A.   Yes.

22       Q.   Can you tell me what you did when you first

23   woke up that morning?

24       A.   We had breakfast.

Joseph Jadczak
October 3, 2006

Page 62

1       Q.    Okay.

2       A.    So if you are laying on the floor there they

3   can get to you.  If you have fire or smoke, it opens and

4   locks open.  So I was able to run through the 12-by-12

5   door.

6       Q.    The door opened because of the fire and smoke.

7   Is that accurate?

8       A.    Yes.  Yes.  Thank goodness.

9       Q.    Then you said you removed the airplane that

10  you owned from the hangar, and you tried to see what else

11  you could salvage.  Is that right?

12      A.    Yes.

13      Q.    What did you see at the time?

14      A.    I saw the fire spread from the rear of the RV

15  and the wall facing the street, spread forward through

16  the whole RV, through the ceiling in the hangar.  Then it

17  started coming along the side walls.  And I just heard

18  things popping and crashing, and I wasn't going to run

19  back in there.

20      Q.    I don't blame you.

21            You said you saw the fire spread from

22  the rear of the RV.  Is that right?

23      A.    Yes.

24      Q.    Did it spread quickly?

Joseph Jadczak
October 3, 2006

Page 68

1    is the electricity on in the RV?

2        A.    No.

3        Q.    Is the plumbing hooked up on the RV?

4        A.    No.

5        Q.    Is anything connected to the RV in terms of

6    making it operational in any respect?

7        A.    Not unless we intend to use it or have someone

8    sleep in there if we have a bunch of people come down.

9    The kids or something, they like to sleep in there when

10   they come down.

11       Q.    As opposed to your residence?

12       A.    Yes.

13       Q.    Is that because it's fun to do?

14       A.    Yes.

15       Q.    So the day before the fire, did you say

16   earlier that you plugged something in?

17       A.    Yes.

18       Q.    What did you plug in exactly?

19       A.    The electric cable for the RV.

20       Q.    And where did you plug that in?

21       A.    Right next to the RV, where I have an outlet

22   for the RV.

23       Q.    So it's an outlet on the wall?

24       A.    Yes.   It's a special 30 amp.

Joseph Jadczak
October 3, 2006

Page 70

1         A.    To run the lights and test the refrigerator,

2    and basically just check everything in the RV.

3         Q.    Did you leave the cable plugged in overnight?

4         A.    Yes.

5         Q.    Is that a standard practice of yours, to plug

6    in the electric cable and leave it on overnight?

7         A.    When we're working in there, or as we were

8    living in there for those nine months, never had a

9    problem with it before.

10        Q.    So you would leave it on overnight?

11        A.    Yeah.

12        Q.    That's so you could, when you wake up, if you

13   are sleeping in the RV, you could turn a light switch on

14   and it would work for you?

15        A.    Your television, hair dryer, whatever else you

16   needed.

17        Q.    You said earlier that you lived in the RV

18   actually inside the hangar for a period of nine months.

19   Is that right, sir?

20        A.    That's right.

21        Q.    And during that period of nine months did you

22   leave the cable plugged in continuously?

23        A.    Yes.

24        Q.    And you never had any problems?

Joseph Jadczak
October 3, 2006

Page 74

1    Q.    ACDC?

2    A.    Yes.  It's called a converter.

3    Q.    And where is that physically located?

4    A.    In the back underneath the bed.

5    Q.    In the RV?

6    A.    At the face of the bed.  Yes, in the RV.  It's

7    part of the RV.

8    Q.    Did you say at the face of the bed?

9    A.    Yes.

10    Q.    Underneath?

11    A.    At the foot of the bed.

12    Q.    Thank you.

13          Well, let me ask you this, Mr. Jadczak.

14    You saw the damage from the fire in your hangar and you

15    saw the fire and smoke and you removed the plane on that

16    day.

17          To the best of your ability, what do you

18    think, or I'm just asking you to give me an estimation,

19    what do you think caused this fire?

20    A.    Something electrical.

21    Q.    Something electrical?

22    A.    Yes.

23    Q.    Why do you say that?  And I ask you this

24    knowing that you are not, like, an expert in fire origin

Joseph Jadczak
October 3, 2006

Page 75

1    or cause and origin or anything like that.

2         A.    That was the initial thought of the Fire

3    Marshal.

4         Q.    So you were informed from somebody else that

5    it may have been electrical in nature?

6         A.    Yes.

7         Q.    So you are basing that previous statement on

8    your relying on what somebody else told you?

9         A.    Yes.

10        Q.    You don't have an independent, like, idea or

11   hypothesis as to what may have occurred?

12        A.    Must have been electrical, because there is no

13   propane in the back or anything like that or any fuels.

14        Q.    I thought I saw in your contents list that you

15   had some, like, motor oil or gasoline that was destroyed

16   or damaged?

17        A.    No gasoline.  Motor oil.

18        Q.    Maybe that was my mistake.

19        A.    Gasoline was in the RV for the generator, and

20   in the tractor.

21        Q.    Inside the tank of the RV?

22        A.    Yes.  And in the tractor, garden tractor, and

23   in the little moped.  But I don't store gasoline in the

24   hangar.

Joseph Jadczak
October 3, 2006

Page 82

1        A.    Yes.

2        Q.    Now, we've seen numerous pictures of the

3   hangar itself and what the fire did.

4                   Could you just describe to me what you

5   saw?  What kind of damages did you see to the hangar?

6        A.    **Everything was just totally destroyed.  The**

7   **roof caved in.  The 12-by-12 door fell on top of what was**

8   **left of the RV, which was only the hood and the bumper.**

9   **The 40-foot door was burned and buckled.  It fell because**

10  **there was nothing to support it because the frame was all**

11  **burned.  Everything was just in a pile of ash.  You**

12  **couldn't make anything out, because it was so hot it**

13  **just, like, melted everything.**

14       Q.    When you prepared your contents list, did you

15  prepare that contents list based on your memory of what

16  you thought was in there?

17       A.    **For the most part, yeah.**

18       Q.    What do you mean by "for the most part"?

19       A.    **Everything I could remember.  I just closed my**

20  **eyes and just pictured where I had everything in the**

21  **hangar.  I was pretty well organized.  I knew where**

22  **things were at.**

23       Q.    One of these exhibits for this examination

24  under oath is pictures of the hangar and the RV and the

Joseph Jadczak
October 3, 2006

Page 93

1    the items that were damaged and/or destroyed by the fire,

2    okay, Mr. Jadczak.  Ultimately, this computer printout,

3    which looks like an MS XL spreadsheet, of items that were

4    lost in the fire were compiled and created based on what

5    you may have recalled was present in the hangar or other

6    locations on your property before the fire.  Is that

7    accurate?

8         A.    Yes.

9         Q.    As we sit here today, do you have any receipts

10   or items of warranty or manuals or any other types of

11   documents reflecting the purchase and/or ownership of

12   these items that are listed on the property inventory?

13        A.    **Unfortunately, 99 percent of my receipts were**

14   **in a filing cabinet in the hangar.**

15        Q.    So you store a lot of -- most of your receipts

16   in the hangar, and they were destroyed by the fire.  Is

17   that right?

18        A.    Yes.

19        Q.    And you were telling me earlier that you

20   closed your eyes and you thought about what you may have

21   had in the hangar shortly before the loss, and you told

22   me that you were a pretty organized man, so you might be

23   able to recall what was in there.  Is that accurate?

24        A.    Yes.

Page 94

1        Q.    What instructions, if any, did Eagle Adjusting

2    give to you in connection with creating an inventory list

3    in general?

4        **A.    Told me to take my time, think about**

5    **everything that I had in there.  And he said, You will**

6    **probably remember things that you won't write down later**

7    **on, but do the best that you can.**

8        Q.    And that's what you did?

9        **A.    Yes.**

10       Q.    It looks like we have close to three full

11   pages of items to go through, so let's begin.

12                    It looks like you had some VHS tapes

13   that were in the hangar at the time of the fire.

14                    Does that sound familiar to you?

15       **A.    Yes.**

16       Q.    The quantity listed here is 20.

17                    It looks like you had a television and a

18   VCR at the time of the fire inside of the hangar.  Is

19   that right?

20       **A.    Yes.**

21       Q.    Did you watch television and use the VCR in

22   the hangar?

23       **A.    Occasionally.**

24       Q.    Did you have, like, seats and couches and

Joseph Jadczak
October 3, 2006

Page 95

1    things of that nature to sit and recline and watch movies

2    and television?

3         A.    I had two desks and two chairs in there.

4         Q.    The VHS tapes, could you just list just a

5    couple of the titles that you recall?

6         A.    They were movies; Officer and a Gentleman, Top

7    Gun, Jazz Singer, Mrs. Doubtfire, Ghost.

8         Q.    Okay.  That's good.  Thank you.

9               These are movies you have accumulated

10   over the years.  Is that right?

11        A.    Yes.

12        Q.    And you might have purchased these when, in

13   your best estimation?

14        A.    It varied.  Some as little as a year before

15   the fire, or nine months.  Some three to five years

16   before.

17        Q.    Do you have a DVD player?

18        A.    Not in the hangar.

19        Q.    But you do own one?

20        A.    I do.

21        Q.    The next item is a 13-inch television.

22              Do you know -- and the quantity is two.

23   You had two TV's in the hangar.  Is that right?

24        A.    Three.

Joseph Jadczak
October 3, 2006

Page 96

1        Q.    Okay.  You had three TV's in the hangar.  But

2    it looks like you had two 13-inch TV's in the hangar?

3        A.    There were two TV's in the RV and one TV on my

4    desk.

5        Q.    Okay.  And, I'm sorry, where were these VHS

6    tapes located in the hangar, if you recall?

7        A.    Some were in my desk.  Some were in the RV.

8        Q.    You said you had two desks?

9        A.    Yes.

10       Q.    And where were the two 13-inch televisions

11   located in the hangar?

12       A.    One was on the desk.

13       Q.    Okay.

14       A.    Two were in the RV.  One was in the back of

15   the RV, one was in the front of the RV.  Had an

16   entertainment center on it.

17       Q.    Do you know the size of the TV on the desk?

18       A.    That was the 13.

19       Q.    Okay.  And then there was another 13-inch

20   television in the RV.  Is that right?

21       A.    Yes.

22       Q.    Do you know the manufacturer of these

23   televisions?

24       A.    One was Panasonic, one was Hitachi, and I

Joseph Jadczak
October 3, 2006

Page 98

1      A.    One was in the RV and one was on the desk.

2      Q.    Do you know the brand names?

3      A.    Panasonic and JVC, I think.

4      Q.    Do you remember when you bought them?

5      A.    The one came with the RV, and the other JVC

6   was probably about three, four years ago.

7      Q.    Did you use these televisions and these VCR's

8   often?

9      A.    Yes.

10     Q.    When you were doing things in the hangar, you

11  would have the television on?

12     A.    I would put it on every morning and check the

13  weather before I fly, watch the weather channel.  Or if

14  my wife is busy cleaning the house, I would sit out there

15  and watch TV.

16     Q.    The next item are -- quantity is one.  It says

17  maps.  Does that sound familiar to you?

18     A.    Yes.

19     Q.    Are these aerial maps?

20     A.    I had aerial and I had road maps.

21     Q.    I'm sorry, I should have given you one of

22  these to look at.

23     A.    That's all right.

24     Q.    You had topographical maps and aerial maps.

Joseph Jadczak
October 3, 2006

Page 102

1    you and your wife?

2         A.    She goes all over.  The malls, Strawbridge's,

3    Sears, Peebles, J.C. Penney.

4         Q.    What about yourself?

5         A.    I don't shop.

6         Q.    Does she buy your clothes?

7         A.    I go sit down and watch a movie.  She goes out

8    and buys everything.

9         Q.    So she buys the clothes that you wear?

10        A.    Yeah, other than my work clothes.  I will go

11   out to Sears and get them, or my work boots, I will go to

12   a work store and buy those.

13        Q.    The next is a vacuum cleaner.

14              Do you know what brand this vacuum

15   cleaner is?

16        A.    No.

17        Q.    Do you know where it was located?

18        A.    In the RV.

19        Q.    So it's a vacuum cleaner used in the RV?

20        A.    Yeah.

21        Q.    Do you know when you bought it?

22        A.    About the time we moved down there in 2000.

23        Q.    Did you use it often in the RV?

24        A.    Oh, yeah.

Joseph Jadczak
October 3, 2006

Page 103

1        Q.    Do you know how old it was?  I'm sorry, 2000.

2   Six years old.

3                Do you know how much you paid for it?

4        A.    No, I would be guessing.

5        Q.    The next item is a clock, and there is a

6   quantity of two.  Do you know what these are referring

7   to?

8        A.    Yes.  There was one in the hangar and there

9   was one in the RV.

10       Q.    Wall clocks?

11       A.    Yes.

12       Q.    Are these standard wall clocks that you might

13   buy at Target or something like that, or were these more

14   expensive clocks?

15       A.    It's a pretty standard clock.

16       Q.    The next item is a toaster.  Where was this

17   toaster located, sir?

18       A.    In the RV.

19       Q.    Do you know the brand name?

20       A.    No, I don't.

21       Q.    Do you know if it came with the RV when you

22   purchased it?

23       A.    No, we bought it.

24       Q.    Do you know how much it would have cost?

Joseph Jadczak
October 3, 2006

Page 121

1      A.   Yes.

2      Q.   Was it a set?

3      A.   Yes.  It came with a variety of different

4   sizes.

5      Q.   Do you recall about how much they were?

6      A.   Not without looking at the list again, because

7   I don't have all that information in front of me.  At

8   that time I did.

9      Q.   Okay.  Then we have sheets.

10           Sheets for bedding in the RV?

11     A.   Yes.

12     Q.   How many people could sleep in the RV?

13     A.   Seven.

14     Q.   Does that mean there is seven beds?

15     A.   There was a queen bed, a couch that converted

16   to the bed, the dinette dropped down to a bed, and then a

17   pull-out single right where the entertainment section is.

18   It used to be a queen, but when the entertainment section

19   went in it made it a single.

20     Q.   You said the dinette makes a bed?

21     A.   Yes.  Two there, two people can sleep there,

22   two on the couch and two in the queen and one up on top.

23     Q.   Were these items that, let's say from the

24   trailer hitch on down; fans, dishes, silverware, glasses,

Joseph Jadczak
October 3, 2006

Page 153

1      Q.   Did you use them on a daily basis?

2      **A.   Once a week to wash my work clothes in it.**

3      Q.   How often would your wife use it?

4      **A.   Every week.**

5      Q.   Every day or every week?

6      **A.   Well, once or twice a week she would throw my**

7   **dirty work clothes, or towels, maybe, or beach towels**

8   **that would have sand on it she didn't want to wash in the**

9   **house.**

10      Q.   But you had a washer and dryer in the house,

11   too?

12      **A.   Yes.**

13      Q.   Would you use the washer and dryer in the

14   house more often than you would use the ones in the

15   hangar?

16      **A.   Yes.**

17      Q.   Next we have a microwave stand.  That sounds

18   pretty self-explanatory.

19               You had a microwave in the hangar?

20      **A.   Yes.**

21      Q.   So you would have meals out there?

22      **A.   Occasionally heat something up if I'm working**

23   **out there.**

24      Q.   Do you know where you bought this stand?

LAW OFFICES OF

# MERRY, FARNEN & RYAN

A PROFESSIONAL CORPORATION
27739 JEFFERSON AVENUE
ST. CLAIR SHORES, MICHIGAN 48081-1309

TELEPHONE (586) 776-6700
TELECOPIER (586) 776-1501

JEFFREY M. SMYTHE

DIRECT DIAL: (586) 585-2406
jsmythe@mfr-law.comt

March 27, 2007

**_Via Fax & U.S. Mail_**
Fax: 302-655-4043

Michael L. Sensor, Esq.
704 N. King Street
PO Box 1568
Wilmington, DE 19899-1568

> RE: **CLAIM OF JOSEPH AND CATHERINE JADCZAK**
> CLAIM No. 1038220
> POLICY No. 30318013
> D/LOSS: 5/29/2006
> MFR FILE: H20 06198

ᴿCEIVED

APR -1 2007

Dear Mr. Sensor:

Thank you for your e-mail correspondence dated March 14, 2007. I write to you now, on behalf of Homesite, to address the points you raised in your e-mail message. As you know, Homesite is offering in good faith the following payments toward resolution of this disputed claim. I now provide you once again with a description of the offer of payment for this claim:

Coverage A –Dwelling: building repairs-  $3,584.74 (RCV)
                        Landscaping -    $21,772.00 (RCV)

**Total-Coverage A:     $25,356.74**

Coverage B -Other Structures:    Limit      $62,200.00
                                 5% debris  $3,110.00

**Total-Coverage B      $65,310.00**

Coverage C -Personal Property:

A77

MERRY, FARNEN & RYAN, P.C.

March 27, 2007
Page 2 of 5

---

|  | RCV | $45,646.89 |
|  | Depreciation | $14,196.68 |

**ACV of Coverage C:    $31,450.22**

Total of Coverages A, B and C=$136,313.63

Total of Coverages A, B and C (ACV) to be issued= $122,116.96

As you can see, Homesite is willing to pay the limits of coverage on Coverage B—Other Structures to the Jadczaks for the damage to the hanger caused by the fire.  While Homesite acknowledges that your position is that the hanger should be covered under Coverage A—Dwelling of the policy, it respectfully disagrees with your position.  Please refer to the Jadczaks' policy which states in pertinent part that we cover:

1.  The dwelling on the "residence premises" shown in the Declaration, including structures attached to the dwelling; and

2.  Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling of other structures on the "residence premises."

**Section I—Property Coverage, Coverage A—Dwelling,** p. 2 of policy.

Please note that the Jadczaks' dwelling is in fact the residence premises where they reside.  Coverage A does not include the hanger which I note is set apart from the dwelling by clear space.  Moreover, Mr. Jadczak testified that the hangar is set apart from the actual house.  Fire damage to the hanger is therefore appropriately valuated under Coverage B—Other Structures of the Homesite policy which says:

We cover other structures on the "residence premises" set apart from the dwelling by clear space.  This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

This coverage does not apply to land, including land on which the other structures are located.

We do not cover other structures:

1.    Used in whole or in part for "business," or

MERRY, FARNEN & RYAN, P.C.

March 27, 2007
Page 3 of 5

2.      Rented or held for rental to any person not a ten-
ant of the dwelling, unless used solely as a private
garage.

The limit of liability for this coverage will not be more than
10% of the limit of liability that applies to Coverage A.
Use of this coverage does not reduce the Coverage A limit
of liability.

## Section I—Property Coverages, Coverage B—Other Structures, p. 2 of the policy.

I must also point out that Coverage B-Other Structures includes
structures connected to the dwelling by a utility line or other connection. Mr.
Jadczak testified that the dwelling and hangar are connected by utility lines.
It is therefore the Company's position that the hangar is appropriately
categorized under Coverage B-Other Structures.

I must also reiterate to you at this time Homesite's denial of coverage
for fire damage to the recreational vehicle located in the hanger at the time
of the fire.  Please refer to Homesite's previous denial letter which cites the
following exclusion:

3.      Motor vehicles or all other motorized land conveyances.
This includes

a.      Their equipment and accessories; or

b.      Electronic apparatus that is designed to be
operated solely by use of the power from the
electrical system of motor vehicles or all
other motorized land conveyances.
Electronic apparatus includes:

(1) Accessories, or antennas; or

(2) Tapes, wires, records, discs, or other
media;

for use with any electronic apparatus.

The exclusion of property described in 3.a.
and 3.b. above applies only while the
property is in or upon the vehicle or
conveyance.

A79

MERRY, FARNEN & RYAN, P.C.

March 27, 2007
Page 4 of 5

---

We do cover motor vehicles or conveyances not subject to motor vehicle registration which are:

    a.    Used to service an "insured's" residence; or

    b.    Designed for assisting the handicapped;

See **SECTION I – COVERAGE C – PERSONAL PROPERTY, Property Not Covered, ¶3**, p. 3 of policy.

This exclusion acts to bar coverage for any damage sustained by the RV. Your argument is that the motor vehicle exclusion does not apply to the RV because it was not subject to registration at the time of the loss as it was not covered by any automobile insurance. This argument unfortunately misses the mark. It does not matter whether the RV is currently being used as a vehicle or whether it has ever been used as a vehicle in the past.

Moreover, it does matter whether the RV was or was not insured by automobile insurance at the time of the loss for purposes of this exclusion. The relevant point is whether the conveyance is **subject to registration—** not whether it is **in fact** registered. Just because the Jadczaks had not used the RV for quite some time does not mean that the RV is no longer subject to registration. I must also point out that the RV is not used to service the insured residence, nor is it designed for assisting the handicapped. Homesite now reaffirms its previous denial of coverage for the RV Coverage under Coverage C pursuant to the above-cited exclusion.

I also note that Mr. Jadczak testified during his EUO that the RV was not covered by automobile insurance at the time of the loss, however, the failure of the Jadczaks to secure auto insurance for the RV does not act to create coverage under the Homesite policy.

Although your position is that the amounts offered by Homesite will be the minimum responsibility owed to your clients, Homesite must respectfully disagree with your assessment. I am advising you now, however, that Homesite does not object to the Jadczaks' cashing the offer of payment issued without prejudice to their right to litigate the remainder of their claim. You are agreeing, however, that upon acceptance by the Jadczaks the payments outlined above will act as a credit against any future judgment regarding coverage which may be entered in the future against Homesite. I also now provide a copy of the personal property inventory list once again which was attached to Homesite's initial offer of settlement.

MERRY, FARNEN & RYAN, P.C.

March 27, 2007
Page 5 of 5

Please feel free to call me with any questions.

Very truly yours,

Jeffrey M. Smythe

JMS/hj

cc:  Maria Loffredo
enclosure

A81

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOSEPH JADCZAK and CATHERINE JADCZAK, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 07-431 GMS ) |
| HOMESITE INSURANCE COMPANY, | ) ) |
| Defendant. | ) |

## PLAINTIFFS' INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(a)(1)

(A) The name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts alleged with particularity in the pleadings, identifying the subjects of the information.

## ANSWER:

(1) Plaintiffs, c/o Michael L. Sensor, Esquire. Plaintiffs have knowledge of the facts alleged in the Complaint, including the value of the realty and property which was damaged and/or destroyed in the fire.

(2) Deputy John Galaska, Office of the State Fire Marshal, Southern Division, 22705 Park Avenue, Georgetown, DE 19947; (302) 856-5600. Deputy Galaska investigated the fire which occurred on plaintiffs' premises and has knowledge of the cause of the fire and the State Fire Marshal's investigation.

(3) Chap Chancellor, AIC, Eagle Adjusting Services, 136 West Lancaster Avenue, Suite 3, Paoli, PA 19301. Mr. Chancellor has knowledge of the value of plaintiffs' personal property which was damaged and destroyed in the fire.

(3) Maria Loffredo, c/o defense counsel. Ms. Loffredo was the claims adjuster assigned to plaintiffs' claim and has knowledge of the facts alleged in the Complaint, including the handling of plaintiffs' claim.

(4) Michael Ryan, Esquire and Jeffrey Smythe, Esquire, Merry, Farnen & Ryan, 27739 Jefferson Avenue, St. Clair Shores, MI 48081-1309; (586) 776-6700. Messrs. Ryan and Smythe conducted the examination under oath of plaintiff Joseph Jadczak and, upon information and belief, gave legal advice to defendant upon which defendant based its coverage determination.

(5)    Mitchell W. May, Esquire, Street & Ellis, P.A., 426 S. State Street, P.O. Box 1366, Dover, DE 19903; (302) 735-8400. This individual has knowledge of facts relating to the settlement costs for the refinancing of plaintiffs' residence necessary to fund the reconstruction of their hangar.

(6)    Representative of Clark & Sons, Inc./Raynor Garage Doors, 500 W. Market Street, Georgetown, DE 19947; (302) 856-3372. This individual has knowledge of facts relating to the replacement of doors on plaintiffs' hangar.

(7)    Representative of Town Communications, 331 W. Lancaster Avenue, P.O. Box 132, Ardmore, PA, 19003; (610) 649-2859. This individual has knowledge of facts relating to the fair market value of plaintiffs' two-way radios.

(8)    Representative of Delaware Camping Center, 200 N. Dupont Highway, Georgetown, DE 19947; (302) 856-4300. This individual has knowledge of facts relating to the fair market value of plaintiffs' camper, tow dolly, and cargo ramp.

(9)    Those individuals designed by defendant in its Initial Disclosures.

(B)    A copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody, or control of the party that are relevant to disputed facts alleged with particularity in the pleadings.

## ANSWER:

(1)    Color photographs of the damage and destruction caused by the fire taken by the Delaware State Fire Marshal in connection with that agency's investigation into the fire.

(2)    Report prepared by the Office of the Delaware State Fire Marshal in connection with their investigation into the fire.

(3)    Documents from the Delaware Camping Center, Clark & Sons, Inc./Raynor Garage Doors, Town Communications, EH Custom Homes, and Street & Ellis pertaining to plaintiffs' out-of-pocket losses.

(4)    Interest statements reflecting the amount of interest paid by plaintiffs on their refinanced mortgage.

(5)    Correspondence from the law firm of Merry, Farnen & Ryan to plaintiffs relating to the examination under oath taken of plaintiff Joseph Jadczak, including a document entitled "The Rights of an Insured When Providing an Examination Under Oath."

(6)    Correspondence and electronic mail from the law firm of Merry, Farnen & Ryan to plaintiffs' attorney concerning partial payment of plaintiffs' claim.

2

A83

   (7) Transcript from plaintiff Joseph Jadczak's examination under oath taken by Jeffrey Smythe, Esquire.

   (8) Correspondence from Maria Loffredo to plaintiffs concerning claim, including Reservation of Rights letter.

   (9) Proof of Loss form issued by defendant to plaintiffs' counsel concerning partial payment of claim.

   (10) Time records of plaintiffs' counsel (to be produced only upon order of the Court or as otherwise provided by law and only if plaintiffs are awarded attorney's fees pursuant to 18 *Del. C.* § 4102).

   (C) A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

**ANSWER:**

Contractual damages:

| | | |
|---|---|---|
| (1) | Rebuilding hangar: | $210,000.00 |
| (2) | Replacement of RV (actual cash value): | $24,430.00 |
| (3) | Replacement of other personal property: | |

| | | | |
|---|---|---|---|
| | (a) | Tow dolly: | $1,800.00 |
| | (b) | Cargo ramp: | $575.00 |
| | (c) | Two-way VHF radios: | $19,101.00 |
| | (d) | Miscellaneous personal property: | $35,801.90 |

| | | |
|---|---|---|
| (4) | Landscaping repair: | $21,772.00 |

| | |
|---|---|
| Subtotal: | $313,479.90 |
| Less amount paid by carrier: | ($136,313.63) |
| Equals contractual damages: | $177,166.27 |

Extracontractual damages:

| | | |
|---|---|---|
| (1) | Rental for replacement hangar: | $4,800.00 |
| (2) | Settlement costs for refinancing to fund reconstruction of hangar: | $9,214.61 |
| (3) | Interest on refinanced mortgage: | To be determined |

A84

(3)    Attorney's fees pursuant to 18 *Del. C.* §
       4102:                              To be determined
(4)    Punitive/bad faith damages:        To be determined

**TOTAL DAMAGES:**                        **$191,180.88**
(exclusive of attorney's fees and punitive/bad faith damages)


       (D)    For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

**ANSWER:**

       Not applicable.


                              PERRY & SENSOR


                              By: /s/   Michael L. Sensor
                                  Michael L. Sensor, Esquire
                                  Delaware Bar ID No. 3541
                                  One Customs House, Suite 560
                                  P.O. Box 1568
                                  Wilmington, DE 19899-1568
                                  Telephone: (302) 655-4482
                                  Attorney for Plaintiffs


Dated: January 17, 2008

4

P | Premium Content | Register | Log In | Help



mobile home

[ Search ]

Dictionary    Thesaurus    Encyclopedia    All Reference    The Web

A D V E R T I S E M E N T

3 results for: *mobile home*
(Browse Nearby Entries)

A D V E R T I S E M E N T

**Mobile Home**                                          Sponsored
Search by Size, Price, & Location. Find Your New Mobile Home    Links
Today.
www.Realtor.com/MobileHomes

**PA Mobile Home Dealer**
View homes from Blacks Home Sales online with images &
virtual tours!
www.blackshomesales.com

**Related Ads:**

Find Mobile Home
Mobile Home Park
in Florida
Manufactured
Home

Mobile Home
Doors & Windows
Used Mobile
Home for Sale
Palm Harbor
Homes

Free download! Get instant dictionary,
thesaurus, and encyclopedia access from your
Windows programs with CleverKeys.

*Dictionary.com Unabridged (v 1.1)* – *Cite This Source* – *Share This*
mobile home
  –noun
  a large house trailer, designed for year–round living in one place.

  Also, mo·bile home.
  Also called manufactured home.

  [Origin: 1950–55]

*Dictionary.com Unabridged (v 1.1)*
*Based on the Random House Unabridged Dictionary, © Random House, Inc.
2006.*

A D V E R T I S E M E N T

The perfect gift for word lovers - click here for
Dictionary.com Premium Gift Subscriptions!

A D V E R T I S E M E N T

**Mobile Home**                                          Sponsored
Get the NADAguides value for your mobile or manufactured    Links
home.
www.NADAguides.com

**Custom Panelized Homes**
Earn your dream income in your own Dream Home.
www.aehi.net

*American Heritage Dictionary* – *Cite This Source* – *Share This*

mo·bile home  P  ◄))  (mō'bəl, –bēl', –bīl')  Pronunciation Key
n.    A large trailer, fitted with parts for connection to utilities, that can
be installed on a relatively permanent site and that is used as a
residence. Also called *manufactured home.*

(Download Now or Buy the Book)
*The American Heritage® Dictionary of the English Language, Fourth Edition*
Copyright © 2006 by Houghton Mifflin Company.

Manufactured home                                              Sponsored
View info on Manufactured home Use our Free Tools and            Link
Research.
www.Banks.com/Manufactured+home

WordNet – Cite This Source – Share This
**mobile home**

*noun*
a large house trailer that can be connected to utilities and can be
parked in one place and used as permanent housing

*WordNet® 3.0, © 2006 by Princeton University.*

View results from: Dictionary | Thesaurus | Encyclopedia | All Reference |
the Web

Share This:

ADVERTISEMENT

Perform a new search, or try your search for "mobile home" at:

Amazon.com – Shop for books, music and more
Reference.com – Encyclopedia Search
Reference.com – Web Search powered by Google
Thesaurus.com – Search for synonyms and antonyms

Get the Dictionary.com Toolbar for your browser – FREE download! *From the
makers of Dictionary.com*

About Dictionary.com | Privacy Policy | Terms of Use | Link to Us | Contact Us
Copyright © 2008, Lexico Publishing Group, LLC. All rights reserved.

A87

dwelling: Definitions from Dictionary.com
Case 1:05-cv-00737-JMS-DMS   Document 23-3   Filed 03/14/2008   Page 28 of 33
Page 1 of 4



P Premium Content | Register | Log In | Help

**dwelling**

Search

Dictionary    Thesaurus    Encyclopedia    All Reference    The Web



ANNOUNCING THE ALL-NEW 2009 LINCOLN MKS
TURNING HEADS AT THE PHILADELPHIA AUTO SHOW   EXPERIENCE MKS

A D V E R T I S E M E N T

## 7 results for: *dwelling*

(Browse Nearby Entries)

Sponsored Links

**Dwelling Insurance**
Save time & up to 75%. Home Quotes from the Top 10 Companies.
*www.HomeInsurance.bz*

**Dwelling Family Multi?**
Free CD Shows Fastest & Safest Way to $20k in <90 Days in Real Estate!
*GetTheCashNow.com*



Try the gift finder at MyGordons.com

Gordon's
JEWELERS
Celebrating Relationships Since 1...

Find a store
$50 off Coupon

A D V E R T I S E M E N T

*Dictionary.com Unabridged (v 1.1)* – Cite This Source – *Share This*
**dwell·ing** 🔊 [dwel-ing] Pronunciation Key – Show IPA Pronunciation
*–noun*
a building or place of shelter to live in; place of residence; abode;
home.

[Origin: 1250–1300; ME; see DWELL, –ING¹]

—*Synonyms* See HOUSE.

*Dictionary.com Unabridged (v 1.1)*
*Based on the Random House Unabridged Dictionary, © Random House, Inc.
2006.*

Related Ads:

Dwelling Pads          Tube Dwelling
Dwelling 2004          Spider
Insurance              Accessory Dwelling
Dwelling               Dwelling Place

Free download! Get instant dictionary,
thesaurus, and encyclopedia access from your
Windows programs with CleverKeys.

*Dictionary.com Unabridged (v 1.1)* – Cite This Source – *Share This*
**dwell** 🔊 [dwel] Pronunciation Key - Show IPA Pronunciation *verb*,
**dwelt or dwelled, dwell·ing,** *noun*
*–verb (used without object)*
1. to live or stay as a permanent resident; reside.
2. to live or continue in a given condition or state: *to dwell in
   happiness.*
3. to linger over, emphasize, or ponder in thought, speech, or
   writing (often fol. by *on* or *upon*): *to dwell on a particular point
   in an argument.*
4. (of a moving tool or machine part) to be motionless for a
   certain interval during operation.



classmates·com®
I graduated in:
1959 or before
1960-69
1970-79
1980-89
1990-99
2000-present
▲ START

Wilson High (985)
Jefferson High (1054)
Commerce High (396)
Springfield High (514)

dwelling - Definitions from Dictionary.com
Case 1:04-cv-01126-GMS   Document 23-3   Filed 03/14/2008   Page 29 of 33
Page 2 of 4

*-noun*
5. *Machinery.*
   a. a flat or cylindrical area on a cam for maintaining a follower in a certain position during part of a cycle.
   b. a period in a cycle in the operation of a machine or engine during which a given part remains motionless.

[Origin: bef. 900; ME *dwellen* to lead astray, stun, abide, OE *dwellan* to lead or go astray, hinder; c. ON *dvelja*]

—*Related forms*
dwell·er, *noun*

*Dictionary.com Unabridged (v 1.1)*
*Based on the Random House Unabridged Dictionary, © Random House, Inc. 2006.*

ADVERTISEMENT

Faster searching with no ads - click here to upgrade to Dictionary.com Premium now!

ADVERTISEMENT



*American Heritage Dictionary* – *Cite This Source* – *Share This*
**dwell**  (dwĕl)   Pronunciation Key
*intr.v.*   **dwelt** (dwĕlt) or **dwelled, dwell·ing, dwells**
1. To live as a resident; reside.
2. To exist in a given place or state: *dwell in joy.*
3.
   a. To fasten one's attention: *kept dwelling on what went wrong.* See Synonyms at brood.
   b. To speak or write at length; expatiate: *dwelt on the need to trim the budget.*

[Middle English dwellen, from Old English dwellan, *to mislead, delay, dwell.*]

**dwell'er** *n.*
*(Download Now or Buy the Book)*
*The American Heritage® Dictionary of the English Language, Fourth Edition*
*Copyright © 2006 by Houghton Mifflin Company.*
*Published by Houghton Mifflin Company. All rights reserved.*

*American Heritage Dictionary* – *Cite This Source* – *Share This*
**dwell·ing**  (dwĕl'ĭng)   Pronunciation Key

*n.*   A place to live in; an abode.

*(Download Now or Buy the Book)*
*The American Heritage® Dictionary of the English Language, Fourth Edition*
*Copyright © 2006 by Houghton Mifflin Company.*
*Published by Houghton Mifflin Company. All rights reserved.*

*WordNet* – *Cite This Source* – *Share This*
**dwelling**

*noun*
housing that someone is living in: "he built a modest dwelling near the pond"; "they raise money to provide homes for the homeless"

*WordNet® 3.0, © 2006 by Princeton University.*

A89

_Kernerman English Multilingual Dictionary (Beta Version)_ – _Cite This Source_ – _Share This_
'dwelling _noun_
   a house, flat _etc_

| | | | |
|---|---|---|---|
| _Arabic:_ | منزل، مَسْكَن | _Japanese:_ | 住居 |
| _Chinese (Simplified):_ | 住处 | _Korean:_ | 거주지, 집 |
| _Chinese (Traditional):_ | 住處 | _Latvian:_ | mājoklis |
| _Czech:_ | dům, byt, obydlí | _Lithuanian:_ | būstas |
| _Danish:_ | bolig | _Norwegian:_ | bolig, hus, leilighet |
| _Dutch:_ | verblijfplaats | _Polish:_ | mieszkanie |
| _Estonian:_ | elukoht | _Portuguese (Brazil):_ | moradia |
| _Finnish:_ | asunto | _Portuguese (Portugal):_ | habitação |
| _French:_ | habitation | _Romanian:_ | locuinţă |
| _German:_ | die Wohnung | _Russian:_ | жильё |
| _Greek:_ | κατοικία | _Slovak:_ | obydlie, bývanie |
| _Hungarian:_ | lakóhely | _Slovenian:_ | bivališče |
| _Icelandic:_ | bústaður | _Spanish:_ | morada, vivienda |
| _Indonesian:_ | tempat tinggal | _Swedish:_ | boning, bostad |
| _Italian:_ | abitazione, dimora | _Turkish:_ | ev, mesken |

_See also:_ dwell, dwell on

_Kernerman English Multilingual Dictionary (Beta Version), © 2000–2006 K Dictionaries Ltd._

_Merriam-Webster's Dictionary of Law_ – _Cite This Source_ – _Share This_
Main Entry: dwell·ing
Function: _noun_
: a structure where a person lives and esp. sleeps called also _dwelling house_ —see also BURGLARY
NOTE: Courts disagree as to how permanent or consistent the habitation of a structure must be in order for it to be considered a dwelling, but most courts agree that a dwelling includes its curtilage.

_Merriam-Webster's Dictionary of Law, © 1996 Merriam-Webster, Inc._

View results from: Dictionary | Thesaurus | Encyclopedia | All Reference | the Web

Share This:       

A90



A D V E R T I S E M E N T

Perform a new search, or try your search for "dwelling" at:

Amazon.com – Shop for books, music and more
Reference.com – Encyclopedia Search
Reference.com – Web Search powered by Google
Thesaurus.com – Search for synonyms and antonyms

Get the Dictionary.com Toolbar for your browser – FREE download! *From the makers of Dictionary.com*

About Dictionary.com | Privacy Policy | Terms of Use | Link to Us | Contact Us

Copyright © 2008, Lexico Publishing Group, LLC. All rights reserved.

A91

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOSEPH JADCZAK AND                          )
CATHERINE JADCZAK,                          )
                                            )
                    Plaintiffs,             )
                                            )      C.A. No. 07-0431GMS
v.                                          )
                                            )
HOMESITE INSURANCE COMPANY,                 )
                                            )
                    Defendant.              )

## AFFIDAVIT OF JOSEPH JADCZAK

STATE OF DELAWARE       )
                        ) SS
COUNTY OF SUSSEX        )

Joseph Jadczak, being duly sworn, deposes and says:

1. I make this affidavit on personal knowledge, and in support of the plaintiffs' motion for partial summary judgment on the "dwelling" issue.

2. I am told that Homesite's policy declarations describe my main house as a "clapboard structure." This is incorrect. In fact, the main house has (and has always had) a Dryvit exterior, not a board exterior.

3. By contrast, my residential airplane hangar is framed with a Hardie board exterior.

4. My residential hangar is heated and insulated to render it habitable as a dwelling. As noted in my examination under oath, it is also equipped with electrical, cable television, telephone and sewer service. *and water. JJ*

_Joseph Jadczak_

SWORN TO AND SUBSCRIBED before me, a Notary Public in and for the State and County aforesaid.

2/28/08

_Carole Heidinger_

NOTARY PUBLIC

My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Carole H. Heidinger, Notary Public
City of Philadelphia, Philadelphia County
My Commission Expires Aug. 24, 2010
Member, Pennsylvania Association of Notaries

1760                                    2                                    A93