IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOSEPH JADCZAK and CATHERINE JADCZAK, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 07-0431 (GMS) |
| HOMESITE INSURANCE COMPANY, | ) ) | |
| Defendant. | ) | |

**DEFENDANT HOMESITE INSURANCE COMPANY'S ANSWERING
BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AND OPENING BRIEF IN SUPPORT OF HOMESITE INSURANCE
COMPANY'S CROSS MOTION FOR SUMMARY JUDGMENT**

Dated: April 11, 2008

Sean J. Bellew (#4072)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2026
  *Attorneys for Defendant*
  *Homesite Insurance Company*

Of counsel:
Melissa Brill
Cozen O'Connor
45 Broadway Atrium, 16th Floor
New York, NY 10006
Telephone: (212) 509-9400

# TABLE OF CONTENTS

Page

1.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.................. 1

2.   THE AIRPLANE HANGAR IS NOT A DWELLING UNDER
     COVERAGE A ....................................................................................................... 2

     A.   SUMMARY OF ARGUMENT ................................................................... 2

     B.   STATEMENT OF FACTS .......................................................................... 3

          1.   Key Policy Provisions............................................................... 3

          2.   Mr. Jadczak's Sworn Testimony About the Hangar .................. 4

          3.   Other Pertinent Facts................................................................. 4

     C.   ARGUMENT .............................................................................................. 5

          1.   Summary Judgment Standard .................................................... 5

          2.   Because the Policy is Clear, Plaintiffs are Bound by its Language. ........... 5

          3.   The Homesite Policy Provides Coverage for the Hangar Under
               Coverage B, Not Coverage A. ................................................... 6

               a)   The Policy is Clear – the Hangar is an Other Structure
                    Covered Under Coverage B – and Must be Enforced as
                    Written. ......................................................................... 6

               b)   Mr. Jadczak's EUO Testimony Further Supports the
                    Conclusion that the Hangar is Covered by Coverage B-
                    Other Structures. ........................................................... 7

               c)   Mr. Jadczak's post-loss communications only further
                    support the legal conclusion that the hangar is and always
                    was covered by Coverage B-Other Structures. ............................ 11

               d)   The Limited Case Law Supports Homesite's Position. ................ 12

               e)   Storing an RV Does Not Make an Airplane Hangar a
                    Dwelling......................................................................... 14

     D.   CONCLUSION.......................................................................................... 15

3.   THE RV IS NOT COVERED UNDER THE POLICY.................................................... 15

A.      SUMMARY OF ARGUMENT ........................................................ 15

B.      STATEMENT OF FACTS ............................................................. 15

     1.     KEY POLICY PROVISIONS ................................................ 15

     2.     MR. JADCZAK'S SWORN TESTIMONY ABOUT THE RV .............. 16

C.      ARGUMENT ............................................................................ 17

     1.     The RV is a Motor Vehicle or Other Motorized Land Conveyance. ........ 17

     2.     The RV was Subject to Motor Vehicle Registration. ............... 17

     3.     The RV was Not Used to Service Plaintiffs' Residence. .......... 18

D.      CONCLUSION ......................................................................... 19

4.     PLAINTIFFS' COST TO STORE THEIR AIRPLANE IS NOT COVERED UNDER THE POLICY ....................................................................... 19

A.      SUMMARY OF ARGUMENT ........................................................ 19

B.      STATEMENT OF FACTS ............................................................. 20

     1.     KEY POLICY PROVISIONS ................................................ 20

     2.     OTHER PERTINENT FACTS ............................................... 20

C.      ARGUMENT ............................................................................ 21

D.      CONCLUSION ......................................................................... 21

5.     HOMESITE DID NOT ACT IN BAD FAITH OR VIOLATE THE CONSUMER FRAUD ACT ................................................................................... 21

A.      SUMMARY OF ARGUMENT ........................................................ 21

B.      STATEMENT OF FACTS ............................................................. 22

C.      ARGUMENT ............................................................................ 23

     1.     Homesite Did Not Act in Bad Faith .......................................... 23

     2.     Homesite Did Not Violate the Delaware Consumer Fraud Act ............... 24

D.      CONCLUSION ......................................................................... 25

6.     PRAYER FOR RELIEF ................................................................. 25

# TABLE OF AUTHORITIES

Page

## CASES

Casson v. Nationwide Ins. Co.,
455 A.2d 361 (Del. Super. 1982) .............................................................................23

DiSimplico v. Equitable Variable Life Ins. Co.,
1988 WL 15394 (Del.Super. 1988) ..........................................................................25

Eames v. Nationwide Mut. Ins. Co.,
412 F. Supp. 2d 431 (D. Del. 2006) ........................................................................25

Eastman Kodak Co. v. Image Tech. Servs., Inc.,
504 U.S. 451 (1992) ...................................................................................................5

Farmers Mutual Insurance Association v. Martin, et al.,
84 So. 2d 688 (Miss. 1956) ................................................................................. 13-14

Goodman v. Continental Cas. Co.,
347 A.2d 662 (Del. Super. 1975) ..............................................................................5

Grissom v. Nationwide Mutual Ins. Co.,
599 A.2d 1086 (Del. Ch. 1991) ................................................................................6

Hallowell v. State Farm Mutual Automobile Ins. Co.,
443 A.2d 925 (Del. Super. 1982) .......................................................................... 5-6

Howard v. H. Robert Anderson & Assoc., Inc.,
2004 WL 3371968 (Minn. Dist. Ct.) .................................................................. 12-13

Hudson v. State,
569 A.2d 1168 (Del. Super. 1990) .............................................................................5

IMX, Inc. v. LendingTree, LLC,
405 F. Supp. 2d 479 (D. Del. 2005) ..........................................................................5

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986) ..................................................................................................5

Pennsylvania Coal Ass'n v. Babbitt,
63 F.3d 231 (3d Cir. 1995) .........................................................................................5

Tackett v. State Farm Fire & Cas. Ins. Co.,
653 A.2d 254 (Del. 1995) .................................................................................... 23-24

Tenos v. State Farm Ins. Co.,
    716 A.2d 626 (Pa. Super. 1998) ............................................................................18

## STATUTES, RULES & REGULATIONS

6 Del. C. § 2513 .......................................................................................................24

21 Del. C. § 101(35) ................................................................................................17

21 Del. C. § 101(53) ................................................................................................17

21 Del. C. § 101(80) ................................................................................................17

21 Del. C. § 2101(a) .................................................................................................18

Fed.R.Civ.P. 9(b) ...............................................................................................21, 25

Fed.R.Civ.P. 56 ..........................................................................................................5

Rule 56(c) ....................................................................................................................5

## OTHER AUTHORITIES

Couch on Insurance Third Edition, § 20:23 (2007) ................................................14

Restatement (Second) of Torts § 908 (1979) ..........................................................24

Websters Ninth New Collegiate Dictionary ...........................................................19

Defendant Homesite Insurance Company ("Homesite"), through its undersigned attorneys, hereby files this Answering Brief in opposition to plaintiffs Joseph and Catherine Jadczak's Motion for Partial Summary Judgment and Opening Brief in support of Homesite's Cross Motion for Summary Judgment.

Homesite's Cross Motion for Summary Judgment should be granted because (1) plaintiffs' airplane hangar is not covered under the Policy's Coverage A-Dwelling, (2) coverage for plaintiffs' RV is precluded by the Policy's Motor Vehicle exclusion, (3) plaintiffs' claim for rent to store their airplane is not covered under the Policy's Coverage D-Loss of Use and (4) plaintiffs cannot demonstrate that Homesite acted in bad faith.

## 1.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs live at a residential airpark, at which they had both a home and an airplane hangar on their land.  On May 29, 2006, plaintiffs' airplane hangar was completely destroyed by fire.  Plaintiffs' Recreational Vehicle, stored inside the airplane hangar, was destroyed in the fire. Finally, plaintiffs' home was slightly damaged, and plaintiffs lost certain items of personal property in the fire.  On that date, plaintiffs' property, located at 29555 Eagles Crest Drive, Milton, Delaware, was insured under a Homesite homeowners policy (the "Policy").

Homesite paid plaintiffs' claim for the airplane hangar, up to Policy limits, under Coverage B-Other Structures.  Plaintiffs now claim that they are entitled to additional coverage for the airplane hangar under Coverage A-Dwelling.  Homesite denied plaintiffs' claim for the RV, because of the Policy's Motor Vehicle exclusion.  Plaintiffs seek coverage for the RV despite that exclusion.  Plaintiffs also seek coverage, under Coverage D-Loss of Use, for the rental of an alternative hangar for their airplane.

On May 25, 2007, the Jadczaks filed suit against Homesite in Delaware state court. Homesite removed the action to the United States District Court for the District of Delaware and answered the Complaint on August 10, 2007.

2.    **THE AIRPLANE HANGAR IS NOT A DWELLING UNDER COVERAGE A**

   A.    **SUMMARY OF ARGUMENT[1]**

Plaintiffs' airplane hangar is not, and never was, a dwelling. This is true under the Policy at issue, and by any other stretch of the imagination.

Plaintiffs live at a residential airpark, at which owners may have both a home and an airplane hangar on their land. On May 29, 2006, plaintiffs' airplane hangar[2] was completely destroyed by fire. On that date, plaintiffs' property, located at 29555 Eagles Crest Drive, Milton, Delaware, was insured under a Homesite Policy.

The Policy's Coverage A provides coverage for the dwelling on the residence premises. The Policy's Coverage B provides coverage for *other structures* on the residence premises *set apart from the dwelling by clear space*. The airplane hangar is an other structure, set apart from the dwelling by clear space. As a matter of law, the Policy, therefore, clearly and unambiguously covers the airplane hangar under Coverage B–Other Structures. Upon completion of its investigation, Homesite paid plaintiffs the full limits under Coverage B.

Because plaintiffs want more than the Coverage B limits, they would now have the Court find that *the airplane hangar is one of two dwellings* on the residence premises, and so entitles plaintiffs to higher limits under Coverage A of the Policy, which covers only the dwelling on the residence premises insured by the Policy.

---

[1] In an attempt at simplifying this multi-issue brief, the sections required by D. Del. LR 7.1.3 will be replicated for each argument.

[2] For the first time here, plaintiffs refer to their airplane hangar as a "residential hangar." Previously, plaintiffs more accurately described the hangar as an "aircraft hangar." *See* Plaintiffs' Complaint, p.5.

Pursuant to the plain and unambiguous language of the Policy, plaintiffs' argument must fail.  Mr. Jadczak's EUO testimony, as well as his post-loss communications, only further support the conclusion that the airplane hangar is covered only by Coverage B-Other Structures.

B.    **STATEMENT OF FACTS**

1.    **Key Policy Provisions**

The Homesite Policy clearly and unambiguously covers the hangar under Coverage B – Other Structures.  The Policy provides in relevant part as follows:

**New Business Declarations**

**Insured Location**

29555 Eagles Crest Rd Milton DE 19968-3621

**Description of Dwelling**

2000 Clapboard structure, Single family home, Primary residence, Partially Protected, . . .

\*    \*    \*

**SECTION I – PROPERTY COVERAGES**

**COVERAGE A - DWELLING**

We cover:

The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

\*    \*    \*

**COVERAGE B – Other Structures**

We cover other structures on the "residence premises" set apart from the dwelling by clear space.  This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

\*    \*    \*

<u>See</u> Homesite Policy Number 30318013, attached hereto as Exhibit "A."

3

### 2.    Mr. Jadczak's Sworn Testimony About the Hangar

As a matter of fact and law, the airplane hangar is covered under Coverage B-Other Structures. Although Mr. Jadczak's EUO testimony is not necessary to reach this conclusion, his testimony only further supports it.

Mr. Jadczak's Examination Under Oath was taken on October 3, 2006. His sworn EUO testimony clearly demonstrates that the airplane hangar can, by no stretch of the imagination, be characterized as plaintiffs' primary residence or dwelling. Pertinent portions of the October 3, 2006 transcript of Joseph Jadczak's EUO, attached hereto as Exhibit "B," are cited below.

### 3.    Other Pertinent Facts

Again, this coverage issue is easily resolved as a matter of law; the airplane hangar is covered under Coverage B-Other Structures. Although Mr. Jadczak's post-loss communications are not necessary to reach this conclusion, those actions only further support it.

On July 7, 2006, Mr. Jadczak signed a Replacement Cost Questionnaire for his renewal policy and returned it to Homesite. See Replacement Cost Questionnaire, attached hereto as Exhibit "C."

By September 1, 2006 letter from Homesite to Mr. Jadczak, Homesite confirmed that the following changes were made to the Policy: "ADDED HO 04 48 OTHER STRUCTURE – INCR LM." See September 1, 2006 letter from Homesite to Mr. Jadczak, attached hereto as Exhibit "D."

Following the loss, Homesite Policy Number 30318013 was issued to the Jadczaks for the policy period from August 16, 2006 through August 16, 2007. That Policy contained Endorsement HO 04 48. See Endorsement HO 04 48 to the August 16, 2006 through August 16, 2007 Policy, attached hereto as "Exhibit E."

C.    **ARGUMENT**

1.    **Summary Judgment Standard**[3]

In deciding a motion for summary judgment, a court will view the underlying facts and all reasonable inferences in the light most favorable to the opposing party.  <u>Pennsylvania Coal Ass'n v. Babbitt</u>, 63 F.3d 231, 236 (3d Cir. 1995); <u>IMX, Inc. v. LendingTree</u>, *LLC*, 405 F. Supp. 2d 479, 484 (D. Del. 2005).  Under Rule 56(c), summary judgment is warranted when, viewing the evidence in the light most favorable to the non-movant, the Court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  See, Fed.R.Civ.P. 56; <u>Eastman Kodak Co. v. Image Tech. Servs., Inc.</u>, 504 U.S. 451, 457 (1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Here, there is no issue of fact, material or immaterial.  Plaintiffs' airplane hangar is an Other Structure as defined by the Policy's Coverage B.

2.    **Because the Policy is Clear, Plaintiffs are Bound by its Language.**

The interpretation of insurance contracts is a question of law.  <u>Hudson v. State</u>, 569 A.2d 1168, 1170 (Del. Super. 1990).  Unless otherwise provided by statute, the rights and responsibilities of the parties to a contract of insurance are those which are set forth in the contract.  <u>Goodman v. Continental Cas. Co.</u>, 347 A.2d 662 (Del. Super. 1975). Thus, the focus of the Court's analysis should be on the clear and unambiguous language of the Policy.

Although insurance contracts are to be construed in favor of the insured, this rule only applies where the policy language is ambiguous, for "where the language of an insurance contract is clear and unequivocal, a party will be bound by its plain meaning...."  <u>Hallowell v.</u>

---

[3] The Summary Judgment standard is intended to apply to all sections of this Brief.

State Farm Mutual Automobile Ins. Co., 443 A.2d 925, 926 (Del. Super. 1982).  In order to find that the policy provisions are ambiguous, the Court must determine that two or more equally reasonable interpretations of the policy provisions exist.  Id.  at 926; Grissom v. Nationwide Mutual Ins. Co., 599 A.2d 1086, 1088 (Del. Ch. 1991).

The Homesite Policy's Coverage B unambiguously covers:

> other structures on the "residence premises" set apart from the dwelling by clear space.  This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

Plaintiffs' airplane hangar is a structure, other than the house (dwelling), that is set apart from the house by clear space.  The Homesite Policy language is unambiguous – it provides coverage for the airplane hangar under Coverage B-Other Structures.   There is no other reasonable interpretation of the Policy language.

Despite a desire to collect more money for their airplane hangar, and despite several creative arguments, an airplane hangar is simply not a dwelling under the Policy.  Because the Policy language is clear, and is not subject to any other reasonable interpretation, plaintiffs are bound by it.

> **3.    The Homesite Policy Provides Coverage for the Hangar Under Coverage B, Not Coverage A.**
>
> > **a)    The Policy is Clear – the Hangar is an Other Structure Covered Under Coverage B – and Must be Enforced as Written.**

The "dwelling issue" in this case is ripe for decision on summary judgment.  There is no issue - the hangar is covered by the Policy's Coverage B.  Upon completion of its investigation, Homesite paid the Coverage B limits to the Jadczaks.  It is beyond dispute that the airplane hangar is not a dwelling covered under the Policy's Coverage A.

The only real issue here is whether the Jadczaks can collect more money by trying to turn their airplane hangar into a dwelling, or primary residence.  They cannot.

The policy provides coverage for Other Structures under Coverage B. The covered structures are described as "other structures on the "residence premises" set apart from the dwelling by clear space. <u>See</u> Exhibit A. This includes structures connected to the dwelling by only a fence, utility line, or similar connection." The airplane hangar, set apart from the house by a driveway, clearly and unambiguously falls under Coverage B.

The Policy provides coverage for the insured's Dwelling under Coverage A. The Dwelling is described as "the dwelling on the "residence premises" shown in the Declarations." The Declarations describe the dwelling as a "2000 Clapboard structure, Single family home, Primary residence . . ." <u>See</u> Exhibit A. The airplane hangar, neither a single family home nor a primary residence, clearly and unambiguously falls outside of Coverage A.

It defies the imagination that plaintiffs are trying to characterize their airplane hangar, set apart by a driveway from their $660,000 home[4], as their dwelling. There is no ambiguity, patent or latent, in the Policy's language. As a matter of law, the airplane hangar falls under Coverage B, the limits of which have already been paid.

> **b)    Mr. Jadczak's EUO Testimony Further Supports the Conclusion that the Hangar is Covered by Coverage B-Other Structures.**

The Homesite policy is clear – it covers Other Structures under Coverage B. As a matter of law, an airplane hangar, separated from the house by a driveway, is never going to be anything else. Nonetheless, plaintiffs have tried valiantly to find facts to support the conclusion that the Jadczaks used an airplane hangar as their primary residence and dwelling, when their $660,000 home was feet away. The facts do not support their attempt.

Mr. Jadczak's sworn EUO testimony clearly demonstrates that the airplane hangar cannot, by any stretch of the imagination, be characterized as plaintiffs' primary residence or

---

[4] The amount for which the home was insured under the Coverage A limits of the Policy. *See* Exhibit A. This amount was later increased to $822,000.

dwelling.  See pertinent portions of the October 3, 2006 transcript of Joseph Jadczak's EUO, attached hereto as Exhibit B.

At his EUO, Mr. Jadczak, himself, referred to his house (as opposed to his airplane hangar) as the dwelling:

> Q.    As I understand it, you were living in the RV at the time, and you built the hangar first.  Is that right, sir?
>
> A.    That's right.
>
> Q.    Then you built the dwelling?
>
> A.    Yes. (Exhibit B, p. 51, lines 3-8)
>
> *   *   *
>
> Q.    You did live in [the RV]?
>
> A.    We did.
>
> Q.    While you were building the dwelling. Right?
>
> A.    Yes. (Exhibit B, p. 56, lines 15-18)

Mr. Jadczak's testimony also proves that the hangar was an Other Structure, set apart from the dwelling by clear space (as set forth in the Policy, Coverage B):

> A.    The driveway is splitting the house and the hangar.
> (Exhibit B, p. 52, lines 8-9)

Additionally, Mr. Jadczak's testimony proves that the Jadczaks did not use the airplane hangar as a "dwelling" (which the Policy describes as a "single family home" and "primary residence").

> Q.    Now, before the loss on Memorial Day, what did you use your hangar for?
>
> A.    The parking of the airplane and the parking of the RV.  I also had tools.  I would do just personal odds and ends work on cars or the plane or the RV.  Also had personal items in there.
> (Exhibit B, p. 55, lines 2-7)

8

\*   \*   \*

Q.     Let me ask you this. When the RV is stored, let's say, you know, in the days leading up to the fire, is the electricity on in the RV?

A.     No.

Q.     Is the plumbing hooked up on the RV?

A.     No.

Q.     Is anything connected to the RV in terms of making it operational in any respect?

A.     Not unless we intend to use it or have someone sleep there if we have a bunch of people come down. (Exhibit B, p. 67, lines 23-24 to p. 68, lines 1-8)

\*   \*   \*

A.     . . . I told [the adjuster] I hadn't used the RV for three years. (Exhibit B, p. 69, lines 4-5)

\*   \*   \*

Q.     So it's your testimony today that the electric cable [the only source of power to the RV] was not plugged into the outlet on the wall from the RV for a period of three continuous years?

A.     Absolutely not. (Exhibit B, p.69, lines 10-13)

\*   \*   \*

In an attempt to take the airplane hangar out of Coverage B, plaintiffs state that the airplane hangar was hooked up to utilities. ((D.I. 22, Plaintiffs' Memorandum of Law in support of their Motion for Summary Judgment ("Plaintiffs' Memo"), p.7). However, the Policy's Coverage B specifically includes Other Structures connected to the dwelling by a utility line. See Exhibit A.

In an attempt to make the airplane hangar seem like a dwelling, plaintiffs state that a Recreational Vehicle was parked in the hangar. (Plaintiffs' Memo, p.7). However, parking an RV in your garage does not make your garage a dwelling.

Plaintiffs also incorrectly state that the Jadczaks watched television and videos in the airplane hangar on a daily basis.  (D.I. 22 at p.7).  In fact, Mr. Jadczak did no more than check the weather each morning (Exhibit B, p. 57, lines 4-5), presumably for conditions before flying to work.  Mr. Jadczak did testify that he "occasionally" watched television in the hangar, but he hardly described it as a place that he and his wife would go to watch television on a daily basis.

> Q.      It looks like you had a television and a VCR at the time of the fire inside of the hangar.  Is that right?
>
> A.      Yes.
>
> Q.      Did you watch television and use the VCR in the hangar?
>
> A.      Occasionally.
>
> Q.      Did you have, like, seats and couches and things of that nature to sit and recline and watch movies and television?
>
> A.      I had two desks and two chairs in there. (Exhibit B, p. 94, line 17 to p. 95, line 3)
>
> *   *   *

In another attempt to make the airplane hangar seem like a dwelling, plaintiffs state that they kept a microwave in the airplane hangar.  However, Mr. Jadczak's testimony makes it clear that the Jadczaks were not eating meals in the hangar.  (Plaintiffs' Memo, p.7)

> Q.      So you would have meals out there?
>
> A.      Occasionally heat something up if I'm working out there. (Exhibit B, p. 153, lines 21-23)
>
> *   *   *

Plaintiffs also misleadingly state that the Jadczaks bathed in the hangar.  (D.I. 22 at Memo, p.11)  In fact, the only possible place to bathe was the RV, to which the plumbing was not even connected.  (Exhibit B, p. 67)

It is beyond question that the Jadczaks' airplane hangar was just what its name implies – an airplane hangar. No creative arguments are going to change that. Under the clear and unambiguous terms of the Policy, the airplane hangar is an Other Structure, and is covered under Coverage B. Mr. Jadczak's testimony only strengthens that conclusion.

> **c)** **Mr. Jadczak's post-loss communications only further support the legal conclusion that the hangar is and always was covered by Coverage B-Other Structures.**

Mr. Jadczak's communications with Homesite after the May 29, 2006 loss indicate that plaintiffs knew that the airplane hangar was not a dwelling, and was covered only under the Policy's coverage B – Other Structures. On July 7, 2006, Mr. Jadczak signed a Replacement Cost Questionnaire for his renewal policy and returned it to Homesite. See Exhibit C. All of the information provided by Mr. Jadczak proves that his house (as opposed to his airplane hangar) is his dwelling.

In response to questions about his "dwelling" and "home," Mr. Jadczak indicated that it was a Ranch style, single family home with a "Composition Shingle" roof. He further described its exterior as "Hardy Plank" and "Stucco on Frame."[5] He listed the total living area as 3685 square feet.[6] Additionally, he requested that the Policy limits on his "dwelling" be changed to $850,000. See Exhibit C. It is obvious that none of these statements apply to the Jadzcak's airplane hangar.

In response to a question about his garage, Mr. Jadczak indicated that he had an attached and a detached garage. The attached garage, according to the Replacement Cost Questionnaire, contained three cars. With regard to the "detached garage" (the airplane hangar), Mr. Jadczak

---

[5] The fact that the Policy's Declarations page referred to the house as a "Clapboard structure, Single family home" is a non-issue. It is perfectly clear that this referred to the Jadczak's home, and not the airplane hangar located nearby.

[6] Additionally, in his EUO testimony, Mr. Jadczak confirms that his home is 4400 square feet, including the attached garage, and that his hangar was 1936 square feet. (Exhibit B, p. 51, lines 13-17).

requested that the Policy limits be changed from $82,200 to $200,000. Not coincidentally, $82,200 was the Coverage B-Other Structures limits on the renewal Policy and $200,000 was the approximate amount plaintiffs claim it will cost to rebuild their hangar.

Further confirming that all agreed that the airplane hangar was an "Other Structure" covered under Coverage B is the September 1, 2006 letter from Homesite to Mr. Jadczak confirming that the following changes were made to the Policy: "ADDED HO 04 48 OTHER STRUCTURE – INCR LM." See Exhibit D. In other words, the policy had been endorsed to increase the Coverage B-Other Structures limit.

Finally, the renewal policy was issued with the HO 04 48 Endorsement, which demonstrates without question that the hangar is an "Other Structure." See Exhibit E. The Endorsement states:

**OTHER STRUCTURES
INCREASED LIMITS**

| Description of Structure | Additional Limit of Liability |
|---|---|
| 1. HANGAR | 1. $82,000 |

It is beyond dispute that the Jadczak's airplane hangar is, and always was, covered by Homesite only under Coverage B-Other Structures. Mr. Jadczak's post-loss communications only strengthen this conclusion.

**d)    The limited case law supports Homesite's position.**

Plaintiffs' argument, that an airplane hangar is a dwelling, is unique at best. Therefore, it is not surprising that the case law is scarce.

The one Minnesota case cited by plaintiffs on this issue is completely off-point. (D.I. 22 at pp. 11-12). In Howard v. H. Robert Anderson & Assoc., Inc., 2004 WL 3371968 (Minn. Dist. Ct.), the structure at issue was *a cabin located in a different town* from the insured property. The policy at issue precluded coverage for structures located away from the insured premises and

12

used as a dwelling.  It was undisputed that, when in that other town, the insured lived in the cabin.

The facts in <u>Howard</u> are completely inapplicable here.  First, here, the structure at issue is not a cabin, but an airplane hangar.  Second, the airplane hangar is located right next to the house, not in another town.  Third, to fall under Coverage A-Dwelling, the Homesite Policy requires not only that the structure be a dwelling, but also that it be a single family home and primary residence.  <u>See</u> Exhibit A.

Plaintiffs are unable to cite a single case that found that an airplane hangar, or any other similar structure, located next to a house, was a dwelling, single family home and/or primary residence.

Much more on point is <u>Farmers Mutual Insurance Association v. Martin, et al.</u>, 84 So. 2d 688 (Miss. 1956).  In <u>Martin</u>, a windstorm policy covered a "one-story frame dwelling with approved roof, occupied by tenant, including permanent building equipment and fixtures therefor while anywhere on the above described premises."  <u>Martin</u>, 84 So. 2d at 689.  While the policy was in force, a detached garage was destroyed by wind.

The garage was built to accommodate two cars, was detached and located ten feet from the dwelling.  The garage was rented to a tenant, who stored a car and other 'stuff' there.  The tenant also kept some chairs and a bed, and on hot summer nights he sometimes slept in the garage.  <u>Id.</u>

The Mississippi Supreme Court stated that "the decision of this case does not depend upon the definition of the word 'dwelling' because that word alone is not used in the policy contract."  <u>Id.</u>  The property insured is not only said to be a dwelling, but it is further described and identified as 'the one-story frame dwelling with approved roof, occupied by tenant, including permanent building equipment and fixtures therefor while anywhere on the above

described premises.'"   The Court went on to hold that to call this garage a covered dwelling would be "to do violence to the plain and unambiguous terms of the policy contract."  Id. at 690; Couch on Insurance Third Edition, §  20:23 (2007).

In Martin, the Mississippi Supreme Court recognized that, in order to qualify for coverage, the policy required that the structure be more than just a dwelling, but had to be the dwelling described therein.  Martin, 84 So. 2d at 689-90.  That holding is directly on point here. In order to qualify under Coverage A-Dwelling, the Policy requires not only that a structure be a dwelling, but also that it be a single family home and primary residence.  That is obviously not the case with the airplane hangar.

What little law there is on this topic clearly supports the position that the airplane hangar falls under the Policy's Coverage B-Other Structures, as a matter of law.

### e)        Storing an RV Does Not Make an Airplane Hangar a Dwelling.

Plaintiffs argue that their airplane hangar is a dwelling covered under the Policy's Coverage A because there is a mobile home stored in it.  (Plaintiffs' Memo, p.13).  This is incorrect for several reasons.  First, the vehicle stored in the hangar was an RV, not a mobile home.  (Exhibit B, p. 67).  Second, plaintiffs did not live in the RV, or the hangar.  In fact, they used the hangar to store the RV.  (Exhibit B, p. 55).  Nor was the RV, or the hangar, a single family home or a primary residence.  Finally, plaintiffs' own insurance claim and Complaint belies their position.  Plaintiffs have claimed coverage for the RV not under Coverage A-Dwelling, but under Coverage C-Personal Property.[7]  They continue to pursue the Coverage C RV claim in this litigation.

Storing an unused RV (or even a used RV) in your airplane hangar does not qualify your airplane hangar as a dwelling, a primary residence or a single family home.

---

[7] This claim is also problematic, for reasons explained below.

D.        **CONCLUSION**

For the foregoing reasons, plaintiffs' airplane hangar is not a dwelling covered under the Policy's Coverage A, and Homesite's Motion for Summary Judgment on the dwelling issue must be granted.

**3.        THE RV IS NOT COVERED UNDER THE POLICY.**

A.        **SUMMARY OF ARGUMENT**

On May 29, 2006, when plaintiffs' airplane hangar was destroyed by fire, the Recreational Vehicle stored in the airplane hangar was destroyed, as well.  Plaintiffs made a claim for the loss of their RV under the Coverage C-Personal Property section of the Policy.

Because the Policy clearly and unambiguously precludes coverage for Motor Vehicles, there is no coverage for plaintiffs' RV under the Policy.

Plaintiffs will likely argue that the exception (for vehicles not subject to registration and used to service the insured residence) to the Motor Vehicle exclusion applies, adding coverage back.  The exception does not apply because (1) the RV was subject to registration and (2) the RV was not used to service the residence.

Therefore, as a matter of law, there is no coverage under the Policy for the RV, and Homesite's Motion for Summary Judgment on this issue should be granted.

B.        **STATEMENT OF FACTS**

1.        **KEY POLICY PROVISIONS**

The Homesite Policy clearly and unambiguously precludes coverage for the RV.  The Policy provides in relevant part as follows:

**SECTION I – PROPERTY COVERAGES**

**COVERAGE C – Personal Property**

We cover personal property owned or used by an "insured" while it is anywhere in the world. . . .

15

**Property Not Covered.** We do not cover:

\*   \*   \*

3. Motor Vehicles . . . *[deleted and replaced by DE Special Provisions]*

\*   \*   \*

**SPECIAL PROVISIONS - DELAWARE**

**SECTION I – PROPERTY COVERAGES**

**COVERAGE C – PERSONAL PROPERTY**

\*   \*   \*

**PROPERTY NOT COVERED**

3. Motor Vehicles or all other motorized land conveyances. . .

\*   \*   \*

We do cover vehicles or conveyances not subject to motor vehicle registration which are:

a. Used to service an "insured's" residence; . . .

<u>See</u> Exhibit A.

**2.  <u>MR. JADCZAK'S SWORN TESTIMONY ABOUT THE RV</u>**

As a matter of law, there is no coverage for the RV under the Policy. Although Mr. Jadczak's EUO testimony is not necessary to reach this conclusion, his testimony only further supports it.

Regardless of whether the RV was actually registered, it was certainly *subject* to registration. Additionally, Mr. Jadczak's testimony proves that, shortly before the fire, he was planning to drive the RV (and therefore, register it). <u>See</u> Exhibit B, pp. 35-36, 41 (repaired RV muffler and put tires on RV in 2005); pp. 65, 67 (intended to travel in RV in July 2005 with grandchildren).

C.     **ARGUMENT**

    1.     **The RV is a Motor Vehicle or Other Motorized Land Conveyance.**

The Policy precludes coverage for Motor Vehicles and all other motorized land conveyances. Pursuant to the clear and unambiguous terms of the Policy, the RV falls under that exclusion. Additionally, under Delaware law, there is no question that an RV is a Motor Vehicle. Section 101 of the Delaware Code provides:

> "Motor vehicle" includes every vehicle, as defined in this section, which is self-propelled . . .

21 Del. C. § 101(35). Section 101 goes on to define Vehicle:

> "Vehicle" means every device in, upon or by which any person or property is or may be transported or drawn upon a public highway, . . .

21 Del. C. § 101(80). Section 101 defines Recreational Vehicle, as follows:

> "Recreational vehicle" includes every motor vehicle used for temporary human living quarters, not the residence of the owner or occupant, and used for recreational or vacation activities, including motor homes, self-propelled campers and other motor vehicles with permanently attached camper components. . . .

21 Del. C. § 101(53).

Finally, plaintiffs do not contest that the RV is a Motor Vehicle pursuant to the Policy exclusion. Rather, they contend that the RV falls under the exception to the exclusion for vehicles not subject to registration that are used to service an insured's residence. Because the RV was subject to registration and was not used to service the Jadczak's residence, it does not fall under the exception to the exclusion.

    2.     **The RV was Subject to Motor Vehicle Registration.**

The RV does not fall under the exception to the Motor Vehicle exclusion because it was subject to registration and was not used to service the Jadczak's residence. Delaware law is clear – RV's are subject to motor vehicle registration.

> § 2101. Operation of unregistered vehicle; exceptions.
>
> (a) No person shall drive or move, nor shall any person, being the owner of a vehicle, knowingly permit to be driven or moved upon any highway *any vehicle*, except trackless trolley coaches, of a type required to be registered hereunder, which is not registered and for which current registration plates have not been issued as provided in this chapter or for which the appropriate fees have not been paid when and as required by this chapter

21 Del. C. § 2101(a).[8]  Delaware law prohibits any person from operating a vehicle without registration.  As is set forth above, Delaware law defines "vehicle" to include RV's.  Therefore, the Jadczaks' RV was subject to registration.

The Policy provides an exception to the Motor Vehicle exclusion where, *inter alia*, a vehicle is not <u>subject</u> to registration.  The Jadczaks' RV was <u>subject</u> to registration, regardless of whether it was actually registered.  Therefore, the RV cannot fall under the exception to the Motor Vehicle exclusion, and it is excluded from coverage under the Policy.

### 3.    <u>The RV was Not Used to Service Plaintiffs' Residence.</u>

As a matter of law, the RV falls under the Policy's Motor Vehicle exclusion, and does not fall under that exclusion's exception for vehicles (not subject to motor vehicle registration and *used to service an insured's residence*.  There is no evidence that the Jadczaks' RV was used to service, i.e., maintain or repair, their residence.

In <u>Tenos v. State Farm Ins. Co.</u>, 716 A.2d 626 (Pa. Super. 1998), the court was asked to decide whether an ATV fell under a similar exception to a motor vehicle exclusion for vehicles used to *service* the insured location.  The court held that the word "service" in this context contemplates some sort of maintenance or repair to the premises.

---

[8] *See also*, www.dmv.org/de-delaware/rv-motor-homes.php (Delaware's unofficial Department of Motor Vehicles website), which confirms that RV's must be registered in Delaware and www.dmv.de.gov (Delaware's official DMV website), which provides the fees for registering an RV.

Also, according to the National Underwriter Company's October 23, 2007 Fire Casualty and Surety Bulletin, a homeowner may have certain "vehicles" that are used to "service" the home (such as a tractor). Mere use of a vehicle for recreation or enjoyment cannot be interpreted as "serving the residence." National Underwriter cites <u>Websters Ninth New Collegiate Dictionary</u>'s definition of service, which is "to repair or provide maintenance." <u>See</u> National Underwriter Company's October 23, 2007 Fire Casualty and Surety Bulletin, attached hereto as Exhibit F.

Plaintiffs' RV was not, as a matter of law, used to service, i.e., repair or provide maintenance to, plaintiffs' residence. Because the RV was a motor vehicle, was subject to registration and was not used to service the insured's premises, is it excluded from coverage by the Policy's Motor Vehicle exclusion.

### D.    CONCLUSION

For the foregoing reasons, coverage for plaintiffs' RV is precluded by the Policy's Motor Vehicle exclusion, and Homesite's Motion for Summary Judgment on the RV issue must be granted.

### 4.    PLAINTIFFS' COST TO STORE THEIR AIRPLANE IS NOT COVERED UNDER THE POLICY

### A.    SUMMARY OF ARGUMENT

After their airplane hangar was destroyed, plaintiffs paid a neighbor for the use of her airplane hangar to store plaintiffs' airplane. Plaintiffs now seek coverage for the airplane hangar rental under the Policy's Coverage D-Loss of Use. Plaintiffs' rental of a hangar to store their airplane is not covered under the Policy's Coverage D-Loss of Use.

Coverage D-Loss of Use provides coverage for certain expenses incurred when a covered loss makes *that part of the "residence premises" where the insured resides not fit to live in*. Here, it is beyond dispute that plaintiffs' house was not rendered unfit to live in. Therefore, loss

of use coverage was never implicated by plaintiffs' loss, and rental of a hangar for plaintiffs' airplane is simply not covered by the Policy.

**B.     STATEMENT OF FACTS**

**1.     KEY POLICY PROVISIONS**

The Homesite Policy does not provide coverage for the rent incurred by plaintiffs to store their airplane.  Thus, the Policy clearly and unambiguously precludes coverage for plaintiffs' loss of use claim.  The Policy provides in relevant part as follows:

**SECTION I – PROPERTY COVERAGES**

**COVERAGE D – Loss of Use**

\*   \*   \*

1.  If a loss covered under this Section makes that part of the "residence premises" where you reside not fit to live in, we cover, at your choice, either of the following. . .

     **a.  Additional Living Expense**, meaning any necessary increase in living expenses incurred by you so that our household can maintain its normal standard of living; or

     **b.  Fair Rental Value**, meaning the fair rental value of that part of the "residence premises" where you reside less any expenses that do not continue while the premises is not fit to live in.

**2.     OTHER PERTINENT FACTS**

In order to trigger the Policy's Coverage D-Loss of Use coverage, that part of the residence premises where the Jadczaks live had to be rendered unfit to live in.  The  Jadczaks have never claimed that their home was rendered unfit to live in, nor is there any evidence to that effect.  In fact, at his EUO, Mr. Jadczak testified that the only damage to the residence caused by the fire was heat damage to the soffit above the attached garage, separation of the seal around the windows of the garage doors and damage to the landscaping.  (Exhibit B, p.78, line 11 – p. 79, line 13).  Certainly, none of this damage rendered the Jadczaks' home unfit to live in.

C.    **ARGUMENT**

The Policy's Coverage D-Loss of Use provides coverage for certain expenses incurred when a covered loss makes *that part of the "residence premises" where the insured resides not fit to live in*. Here, it is beyond dispute that plaintiffs' house was not rendered unfit to live in. Therefore, loss of use coverage was never implicated by plaintiffs' loss and plaintiffs are not entitled to coverage under the Policy's Coverage D-Loss of Use.

D.    **CONCLUSION**

For the foregoing reasons, plaintiffs are not entitled to Loss of Use coverage for the cost to rent a hangar to store their airplane, and Homesite's Motion for Summary Judgment on the Loss of Use issue must be granted.

5.    **HOMESITE DID NOT ACT IN BAD FAITH OR VIOLATE THE CONSUMER FRAUD ACT**

A.    **SUMMARY OF ARGUMENT**

Plaintiffs cannot prove that Homesite has acted in bad faith or has violated Delaware's Consumer Fraud Act. As is set forth above, as a matter of law, Homesite at all times acted in good faith with regard to plaintiffs. Each of Homesite's coverage determinations was correct, and Homesite provided coverage to plaintiffs where it was due under the Policy. Even if this Court should find that one or more of Homesite's coverage determinations was incorrect, there existed a set of facts or circumstances known to Homesite that created a bona fide dispute and, therefore, a meritorious defense to Homesite's liability under the Policy.

Additionally, plaintiffs have failed to allege any facts sufficient to sustain a claim of violation of Delaware's Consumer Fraud Act. Such a claim requires allegations of the use of fraud in connection with the sale of merchandise, which are non-existent here. Additionally, Federal Rule of Civil Procedure 9(b) requires that plaintiffs must state the alleged circumstances constituting fraud with particularity. Plaintiffs have been and will be unable to do so.

Therefore, Homesite's Motion for Summary Judgment with regard to plaintiffs' claims for bad faith and violation of Delaware's Consumer Fraud Act must be granted.

**B.    STATEMENT OF FACTS**

Despite plaintiffs' unsupported statements to the contrary, Homesite at all times acted in good faith and handled plaintiffs' claim promptly and appropriately. Plaintiffs' fire occurred on May 29, 2006. All within two weeks of the fire, plaintiffs submitted their claim to Homesite, Homesite assigned an adjuster and an investigator, and the adjuster contacted plaintiffs to set up a meeting. In addition to Homesite's adjuster and investigator, a separate cause and origin investigator inspected the scene. See July 20, 2006 Cause and Origin Report, attached hereto as Exhibit "G."

Once the investigation was underway, Homesite became aware of coverage issues, and issued a detailed Reservation of Rights letter to plaintiffs on June 27, 2006. See June 27, 2006 Reservation of Rights letter, attached hereto as Exhibit "H."

Homesite continued to investigate the claim and to communicate with plaintiffs. Mr. Jadczak's Examination Under Oath was taken on October 3, 2006. See Exhibit B. Homesite sent a denial letter with regard to the RV claim to the Jadczaks on November 16, 2006. See November 16, 2006 denial letter, attached hereto as Exhibit "I."

On March 5, 2007, Homesite issued three payments to plaintiffs: $21,772[9] under Coverage A, $68,894[10] under Coverage B and $31,450[11] under Coverage C. In response to an inquiry regarding those amounts, Homesite's counsel sent a July 30, 2007 letter to plaintiffs' counsel setting forth the basis for Homesite's calculations. See July 30, 2007 letter to Michael Sensor, Esq., attached hereto as Exhibit "J."

---

[9] For damage to the dwelling, including landscaping.
[10] Policy limits for the hangar, plus 5% for debris removal.
[11] For the replacement cost of plaintiffs' contents, minus depreciation.

Plaintiffs' allegations regarding a failure to preserve evidence to support a subrogation claim are a red herring because there is no subrogation potential in this matter. Additionally, plaintiffs' allegation that Homesite failed to retain a cause and origin investigator is incorrect and irrelevant. Homesite did retain a cause and origin investigator, who concluded that the fire was of an accidental nature and was likely caused by the RV's battery charger. See Exhibit G. The cause of the fire is not at issue in this matter.

Homesite paid plaintiffs' entire claim for damage to their dwelling and landscaping, paid the policy limits for the loss of the airplane hangar, and paid plaintiffs' covered contents claim. Homesite did not provide coverage for plaintiffs' RV, nor did Homesite provide additional coverage for the airplane hangar under Coverage A-Dwelling. Homesite's coverage positions were correct, and fully supported by the Policy and facts of the claim.

### C.     ARGUMENT

#### 1.     Homesite Did Not Act in Bad Faith

Under Delaware law, a lack of good faith, or the presence of bad faith, is actionable where the insured can show that the insurer's denial of benefits was "clearly without any reasonable justification." Tackett v. State Farm Fire & Cas. Ins. Co., 653 A.2d 254 (Del. 1995) (citing Casson v. Nationwide Ins. Co., 455 A.2d 361 (Del. Super. 1982). "The ultimate question is whether at the time the insurer denied liability, there existed a set of facts or circumstances known to the insurer which created a bona fide dispute and therefore a meritorious defense to the insurer's liability." Casson, supra.

A first-party claim against an insurer for bad faith denial or delay in claim payments sounds in contract and arises from the implied covenant of good faith and fair dealing. Tackett, supra. Recovery is limited to those damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made. Id.

Courts have generally precluded a party from obtaining damages for the emotional distress caused by breach of contract. This restriction has been applied in insurance bad faith cases to preclude recovery for emotional distress. Id. There is generally no basis for the recovery of damages for emotional distress in the absence of intentional conduct and physical injury, and an insured is not entitled to the recovery of punitive damages in a bad faith action unless the insurer's breach is particularly egregious, reckless or malicious. Id.

> The penal aspect and public policy considerations which justify the imposition of punitive damages require that they be imposed only after a close examination of whether the defendant's conduct is "outrageous," because of "evil motive" or "reckless indifference to the rights of others." ... Mere inadvertence, mistake or errors of judgment which constitute mere negligence will not suffice. It is not enough that a decision be wrong. It must result from a conscious indifference to the decision's foreseeable effect.

Id. (quoting Restatement (Second) of Torts § 908 (1979)).

Here, not only were Homesite's coverage decisions justified, they were correct. Even if the decisions were incorrect, they were completely justifiable based on the Policy and case law cited herein. As a matter of law, plaintiffs cannot establish that Homesite acted without any reasonable justification.

Here, Homesite paid the entire covered claim, and was correct in its denial of the non-covered portions of the claim, as described above. Even if it is found that Homesite was incorrect in its partial denial of coverage, the coverage issues created a bona fide dispute and, therefore, a meritorious defense to plaintiffs' claims. There is no question that there was a reasonable justification for coming to the conclusions that Homesite did. Therefore, as a matter of law, Homesite acted in good faith with regard to the Jadczaks' claim.

### 2. Homesite Did Not Violate the Delaware Consumer Fraud Act

Without alleging a single fact to support their claim, plaintiffs allege that Homesite violated the Delaware Consumer Fraud Act, 6 Del. C. § 2513. The Delaware Consumer Fraud

Act prohibits the use of fraud in connection with the sale of merchandise.  Specifically, the Act prohibits:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

Federal Rule of Civil Procedure 9(b) mandates that:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Here, plaintiffs fail to allege any facts with regard to fraud on the part of Homesite with regard to the sale of merchandise (presumably the policy).  Therefore, plaintiffs' claim for a violation of the Delaware Consumer Fraud Act must be dismissed.  FRCP 9(b); Eames v. Nationwide Mut. Ins. Co., 412 F. Supp. 2d 431 (D. Del. 2006).[12]

### D.    CONCLUSION

For the foregoing reasons, plaintiffs cannot prove that Homesite acted in bad faith or violated Delaware's Consumer Fraud Act.   Therefore, Homesite's Motion for Summary Judgment on these issues must be granted.

### 6.    PRAYER FOR RELIEF

For the foregoing reasons, Homesite submits that summary judgment should be entered in its favor and against plaintiffs, declaring that (1) plaintiffs' airplane hangar is not covered under the Policy's Coverage A-Dwelling, (2) coverage for plaintiffs' RV is precluded by the Policy's Motor Vehicle exclusion, (3) plaintiffs' claim for rent to store their airplane is not

---

[12] It follows, obviously, that plaintiffs cannot establish that Homesite committed "gross, oppressive or aggravated" fraud, and so cannot be entitled to punitive damages under the Act. DiSimplico v. Equitable Variable Life Ins. Co., 1988 WL 15394 (Del. Super. 1988).

covered under the Policy's Coverage D-Loss of Use and (4) plaintiffs cannot demonstrate that Homesite has acted in bad faith or violated the Delaware Consumer Fraud Act.

Respectfully submitted,

Dated: April 11, 2008

*/s/ Sean J. Bellew*
Sean J. Bellew (#4072)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2026
    *Attorneys for Defendant*
    *Homesite Insurance Company*

Of counsel:
Melissa Brill
Cozen O'Connor
45 Broadway Atrium, 16th Floor
New York, NY 10006
Telephone: (212) 509-9400

# EXHIBIT A

# CERTIFICATE OF AUTHENTICITY

    I, **William Sullivan, an Underwriter for Homesite Insurance Company, hereby certify that this policy of insurance is a true and correct copy of our policy # 30318013, issued by Homesite Insurance Company TO:**

**Joseph W Jadczak Jr.**
**Catherine Jadczak**
**29555 Eagles Crest Rd.**
**Milton, DE 19968**

**Which was EFFECTIVE:**

12:01 AM August 16, 2005 through
12:01 AM August 16, 2006 (local time)

**Signed, this 6th day of June, 2007.**

*William Sullivan*

**William Sullivan**
 **Underwriter**

**Notary:**

Commonwealth of Massachusetts                                      June 6, 2007
Suffolk County

Then personally appeared the above named William Sullivan and acknowledged the
foregoing to be his free act and deed, before me,

*Susan Grady Madison*
Notary Public

My Commission Expires  4/13/2012

## AIG Homeowners Insurance Program

99 Bedford Street
Boston, MA 02111-2217
Tel. 1-(866) 342-2045 Fax 1-(866) 360-3202

**New Business Declarations**
**For Policy Number 30318013**

**Policy Period** This policy covers the listed location(s)
**From** 12:01 AM August 16, 2005
**Through** 12:01 AM August 16, 2006 (local time)

JOSEPH W JADCZAK JR.
CATHERINE JADCZAK
29555 EAGLES CREST RD
MILTON DE 19968

**Issued by Homesite Insurance Company**

### Tier 001

**Insured Location**
29555 EAGLES CREST RD  MILTON DE 19968-3621

**Description of Dwelling**
2000 Clapboard structure, Single family home, Primary residence, Partially Protected, territory code 0002, over 1000ft. from hydrant, within 5 miles from fire station.

| Deductible $250 Windstorm or Hail Deductible $500 | In case of loss under Section I, we cover only that part of the loss over the deductible stated. For Wind or Hail deductible, see endorsement HH 80 06. |
|---|---|

| Coverage | Limit | Premium |
|---|---|---|
| **Section I - Property** | | |
| Coverage A - Dwelling | $622,000 | $1,527.00 |
| Coverage B - Other Structures | $62,200 | Included |
| Coverage C - Personal Property | $435,400 | Included |
| Coverage D - Loss Of Use | $124,400 | Included |
| **Section II - Liability** | | |
| Coverage E - Personal Liability | $300,000 | $16.00 |
| Coverage F - Medical Payments To Others | $3,000 | $2.00 |
| **Additional Coverages** See **Additional Coverages** on reverse side for details | | $258.00 |
| **Surcharges** See **Surcharges** on reverse side for details | | $0.00 |
| **Discounts** See **Discounts** on reverse side for details | | -$140.00 |

| **Total** | | **$1,663.00** |
|---|---|---|

Countersigned_____ Date_____ Authorized Representative _____

Page 2

## Additional Coverages $258.00

| | | Limit | Premium |
|---|---|---|---|
| HO 04 20 0694 | Specified Additional Amount Insurance for Cov A | | $90.00 |
| HO 04 90 0491 | Personal Property Replacement Cost | | $168.00 |

## Surcharges $0.00

| | Premium |
|---|---|

## Discounts -$140.00

| | | Premium |
|---|---|---|
| HD-016 1298 | New Home Credit | -$94.00 |
| HO 04 16 0491 | Premises Alarm or Fire Protection System | -$46.00 |

## Contracts and Amendments

| **HO 00 03 0491** | **Special Form (HO 00 03 0491)** |
|---|---|
| HH 80 06 1101 | Windstorm or Hail Fixed-Dollar Deductible |
| HO 01 07 1298 | Special Provisions - Delaware |
| HO 04 32 0502 | Limited Fungi, Wet or Dry Rot, or Bacteria Coverage |
| HO 04 96 0491 | No Section II Coverage - Home Day Care Business |
| HO 04 98 0491 | Refrigerated Property Coverage |

Page 3

## Mortgagees

CITI MORTGAGE INC
PO BOX 7706
SPRINGFIELD, OH 45501
0017656901

CITI MORTGAGE INC
PO BOX 7706
SPRINGFIELD, OH 45501
002001066049

## Important Messages

These Declarations are not the entire insurance policy. All information contained in the Declarations regarding the insured, covered property, coverage limits, deductibles, and premium charges is subject to the specific terms and conditions of the policy contract. Please read your policy contract and amendments carefully.

**AIG Homeowners Insurance Program**

99 Bedford Street
Boston, MA 02111-2217
Tel. 1-(866) 342-2045  Fax 1-(866) 360-3202

*Policy Contract Pack*

*Important information about your AIG Policy*

# Thank You for choosing AIG Homeowners Insurance Program

## You have selected Special Form (HO 00 03 0491).

**The following State Amendatory Endorsements may modify your contract.
Please review the information in this package carefully.**

**If you have any questions regarding the information contained in this package, please
call us at 1-(866) 342-2045.**

HOMEOWNERS
HO 00 03 04 91

# HOMEOWNERS 3
# SPECIAL FORM

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We," "us" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined as follows:

1. "Bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.

2. "Business" includes trade, profession or occupation.

3. "Insured" means you and residents of your household who are:

   a. Your relatives; or

   b. Other persons under the age of 21 and in the care of any person named above.

   Under Section II, "insured" also means:

   c. With respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in 3.a. or 3.b. above. A person or organization using or having custody of these animals or watercraft in the course of any "business" or without consent of the owner is not an "insured";

   d. With respect to any vehicle to which this policy applies:

      (1) Persons while engaged in your employ or that of any person included in 3.a. or 3.b. above; or

      (2) Other persons using the vehicle on an "insured location" with your consent.

4. "Insured location" means:

   a. The "residence premises";

   b. The part of other premises, other structures and grounds used by you as a residence and:

      (1) Which is shown in the Declarations; or

      (2) Which is acquired by you during the policy period for your use as a residence;

   c. Any premises used by you in connection with a premises in 4.a. and 4.b. above;

   d. Any part of a premises:

      (1) Not owned by an "insured"; and

      (2) Where an "insured" is temporarily residing;

   e. Vacant land, other than farm land, owned by or rented to an "insured";

   f. Land owned by or rented to an "insured" on which a one or two family dwelling is being built as a residence for an "insured";

   g. Individual or family cemetery plots or burial vaults of an "insured"; or

   h. Any part of a premises occasionally rented to an "insured" for other than "business" use.

5. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

   a. "Bodily injury"; or

   b. "Property damage."

6. "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

7. "Residence employee" means:

   a. An employee of an "insured" whose duties are related to the maintenance or use of the "residence premises", including household or domestic services; or

   b. One who performs similar duties elsewhere not related to the "business" of an "insured."

8. "Residence premises" means:

   a. The one family dwelling, other structures, and grounds; or

   b. That part of any other building;

   where you reside and which is shown as the "residence premises" in the Declarations.

   "Residence premises" also means a two family dwelling where you reside in at least one of the family units and which is shown as the "residence premises" in the Declarations.

## SECTION I – PROPERTY COVERAGES

### COVERAGE A – Dwelling

We cover:

1. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

2. Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises."

This coverage does not apply to land, including land on which the dwelling is located.

### COVERAGE B – Other Structures

We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

This coverage does not apply to land, including land on which the other structures are located.

We do not cover other structures:

1. Used in whole or in part for "business"; or

2. Rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A. Use of this coverage does not reduce the Coverage A limit of liability.

### COVERAGE C – Personal Property

We cover personal property owned or used by an "insured" while it is anywhere in the world. At your request, we will cover personal property owned by:

1. Others while the property is on the part of the "residence premises" occupied by an "insured";

2. A guest or a "residence employee," while the property is in any residence occupied by an "insured."

Our limit of liability for personal property usually located at an "insured's" residence, other than the "residence premises," is 10% of the limit of liability for Coverage C, or $1000, whichever is greater. Personal property in a newly acquired principal residence is not subject to this limitation for the 30 days from the time you begin to move the property there.

**Special Limits of Liability.** These limits do not increase the Coverage C limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category.

1. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum, coins and medals.

2. $1000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

   This limit includes the cost to research, replace or restore the information from the lost or damaged material.

3. $1000 on watercraft, including their trailers, furnishings, equipment and outboard engines or motors.

4. $1000 on trailers not used with watercraft.

5. $1000 for loss by theft of jewelry, watches, furs, precious and semi-precious stones.

6. $2000 for loss by theft of firearms.

7. $2500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.

8. $2500 on property, on the "residence premises," used at any time or in any manner for any "business" purpose.

9. $250 on property, away from the "residence premises," used at any time or in any manner for any "business" purpose. However, this limit does not apply to loss to adaptable electronic apparatus as described in Special Limits 10. and 11. below.

10. $1000 for loss to electronic apparatus, while in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power. Electronic apparatus includes:

    a. Accessories or antennas; or

    b. Tapes, wires, records, discs or other media;

    for use with any electronic apparatus.

Copyright, Insurance Services Office, Inc., 1990

11. $1000 for loss to electronic apparatus, while not in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus:

a. Is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power;

b. Is away from the "residence premises"; and

c. Is used at any time or in any manner for any "business" purpose.

Electronic apparatus includes:

a. Accessories and antennas; or

b. Tapes, wires, records, discs or other media;

for use with any electronic apparatus.

**Property Not Covered.** We do not cover:

1. Articles separately described and specifically insured in this or other insurance;

2. Animals, birds or fish;

3. Motor vehicles or all other motorized land conveyances. This includes:

a. Their equipment and accessories; or

b. Electronic apparatus that is designed to be operated solely by use of the power from the electrical system of motor vehicles or all other motorized land conveyances. Electronic apparatus includes:

   (1) Accessories or antennas; or

   (2) Tapes, wires, records, discs or other media;

   for use with any electronic apparatus.

   The exclusion of property described in **3.a.** and **3.b.** above applies only while the property is in or upon the vehicle or conveyance.

We do cover vehicles or conveyances not subject to motor vehicle registration which are:

a. Used to service an "insured's" residence; or

b. Designed for assisting the handicapped;

4. Aircraft and parts. Aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

5. Property of roomers, boarders and other tenants, except property of roomers and boarders related to an "insured";

6. Property in an apartment regularly rented or held for rental to others by an "insured," except as provided in Additional Coverages **10.**;

7. Property rented or held for rental to others off the "residence premises";

8. "Business" data, including such data stored in:

a. Books of account, drawings or other paper records; or

b. Electronic data processing tapes, wires, records, discs or other software media;

However, we do cover the cost of blank recording or storage media, and of pre-recorded computer programs available on the retail market; or

9. Credit cards or fund transfer cards except as provided in Additional Coverages **6.**

**COVERAGE D – Loss Of Use**

The limit of liability for Coverage D is the total limit for all the coverages that follow.

1. If a loss covered under this Section makes that part of the "residence premises" where you reside not fit to live in, we cover, at your choice, either of the following. However, if the "residence premises" is not your principal place of residence, we will not provide the option under paragraph **b.** below.

a. **Additional Living Expense,** meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or

b. **Fair Rental Value,** meaning the fair rental value of that part of the "residence premises" where you reside less any expenses that do not continue while the premises is not fit to live in.

Payment under **a.** or **b.** will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

2. If a loss covered under this Section makes that part of the "residence premises" rented to others or held for rental by you not fit to live in, we cover the:

**Fair Rental Value,** meaning the fair rental value of that part of the "residence premises" rented to others or held for rental by you less any expenses that do not continue while the premises is not fit to live in.

Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3. If a civil authority prohibits you from use of the "residence premises" as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense and Fair Rental Value loss as provided under **1.** and **2.** above for no more than two weeks.

The periods of time under **1.**, **2.** and **3.** above are not limited by expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

## ADDITIONAL COVERAGES

1. **Debris Removal.** We will pay your reasonable expense for the removal of:

   a. Debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or

   b. Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

   This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

   We will also pay your reasonable expense, up to $500, for the removal from the "residence premises" of:

   a. Your tree(s) felled by the peril of Windstorm or Hail;

   b. Your tree(s) felled by the peril of Weight of Ice, Snow or Sleet; or

   c. A neighbor's tree(s) felled by a Peril Insured Against under Coverage C;

   provided the tree(s) damages a covered structure. The $500 limit is the most we will pay in any one loss regardless of the number of fallen trees.

2. **Reasonable Repairs.** In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage. If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by an applicable Peril Insured Against.

   This coverage:

   a. Does not increase the limit of liability that applies to the covered property;

   b. Does not relieve you of your duties, in case of a loss to covered property, as set forth in SECTION I – CONDITION **2.d.**

3. **Trees, Shrubs and Other Plants.** We cover trees, shrubs, plants or lawns, on the "residence premises," for loss caused by the following Perils Insured Against: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles not owned or operated by a resident of the "residence premises," Vandalism or malicious mischief or Theft.

   We will pay up to 5% of the limit of liability that applies to the dwelling for all trees, shrubs, plants or lawns. No more than $500 of this limit is available for any one tree, shrub or plant. We do not cover property grown for "business" purposes.

   This coverage is additional insurance.

4. **Fire Department Service Charge.** We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

   This coverage is additional insurance. No deductible applies to this coverage.

5. **Property Removed.** We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed. This coverage does not change the limit of liability that applies to the property being removed.

6. **Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.**

   We will pay up to $500 for:

   a. The legal obligation of an "insured" to pay because of the theft or unauthorized use of credit cards issued to or registered in an "insured's" name;

   b. Loss resulting from theft or unauthorized use of a fund transfer card used for deposit, withdrawal or transfer of funds, issued to or registered in an "insured's" name;

   c. Loss to an "insured" caused by forgery or alteration of any check or negotiable instrument; and

   d. Loss to an "insured" through acceptance in good faith of counterfeit United States or Canadian paper currency.

Copyright, Insurance Services Office, Inc., 1990

**HO 00 03 04 91**
29.21713.hpolprdiraig.6/14.9:48  007

We do not cover use of a credit card or fund transfer card:

**a.** By a resident of your household;

**b.** By a person who has been entrusted with either type of card; or

**c.** If an "insured" has not complied with all terms and conditions under which the cards are issued.

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

We do not cover loss arising out of "business" use or dishonesty of an "insured."

This coverage is additional insurance. No deductible applies to this coverage.

Defense:

**a.** We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

**b.** If a suit is brought against an "insured" for liability under the Credit Card or Fund Transfer Card coverage, we will provide a defense at our expense by counsel of our choice.

**c.** We have the option to defend at our expense an "insured" or an "insured's" bank against any suit for the enforcement of payment under the Forgery coverage.

**7. Loss Assessment.** We will pay up to $1000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under COVERAGE A – DWELLING, other than earthquake or land shock waves or tremors before, during or after a volcanic eruption.

This coverage applies only to loss assessments charged against you as owner or tenant of the "residence premises."

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

The limit of $1000 is the most we will pay with respect to any one loss, regardless of the number of assessments.

Condition **1.** Policy Period, under SECTIONS I AND II CONDITIONS, does not apply to this coverage.

**8. Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

**a.** Perils Insured Against in COVERAGE C – PERSONAL PROPERTY. These perils apply to covered buildings and personal property for loss insured by this additional coverage;

**b.** Hidden decay;

**c.** Hidden insect or vermin damage;

**d.** Weight of contents, equipment, animals or people;

**e.** Weight of rain which collects on a roof; or

**f.** Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items **b., c., d., e.,** and **f.** unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

This coverage does not increase the limit of liability applying to the damaged covered property.

**9. Glass or Safety Glazing Material.**

We cover:

**a.** The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window; and

**b.** Damage to covered property by glass or safety glazing material which is part of a building, storm door or storm window.

This coverage does not include loss on the "residence premises" if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant.

Loss for damage to glass will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

This coverage does not increase the limit of liability that applies to the damaged property.

10. **Landlord's Furnishings.** We will pay up to $2500 for your appliances, carpeting and other household furnishings, in an apartment on the "residence premises" regularly rented or held for rental to others by an "insured," for loss caused only by the following Perils Insured Against:

a. **Fire or lightning.**

b. **Windstorm or hail.**

This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.

c. **Explosion.**

d. **Riot or civil commotion.**

e. **Aircraft,** including self-propelled missiles and spacecraft.

f. **Vehicles.**

g. **Smoke,** meaning sudden and accidental damage from smoke.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

h. **Vandalism or malicious mischief.**

i. **Falling objects.**

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

j. **Weight of ice, snow or sleet** which causes damage to property contained in a building.

k. **Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

This peril does not include loss:

(1) To the system or appliance from which the water or steam escaped;

(2) Caused by or resulting from freezing except as provided in the peril of freezing below; or

(3) On the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises."

In this peril, a plumbing system does not include a sump, sump pump or related equipment.

l. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

m. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

This peril does not include loss on the "residence premises" while the dwelling is unoccupied, unless you have used reasonable care to:

(1) Maintain heat in the building; or

(2) Shut off the water supply and drain the system and appliances of water.

n. **Sudden and accidental damage from artificially generated electrical current.**

This peril does not include loss to a tube, transistor or similar electronic component.

o. **Volcanic eruption** other than loss caused by earthquake, land shock waves or tremors.

The $2500 limit is the most we will pay in any one loss regardless of the number of appliances, carpeting or other household furnishings involved in the loss.

---

## SECTION I – PERILS INSURED AGAINST

**COVERAGE A – DWELLING and COVERAGE B – OTHER STRUCTURES**

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property. We do not insure, however, for loss:

1. Involving collapse, other than as provided in Additional Coverage 8.;

2. Caused by:

a. Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the dwelling is vacant, unoccupied or being constructed, unless you have used reasonable care to:

(1) Maintain heat in the building; or

(2) Shut off the water supply and drain the system and appliances of water;

b. Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

(1) Fence, pavement, patio or swimming pool;

(2) Foundation, retaining wall, or bulkhead; or

(3) Pier, wharf or dock;

c. Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

d. Vandalism and malicious mischief if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

e. Any of the following:

(1) Wear and tear, marring, deterioration;

(2) Inherent vice, latent defect, mechanical breakdown;

(3) Smog, rust or other corrosion, mold, wet or dry rot;

(4) Smoke from agricultural smudging or industrial operations;

(5) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C of this policy.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

(6) Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings;

(7) Birds, vermin, rodents, or insects; or

(8) Animals owned or kept by an "insured."

If any of these cause water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

3. Excluded under Section I – Exclusions.

Under items **1.** and **2.**, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

**COVERAGE C – PERSONAL PROPERTY**

We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in SECTION I – EXCLUSIONS.

1. **Fire or lightning.**

2. **Windstorm or hail.**

This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft,** including self-propelled missiles and spacecraft.

6. **Vehicles.**

7. **Smoke,** meaning sudden and accidental damage from smoke.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. **Vandalism or malicious mischief.**

9. **Theft,** including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

This peril does not include loss caused by theft:

a. Committed by an "insured";

b. In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied; or

c. From that part of a "residence premises" rented by an "insured" to other than an "insured."

This peril does not include loss caused by theft that occurs off the "residence premises" of:

a. Property while at any other residence owned by, rented to, or occupied by an "insured," except while an "insured" is temporarily living there. Property of a student who is an "insured" is covered while at a residence away from home if the student has been there at any time during the 45 days immediately before the loss;

b. Watercraft, and their furnishings, equipment and outboard engines or motors; or

c. Trailers and campers.

10. **Falling objects.**

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

11. **Weight of ice, snow or sleet** which causes damage to property contained in a building.

12. **Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

This peril does not include loss:

a. To the system or appliance from which the water or steam escaped;

b. Caused by or resulting from freezing except as provided in the peril of freezing below; or

c. On the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises."

In this peril, a plumbing system does not include a sump, sump pump or related equipment.

13. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

14. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

This peril does not include loss on the "residence premises" while the dwelling is unoccupied, unless you have used reasonable care to:

a. Maintain heat in the building; or

b. Shut off the water supply and drain the system and appliances of water.

15. **Sudden and accidental damage from artificially generated electrical current.**

This peril does not include loss to a tube, transistor or similar electronic component.

16. **Volcanic eruption** other than loss caused by earthquake, land shock waves or tremors.

## SECTION I – EXCLUSIONS

1. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

a. **Ordinance or Law,** meaning enforcement of any ordinance or law regulating the construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

b. **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption; landslide; mine subsidence; mudflow; earth sinking, rising or shifting; unless direct loss by:

(1) Fire;

(2) Explosion; or

(3) Breakage of glass or safety glazing material which is part of a building, storm door or storm window;

ensues and then we will pay only for the ensuing loss.

This exclusion does not apply to loss by theft.

c. **Water Damage,** meaning:

(1) Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

(2) Water which backs up through sewers or drains or which overflows from a sump; or

Copyright, Insurance Services Office, Inc., 1990

(3) Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

Direct loss by fire, explosion or theft resulting from water damage is covered.

d. **Power Failure,** meaning the failure of power or other utility service if the failure takes place off the "residence premises." But, if a Peril Insured Against ensues on the "residence premises," we will pay only for that ensuing loss.

e. **Neglect,** meaning neglect of the "insured" to use all reasonable means to save and preserve property at and after the time of a loss.

f. **War,** including the following and any consequence of any of the following:

(1) Undeclared war, civil war, insurrection, rebellion or revolution;

(2) Warlike act by a military force or military personnel; or

(3) Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

g. **Nuclear Hazard,** to the extent set forth in the Nuclear Hazard Clause of SECTION I – CONDITIONS.

h. **Intentional Loss,** meaning any loss arising out of any act committed:

(1) By or at the direction of an "insured"; and

(2) With the intent to cause a loss.

2. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

a. **Weather conditions.** However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph **1.** above to produce the loss;

b. **Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body;

c. **Faulty, inadequate or defective:**

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property whether on or off the "residence premises."

## SECTION I – CONDITIONS

1. **Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

a. To the "insured" for more than the amount of the "insured's" interest at the time of loss; or

b. For more than the applicable limit of liability.

2. **Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done:

a. Give prompt notice to us or our agent;

b. Notify the police in case of loss by theft;

c. Notify the credit card or fund transfer card company in case of loss under Credit Card or Fund Transfer Card coverage;

d. Protect the property from further damage. If repairs to the property are required, you must:

(1) Make reasonable and necessary repairs to protect the property; and

(2) Keep an accurate record of repair expenses;

e. Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

f. As often as we reasonably require:

(1) Show the damaged property;

(2) Provide us with records and documents we request and permit us to make copies; and

(3) Submit to examination under oath, while not in the presence of any other "Insured," and sign the same;

g. Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

(1) The time and cause of loss;

(2) The interest of the "insured" and all others in the property involved and all liens on the property;

(3) Other insurance which may cover the loss;

(4) Changes in title or occupancy of the property during the term of the policy;

(5) Specifications of damaged buildings and detailed repair estimates;

(6) The inventory of damaged personal property described in **2.e.** above;

(7) Receipts for additional living expenses incurred and records that support the fair rental value loss; and

(8) Evidence or affidavit that supports a claim under the Credit Card, Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

3. **Loss Settlement.** Covered property losses are settled as follows:

a. Property of the following types:

(1) Personal property;

(2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and

(3) Structures that are not buildings;

at actual cash value at the time of loss but not more than the amount required to repair or replace.

b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

(a) The limit of liability under this policy that applies to the building;

(b) The replacement cost of that part of the building damaged for like construction and use on the same premises; or

(c) The necessary amount actually spent to repair or replace the damaged building.

(2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

(a) The actual cash value of that part of the building damaged; or

(b) That proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

(3) To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

(a) Excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

(b) Those supports in **(a)** above which are below the surface of the ground inside the foundation walls, if there is no basement; and

(c) Underground flues, pipes, wiring and drains.

(4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of **b.(1)** and **b.(2)** above.

However, if the cost to repair or replace the damage is both:

(a) Less than 5% of the amount of insurance in this policy on the building; and

(b) Less than $2500;

we will settle the loss according to the provisions of **b.(1)** and **b.(2)** above whether or not actual repair or replacement is complete.

Copyright, Insurance Services Office, Inc., 1990

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability according to the provisions of this Condition **3. Loss Settlement.**

4. **Loss to a Pair or Set.** In case of loss to a pair or set we may elect to:

   a. Repair or replace any part to restore the pair or set to its value before the loss; or

   b. Pay the difference between actual cash value of the property before and after the loss.

5. **Glass Replacement.** Loss for damage to glass caused by a Peril Insured Against will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

6. **Appraisal.** If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

   Each party will:

   a. Pay its own appraiser; and

   b. Bear the other expenses of the appraisal and umpire equally.

7. **Other Insurance.** If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

8. **Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

9. **Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with like property.

10. **Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

    a. Reach an agreement with you;

    b. There is an entry of a final judgment; or

    c. There is a filing of an appraisal award with us.

11. **Abandonment of Property.** We need not accept any property abandoned by an "insured."

12. **Mortgage Clause.**

    The word "mortgagee" includes trustee.

    If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

    If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

    a. Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

    b. Pays any premium due under this policy on demand if you have neglected to pay the premium; and

    c. Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

    If we decide to cancel or not to renew this policy, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

    If we pay the mortgagee for any loss and deny payment to you:

    a. We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

    b. At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

    Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

13. **No Benefit to Bailee.** We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

14. **Nuclear Hazard Clause.**

   a. "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

   b. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against in Section I.

   c. This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

15. **Recovered Property.** If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

16. **Volcanic Eruption Period.** One or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

## SECTION II – LIABILITY COVERAGES

### COVERAGE E – Personal Liability

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which the "insured" is legally liable. Damages include prejudgment interest awarded against the "insured"; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the "occurrence" equals our limit of liability.

### COVERAGE F – Medical Payments To Others

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing "bodily injury." Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except "residence employees." As to others, this coverage applies only:

1. To a person on the "insured location" with the permission of an "insured"; or

2. To a person off the "insured location," if the "bodily injury":

   a. Arises out of a condition on the "insured location" or the ways immediately adjoining;

   b. Is caused by the activities of an "insured";

   c. Is caused by a "residence employee" in the course of the "residence employee's" employment by an "insured"; or

   d. Is caused by an animal owned by or in the care of an "insured."

## SECTION II – EXCLUSIONS

1. **Coverage E – Personal Liability** and **Coverage F – Medical Payments to Others** do not apply to "bodily injury" or "property damage":

   a. Which is expected or intended by the "insured";

   b. Arising out of or in connection with a "business" engaged in by an "insured." This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business";

Copyright, Insurance Services Office, Inc., 1990

**HO 00 03 04 91**
37.21721.hpolprdiraig.6/14.9:48 007

c. Arising out of the rental or holding for rental of any part of any premises by an "insured." This exclusion does not apply to the rental or holding for rental of an "insured location":

   (1) On an occasional basis if used only as a residence;

   (2) In part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

   (3) In part, as an office, school, studio or private garage;

d. Arising out of the rendering of or failure to render professional services;

e. Arising out of a premises:

   (1) Owned by an "insured";

   (2) Rented to an "insured"; or

   (3) Rented to others by an "insured";

   that is not an "insured location";

f. Arising out of:

   (1) The ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an "insured";

   (2) The entrustment by an "insured" of a motor vehicle or any other motorized land conveyance to any person; or

   (3) Vicarious liability, whether or not statutorily imposed, for the actions of a child or minor using a conveyance excluded in paragraph (1) or (2) above.

   This exclusion does not apply to:

   (1) A trailer not towed by or carried on a motorized land conveyance.

   (2) A motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and:

      (a) Not owned by an "insured"; or

      (b) Owned by an "insured" and on an "insured location";

   (3) A motorized golf cart when used to play golf on a golf course;

   (4) A vehicle or conveyance not subject to motor vehicle registration which is:

      (a) Used to service an "insured's" residence;

      (b) Designed for assisting the handicapped; or

      (c) In dead storage on an "insured location";

g. Arising out of:

   (1) The ownership, maintenance, use, loading or unloading of an excluded watercraft described below;

   (2) The entrustment by an "insured" of an excluded watercraft described below to any person; or

   (3) Vicarious liability, whether or not statutorily imposed, for the actions of a child or minor using an excluded watercraft described below.

   Excluded watercraft are those that are principally designed to be propelled by engine power or electric motor, or are sailing vessels, whether owned by or rented to an "insured." This exclusion does not apply to watercraft:

   (1) That are not sailing vessels and are powered by:

      (a) Inboard or inboard-outdrive engine or motor power of 50 horsepower or less not owned by an "insured";

      (b) Inboard or inboard-outdrive engine or motor power of more than 50 horsepower not owned by or rented to an "insured";

      (c) One or more outboard engines or motors with 25 total horsepower or less;

      (d) One or more outboard engines or motors with more than 25 total horsepower if the outboard engine or motor is not owned by an "insured";

      (e) Outboard engines or motors of more than 25 total horsepower owned by an "insured" if:

         (i) You acquire them prior to the policy period; and

            (a) You declare them at policy inception; or

            (b) Your intention to insure is reported to us in writing within 45 days after you acquire the outboard engines or motors.

         (ii) You acquire them during the policy period.

         This coverage applies for the policy period.

   (2) That are sailing vessels, with or without auxiliary power:

      (a) Less than 26 feet in overall length;

      (b) 26 feet or more in overall length, not owned by or rented to an "insured."

Copyright, Insurance Services Office, Inc., 1990

(3) That are stored;

h. Arising out of:

   (1) The ownership, maintenance, use, loading or unloading of an aircraft;

   (2) The entrustment by an "insured" of an aircraft to any person; or

   (3) Vicarious liability, whether or not statutorily imposed, for the actions of a child or minor using an aircraft.

An aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

i. Caused directly or indirectly by war, including the following and any consequence of any of the following:

   (1) Undeclared war, civil war, insurrection, rebellion or revolution;

   (2) Warlike act by a military force or military personnel; or

   (3) Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental;

j. Which arises out of the transmission of a communicable disease by an "insured";

k. Arising out of sexual molestation, corporal punishment or physical or mental abuse; or

l. Arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance(s) as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed physician.

Exclusions **e., f., g.,** and **h.** do not apply to "bodily injury" to a "residence employee" arising out of and in the course of the "residence employee's" employment by an "insured."

2. **Coverage E – Personal Liability,** does not apply to:

a. Liability:

   (1) For any loss assessment charged against you as a member of an association, corporation or community of property owners;

   (2) Under any contract or agreement. However, this exclusion does not apply to written contracts:

   (a) That directly relate to the ownership, maintenance or use of an "insured location"; or

   (b) Where the liability of others is assumed by the "insured" prior to an "occurrence";

   unless excluded in (1) above or elsewhere in this policy;

b. "Property damage" to property owned by the "insured";

c. "Property damage" to property rented to, occupied or used by or in the care of the "insured." This exclusion does not apply to "property damage" caused by fire, smoke or explosion;

d. "Bodily injury" to any person eligible to receive any benefits:

   (1) Voluntarily provided; or

   (2) Required to be provided;

by the "insured" under any:

   (1) Workers' compensation law;

   (2) Non-occupational disability law; or

   (3) Occupational disease law;

e. "Bodily injury" or "property damage" for which an "insured" under this policy:

   (1) Is also an insured under a nuclear energy liability policy; or

   (2) Would be an insured under that policy but for the exhaustion of its limit of liability.

A nuclear energy liability policy is one issued by:

   (1) American Nuclear Insurers;

   (2) Mutual Atomic Energy Liability Underwriters;

   (3) Nuclear Insurance Association of Canada;

or any of their successors; or

f. "Bodily injury" to you or an "insured" within the meaning of part **a.** or **b.** of "insured" as defined.

3. **Coverage F – Medical Payments to Others,** does not apply to "bodily injury":

a. To a "residence employee" if the "bodily injury":

   (1) Occurs off the "insured location"; and

   (2) Does not arise out of or in the course of the "residence employee's" employment by an "insured";

Copyright, Insurance Services Office, Inc., 1990

b. To any person eligible to receive benefits:

   (1) Voluntarily provided; or

   (2) Required to be provided;

  under any:

   (1) Workers' compensation law;

   (2) Non-occupational disability law; or

   (3) Occupational disease law;

c. From any:

   (1) Nuclear reaction;

   (2) Nuclear radiation; or

   (3) Radioactive contamination;

  all whether controlled or uncontrolled or however caused; or

   (4) Any consequence of any of these; or

d. To any person, other than a "residence employee" of an "insured," regularly residing on any part of the "insured location."

---

## SECTION II – ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses.** We pay:

  a. Expenses we incur and costs taxed against an "insured" in any suit we defend;

  b. Premiums on bonds required in a suit we defend, but not for bond amounts more than the limit of liability for Coverage E. We need not apply for or furnish any bond;

  c. Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) up to $50 per day, for assisting us in the investigation or defense of a claim or suit; and

  d. Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

2. **First Aid Expenses.** We will pay expenses for first aid to others incurred by an "insured" for "bodily injury" covered under this policy. We will not pay for first aid to you or any other "insured."

3. **Damage to Property of Others.** We will pay, at replacement cost, up to $500 per "occurrence" for "property damage" to property of others caused by an "insured."

We will not pay for "property damage":

  a. To the extent of any amount recoverable under Section I of this policy;

  b. Caused intentionally by an "insured" who is 13 years of age or older;

  c. To property owned by an "insured";

  d. To property owned by or rented to a tenant of an "insured" or a resident in your household; or

  e. Arising out of:

   (1) A "business" engaged in by an "insured";

   (2) Any act or omission in connection with a premises owned, rented or controlled by an "insured," other than the "insured location"; or

   (3) The ownership, maintenance, or use of aircraft, watercraft or motor vehicles or all other motorized land conveyances.

    This exclusion does not apply to a motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and not owned by an "insured."

4. **Loss Assessment.** We will pay up to $1000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of:

  a. "Bodily injury" or "property damage" not excluded under Section II of this policy; or

  b. Liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided:

   (1) The director, officer or trustee is elected by the members of a corporation or association of property owners; and

   (2) The director, officer or trustee serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

This coverage applies only to loss assessments charged against you as owner or tenant of the "residence premises."

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

Regardless of the number of assessments, the limit of $1000 is the most we will pay for loss arising out of:

a. One accident, including continuous or repeated exposure to substantially the same general harmful condition; or

b. A covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

The following do not apply to this coverage:

1. Section II – Coverage E – Personal Liability Exclusion **2.a.(1)**;

2. Condition 1. Policy Period, under SECTIONS I AND II – CONDITIONS.

## SECTION II – CONDITIONS

1. **Limit of Liability.** Our total liability under Coverage E for all damages resulting from any one "occurrence" will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of "insureds," claims made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence."

Our total liability under Coverage F for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the limit of liability for Coverage F as shown in the Declarations.

2. **Severability of Insurance.** This insurance applies separately to each "insured." This condition will not increase our limit of liability for any one "occurrence."

3. **Duties After Loss.** In case of an accident or "occurrence," the "insured" will perform the following duties that apply. You will help us by seeing that these duties are performed:

a. Give written notice to us or our agent as soon as is practical, which sets forth:

(1) The identity of the policy and "insured";

(2) Reasonably available information on the time, place and circumstances of the accident or "occurrence"; and

(3) Names and addresses of any claimants and witnesses;

b. Promptly forward to us every notice, demand, summons or other process relating to the accident or "occurrence";

c. At our request, help us:

(1) To make settlement;

(2) To enforce any right of contribution or indemnity against any person or organization who may be liable to an "insured";

(3) With the conduct of suits and attend hearings and trials; and

(4) To secure and give evidence and obtain the attendance of witnesses;

d. Under the coverage – Damage to Property of Others -- submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in the "insured's" control;

e. The "insured" will not, except at the "insured's" own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the "bodily injury."

4. **Duties of an Injured Person – Coverage F – Medical Payments to Others.**

The injured person or someone acting for the injured person will:

a. Give us written proof of claim, under oath if required, as soon as is practical; and

b. Authorize us to obtain copies of medical reports and records.

The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

5. **Payment of Claim – Coverage F – Medical Payments to Others.** Payment under this coverage is not an admission of liability by an "insured" or us.

Copyright, Insurance Services Office, Inc., 1990

6. **Suit Against Us.** No action can be brought against us unless there has been compliance with the policy provisions.

No one will have the right to join us as a party to any action against an "insured." Also, no action with respect to Coverage E can be brought against us until the obligation of the "insured" has been determined by final judgment or agreement signed by us.

7. **Bankruptcy of an Insured.** Bankruptcy or insolvency of an "insured" will not relieve us of our obligations under this policy.

8. **Other Insurance – Coverage E – Personal Liability.** This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

## SECTIONS I AND II – CONDITIONS

1. **Policy Period.** This policy applies only to loss in Section I or "bodily injury" or "property damage" in Section II, which occurs during the policy period.

2. **Concealment or Fraud.** The entire policy will be void if, whether before or after a loss, an "insured" has:

   **a.** Intentionally concealed or misrepresented any material fact or circumstance;

   **b.** Engaged in fraudulent conduct; or

   **c.** Made false statements;

   relating to this insurance.

3. **Liberalization Clause.** If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

   This Liberalization Clause does not apply to changes implemented through introduction of a subsequent edition of our policy.

4. **Waiver or Change of Policy Provisions.**

   A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

5. **Cancellation.**

   **a.** You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

   **b.** We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations.

   Proof of mailing will be sufficient proof of notice.

   (1) When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

   (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

   (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

   (a) If there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

   (b) If the risk has changed substantially since the policy was issued.

   This can be done by letting you know at least 30 days before the date cancellation takes effect.

   (4) When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 30 days before the date cancellation takes effect.

   **c.** When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

   **d.** If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

6. **Nonrenewal.** We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

7. **Assignment.** Assignment of this policy will not be valid unless we give our written consent.

8. **Subrogation.** An "insured" may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an "insured" must sign and deliver all related papers and cooperate with us.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death.** If any person named in the Declarations or the spouse, if a resident of the same household, dies:

a. We insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

b. "Insured" includes:

(1) Any member of your household who is an "insured" at the time of your death, but only while a resident of the "residence premises"; and

(2) With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

Copyright, Insurance Services Office, Inc., 1990

Homesite Insurance Company

**HOMEOWNERS**
**HH 80 06 11 01**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## WINDSTORM OR HAIL FIXED-DOLLAR DEDUCTIBLE

**Windstorm or Hail**
**Deductible Amount***
**$  500**

For the premium charged, we will pay only that part of the total of the loss for all Section I Property Coverages that exceeds the windstorm or hail deductible stated in this endorsement. This deductible applies in the event of direct physical loss to property covered under this policy caused directly or indirectly by windstorm or hail. Such deductible applies regardless of any other cause or event contributing concurrently or in any sequence to the loss. No other deductible provision in the policy applies to direct physical loss caused by windstorm or hail.

*Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

HH 80 06 11 01          Includes copyrighted material of Insurance Services Office, Inc.
                        with its permission,
                        Copyright, Insurance Services Office, Inc., 1996                    **Page 1 of 1**
                                                                              44.21728.hpolprdiraig.6/14.9:48  007
Policy Number 30318013

HOMEOWNERS
HO 01 07 12 98

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## SPECIAL PROVISIONS – DELAWARE

### SECTION I – PROPERTY COVERAGES
### COVERAGE C – PERSONAL PROPERTY
### SPECIAL LIMITS OF LIABILITY

Items **10.** and **11.** are deleted and replaced by the following:

10. $1,000 for loss to electronic apparatus, while in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power. Electronic apparatus includes:

   a. Accessories or antennas; or

   b. Tapes, wires, records, discs or other media;

   for use with any electronic apparatus described in this Item **10.**

11. $1,000 for loss to electronic apparatus, while not in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus:

   a. Is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power;

   b. Is away from the "residence premises"; and

   c. Is used at any time or in any manner for any "business" purpose.

   Electronic apparatus includes:

   a. Accessories and antennas; or

   b. Tapes, wires, records, discs or other media;

   for use with any electronic apparatus described in this Item **11.**

### PROPERTY NOT COVERED

Item **3.b.** is deleted and replaced by the following:

3. Motor vehicles or all other motorized land conveyances. This includes:

   b. Electronic apparatus that is designed to be operated solely by use of the power from the electrical system of motor vehicles or all other motorized land conveyances. Electronic apparatus includes:

      (1) Accessories or antennas; or

      (2) Tapes, wires, records, discs or other media;

      for use with any electronic apparatus described in this Item **3.b.**

      The exclusion of property described in **3.a.** and **3.b.** above applies only while the property is in or upon the vehicle or conveyance.

   We do cover vehicles or conveyances not subject to motor vehicle registration which are:

   a. Used to service an "insured's" residence; or

   b. Designed for assisting the handicapped;

### COVERAGE D – LOSS OF USE

Item **1.** is deleted and replaced by the following:

1. If a loss covered under this Section makes that part of the "residence premises" where you reside not fit to live in, we cover the Additional Living Expense, meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

   Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

### ADDITIONAL COVERAGES

9. **Glass or Safety Glazing Material** is deleted and replaced by the following:

9. **Glass Or Safety Glazing Material**

   a. We cover:

      (1) The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window;

      (2) The breakage, caused directly by Earth Movement, of glass or safety glazing material which is part of a covered building, storm door or storm window; and

      (3) The direct physical loss to covered property caused solely by the pieces, fragments or splinters of broken glass or safety glazing material which is part of a building, storm door or storm window.

Copyright, Insurance Services Office, Inc., 1998

b. This coverage does not include loss:

(1) To covered property which results because the glass or safety glazing material has been broken, except as provided in **a.(3)** above; or

(2) On the "residence premises" if the dwelling has been vacant for more than 30 consecutive days immediately before the loss, except when the breakage results directly from Earth Movement as provided for in **a.(2)** above. A dwelling being constructed is not considered vacant.

Loss to glass covered under this Additional Coverage **9.** will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

For Forms **HO 00 01** and **HO 00 08**, we will pay up to $100 for loss under this coverage.

This coverage does not increase the limit of liability that applies to the damaged property.

(This is Additional Coverage **8.** in Forms **HO 00 01** and **HO 00 08.**)

The following Additional Coverage is added to all forms except **HO 00 08**. With respect to Form **HO 00 04**, the words 'covered building' used below, refer to property covered under Additional Coverage **10.** Building Additions And Alterations.

**11. Ordinance Or Law**

a. You may use up to 10% of the limit of liability that applies to Coverage A (or for Form **HO 00 04**, you may use up to 10% of the limit of liability that applies to Building Additions And Alterations) for the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:

(1) The construction, demolition, remodeling, renovation or repair of that part of a covered building or other structure damaged by a Peril Insured Against;

(2) The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a Peril Insured Against to another part of that covered building or other structure; or

(3) The remodeling, removal or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a Peril Insured Against.

b. You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in **a.** above.

c. We do not cover:

(1) The loss in value to any covered building or other structure due to the requirements of any ordinance or law; or

(2) The costs to comply with any ordinance or law which requires any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants on any covered building or other structure.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This coverage is additional insurance.

(This is Additional Coverage **10.** in Forms **HO 00 01** and **HO 00 06.**)

**SECTION I – EXCLUSIONS**

**1. Ordinance or Law** is deleted and replaced by the following:

1. Ordinance Or Law, meaning any ordinance or law:

a. Requiring or regulating the construction, demolition, remodeling, renovation or repair of property, including removal of any resulting debris. This Exclusion **1.a.** does not apply to the amount of coverage that may be provided for under Additional Coverages, Glass Or Safety Glazing Material or Ordinance Or Law;

Copyright, Insurance Services Office, Inc., 1998

b. The requirements of which result in a loss in value to property; or

c. Requiring any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This exclusion applies whether or not the property has been physically damaged.

(This is Exclusion **1.a.** in Form **HO 00 03.**)

2. **Earth Movement** is deleted and replaced by the following:

2. Earth Movement, meaning earthquake, including land shock waves or tremors before, during or after a volcanic eruption; landslide; mine subsidence; mudflow; earth sinking, rising or shifting; unless direct loss by:

a. Fire; or

b. Explosion;

ensues and then we will pay only for the ensuing loss.

(This is Exclusion **1.b.** in Form **HO 00 03.**)

4. **Power Failure** is deleted and replaced by the following:

4. Power Failure, meaning the failure of power or other utility service if the failure takes place off the "residence premises". But if the failure of power or other utility service results in a loss, from a Peril Insured Against on the "residence premises", we will pay for the loss or damage caused by that Peril Insured Against.

(This is Exclusion **1.d.** in Form **HO 00 03.**)

## SECTION I – CONDITIONS

3. **Loss Settlement**

Under Form **HO 00 06,** Item **b.(2)** is deleted and replaced by the following:

(2) If the damage is not repaired or replaced within a reasonable time, at actual cash value but not more than the amount required to repair or replace.

## SECTION II – LIABILITY COVERAGES

**Under Coverage E – Personal Liability,** Item **2.** is deleted and replaced by the following:

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the "occurrence" has been exhausted by payment of judgments or settlements.

(This paragraph also replaces Paragraph **2.** in Farmers Personal Liability Endorsement **HO 24 73** and Paragraph **D.3.b.** in Property Remediation For Escaped Liquid Fuel And Limited Lead And Escaped Liquid Fuel Liability Coverages Endorsements **HO 05 80, HO 05 81,** and **HO 05 82** when such endorsements are made part of this policy.)

## SECTION II – EXCLUSIONS

Under **1. Coverage E – Personal Liability** and **Coverage F – Medical Payments To Others,** Item **a.** is deleted and replaced by the following:

a. Which is expected or intended by one or more "insureds";

## SECTIONS I AND II – CONDITIONS

2. **Concealment or Fraud** is deleted and replaced by the following:

2. **Concealment Or Fraud**

a. Under Section I – Property Coverages, with respect to all "insureds" covered under this policy, we provide no coverage for loss under Section I – Property Coverages if, whether before or after a loss, one or more "insureds" have:

(1) Intentionally concealed or misrepresented any material fact or circumstance;

(2) Engaged in fraudulent conduct; or

(3) Made false statements;

relating to this insurance.

b. Under Section II – Liability Coverages, we do not provide coverage to one or more "insureds" who, whether before or after a loss, have:

(1) Intentionally concealed or misrepresented any material fact or circumstance;

(2) Engaged in fraudulent conduct; or

(3) Made false statements;

relating to this insurance.

**5. Cancellation**

The first two paragraphs of Item **b.** and Item **b.(3)** are deleted and replaced by the following:

**b.** We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you or mailed to you at your last known address.

Proof of mailing will be sufficient proof of notice.

**(3)** When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

**(a)** If there has been a material misrepresentation of fact, made by or with the knowledge of the named insured, which if known to us would have caused us not to issue the policy; or

**(b)** If the risk has changed substantially since the policy was issued.

This can be done by letting you know at least 30 days before the date cancellation takes effect.

The following is added to Paragraphs **b.(2), (3)** and **(4):**

However, if any one of the following conditions exist at any building that is covered in this policy, we may cancel this policy by letting you know at least 5 days before the date cancellation takes effect.

**(a)** The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

**(i)** Seasonal unoccupancy; or

**(ii)** Buildings in the course of construction, renovation or addition.

Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

**(b)** After damage by a covered peril, permanent repairs to the building:

**(i)** Have not started; and

**(ii)** Have not been contracted for;

within 30 days of payment of loss.

**(c)** The building has:

**(i)** An outstanding order to vacate;

**(ii)** An outstanding demolition order; or

**(iii)** Been declared unsafe by governmental authority.

**(d)** Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to removal that is necessary or incidental to any renovation or remodeling.

**(e)** Failure to:

**(i)** Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

**(ii)** Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

**6. Nonrenewal** is deleted and replaced by the following:

**6. Nonrenewal**

We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your last known address, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

All other provisions of this policy apply.

Copyright, Insurance Services Office, Inc., 1998

**HO 01 07 12 98**
48.21732.hpolprdiraig.6/14.9:48  007

HOMEOWNERS
HO 04 32 05 02

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LIMITED FUNGI, WET OR DRY ROT, OR BACTERIA
## COVERAGE
### FOR USE WITH FORM HO 00 03

### SCHEDULE*

| | These limits of liability apply to the total of all loss or costs payable under this endorsement, regardless of the number of "occurrences", the number of claims-made, or the number of locations insured under this endorsement and listed in this Schedule. | |
|---|---|---|
| 1. | Section I - Property Coverage Limit Of Liability for the Additional Coverage "Fungi", Wet Or Dry Rot, Or Bacteria | $2,500 |
| 2. | Section II - Coverage E Aggregate Sublimit Of Liability for "Fungi", Wet Or Dry Rot, Or Bacteria | $25,000 |
| | *Entries may be left blank if shown elsewhere in this policy for this coverage. | |

### DEFINITIONS

The following definition is added:

**"Fungi"**

**a.** "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**b.** Under Section II, this does not include any fungi that are, are on, or are contained in, a good or product intended for consumption.

### SECTION I - PROPERTY COVERAGES

### ADDITIONAL COVERAGES

The following Additional Coverage is added:

**12. "Fungi", Wet Or Dry Rot, Or Bacteria**

**a.** The amount shown in the Schedule above is the most we will pay for:

**(1)** The total of all loss payable under Section I - Property Coverages caused by "fungi", wet or dry rot, or bacteria;

**(2)** The cost to remove "fungi", wet or dry rot, or bacteria from property covered under Section I - Property Coverages;

**(3)** The cost to tear out and replace any part of the building or other covered property as needed to gain access to the "fungi", wet or dry rot, or bacteria; and

**(4)** The cost of testing of air or property to confirm the absence, presence or level of "fungi", wet or dry rot, or bacteria, whether performed prior to, during or after removal, repair, restoration or replacement. The cost of such testing will be provided only to the extent that there is a reason to believe that there is the presence of fungi, wet or dry rot, or bacteria.

**b.** The coverage described in **12.a.** only applies when such loss or costs are a result of a Peril Insured Against that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at and after the time the Peril Insured Against occurred.

c. The amount shown in the Schedule for this coverage is the most we will pay for the total of all loss or costs payable under this Additional Coverage regardless of the:

(1) Number of locations insured under this endorsement; or

(2) Number of claims-made.

d. If there is loss or damage to covered property, not caused, in whole or in part, by "fungi", wet or dry rot, or bacteria, loss payment will not be limited by the terms of this Additional Coverage, except to the extent that "fungi", wet or dry rot, or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Additional Coverage.

This coverage does not increase the limit of liability applying to the damaged covered property.

## SECTION I - PERILS INSURED AGAINST

### COVERAGE A - DWELLING AND COVERAGE B - OTHER STRUCTURES

Paragraph **2.e.(3)** is deleted and replaced by the following:

(3) Smog, rust or other corrosion;

Paragraph **2.e.(9)** is added:

(9) Constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

### COVERAGE C - PERSONAL PROPERTY

Paragraph **12.d** is added:

d. Caused by constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

## SECTION I - EXCLUSIONS

Exclusion **1.i.** is added.

i. **"Fungi", Wet Or Dry Rot, Or Bacteria**

"Fungi", Wet Or Dry Rot, Or Bacteria meaning the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot, or bacteria.

This exclusion does not apply:

(1) When "fungi", wet or dry rot, or bacteria results from fire or lightning; or

(2) To the extent coverage is provided for in the "Fungi", Wet Or Dry Rot, Or Bacteria Additional Coverage under Section I - Property Coverages with respect to loss caused by a Peril Insured Against other than fire or lightning.

Direct loss by a Peril Insured Against resulting from "fungi", wet or dry rot, or bacteria is covered.

## SECTION II - CONDITIONS

Condition **1. Limit Of Liability** is deleted and replaced by the following:

1. **Limit Of Liability**

Our total liability under Coverage **E** for all damages resulting from any one "occurrence" will not be more than the Coverage **E** limit of liability shown in the Declarations. This limit is the same regardless of the number of "insureds", claims-made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions will be considered to be the result of one "occurrence".

Our total liability under Coverage **F** for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the Coverage **F** limit of liability shown in the Declarations.

However, our total liability under Coverage **E** for the total of all damages arising directly or indirectly, in whole or in part, out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi", wet or dry rot, or bacteria will not be more than the Section II - Coverage **E** Aggregate Sublimit Of Liability for "Fungi", Wet Or Dry Rot, Or Bacteria. That sublimit is the amount shown in the Schedule. This is the most we will pay regardless of the:

a. Number of locations insured under the policy to which this endorsement is attached;

b. Number of persons injured;

c. Number of persons whose property is damaged;

d. Number of "insureds"; or

e. Number of "occurrences" or claims-made

This sublimit is within, but does not increase, the Coverage **E** limit of liability. It applies separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations.

With respect to damages arising out of "fungi", wet or dry rot, or bacteria described in **1.** Limit Of Liability of this endorsement, Condition **2. Severability Of Insurance** is deleted and replaced by the following:

2. **Severability Of Insurance**

This insurance applies separately to each "insured" except with respect to the Aggregate Sublimit of Liability described in this endorsement under Section **II** - Conditions **1.** Limit Of Liability. This condition will not increase the limit of liability for this coverage.

**SECTION I AND II CONDITIONS**

Condition **1.** Policy Period is deleted and replaced by the following:

1. **Policy Period**

This policy applies only to loss or costs in Section **I** or "bodily injury" or "property damage" in Section **II,** which occurs during the policy period.

All other provisions of the policy apply.

HOMEOWNERS
HO 04 96 04 91

## <u>NO</u> SECTION II – LIABILITY COVERAGES FOR HOME DAY CARE BUSINESS
## <u>LIMITED</u> SECTION I – PROPERTY COVERAGES FOR HOME DAY CARE BUSINESS

If an "insured" regularly provides home day care services to a person or persons other than "insureds" and receives monetary or other compensation for such services, that enterprise is a "business." Mutual exchange of home day care services, however, is not considered compensation. The rendering of home day care services by an "insured" to a relative of an "insured" is not considered a "business."

Therefore, with respect to a home day care enterprise which is considered to be a "business," this policy:

1. Does not provide Section II – Liability Coverages because a "business" of an "insured" is excluded under exclusion **1.b.** of Section II – Exclusions;

2. Does not provide Section I – Coverage B coverage where other structures are used in whole or in part for "business";

3. Limits coverage for property used on the "residence premises" for the home day care enterprise to $2,500, because Coverage C – Special Limits of Liability – item **8.** imposes that limit on "business" property on the "residence premises." (Item **8.** corresponds to item **5.** in Form **HO  00  08.**);

4. Limits coverage for property used away from the "residence premises" for the home day care enterprise to $250, because Coverage C – Special Limits of Liability – item **9.** imposes that limit on "business" property away from the "residence premises." Special Limit of Liability item **9.** does not apply to adaptable electronic apparatus as described in Special Limit of Liability items **10.** and **11.** (Items **9., 10.** and **11.** correspond to items **6., 7.** and **8.** respectively in Form **HO 00 08.**)

THIS ENDORSEMENT DOES **NOT** CONSTITUTE A REDUCTION OF COVERAGE.

**HOMEOWNERS**
**HO 04 98 04 91**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## REFRIGERATED PROPERTY COVERAGE

For an additional premium, we insure, up to $500, covered property stored in freezers or refrigerators on the "residence premises" for direct loss caused by:

1. Interruption of electrical service to the refrigeration unit. The interruption must be caused by damage to the generating or transmitting equipment; or

2. Mechanical failure of the unit storing the property.

Coverage will apply only if you have maintained the refrigeration unit in proper working condition immediately prior to the loss.

This endorsement does not increase the limit of liability for Coverage C – Personal Property.

The Section I – Power Failure exclusion does not apply to this coverage.

**Special Deductible**

The following deductible applies to covered loss to refrigerated property:

We will pay only that part of the loss that exceeds $100. No other deductible applies to this coverage.

All other provisions of this policy apply.

HO 04 98 04 91    Copyright, Insurance Services Office, Inc., 1990    **Page 1 of 1**
Policy Number 30318013                                               53.21737.hpolprdiraig.6/14.9:48 007

**HOMEOWNERS**
**HO 04 16 04 91**

## PREMISES ALARM OR
## FIRE PROTECTION SYSTEM

For a premium credit, we acknowledge the installation of an alarm system or automatic sprinkler system approved by us on the "residence premises." You agree to maintain this system in working order and to let us know promptly of any change made to the system or if it is removed.

HOMEOWNERS
HO 04 20 06 94

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SPECIFIED ADDITIONAL AMOUNT OF INSURANCE FOR
# COVERAGE A - DWELLING
### Forms HO 00 02 and HO 00 03 Only

**(Applies only when loss to dwelling building exceeds the
Coverage A Limit of Liability shown in the Declarations)**

To the extent that coverage is provided, we agree to provide an additional amount of insurance in accordance with the following provisions:

A. If you have:

1. Allowed us to adjust the Coverage A limit of liability and the premium in accordance with:
   a. The property evaluations we make; and
   b. Any increases in inflation; and
2. Notified us, within 30 days of completion, of any improvements, alterations or additions to the dwelling building which increase the replacement cost of the dwelling building by 5% or more;

the provisions of this endorsement will apply after a loss, provided you elect to repair or replace the damaged or destroyed dwelling building.

B. If there is a loss to the dwelling building that exceeds the Coverage A limit of liability shown in the Declarations, for the purpose of settling that loss only:

1. We will provide an additional amount of insurance, up to 25%* of the Coverage A limit of liability; and
2. The Section I Condition 3. Loss Settlement paragraph **b.** is deleted and replaced by paragraphs **b., c.,** and **d.** as follows:

b. The dwelling building under Coverage A at replacement cost without deduction for depreciation. We will pay no more than the smallest of the following amounts for like construction and use on the same premises:
   (1) The replacement cost of that part of the dwelling building damaged or destroyed;
   (2) The necessary amount actually spent to repair or replace the damaged or destroyed dwelling building; or
   (3) The limit of liability under this policy that applies to the dwelling building, plus any additional amount provided by this endorsement.

c. We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.

d. You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to the dwelling building on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability on a replacement cost basis.

\* Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

**HOMEOWNERS**
**HO 04 90 04 91**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PERSONAL PROPERTY REPLACEMENT COST

**SECTION I**

For an additional premium, covered losses to the following property are settled at replacement cost at the time of loss:

    **a.** Coverage C – Personal Property;

    **b.** If covered in this policy, awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings.

Personal Property Replacement Cost coverage will also apply to the following articles or classes of property if they are separately described and specifically insured in this policy:

    **a.** Jewelry;

    **b.** Furs and garments trimmed with fur or consisting principally of fur;

    **c.** Cameras, projection machines, films and related articles of equipment;

    **d.** Musical equipment and related articles of equipment;

    **e.** Silverware, silver-plated ware, goldware, gold-plated ware and pewterware, but excluding pens, pencils, flasks, smoking implements or jewelry; and

    **f.** Golfer's equipment meaning golf clubs, golf clothing and golf equipment.

Personal Property Replacement Cost coverage will not apply to other classes of property separately described and specifically insured.

**1. PROPERTY NOT ELIGIBLE**

Property listed below is not eligible for replacement cost settlement. Any loss will be settled at actual cash value at the time of loss but not more than the amount required to repair or replace.

    **a.** Antiques, fine arts, paintings and similar articles of rarity or antiquity which cannot be replaced.

    **b.** Memorabilia, souvenirs, collectors items and similar articles whose age or history contribute to their value.

    **c.** Articles not maintained in good or workable condition.

    **d.** Articles that are outdated or obsolete and are stored or not being used.

**2. REPLACEMENT COST**

The following loss settlement procedure applies to all property insured under this endorsement:

    **a.** We will pay no more than the least of the following amounts:

        **(1)** Replacement cost at the time of loss without deduction for depreciation;

        **(2)** The full cost of repair at the time of loss;

        **(3)** The limit of liability that applies to Coverage C, if applicable;

        **(4)** Any applicable special limits of liability stated in this policy; or

        **(5)** For loss to any item separately described and specifically insured in this policy, the limit of liability that applies to the item.

    **b.** When the replacement cost for the entire loss under this endorsement is more than $500, we will pay no more than the actual cash value for the loss or damage until the actual repair or replacement is complete.

    **c.** You may make a claim for loss on an actual cash value basis and then make claim within 180 days after the loss for any additional liability in accordance with this endorsement.

All other provisions of this policy apply.

# EXHIBIT B

Joseph Jadczak
October 3, 2006

NOV - 1 2006

Page 1

1    IN RE:   INSURANCE CLAIM OF JOSEPH and CATHERINE JADCZAK

2

3    Policy No. 30318013

4    Claim No. 1038220

5    Date of Loss:  5/29/06

6

7        Examination under oath, taken pursuant to notice at

8    the law offices of Perry & Sensor, 704 N. King Street,

9    First Federal Plaza, Suite 560, Wilmington, Delaware,

10   beginning at 2:12 p.m., on Tuesday, October 3, 2006,

11   before Debra A. Donnelly, Registered Professional

12   Reporter and Notary Public.

13

14   APPEARANCES:

15

        MICHAEL L. SENSOR, ESQUIRE

16   PERRY & SENSOR

            First Federal Plaza, Suite 560

17       704 N. King Street

            Wilmington, DE  19801

18       for Joseph Jadczak

19   JEFFREY M. SMYTHE, ESQUIRE

        MERRY, FARNEN & RYAN, P.C.

20       27739 Jefferson Avenue

            St. Clair Shores, MI  48081

21       for Homesite Insurance Company

22

        - - - - - - - - - - - - - - - - - - - - - - - - -

23                  CORBETT & WILCOX

            REGISTERED PROFESSIONAL REPORTERS

24    230 N. MARKET  STREET    WILMINGTON, DELAWARE  19801

Joseph Jadczak
October 3, 2006

1          JOSEPH W. JADCZAK, JR.,

2       having been first sworn on oath, was

3       examined and testified as follows:

4               EXAMINATION

5    BY MR. SMYTHE:

6       Q.    This is the time and date for the examination

7    of Mr. Joseph Jadczak, Jr.  This is Claim No. 1038220

8    against Policy No. 30318013.  This is a claim arising out

9    of a date of loss of 5/29/2006.

10               Mr. Jadczak, we are here today to

11   conduct your examination under oath.  Let me mention to

12   you a few ground rules, if you will, before we begin.

13               This is not a memory contest, as I

14   mentioned to you off the record.  If you don't know the

15   answer to a question, feel free to say I don't know.  I

16   don't want you to guess unless I ask you to give me an

17   estimation or a best possible guess.

18               Also, if a question requires an answer

19   in the affirmative or the negative, please say yes or no,

20   rather than nodding your head, so the court reporter can

21   develop a clear record.

22               And I will also remind you that you are

23   under oath and subject to the penalties of perjury in the

24   event that you give false testimony today.  More

Joseph Jadczak
October 3, 2006

Page 3

1    importantly, there is a policy condition in your Homesite

2    insurance policy that says if you provide fraudulent

3    information or you give a material misrepresentation,

4    that effectively voids the policy and it can lead to

5    total claim denial.

6                Do you understand what I just told you?

7    A.    I do.

8    Q.    Thank you.

9                Let's begin.  Can you please state your

10   full name for the record, sir?

11   A.    **Joseph Walter Jadczak, Jr.**

12   Q.    Walker is your middle name?

13   A.    **Walter.**

14   Q.    Walter.  Thank you, sir.

15               What's your date of birth, sir?

16   A.    **February 26th, 1948.**

17   Q.    And what's your Social Security number, sir?

18   A.    **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.**

19   Q.    Are you married, sir?

20   A.    **I am.**

21   Q.    What's your wife's name?

22   A.    **Catherine, with a C.**

23   Q.    How long have you been married, sir?

24   A.    **Thirty-seven years.**

Joseph Jadczak
October 3, 2006

Page 4

1      Q.   Have you been married previous to your

2   marriage with Catherine?

3      A.   No.

4      Q.   Do you have any children from the marriage?

5      A.   I have two.

6      Q.   What are your children's names?

7      A.   Joseph, III, and Denise.   Joseph is 37.

8   Denise will be 36 on Friday, October 6th.

9      Q.   And where do you currently reside, sir?

10      A.   29555 Eagles Crest Road, Milton, Delaware

11   19968.

12      Q.   Do you own that property?

13      A.   I do.

14      Q.   When did you purchase it?

15      A.   We purchased the ground in 1997.   Started

16   construction in the fall of 1999.

17      Q.   And how much did you purchase the land for?

18      A.   $41,000.

19      Q.   You said you started construction in the fall

20   of 1999?

21      A.   I did.

22      Q.   What exactly did you construct on the land?

23      A.   The first thing we constructed was the hangar.

24      Q.   And then what?

Joseph Jadczak
October 3, 2006

1      **A.    And then the home.**

2      Q.    Are there any other structures on the property

3      besides the two you mentioned?

4      **A.    The utility shed.**

5      Q.    Is your property at Eagles Crest Road subject

6      to a mortgage?

7      **A.    It is.**

8      Q.    What's the name of the mortgagee, if you will?

9      **A.    Citi Mortgage, C-I-T-I.**

10     Q.    Do you know the remaining balance on the

11     mortgage as of today's date?  Rough estimate, if you

12     could?

13     **A.    I'm in the process of remortgaging to rebuild**

14     **the hangar.  Prior to that, it was about 71,000.**

15     Q.    That was the remaining balance?

16     **A.    That was the remaining balance before I had to**

17     **remortgage.**

18     Q.    And you mentioned that you have plans to

19     rebuild the hangar?

20     **A.    I do.**

21     Q.    Have you broken ground, so to speak, on the

22     hangar?

23     **A.    I have.  It's almost complete.**

24     Q.    When did you start rebuilding?

Joseph Jadczak
October 3, 2006

Page 6

1      A.    June.   The end of June of this year.

2      Q.    Have you ever fallen behind on your mortgage

3   payment?

4      A.    No, sir.

5      Q.    How many homes have you owned in the past

6   besides the one at Eagles Crest Road?

7      A.    Three.   I'm sorry, two prior to Eagles Crest,

8   Eagles Crest being my third.

9      Q.    Were they in the state of Delaware?

10     A.    No, sir.

11     Q.    What states were they in, if you would?

12     A.    Philadelphia, Pennsylvania, and Delran, New

13   Jersey.

14     Q.    You said Delray?

15     A.    Delran.

16     Q.    Oh, Delran?

17     A.    Yes.

18     Q.    Is that two words, D-E-L-R-A-N?

19     A.    One word.

20     Q.    Thank you.

21            And when did you own those two prior

22   homes, sir?

23     A.    The first home was bought in the fall of 1969.

24   The second home was purchased December of 1980.

Joseph Jadczak
October 3, 2006

1          Q.   Do you currently own any other properties

2     besides the Eagles Crest Road property?

3          **A.   I do at my business.**

4          Q.   Through your business?

5               Are they in your business, is it in the

6     name of the business?

7          **A.   It's in my name, personal name.**

8          Q.   Where are those properties located?

9          **A.   In Philadelphia.**

10         Q.   How many properties are we talking about?

11         **A.   Two.**

12         Q.   Those are in connection with your business?

13         **A.   They are.**

14         Q.   And I understand that you brought with you

15    today a copy of the deed to your home.  Is that correct?

16              MR. SENSOR:  Yes, it's right here.

17              MR. SMYTHE:  Thank you.

18    BY MR. SMYTHE:

19         Q.   Yourself and your wife are the only names on

20    this deed?

21         **A.   We are.**

22              MR. SMYTHE:  Can we mark this as the

23    first exhibit, please.

24              (Jadczak Deposition Exhibit No. 1 was

Joseph Jadczak
October 3, 2006

1    marked for identification.)

2    BY MR. SMYTHE:

3        Q.    I note that we have marked as Exhibit 1 a copy

4    of the deed to the property located at Eagles Crest Road.

5                Mr. Jadczak, can you tell me a little

6    bit about your educational history, like how far in

7    school you went?

8        A.    **High school, 12th grade.**

9        Q.    So you graduated from high school?

10       A.    **I did.**

11       Q.    Where about did you graduate from high school?

12       A.    **In Philadelphia.**

13       Q.    What year was that?

14       A.    **1967.**

15       Q.    Any other further schooling?

16       A.    **Flying.**

17       Q.    At a flight school?

18       A.    **In Northeast Philadelphia, yes.**

19       Q.    What was the name of that institution?

20       A.    **Delaware Aviation.**

21       Q.    When was that?

22       A.    **Started in October 1976.**

23       Q.    What did you have to do?  Were you a student

24    at Delaware Aviation?

Joseph Jadczak
October 3, 2006

1      A.    I got my private license there, and then went

2  on to Burlington County Airport, where I got my

3  instrument/commercial, multi-engine rating.

4      Q.    Is that also a license?

5      A.    Yes.  Actually, they are ratings, I'm sorry.

6      Q.    Instrument, what was that?

7      A.    Instrument, multi-engine and commercial.

8            MR. SENSOR:  It means he can fly a

9  Fed Ex plane at night in the fog.

10  BY MR. SMYTHE:

11     Q.    These are ratings, you say?

12     A.    Yes.

13     Q.    Does that mean you can fly a commercial

14  airplane?

15     A.    Yes, I can.  If I get type rated.

16     Q.    How long did it take you to get rated, if you

17  will?

18     A.    The private license took from October of '76

19  until May of 1977.

20     Q.    So a little under -- like, around six months?

21     A.    Approximately.

22     Q.    Okay.  And you have been a licensed pilot ever

23  since then?

24     A.    Yes.  The other ratings took a little longer.

Joseph Jadczak
October 3, 2006

1       Q.   To achieve?

2       **A.   More hours, yeah.   Minimum hours for each**

3   **rating.**

4       Q.   You mean flight hours?

5       **A.   Yes.**

6       Q.   Okay.   Thank you.

7       **A.   And schooling.**

8       Q.   Okay.

9       **A.   Music school?**

10              MR. SENSOR:   I'm not allowed to talk to

11   you.

12              THE WITNESS:   I don't know if it's

13   relevant or not, but I went to music school after high

14   school.

15   BY MR. SMYTHE:

16       Q.   Okay.   What was the name of that school?

17       **A.   Granoff's, G-R-A-N-O-F-F-S.   That was on**

18   **Spruce Street in Philadelphia.**

19       Q.   You are a musician?

20       **A.   I am.**

21       Q.   Do you play the drums?

22       **A.   I do.**

23       Q.   Do you play the guitar?

24       **A.   No, I don't.   I don't do it professionally.**

Joseph Jadczak
October 3, 2006

1       Q.   When was that?

2       **A.   The schooling was in 1967.**

3            Q.   Did you receive any credentials or credits for

4    that schooling?

5       **A.   Credits.   I didn't stay with it that long.**

6       Q.   Was it a two-year program?

7       **A.   I don't recall.   Sorry.**

8       Q.   That's quite all right.

9                 Let's talk a little bit about your

10   employment history, Mr. Jadczak.

11                Where are you currently employed?

12      **A.   At Pratt Transportation Company Incorporated.**

13      Q.   Did you say Pratt?

14      **A.   Pratt.**

15      Q.   Pratt Transportation Company Incorporated?

16      **A.   Yes.**

17      Q.   And where is that business incorporated at?

18      **A.   In Pennsylvania.**

19      Q.   What's your position there?

20      **A.   President.**

21      Q.   Are you the owner of the company?

22      **A.   I am.**

23      Q.   How long have you owned the company?

24      **A.   My father started it in 1948, and I came in**

Joseph Jadczak
October 3, 2006

Page 12

1    with him in 1968 after the Navy.

2        Q.    You said you were in the Navy?

3        A.    I was.

4        Q.    When were you in the Navy, sir?

5        A.    1968.

6        Q.    Just one year?

7        A.    Yeah.

8        Q.    And what is the nature of the business at

9    Pratt Transportation Company?

10       A.    It's a trucking business.

11       Q.    Semi-trucks?

12       A.    Yes.

13       Q.    Interstate travel, transportation of goods?

14       A.    Correct, yes.

15       Q.    How many trucks do you have?

16       A.    Four.

17       Q.    How many employees do you have?

18       A.    Two.

19       Q.    Is that including yourself?

20       A.    It is.

21             I also have a State inspection station,

22    Pennsylvania state inspection.

23       Q.    You have?

24       A.    Yes.

Joseph Jadczak
October 3, 2006

Page 13

1       Q.   I'm sorry, I didn't understand what you meant

2    by that.

3       A.   A Pennsylvania State inspection, inspection of

4    motor vehicles.

5       Q.   You are an inspector?

6       A.   State inspector, yes.

7               MR. SENSOR:   Just on the record,

8    Pennsylvania has decentralized inspection and

9    registration.  So some states, like Delaware, the state

10   does it.  In Pennsylvania it's done by private garages.

11              MR. SMYTHE:   Oh, okay.  Thanks for the

12   info.

13              MR. SENSOR:   So I could run Sensor's

14   Garage and be a Pennsylvania State inspection station.

15   BY MR. SMYTHE:

16      Q.   So you run an inspection station.  Is that

17   correct?

18      A.   I do, yes.

19      Q.   And where is that located?

20      A.   On the same property, Philadelphia.

21      Q.   I'm sorry, I'm not too familiar with that.

22   Can you tell me what you do in that capacity?

23      A.   Inspect cars, trucks, trailers for safety.

24   Everything but emissions.  Someone else does our

Joseph Jadczak
October 3, 2006

1    **emissions for us.**

2        Q.   Is that similar to what I would see at a weigh

3    station?  Or, no, that's different?

4        **A.   Yeah.  Self-storage units.   I also have**

5    **self-storage units.**

6        Q.   You also own?

7        **A.   Own and rent out self-storage units.**

8        Q.   Thank you.

9        **A.   Put my other hat on.**

10       Q.   Where are those located, sir?

11       **A.   Adjacent to the same property.**

12       Q.   Okay.  So we're talking Philly?

13       **A.   Yes.**

14       Q.   What's the address of this business property?

15       **A.   2224 Granite Street.**

16       Q.   Okay.  What's the name of that?  Is that a

17   separate business that you have, the self-storage units?

18       **A.   It is.**

19       Q.   Okay.  What's the name of that business?

20       **A.   J&J.**

21       Q.   That's it?

22       **A.   That's it.**

23       Q.   It's a corporation or a --

24       **A.   No, just privately owned.  It's just about 25**

Hanson Renaissance Court Reporting & Video
(313) 567 - 8100  www.hansonreporting.com

Joseph Jadczak
October 3, 2006

Page 15

1   **units.**

2        Q.   And you rent it out to the general public?

3        **A.   Yes.   Mostly businessmen, contractors.**

4        Q.   Now, besides Pratt Transportation Company, the

5   State inspection station, and the self-storage units,

6   J&J, are there any other businesses or entities that you

7   own and operate?

8        **A.   No.   Isn't that enough?**

9        Q.   Have you had businesses in the past that

10  you've owned and operated that you are currently not

11  running?

12       **A.   No.**

13       Q.   Mr. Jadczak, now I want to take you through

14  what we call the financials, if you will.  This is where

15  I ask you about your monthly income and some expenses

16  that you incur on a monthly basis.  This is, again, a

17  standard set of questions that we ask in all these

18  examinations under oath.

19       **A.   Okay.**

20       Q.   So I will ask the following.

21            Can you take me through, like, in a

22  month what kind of bills that you may incur on a monthly

23  basis?

24       **A.   Personalwise or businesswise?**

Joseph Jadczak
October 3, 2006

Page 16

1      Q.    Personal.

2      A.    **Utilities.**

3        Q.    And if you could, just give me an estimate of

4    how much you pay per month.

5      A.    **Electric would be in the neighborhood of 250.**

6    **Cable about 59.  Phone about 38.**

7        Q.    Is that a land-line phone or a cell phone?

8      A.    **Land line.  Cell phones are much more.**

9                  **Landscaping for my property, that**

10   **varies.  It's about 380 a month for lawn care, cutting,**

11   **and more than that when they do landscaping and tree**

12   **shrubs, things like that, irrigation.**

13       Q.    How large is the property that you own at

14   Eagles Crest?

15     A.    **About one-and-three-quarter acres.**

16       Q.    You said irrigation, too?

17     A.    **Yes.**

18       Q.    What other kind of monthly expenses can you

19   think of?

20     A.    **Well, we pay our own medical.  That's a**

21   **thousand a month.**

22       Q.    You and your wife?

23     A.    **Yes.  900 and -- close to a thousand.**

24                  **Car insurance, airplane insurance, truck**

Joseph Jadczak
October 3, 2006

1   insurance, but that's business related.

2                   **You want personal.   Right?**

3        Q.   Yes, personal is fine.   But you have a

4   personal car.   Is that right?

5        **A.   Yes.**

6        Q.   What would you pay for car insurance, in your

7   best estimation?

8        **A.   It's around $2800 a year for all the vehicles.**

9        Q.   How much is your mortgage?

10       **A.   Right now, $1,106, which will change after we**

11   **remortgage.   We will be 1523 when we remortgage.**

12       Q.   Do you have any credit cards, sir?

13       **A.   I do.**

14       Q.   How many credit cards do you own?

15       **A.   Master Charge, Sears, Penney's, Peebles.**

16   **Approximately six.**

17       Q.   And do you have balances currently on those

18   cards?

19       **A.   No.**

20       Q.   So you pay them all off?

21       **A.   I pay them off every month.**

22       Q.   Can you think of any other monthly expenses

23   that you incur?

24       **A.   My fuel, flying back and forth to work.**

Joseph Jadczak
October 3, 2006

Page 18

1        Q.    Okay.  Do you fly your plane on a daily basis

2    during the work week to work?

3        A.    I do.

4        Q.    How much would that cost you in a month, do

5    you think?

6        A.    A month?

7        Q.    Yes.

8        A.    Approximately 550 a week.

9        Q.    Okay.  That will work.

10                 How far is the flight to work?

11        A.    It's 78.8 miles.  It takes about 39 minutes,

12    38 minutes.

13        Q.    And you work in, is it Northeast Philadelphia?

14        A.    Northeast Philadelphia.

15        Q.    All right.  Can you think of any other monthly

16    expenses that you would incur?

17        A.    Maintenance on the airplane.  That varies.

18        Q.    Does it depend on the season?

19        A.    No, actually, the hours.

20        Q.    Meaning how often you fly?

21        A.    How often I change the oil and have everything

22    checked.  Then yearly you have an annual done on it,

23    which is an inspection.

24                 And maintenance on my cars.

Joseph Jadczak
October 3, 2006

Page 19

1        Q.    Now, maintenance on an airplane in a given

2   month, are we talking a couple hundred dollars or a

3   couple thousand dollars?

4        **A.    Usually it's in the neighborhood of $200 every**

5   **time they change the oil for just the oil.  That's about**

6   **every three weeks.**

7        Q.    How much would your gross monthly income be

8   combining any income that your wife may bring in?

9        **A.    Gross monthly?  I can't give you an exact**

10  **number.**

11                   MR. SENSOR:  Can you annualize it?

12                   THE WITNESS:  I can annualize it in the

13  neighborhood of 60,000.

14  BY MR. SMYTHE:

15       Q.    Is that between you and your wife?

16       **A.    Yes.**

17       Q.    Thank you for that information, sir.

18       **A.    You're welcome.**

19       Q.    Now, Mr. Jadczak, I'm going to ask you a

20  couple questions about your insurance history.

21                   This claim is arising from a Homesite

22  insurance policy.  Is that correct?

23       **A.    Yes.**

24       Q.    When did you become an insured of Homesite, if

Joseph Jadczak
October 3, 2006

1    you recall?

2        A.    Well, originally we started out with AIG, and

3    they had turned us over to Homesite.  I believe it was

4    last year.  I'm not a hundred percent sure.

5        Q.    Who was your previous insurer for the Eagles

6    Crest property, if you can remember?

7        A.    It was always AIG.

8        Q.    Have you ever filed an insurance claim before?

9        A.    No.

10        Q.    Any type of claim, like an auto claim or --

11        A.    My wife's car, yeah.

12        Q.    So you have filed --

13        A.    She had totaled her car about six weeks ago.

14        Q.    Oh, really?

15        A.    Mm-hmm.

16        Q.    Did you file that claim, or did your wife file

17    it, if you know?

18        A.    I filed it, and then they called and talked

19    with her.

20        Q.    Was she involved in an accident?

21        A.    Yes.

22        Q.    Is she all right?

23        A.    Yeah.  Just some bumps and bruises.

24        Q.    The car was totaled?

Joseph Jadczak
October 3, 2006

Page 21

1      **A.    Yes.**

2      Q.    What's your auto insurer?

3      **A.    AIG.**

4      Q.    Do you have a package with AIG where it's auto

5    and home?

6      **A.    I do.**

7      Q.    You wouldn't happen to know the claim number

8    off the top of your head, would you?

9                    MR. SENSOR:   We can get that for you.

10                   MR. SMYTHE:   Okay.

11                   THE WITNESS:   I know the girl handling

12   it, Erin Weaver.

13   BY MR. SMYTHE:

14     Q.    Any other insurance claims that you can think

15   of in the past?

16     **A.    No.**

17     Q.    When exactly did the auto accident occur?

18     **A.    Approximately six weeks ago.**

19     Q.    Was it in Delaware or --

20     **A.    It was.**

21     Q.    -- Philadelphia?

22                   Mr. Jadczak, have you ever applied for

23   insurance and been denied?

24     **A.    No.**

Joseph Jadczak
October 3, 2006

Page 22

1        Q.   Has an insurance company ever accused you of

2   fraud, sir?

3        A.   **No.**

4        Q.   Have you ever filed a complaint with the

5   Delaware insurance bureau?

6        A.   **I did on this case.**

7        Q.   When did you file that complaint, sir?

8        A.   **Verbally, like around the middle of the**

9   **summer, end of the summer.**

10       Q.   You spoke on the telephone with somebody?

11       A.   **I did.**

12       Q.   Do you remember who you spoke to?

13       A.   **Joanne Newman.**

14       Q.   Do you know what her position was, sir?

15       A.   **I do not.**

16       Q.   That's the Delaware Department of Insurance.

17   Is that right?

18       A.   **I believe it's the Delaware Department of**

19   **Insurance Commission.**

20            MR. SENSOR:   It's the Insurance

21   Commissioner's office.

22            THE WITNESS:   Yeah.

23   BY MR. SMYTHE:

24       Q.   When did you make this complaint, sir?

Joseph Jadczak
October 3, 2006

Page 23

1       A.    **Roughly around July.**

2       Q.    Have you ever filed any other complaints with

3   the Delaware --

4       A.    **No.**

5       Q.    -- Insurance Commission?

6       A.    **No.**

7       Q.    Just for the record, make sure you wait until

8   I finish asking my question before you answer.  It makes

9   for a clearer record, and you may not know what I'm

10  saying.  You might answer something that I'm not asking

11  you.  So, if you could, that would be great.  Everyone

12  does it.  It's pretty common, so don't worry about it.

13      A.    **I'm sorry.**

14      Q.    That's okay.

15                  Have you ever filed a lawsuit, sir?

16      A.    **No.**

17      Q.    Have you ever been named as a defendant in a

18  lawsuit?

19      A.    **I have.**

20      Q.    Is that in a personal capacity or a business

21  capacity?

22      A.    **Let me simplify it.  I was sued by my sister.**

23  **That does make me a defendant.  Right?**

24      Q.    You were sued by your sister?

Joseph Jadczak
October 3, 2006

1      A.    **After my parents died.**

2      Q.    Okay.  In connection with what?

3      A.    **With the estate.**

4      Q.    With the estate.  Okay.

5            When was that?

6      A.    **1998.**

7      Q.    Was your sister the personal representative of

8  the estate?

9      A.    **I don't understand.**

10     Q.    Do you know why you were named in the case?

11     A.    **Because she owed money to the estate.**

12     Q.    Whose estate was it?

13     A.    **My parents'.  I was the executor.**

14     Q.    Thank you.

15           You said your sister owed money to the

16  estate?

17     A.    **More than what was left.  She just wanted**

18  **more.**

19     Q.    Any other times that you were named as a

20  defendant in any lawsuit?

21     A.    **No.**

22     Q.    Mr. Jadczak, have you ever declared bankruptcy

23  before?

24     A.    **No, sir.**

Joseph Jadczak
October 3, 2006

Page 25

 1          Q.   To your knowledge, has your wife ever declared

 2     bankruptcy before?

 3          **A.   No, sir.**

 4          Q.   Have you ever fallen behind on, let's say, a

 5     credit card payment and then a collection agency

 6     threatened to take you to court or file a lawsuit against

 7     you?

 8          **A.   Never.**

 9          Q.   And you said earlier you have never fallen

10     behind on your mortgage payments?

11          **A.   No, sir.**

12          Q.   Mr. Jadczak, I'm looking at a document from

13     Nextel Town Communications.

14               Could you review this document for me

15     briefly and tell me what this document represents, sir?

16          **A.   This is the radio equipment that I had in the**

17     **hangar that was lost in the fire.  They had given me a**

18     **list of the cost of what we had purchased from them.**

19     **Also on here is my own recollection of different radio**

20     **equipment that I had in the hangar.**

21          Q.   Okay.  So how did you obtain that document?

22          **A.   I called Town Communications and asked them to**

23     **send me a cost on the radios that I had.**

24          Q.   Okay.  In order to submit in support of your

Joseph Jadczak
October 3, 2006

Page 26

1   contents claim.  Is that correct?

2        **A.    Yes.**

3        Q.    Thank you, sir.

4                     Could we mark this as Exhibit 2.

5                     (Jadczak Deposition Exhibit No. 2 was

6   marked for identification.)

7   BY MR. SMYTHE:

8        Q.    I am also reviewing copies of color photos, as

9   well as some black and white photos that were given to

10  me.

11                    Mr. Jadczak, I'm going to hand you this

12  stack of photos.  Do you recognize those photos?

13       **A.    I do.**

14       Q.    Can you tell me who took those photographs?

15       **A.    Some were taken by me.  Others were taken by**

16  **the neighbors when the fire was involved.  And also by**

17  **the neighbors after the fire.**

18       Q.    What are your neighbors' names?

19       **A.    Lou Calafano, C-A-L-A-F-A-N-O.**

20       Q.    Do you know his phone number, sir?

21       **A.    I do not.**

22       Q.    But does he live next-door to you or across

23  the street?

24       **A.    About four properties down.**

Hanson Renaissance Court Reporting & Video
(313) 567 - 8100  www.hansonreporting.com

Joseph Jadczak
October 3, 2006

Page 27

1      Q.   Did any other neighbors take photographs?

2      A.   **Diane Morgan.**

3      Q.   Do you know her phone number, sir?

4      A.   **I'm sorry, I don't.**

5      Q.   Does she live nearby you?

6      A.   **She does.  Two properties over.**

7      Q.   Thank you.

8      A.   **And there was a third neighbor.  All I know is**

9   **her first name is Betty.  I don't know her last name.**

10  **And she lives across the street.**

11     Q.   These neighbors that you mentioned,

12  Mr. Calafano, Diane Morgan, and Betty, they, as far as

13  you know, witnessed the fire?

14     A.   **They did.**

15     Q.   And what was the date of the fire again, sir?

16     A.   **May 29th, 2006.**

17     Q.   Was that a Tuesday?

18     A.   **It was Memorial Day.  It was on a Monday.**

19                MR. SENSOR:  Did you want to mark those

20  photos?

21                MR. SMYTHE:  Yes, I'm going to mark

22  these photos as Exhibit 3.

23                (Jadczak Deposition Exhibit No. 3 was

24  marked for identification.)

Joseph Jadczak
October 3, 2006

1    BY MR. SMYTHE:

2         Q.    I'm also looking at a stack of photographs

3    here which appear to be pictures of the airplane that you

4    owned and the RV that you owned taken before the loss on

5    5/29/06.

6                   Mr. Jadczak, if you could take a look at

7    those and tell me if that's an accurate statement?

8         A.    **Yes, it is.**

9         Q.    Do you know who took those pictures, sir?

10        A.    **I did.   Sorry, I had to think.**

11        Q.    In regard to the neighbors that you mentioned

12   earlier, sir, would your wife -- is it Catherine?

13        A.    **Yes.**

14        Q.    Would Catherine know the phone numbers of the

15   three people you mentioned earlier?

16        A.    **I don't believe so.**

17                   MR. SMYTHE:   Let's mark these as Exhibit

18   4.

19                   (Jadczak Deposition Exhibit No. 4 was

20   marked for identification.)

21                   THE WITNESS:   Catherine doesn't get much

22   of a chance to socialize there when she is always at my

23   daughter's helping with the grandkids and she has a

24   mother in a home, so she's constantly running up here for

Joseph Jadczak
October 3, 2006

Page 29

1    them.

2    BY MR. SMYTHE:

3        Q.    Mr. Jadczak, now I'm looking at a document

4    that you gave to me earlier which looks like it's from a

5    landscaping company.

6                    If you could review these documents for

7    me and tell me what they represent, if you can, sir?

8        A.    Okay.    This would be the repair from damages

9    caused by the fire from the fire engines running on the

10   lawn to -- damage from water and foam that were sprayed

11   on the fire, shrubbery, and flowers and everything around

12   the hangar.

13       Q.    You said foam?

14       A.    They had to foam the hangar.    They sprayed

15   foam on it.

16       Q.    It's a fire suppressant.    Right?

17       A.    I wouldn't know.

18       Q.    Now, is this a bill, sir, or an estimate?

19       A.    Estimate for repairs.

20       Q.    Were the repairs made?

21       A.    Not yet.

22       Q.    The estimate is for $21,772.    Is that right,

23   sir?

24       A.    Correct.

Joseph Jadczak
October 3, 2006

1      Q.   And what's the name of this company?   I

2    couldn't read it on the letterhead.

3      **A.   Sposato, S-P-O-S-A-T-O.**

4      Q.   How did you get in touch with Sposato

5    Landscaping?

6      **A.   They do my landscaping and irrigation.**

7      Q.   Did they give you an estimate on repairing the

8    driveway, sir?

9      **A.   No.  As a matter of fact, I didn't get that**

10   **yet.**

11     Q.   You have an estimate that's outstanding for

12   repairs to the driveway?

13     **A.   I didn't get the estimate yet.  The contractor**

14   **is going to give me the name of someone that will finish**

15   **it off for me.  We are waiting for all the construction**

16   **to be done first.**

17     Q.   What's the name of your contractor?

18     **A.   EH Custom Homes.**

19          MR. SMYTHE:  Let's mark this as Exhibit

20   No. 5.

21          (Jadczak Deposition Exhibit No. 5 was

22   marked for identification.)

23   BY MR. SMYTHE:

24     Q.   Mr. Jadczak, now I'm looking at a document

Joseph Jadczak
October 3, 2006

1    from EH Custom Homes, L.L.C.

2                     As I understand it, that is the

3    contractor that you were doing business with.  Is that

4    right, sir?

5         A.    That's correct.

6         Q.    For repairs to your property?

7         A.    Yes.

8         Q.    Mr. Jadczak, I'm going to hand you this

9    document.  Can you please tell me if you recognize this

10   document?

11        A.    Yes.

12        Q.    What is that document, if you can tell me?

13        A.    This is the contract for the rebuilding of our

14   hangar.

15        Q.    For the hangar only?

16        A.    Yes.

17        Q.    And you said earlier that you had broken

18   ground on that; is that right, rebuilding the hangar?

19        A.    Yes.  If it's relevant, he did repair a soffit

20   on the house that's affected by the fire.

21        Q.    Did you say a soffit?

22        A.    A soffit above the garage that was melted.

23        Q.    A part of the roof?

24        A.    Yeah.  But I don't believe that's on this.

Joseph Jadczak
October 3, 2006

Page 32

1        Q.    You said a soffit on the garage?

2        A.    Yes.

3        Q.    Which is separate from the hangar.  Is that

4    right?

5        A.    Yes.

6        Q.    So you have a garage on your property and a

7    hangar?

8        A.    Yes.

9        Q.    In the garage you would store your personal

10   vehicles.  Right?

11       A.    Yes.

12             MR. SMYTHE:  Let's mark this as Exhibit

13   6.

14             (Jadczak Deposition Exhibit No. 6 was

15   marked for identification.)

16             MR. SMYTHE:  And Exhibit 7 will be a

17   copy of his driver's license.

18             (Jadczak Deposition Exhibit No. 7 was

19   marked for identification.)

20   BY MR. SMYTHE:

21       Q.    Mr. Jadczak, I am looking at some documents,

22   one document in particular from Mellon Bank.  I would

23   like you to review that document and, if you can, tell me

24   what that document consists of?

Joseph Jadczak
October 3, 2006

Page 33

1        A.    **This was a letter verifying my payoff of a**

2   **loan I had with Mellon for the motor home.**

3        Q.    So you paid off the loan on the motor home.

4   Is that right?

5        A.    **That's correct.**

6        Q.    When did that happen?

7        A.    **I don't recall the exact date.  I took a loan**

8   **against the house to pay off the original loan.**

9        Q.    Do you remember what year this might have

10  happened?

11       A.    **Maybe five or six years ago.**

12             MR. SMYTHE:  Let's mark this as Exhibit

13  8, if you would.

14             (Jadczak Deposition Exhibit No. 8 was

15  marked for identification.)

16  BY MR. SMYTHE:

17       Q.    Okay, Mr. Jadczak.  Now I'm looking at what

18  appears to be a purchase agreement for the RV that you

19  owned.

20             Can you please take a look at that and

21  confirm if that is an accurate statement?

22       A.    **Yes, it is.**

23       Q.    Is that your handwriting on that document,

24  sir?

Joseph Jadczak
October 3, 2006

Page 34

1      **A.    No, it's not.  My signature.**

2      Q.    That's your signature there?

3      **A.    Yes.**

4      Q.    Okay.

5      **A.    But the rest of it is not my handwriting.**

6      Q.    Okay.  You purchased this recreational vehicle

7      in 1993.  Is that accurate?

8      **A.    That's correct.**

9      Q.    For a total amount of $93,000?  Does that

10     sound accurate to you?

11     **A.    No, it was 59,605.  That was the loan**

12     **information.  I borrowed 43,000, and that's what they**

13     **said that the --**

14     Q.    How much it would ultimately cost?

15     **A.    How much it would ultimately cost.**

16     Q.    So you purchased the RV for $59,000?

17     **A.    Almost 60,000, not counting the car dolly.**

18     Q.    That's an item that's listed in your contents

19     list.  Correct?

20     **A.    Yes.**

21                   MR. SMYTHE:  Let's mark this as Exhibit

22     No. 9.

23                   (Jadczak Deposition Exhibit No. 9 was

24     marked for identification.)

Joseph Jadczak
October 3, 2006

1    BY MR. SMYTHE:

2        Q.    Okay, Mr. Jadczak.  You have another document

3    in front of you.  Could you tell me what that document

4    is?

5        **A.    This is repairs that I had done to the motor**

6    **home.**

7        Q.    When were these repairs done, sir?

8        **A.    In July of 2005.**

9        Q.    Were these just standard maintenance type of

10   repairs?

11       **A.    No, this was replacement of a bathroom and**

12   **countertop in a kitchen and repairs to the muffler and a**

13   **few other things that needed to be taken care of.**

14       Q.    Would you characterize those repairs as more

15   like upgrades with regard to the bathroom and the kitchen

16   counter?

17       **A.    The bathroom, yes, and the kitchen, yes.  The**

18   **other things were maintenance connected.**

19       Q.    And how much were those upgrades and repairs,

20   if you will?

21       **A.    Well, I have to add them up.**

22       Q.    Is there a couple numbers there?

23       **A.    There is --**

24       Q.    Your best estimate is fine.

Joseph Jadczak
October 3, 2006

Page 36

1      **A.    About 4200 to $4500.**

2      Q.    In total for the upgrades and repairs and

3    everything on there?

4      **A.    Yes.**

5      Q.    Thank you.

6      **A.    I also put tires on there, too, but they are**

7    **not on here.**

8      Q.    Thank you.

9              Let's mark this as Exhibit 10.

10             (Jadczak Deposition Exhibit No. 10 was

11    marked for identification.)

12    BY MR. SMYTHE:

13     Q.    Mr. Jadczak, I'm looking at Exhibit No. 10,

14    which is the repairs on the RV that you made in, is it

15    2005?

16     **A.    Yes.**

17     Q.    It says, Name:  Pratt Auto Repair.  Is that in

18    connection with the business that you own?

19     **A.    It is.**

20     Q.    Okay.  Can you explain that for me?

21     **A.    Well, in order for me to get the RV to the**

22    **camp center that repaired it, I needed to put on one of**

23    **my RT tags.**

24     Q.    What's an RT tag, sir?

Joseph Jadczak
October 3, 2006

Page 37

1      A.    It's a repair and towing.  It's used by auto

2    repair shops for the movement of a vehicle from point A

3    to point B for the reason of repair.

4      Q.    Now, you don't own or you are not employed by

5    Pratt Auto Repair.  Is that correct?

6      A.    I own Pratt Auto Repair.  It's part of Pratt

7    Transportation.

8      Q.    Oh, okay.

9              It's a separate entity, legal entity, if

10   you know?

11     A.    Yes.

12     Q.    How many other separate entities or legal

13   entities or businesses are within the Pratt

14   Transportation Company Incorporated?

15     A.    That's all.

16     Q.    So you don't consider Pratt Auto Repair a

17   separate business.  Is that accurate?

18     A.    It is a separate business, but it comes under

19   the same EIN number as Pratt Transportation.

20     Q.    Does Pratt Auto Repair pay taxes separately

21   from the larger Pratt company?

22     A.    My accountant figures everything out taxwise.

23     Q.    Okay.  So you're not sure?

24     A.    I'm not sure.

Joseph Jadczak
October 3, 2006

1      Q.    And how long has the Pratt Auto Repair company

2    been a part of the larger Pratt company?

3          **A.    Early 1970s, about 1972, '73.**

4      Q.    Is Pratt Auto Repair the legal name of that

5    business?

6          **A.    Yes.**

7      Q.    You said earlier it's the same EIN number?

8          **A.    I believe so.**

9      Q.    What's your understanding of an EIN number,

10   sir?

11         **A.    A federal ID number.**

12     Q.    So are you saying that Pratt Auto Repair did

13   the repairs and upgrades to the RV that you own

14   personally?

15         **A.    No.**

16     Q.    Is the RV that you owned previous to the fire,

17   is it titled with the state?

18         **A.    Yes.**

19     Q.    Whose name is on the title of the RV, sir?

20         **A.    My personal name, Joseph Jadczak.**

21     Q.    That's the only name on the title?  Are there

22   any business names on it?

23         **A.    No.  The only difference would be that my**

24   **wife's name would be on there, but I don't honestly**

Joseph Jadczak
October 3, 2006

Page 39

1    remember.

2        Q.    I guess I'm a little confused, because the

3    Tom's Motor Sales, it appears that they sent a bill for

4    work on the recreational vehicle, but the name,

5    presumably, of the customer is Pratt Auto Repair?

6        A.    Yes.

7        Q.    Could you explain that for me, sir?

8        A.    Well, he did that because the owner's card

9    that I had for the tag had Pratt Auto Repair on it.

10       Q.    The owner's tag?

11       A.    The registration card.  When I had to put the

12   RT tag on the vehicle to move it, I left it with him.  So

13   instead of using my name, he just put that on the bill.

14       Q.    Are you saying that the registration on the RV

15   says Pratt Auto Repair?

16       A.    No.  There was no registration on the RV.  The

17   registration for that tag, which can be moved from

18   vehicle to vehicle, was Pratt Auto Repair.

19       Q.    Thank you.

20       A.    Mm-hmm.  I mean, you're welcome.

21       Q.    Mr. Jadczak, I have a document in front of me

22   from Delaware Camping Center.  There is some handwriting

23   on it.  I'm going to give it to you.

24            Please tell me if you recognize this

Joseph Jadczak
October 3, 2006

Page 40

1   document, and if so, could you tell me what the substance

2   of that document is?

3       A.    Yes.   I went to Delaware Camping Center,

4   because they have done work on the camper previously, and

5   asked them to give me an estimate on what they thought

6   the camper would be worth and the car dolly and the

7   moped.

8       Q.    So is it, like, an appraisal without, of

9   course, seeing the recreational vehicle?

10      A.    Yeah, sight unseen via book value.

11      Q.    The book value estimate of the RV at the time

12  of the loss, as far as you know?

13      A.    As far as I know, that's what he went by.   He

14  wasn't aware of my upgrades that I did either when I had

15  the repairs done.

16      Q.    So this is not taking into consideration the

17  various upgrades that you made that are represented in

18  Exhibit 10.   Is that right?

19      A.    That's right.

20                  MR. SMYTHE:   Thank you.

21                  Let's mark this as Exhibit 11, please.

22                  (Jadczak Deposition Exhibit No. 11 was

23  marked for identification.)

24  BY MR. SMYTHE:

Joseph Jadczak
October 3, 2006

1     Q.   Mr. Jadczak, I have in front of me another

2   document, looks like an invoice from We RV Incorporated,

3   dated July 15th, 2005.  I'm going to hand it to you.

4                Please look at that document and tell me

5   if you recognize it, and if so, what the substance of

6   that document is, to the best of your ability?

7     **A.   This was repairs that were done on the motor**

8   **home for Tom's Motor Sales.  It was a local repair shop**

9   **that did a muffler repair.  They charged Tom's.  He, in**

10  **turn, charged me.**

11    Q.   Again, it says Pratt Auto Repair on the

12  document.  Is that because of the previous explanation

13  that you gave me --

14    **A.   That's correct.**

15    Q.   -- in connection with the registration tag?

16    **A.   That's correct.**

17    Q.   Okay.  Thank you, sir.

18    **A.   You're welcome.**

19                MR. SMYTHE:  Please mark this as Exhibit

20  12.

21                (Jadczak Deposition Exhibit No. 12 was

22  marked for identification.)

23  BY MR. SMYTHE:

24    Q.   All right.  Mr. Jadczak, now I'm looking at a

Joseph Jadczak
October 3, 2006

Page 42

1    set of documents which appear to be a list of contents

2    and items of personal property that were allegedly lost

3    during the fire on Memorial Day of this year.

4              If you could review these documents

5    briefly for me, sir, and tell me if you recognize these?

6        A.    I do.

7        Q.    Did you prepare the list of contents that are

8    submitted in connection with this insurance claim, sir?

9        A.    I prepared this letter.

10       Q.    This letter, okay.  This is --

11       A.    The originals of what I have in contents.

12       Q.    Okay.  The second page of this document, that

13   we will mark as Exhibit 13 --

14       A.    Mm-hmm.

15       Q.    -- you typed this out on the computer?

16       A.    I did.

17       Q.    The next set of documents on this exhibit --

18   why don't we just mark this as Exhibit 13.

19              (Jadczak Deposition Exhibit No. 13 was

20   marked for identification.)

21   BY MR. SMYTHE:

22       Q.    On the third page of Exhibit 13 looks like a

23   spreadsheet, similar items of personal property that were

24   allegedly damaged in the fire Memorial Day.

Joseph Jadczak
October 3, 2006

Page 43

1           Mr. Jadczak, did you prepare this actual

2    spreadsheet list of items?

3        A.    No.

4        Q.    Do you know who did?

5        A.    Eagle Adjusters.

6        Q.    And, as far as you know, did Eagle Adjusters

7    prepare this list of personal property after you

8    submitted this list of personal property?

9        A.    Yes.

10       Q.    Did you type up on the computer any other

11   contents lists in connection with this insurance claim,

12   sir?

13       A.    Not that I can remember, no.

14       Q.    Would you say that this list, which is on

15   page 2 of Exhibit 13, represents the entirety of all the

16   items of personal property that were either damaged or

17   destroyed by the fire?

18       A.    For the most part.  I'd have to double look at

19   it to see if I missed anything.

20       Q.    Did you have any conversations with Eagle

21   Adjusting in connection with this insurance claim, sir?

22       A.    Yes.

23       Q.    Did they advise you to prepare a list of items

24   of personal property?

Joseph Jadczak
October 3, 2006

Page 44

1       **A.    They did.**

2       Q.    After the fire was put out, sir, did you have

3    a chance to review and inspect your property?

4       **A.    No.**

5       Q.    Why not?

6       **A.    They told me not to touch anything until the**

7    **Fire Marshal checked everything.**

8       Q.    Who told you not to touch it?

9       **A.    The adjuster.**

10      Q.    Do you know the adjuster's name?

11      **A.    Chad Chancellor.**

12              MR. SENSOR:   Why don't you show him his

13    card.

14              THE WITNESS:   I don't have that.

15    BY MR. SMYTHE:

16      Q.    As far as you know, sir, is that an adjuster

17    from the Homesite Insurance Company?

18      **A.    Yes.**

19      Q.    So you are saying you didn't even get to view

20    and see for yourself what happened?

21      **A.    Well, I viewed it.   I didn't go in the hangar.**

22    **It was a mess.**

23      Q.    Did the police and the Fire Department, did

24    they tape it off?

Joseph Jadczak
October 3, 2006

1      **A.    No.**

2          Q.    Did you feel it was too dangerous, maybe, to

3      enter the hangar?

4      **A.    That was part of it.**

5          Q.    After the fire -- well, let me ask you this.

6                How long, to the best of your

7      recollection, did the fire smoke, if you will?  The fire

8      was put out, but there is smoke.  How long do you think

9      that went on until it stopped smoldering and there was no

10     more smoke?

11     **A.    At least into the early to mid evening, just**

12     **as it was getting dark.**

13         Q.    Of Monday on Memorial Day?

14     **A.    Yeah.  And that was from about 11:00 in the**

15     **morning.**

16         Q.    Okay.  Mr. Jadczak, we are going to talk a

17     little bit about the airplane that you own.  Then we are

18     going to talk about a description, a geographic

19     description of the property you own on Eagles Crest

20     drive, because I've never seen it myself, and I would

21     like to get some testimony from you just so I can see it

22     in my head.

23     **A.    Okay.**

24         Q.    And then we will discuss the contents claim as

Joseph Jadczak
October 3, 2006

Page 46

1    well.

2         **A.    Okay.**

3         Q.    So in regard to the airplane you own, what

4    kind of airplane is it?

5         **A.    It's a Piper.**

6         Q.    Is that a manufacturer?

7         **A.    Yes.**

8              MR. SENSOR:    Let me just note something

9    for the record.    There is no claim for damage to the

10   airplane.

11             MR. SMYTHE:    Okay.

12             MR. SENSOR:    That's not an issue.

13   Besides the fact it's excluded in the policy, there is no

14   damage to the airplane.

15             MR. SMYTHE:    Thank you.

16   BY MR. SMYTHE:

17        Q.    Piper is a manufacturer of airplanes?

18        **A.    Yes.**

19        Q.    As I've already heard, there was no damage to

20   the airplane because of the fire.    Is that right?

21        **A.    That's right.**

22        Q.    I think I read somewhere in the file that you

23   were able to push the airplane out of the hangar.    Is

24   that right?

Joseph Jadczak
October 3, 2006

Page 47

1     A.    That's right.

2     Q.    How large is this airplane?

3     A.    32-foot wing span.  3100 gross weight.  It's a

4  six-passenger, single-engine airplane.

5     Q.    And did you have to put it in neutral like you

6  would a car to push it?

7     A.    Well, there is no neutral.  The brake was off.

8  My adrenaline just kicked in.

9     Q.    And you were able to move, it's 3100 pounds?

10    A.    That's the gross weight loaded, but it's on

11  three wheels, so it rolls.

12    Q.    Okay.  It can roll?

13    A.    Yeah.

14    Q.    And, as I understand it, you were not able to

15  move the recreational vehicle?

16    A.    It was already on fire.

17    Q.    When did you purchase that airplane, sir?

18    A.    In January 1978.

19    Q.    How many miles do you think are on it?

20    A.    It actually goes by hours.

21    Q.    That's right, like a boat?

22    A.    Yes.  Are you talking about the time of

23  purchase or --

24    Q.    Since 1978, just a rough estimate?

Joseph Jadczak
October 3, 2006

Page 48

1       A.    **Right now there is about 4,600 hours on it.**

2       Q.    And you fly that plane on a daily basis to

3   work.  Is that right?

4       A.    **I do.**

5       Q.    You said that's about a 30-minute flight?

6       A.    **Thirty-eight minutes.**

7       Q.    Is that airplane titled?  Is there a

8   certificate of title that you file?

9       A.    **It's registered with the FAA.**

10      Q.    Okay.  Whose name is the airplane under?

11      A.    **My own.**

12      Q.    Your personal name?

13      A.    **Yes.**

14      Q.    So it's Joseph --

15      A.    **Joseph Jadczak, Jr.**

16      Q.    Your wife's name is not on the title?

17      A.    **No.**

18      Q.    Does she know how to fly?

19      A.    **No.**

20      Q.    Does she fly with you?

21      A.    **She does.**

22      Q.    So you use the airplane for business

23   commuting, and I presume for recreation as well?

24      A.    **Recreation and commuting to work.**

Joseph Jadczak
October 3, 2006

Page 49

1        Q.    Who did you purchase the plane from?

2        **A.    Delaware Aviation.**

3        Q.    Did you say Delray?

4        **A.    Delaware.**

5        Q.    Delaware Aviation?

6        **A.    In Northeast Philadelphia.**

7        Q.    It's a private company?

8        **A.    It's the same people that I got my instruction**

9    **from.  They also sold airplanes.**

10       Q.    Okay.  You said it's a single engine.  Right?

11       **A.    Single engine.**

12       Q.    Where is the plane now?

13       **A.    At the neighbor's two doors away from my**

14   **house.**

15       Q.    Do they also have a hangar?

16       **A.    I'm sorry, it's in Northeast Philadelphia**

17   **right now.**

18       Q.    It's at work?

19       **A.    Yeah.  And then after work I will fly home,**

20   **and I'm using the neighbor's hangar.**

21       Q.    Are the neighbors charging you any type of

22   rent, sir?

23       **A.    Yes.**

24       Q.    How much are they charging you?

Joseph Jadczak
October 3, 2006

Page 50

1      A.   **$400 a month.**

2      Q.   Do you know the name of the neighbors?

3      A.   **Diane Morgan.**

4      Q.   You mentioned her name earlier.  Right?

5      A.   **Yes.**

6      Q.   She took photos of the fire?

7      A.   **She did.**

8      Q.   But you don't know her phone number?

9      A.   **No.**

10     Q.   I forgot to ask.  Do you have a cell phone,

11  sir?

12     A.   **I do.**

13     Q.   I don't know if we went over the amount of a

14  cell phone bill that you might have in terms of monthly

15  expense, unless it's purely a business thing?

16     A.   **It's through the business.**

17     Q.   Is it?

18            Now I want to ask you a couple

19  questions, and I want to have you help me get a good

20  picture of the property that you own at Eagles Crest

21  Drive.

22     A.   **Okay.**

23     Q.   Did you say you purchased the land in, is it

24  1999?

Joseph Jadczak
October 3, 2006

Page 51

1       A.    1997.

2       Q.    1997.

3             As I understand it, you were living in

4    the RV at the time, and you built the hangar first.  Is

5    that right, sir?

6       A.    That's right.

7       Q.    Then you built the dwelling?

8       A.    Yes.

9       Q.    Now, let's say I'm driving in a car and I'm

10   coming to your home and I turn left onto the driveway.

11   What am I going to see?  To the best of your ability, if

12   you could explain, what does your property look like?

13      A.    Well, there is a rancher.  It's 4400 square

14   feet, counting the garage.  And the hangar is right next

15   to it, 50 feet, which is 1936 square feet.

16      Q.    1900 what?

17      A.    1936 square feet.

18      Q.    Thank you.

19      A.    Behind the house is the taxiway.

20      Q.    For the airplane?

21      A.    For the air park.

22      Q.    The air park?

23      A.    Yes.  There is a bunch of homes that are built

24   on this air park.  It's a concept where you keep your

Joseph Jadczak
October 3, 2006

Page 52

1   airplane at home.  It's part of your home, is your

2   hangar.  So you get to sleep with your airplane.

3       Q.   That's in the back of the property?

4       A.   The taxiway is in the back of the property.

5   The hangar and the home are evenly across the front of

6   the property.

7       Q.   Okay.

8       A.   The driveway is splitting the house and the

9   hangar.  It's in the pictures.

10              MR. SENSOR:  There is a plat here, if

11  that would help you.

12              MR. SMYTHE:  It would help.

13  BY MR. SMYTHE:

14      Q.   I'm looking at Exhibit 1, which is the deed to

15  the property, and I'm at the page of "Lands of

16  Joseph R. Hudson."

17              Is that the person that you purchased

18  this land from?

19      A.   Yes.

20      Q.   Okay.  Could you review this document, sir,

21  and tell me if that's an accurate drawing or description

22  of the property you currently own?

23      A.   Yes, it is.

24      Q.   So in back of the -- it says proposed

Joseph Jadczak
October 3, 2006

Page 53

1    residence/garage.  To the right, I think 50 feet from the

2    garage, it says proposed hangar?

3        A.    Yes.

4        Q.    In back of this would be the taxiway.  Is that

5    correct?

6        A.    Yes.  This is all grass.  I have a utility

7    shed there now and then a taxiway.

8        Q.    In the northeast corner?

9        A.    Is a utility shed.

10       Q.    And it looks like the taxiway has an easement?

11       A.    It does.

12       Q.    So a lot of your neighbors, they own

13   single-engine planes as well, too?

14       A.    They do.  Some twins.

15       Q.    This drawing does not show the driveway.

16             From the street here, it looks like,

17   from Eagles Crest Road, could you just indicate to me how

18   the driveway -- what the driveway looks like?

19       A.    This is Eagles Crest Road.  The driveway is

20   blacktop.  Starts here, comes back to here.

21       Q.    Goes straight past the hangar?

22       A.    Past the hangar and to the grass line here.

23   Then there is also an additional blacktop behind the

24   hangar here that goes to the taxiway.

Joseph Jadczak
October 3, 2006

Page 54

1          Q.    So you have an asphalt driveway that goes all

2    the way back to the taxiway.  Is that right?

3          **A.    The asphalt driveway stops about where the**

4    **hangar ends.**

5          Q.    Okay.

6          **A.    And where the house ends, like on an angle**

7    **like that.**

8                 **And then there is a cement apron behind**

9    **the hangar where the door opens up for the plane to go in**

10   **and out.  And behind the cement apron is blacktop, which**

11   **kind of S's out like this around the utility shed and**

12   **onto the taxiway.**

13                **And there is a 12-by-12 door there on**

14   **the hangar where the RV goes in that way.**

15         Q.    And your garage is connected to your

16   residence.  Is that right?

17         **A.    Yes.**

18         Q.    You said the taxiway for the air park earlier.

19   Is that right?

20         **A.    Yes.**

21         Q.    What does air park mean to you?

22         **A.    Air park means a community of homes that have**

23   **their airplanes at home with them, and they share the**

24   **taxiway and runway.**

Joseph Jadczak
October 3, 2006

Page 55

1      Q.   Oh, okay.

2           Now, before the loss on Memorial Day,

3   what did you use your hangar for?

4      **A.   The parking of the airplane and the parking of**

5   **the RV.  I also had tools.  I would do just personal odds**

6   **and ends work on cars or the plane or the RV.  Also had**

7   **personal items in there.**

8      Q.   Did you store items in the hangar?

9      **A.   Yes.  The hangar had an attic, also.**

10     Q.   Above?

11     **A.   Yes.**

12     Q.   Were there items of personal property in the

13   attic at the time of the fire, sir?

14     **A.   Yes.**

15     Q.   Were those damaged and/or destroyed by the

16   fire?

17     **A.   Yes.**

18     Q.   Are those items that were damaged and/or

19   destroyed by the fire in the attic, are those listed in

20   the contents list?

21     **A.   Yes.**

22     Q.   So you work on your plane and your RV in the

23   hangar, and you have other items of personal property in

24   there, too?

Joseph Jadczak
October 3, 2006

Page 56

1       A.    Yes.

2       Q.    Would you say you spend a considerable amount

3    of time in the hangar?

4       A.    Quite a bit.  My wife does wash out there,

5    too, because we had a washer and dryer out there.

6       Q.    So it sounds like the hangar was equipped with

7    electricity and water at least.  Is that right?

8       A.    Everything.

9       Q.    Everything.

10            What does everything mean to you, sir?

11      A.    Water, sewer, electric, cable, phone, heat,

12   washer, dryer, utility sink.

13      Q.    So someone could live in there?

14      A.    We did.

15      Q.    You did live in there?

16      A.    We did.

17      Q.    While you were building the dwelling.  Right?

18      A.    Yes.

19      Q.    So you didn't necessarily live in the RV, you

20   lived in that hangar as well?

21      A.    In the RV, which was inside the hangar.

22      Q.    And you had a television and cable in there at

23   the time?

24      A.    Yes.

Joseph Jadczak
October 3, 2006

Page 57

```
 1          Q.   At the time of the fire?

 2          A.   Yes.

 3          Q.   And you used that television?

 4          A.   Yes.  Oh, yeah.  Check the weather every

 5   morning.

 6          Q.   You said plumbing, too?

 7          A.   Yes.

 8          Q.   There is a bathroom in the hangar?

 9          A.   In the RV, not in the hangar.

10          Q.   So you would have --

11          A.   Intercom and all that stuff.

12          Q.   Pardon me?

13          A.   We had an intercom in there which also was

14   connected with the house.

15          Q.   So because you had plumbing in the RV;

16   therefore, you would have pipes in the hangar, too?

17          A.   I had a setup next to the RV for dumping for

18   the sewer, which the hose went into the sewer.  I had the

19   water, hookup for the water next to it.  Electric hookup.

20   Cable, phone, they were all plugged into the RV.

21   Actually, it was set up for full use where it was sitting

22   at, the RV.

23          Q.   Did other people store items of personal

24   property in your hangar?
```

Joseph Jadczak
October 3, 2006

Page 58

1              MR. SENSOR:  Other than him and his

2    wife?

3              MR. SMYTHE:  Yes, sir.  Thank you.

4              THE WITNESS:  No.  I was going to store

5    my daughter's crib, but no.

6    BY MR. SMYTHE:

7         Q.   So you never rented out any space in your

8    hangar to anyone else?

9         **A.   Oh, no.  It was personal use.**

10        Q.   You said your property is about four,

11   four-and-a-half acres.  Is that accurate?

12        **A.   No, no, no.  One-and-three-quarter acres.**

13   **Just shy of two acres.**

14        Q.   Okay.  Now I would like to take you through

15   the chronology of the date of the loss, if I could,

16   Mr. Jadczak.

17              This fire loss occurred on Memorial Day,

18   which is May 29th, 2006.  Is that right, sir?

19        **A.   That's right.**

20        Q.   That was a Monday.  Is that right?

21        **A.   Yes.**

22        Q.   Can you tell me what you did when you first

23   woke up that morning?

24        **A.   We had breakfast.**

Joseph Jadczak
October 3, 2006

1       Q.   In the home?

2       **A.   Yes.   Took a shower.**

3       Q.   I'm sorry.  What time did you wake up?  I

4    apologize for the excruciating detail.

5       **A.   I usually wake up between 5:00 and 6:00 a.m.**

6       Q.   Even on the holiday?

7       **A.   Yeah.   My body clock always gets me up.**

8       Q.   Okay.  So you think you were up by 6:00 a.m.

9    on that day?

10      **A.   Yes.**

11      Q.   Then breakfast?

12      **A.   Breakfast.**

13      Q.   Shortly thereafter?

14      **A.   Shortly thereafter.   Took a shower, got**

15   **dressed, sat down in the great room and started watching**

16   **television.**

17      Q.   Did you say great room?

18      **A.   Yes.   Family room, great room.**

19      Q.   How long do you think you were watching TV?

20      **A.   By the time I was done my shower and getting**

21   **dressed was probably 7:30, 8 o'clock.   And I was sitting**

22   **there until about 11 o'clock.**

23      Q.   And then what?

24      **A.   And then I was watching TV.   My wife screamed,**

Joseph Jadczak
October 3, 2006

Page 60

1    There is smoke coming out of the hangar.  She was in the

2    back room, in the exercise room doing the treadmill.

3         Q.    In the house?

4         A.    In the house.

5                When she came out -- you can see the

6    hangar from our kitchen, but my back was towards it when

7    I was watching TV -- she yelled that there was smoke

8    coming out of the hangar.

9                I ran out, ran in the hangar, hit the

10   button for the bifold door, pushed the airplane out.  I

11   turned around to see if I could save anything else, but

12   that fast it went up like a cinder box.

13        Q.    Now, as far as you know, did your wife see

14   fire or smoke initially?

15        A.    Both.

16        Q.    So she saw flames and smoke coming from the

17   hangar?

18        A.    Yes.

19        Q.    You said you pushed a button to open a door

20   remotely?

21        A.    It's the bifold door.  There is a hard-wire

22   button there that you push to open it.

23        Q.    Okay.  The doors to that hangar, do they have

24   some sort of codes, security codes?

Joseph Jadczak
October 3, 2006

1       **A.      The -- not the bifold door.   I have a remote**

2   **control for it.   And, also, the 12-by-12 door where the**

3   **RV goes into has a remote control for it.**

4       Q.    Is there any way that somebody can walk into

5   the property and push a button on the hangar itself and

6   get in there?

7       **A.    No.**

8       Q.    So the only way to get in and out, or open and

9   close the doors to the hangar are from a remote control.

10  Is that accurate?

11      **A.    Or a hard-wire button on the inside.**

12      Q.    On the inside of the hangar?

13      **A.    Yes.**

14      Q.    Was the hangar all closed and locked up at the

15  time of the fire?

16      **A.    Yes.**

17      Q.    And you generally lock up at the end of the

18  night or after use in the hangar?

19      **A.    Yes.**

20      Q.    So you said you ran outside and you opened the

21  bifold door.   Is that right?

22      **A.    The 12-by-12 door was open from the smoke and**

23  **the heat.   It has some kind of mechanism that makes the**

24  **door open up if there is fire.   It's an OSHA thing.**

Joseph Jadczak
October 3, 2006

Page 62

1      Q.   Okay.

2      **A.   So if you are laying on the floor there they**

3  **can get to you.  If you have fire or smoke, it opens and**

4  **locks open.  So I was able to run through the 12-by-12**

5  **door.**

6      Q.   The door opened because of the fire and smoke.

7  Is that accurate?

8      **A.   Yes.  Yes.  Thank goodness.**

9      Q.   Then you said you removed the airplane that

10  you owned from the hangar, and you tried to see what else

11  you could salvage.  Is that right?

12     **A.   Yes.**

13     Q.   What did you see at the time?

14     **A.   I saw the fire spread from the rear of the RV**

15  **and the wall facing the street, spread forward through**

16  **the whole RV, through the ceiling in the hangar.  Then it**

17  **started coming along the side walls.  And I just heard**

18  **things popping and crashing, and I wasn't going to run**

19  **back in there.**

20     Q.   I don't blame you.

21          You said you saw the fire spread from

22  the rear of the RV.  Is that right?

23     **A.   Yes.**

24     Q.   Did it spread quickly?

Joseph Jadczak
October 3, 2006

Page 63

1      A.    Very.

2      Q.    What time of the day would you say that you

3  were removing the plane from the hangar?

4      A.    About 11:10 a.m.

5      Q.    11:10?

6      A.    About that.

7      Q.    How soon before the Fire Department arrived?

8      A.    About 25 minutes later; 11:30, 11:35.   There

9  were five.

10     Q.    A number of companies responded to the fire.

11  Is that right?

12     A.    Yes.

13           MR. SENSOR:  Actually, I have, if it

14  will be helpful, I have a copy of the newspaper article

15  about this.  Photos, not the full-blown article.

16           THE WITNESS:  Yeah, I made the papers.

17  Not what I wanted to do.

18           MR. SMYTHE:  Can I get a copy of this?

19           MR. SENSOR:  Yes.  You can use that.  We

20  will get this back, so go ahead and mark it.

21           MR. SMYTHE:  Thank you.

22           Let's mark this as Exhibit 14.

23           (Jadczak Deposition Exhibit No. 14 was

24  marked for identification.)

Joseph Jadczak
October 3, 2006

Page 64

1          MR. SMYTHE:  This is a copy of a local

2    newspaper clipping with photographs of the fire to the

3    hangar.

4          MR. SENSOR:  Let's take a break.

5          (Brief recess taken.)

6    BY MR. SMYTHE:

7      Q.   Mr. Jadczak, I forgot to ask you earlier if

8    you had any type of insurance on the recreational vehicle

9    at the time of the loss?

10     **A.   No.**

11     Q.   Why is that?

12     **A.   We hadn't used it for about three years.**

13     Q.   Any particular reason why you didn't use it

14   for three years?

15     **A.   My wife just didn't want to go.  She said it**

16   **was just another house to clean.  Plus we lived in it for**

17   **nine months, so I think she was all RV'd out.**

18     Q.   So she didn't want to use it generally?

19     **A.   Yeah.  At least for that time being.**

20     Q.   And as of three years ago, did you pay off the

21   balance of the loan on the RV?

22     **A.   It was paid off, I think, prior to the three**

23   **years, but I don't know the exact dates.  I borrowed**

24   **against the house to pay off the original loan because**

Joseph Jadczak
October 3, 2006

Page 65

1   the interest was so high.

2        Q.   If you weren't using it for the three years,

3   any particular reason why you didn't sell it to somebody

4   else?

5        A.   I wanted to eventually use it because of the

6   grandsons.

7        Q.   So you had an intent to use it in the future?

8        A.   Yes.  Oh, yeah.

9        Q.   To travel to see your grandchildren?

10       A.   To go to different places with them.

11       Q.   Oh, to take them with you?

12       A.   Yes.

13       Q.   You said you had two grandchildren?

14       A.   Yes.

15       Q.   Actually, you didn't say that earlier on the

16   record, I think off the record we were talking about

17   that?

18       A.   Yes.  I have two boys, five and two.

19       Q.   Thank you.

20       A.   You're welcome.

21       Q.   Let's go back to the date of the loss.

22              When we left off, we were talking about

23   how the Fire Departments, there was numerous fire

24   companies that responded to this fire.  You said they

Joseph Jadczak
October 3, 2006

Page 66

1    arrived approximately 25 minutes after you first

2    initially encountered the fire.  Is that accurate?

3        **A.    According to what the neighbors told me,**

4    **everyone was calling, it was about 25 minutes.  It was**

5    **Memorial Day and traffic was very heavy.**

6        Q.    On your -- oh, okay.

7        **A.    On Route 1.**

8        Q.    Which is the main route to get to your place?

9        **A.    The main road right around our area.**

10                 MR. SENSOR:  And the main drag to the

11   beach.

12                 THE WITNESS:  Yes, I live near the

13   beach.

14   BY MR. SMYTHE:

15       Q.    I spent many vacations at Bethany Beach.  This

16   is a great state.

17       **A.    Yes.  Just north of that.**

18       Q.    Let's talk about the day before the fire,

19   actually.

20                 Did you interact or do any maintenance

21   on the recreational vehicle on the day before?

22       **A.    No, we didn't do maintenance.**

23       Q.    Let me ask you this question.  Did you do

24   anything to the RV the day before the fire?  Did you plug

Hanson Renaissance Court Reporting & Video
(313) 567 - 8100  www.hansonreporting.com

Joseph Jadczak
October 3, 2006

Page 67

1    anything in or do anything?

2        A.    Yes.

3        Q.    Okay.  What did you do?

4        A.    The day before the fire my wife and I were

5    going to clean the RV to prep it to take a trip in July.

6    July 4th we had plans to go with the grandchildren.

7                 Put the lights on, tried to check

8    everything.  I realized the refrigerator wasn't working,

9    turned everything off.  I said to her, Let's get the

10   refrigerator fixed, and then we will go ahead and clean

11   it after.  So I turned off all the lights, I turned off

12   the propane, refrigerator.  Left it plugged in for the

13   battery so it could be charged.

14       Q.    When you said you checked everything, what

15   does that entail?  What does that mean?

16       A.    Well, it was more for a cleaning mission.

17       Q.    A cleaning mission?

18       A.    Yeah.  We were just going in there, we were

19   going to start cleaning.  So the only thing I did check

20   was the refrigerator to see if it was working.  That's

21   where I started.  As soon as I found out it wasn't

22   working, we stopped there.

23       Q.    Let me ask you this.  When the RV is stored,

24   let's say, you know, in the days leading up to the fire,

Joseph Jadczak
October 3, 2006

Page 68

1    is the electricity on in the RV?

2         A.    No.

3         Q.    Is the plumbing hooked up on the RV?

4         A.    No.

5         Q.    Is anything connected to the RV in terms of

6    making it operational in any respect?

7         A.    **Not unless we intend to use it or have someone**

8    **sleep in there if we have a bunch of people come down.**

9    **The kids or something, they like to sleep in there when**

10   **they come down.**

11        Q.    As opposed to your residence?

12        A.    **Yes.**

13        Q.    Is that because it's fun to do?

14        A.    **Yes.**

15        Q.    So the day before the fire, did you say

16   earlier that you plugged something in?

17        A.    **Yes.**

18        Q.    What did you plug in exactly?

19        A.    **The electric cable for the RV.**

20        Q.    And where did you plug that in?

21        A.    **Right next to the RV, where I have an outlet**

22   **for the RV.**

23        Q.    So it's an outlet on the wall?

24        A.    **Yes.  It's a special 30 amp.**

Joseph Jadczak
October 3, 2006

Page 69

1     Q.    Is it true that the RV was plugged, or the

2   electric cable for the RV was plugged into the outlet on

3   the wall for over three years?

4     **A.    No.    That was scrambled.    I told them I hadn't**

5   **used the RV for three years.**

6     Q.    So that was a miscommunication?

7     **A.    Yes.**

8     Q.    Who did you have the miscommunication with?

9     **A.    The adjuster from Eagle.**

10     Q.    So it's your testimony today that the electric

11   cable was not plugged into the outlet on the wall from

12   the RV for a period of three continuous years?

13     **A.    Absolutely not.**

14     Q.    Did you notice anything when you plugged in

15   the electric cable to the outlet?   A sensation of heat?

16   A spark?   A smell?

17     **A.    No, not at all.**

18     Q.    And what time would you say that you plugged

19   in that electric cable?

20     **A.    About 2:00 in the afternoon on Sunday, the day**

21   **before.**

22     Q.    What was the purpose of plugging in the

23   electric, the cable into the outlet, to run the

24   electricity in the RV?

Joseph Jadczak
October 3, 2006

Page 70

1      **A.    To run the lights and test the refrigerator,**

2    **and basically just check everything in the RV.**

3          Q.    Did you leave the cable plugged in overnight?

4      **A.    Yes.**

5          Q.    Is that a standard practice of yours, to plug

6    in the electric cable and leave it on overnight?

7      **A.    When we're working in there, or as we were**

8    **living in there for those nine months, never had a**

9    **problem with it before.**

10         Q.    So you would leave it on overnight?

11     **A.    Yeah.**

12         Q.    That's so you could, when you wake up, if you

13   are sleeping in the RV, you could turn a light switch on

14   and it would work for you?

15     **A.    Your television, hair dryer, whatever else you**

16   **needed.**

17         Q.    You said earlier that you lived in the RV

18   actually inside the hangar for a period of nine months.

19   Is that right, sir?

20     **A.    That's right.**

21         Q.    And during that period of nine months did you

22   leave the cable plugged in continuously?

23     **A.    Yes.**

24         Q.    And you never had any problems?

Joseph Jadczak
October 3, 2006

Page 71

1       A.    Never.

2            Q.    Did you hire anybody or have anybody perform

3       any services or maintenance services on the RV shortly

4       before the loss, let's say in a period of six months

5       before the loss?

6       A.    No.

7            Q.    No one came onto your property and did work

8       on, let's say, your airplane inside your hangar six

9       months before your loss?  That's a separate question.

10      A.    No, not at all.

11           Q.    Do you know of anyone besides yourself and

12      your wife who may have had access to the hangar that's on

13      your property?

14      A.    No.

15           Q.    And you were telling me earlier that the

16      hangar will open by operation of remote controls.  Is

17      that right?

18      A.    Yes.

19           Q.    Are those remote controls -- or let me ask you

20      this.  How many remote controls are there in total?

21      A.    Receivers or transmitters?

22           Q.    Okay.  Transmitters, the ones you press the

23      button to open the hangar?

24      A.    One in each car.

Joseph Jadczak
October 3, 2006

Page 72

1        Q.    One in each car.

2              How many cars do you have?

3        A.    **Five.**

4        Q.    Do you make monthly car payments on those five

5    cars?

6        A.    **No.**

7        Q.    Are those paid off?

8        A.    **Yes.**

9        Q.    Those are all for personal use?

10       A.    **Yes.**

11       Q.    For the two of you?

12       A.    **Yes.  I'm a car buff.**

13       Q.    Do you have classic cars?

14       A.    **I have a 1977 Monte Carlo.  It's like**

15   **showroom.**

16       Q.    The year I was born.

17       A.    **Can I go off the record?  It's my wife.**

18             **(Brief recess taken.)**

19   BY MR. SMYTHE:

20       Q.    Mr. Jadczak, we were talking earlier about, or

21   I was questioning you earlier about anyone who perhaps

22   may have had access to the hangar on your property.  And

23   I think you told me that you had the remotes, the

24   transmitters, if you will, in the cars that you own.  Is

Joseph Jadczak
October 3, 2006

Page 73

1    that right?

2        A.    Yes.

3        Q.    Is a tansmitter also in the airplane?

4        A.    No.  Well, there is one for the big hangar

5    door.

6        Q.    Oh, the other hangar door?

7        A.    Yes.

8        Q.    To your knowledge, in and around the time of

9    the loss, let's say about a week before the loss, was

10   anybody besides you or your wife actually inside the

11   hangar?

12       A.    I was.

13       Q.    No, anyone else besides you or your wife

14   inside the hangar?

15       A.    No.

16       Q.    No relatives or friends or anything like that?

17       A.    No.

18       Q.    Was there an electric battery charger that was

19   used in connection with the RV in the hangar?

20       A.    There is a built-in converter which has

21   circuit breakers on it which is a dual purpose.  It

22   charges the battery and supplies power to the RV.  And it

23   switches from 120 volt to the 12 volt.  It's called a

24   converter.

Joseph Jadczak
October 3, 2006

Page 74

1      Q.    ACDC?

2      **A.    Yes.   It's called a converter.**

3      Q.    And where is that physically located?

4      **A.    In the back underneath the bed.**

5      Q.    In the RV?

6      **A.    At the face of the bed.   Yes, in the RV.   It's**

7  **part of the RV.**

8      Q.    Did you say at the face of the bed?

9      **A.    Yes.**

10     Q.    Underneath?

11     **A.    At the foot of the bed.**

12     Q.    Thank you.

13              Well, let me ask you this, Mr. Jadczak.

14  You saw the damage from the fire in your hangar and you

15  saw the fire and smoke and you removed the plane on that

16  day.

17              To the best of your ability, what do you

18  think, or I'm just asking you to give me an estimation,

19  what do you think caused this fire?

20     **A.    Something electrical.**

21     Q.    Something electrical?

22     **A.    Yes.**

23     Q.    Why do you say that?  And I ask you this

24  knowing that you are not, like, an expert in fire origin

Joseph Jadczak
October 3, 2006

1    or cause and origin or anything like that.

2        **A.    That was the initial thought of the Fire**

3    **Marshal.**

4        Q.    So you were informed from somebody else that

5    it may have been electrical in nature?

6        **A.    Yes.**

7        Q.    So you are basing that previous statement on

8    your relying on what somebody else told you?

9        **A.    Yes.**

10        Q.    You don't have an independent, like, idea or

11    hypothesis as to what may have occurred?

12        **A.    Must have been electrical, because there is no**

13    **propane in the back or anything like that or any fuels.**

14        Q.    I thought I saw in your contents list that you

15    had some, like, motor oil or gasoline that was destroyed

16    or damaged?

17        **A.    No gasoline.   Motor oil.**

18        Q.    Maybe that was my mistake.

19        **A.    Gasoline was in the RV for the generator, and**

20    **in the tractor.**

21        Q.    Inside the tank of the RV?

22        **A.    Yes.   And in the tractor, garden tractor, and**

23    **in the little moped.   But I don't store gasoline in the**

24    **hangar.**

Joseph Jadczak
October 3, 2006

Page 76

1      Q.    Is that because it could lead to a fire?

2      A.    Yeah.   **They are in containers in the shed out**

3  **in the back.**

4      Q.    The utility shed?

5      A.    **Yes.**

6      Q.    Is that behind the hangar, again?

7      A.    **Yes.   Quite a distance.**

8      Q.    How quite a distance?

9      A.    **Forty feet, fifty feet.**

10     Q.    This electric battery charger we were just

11  discussing that's in the back of the RV at the foot of

12  the bed, did that come with the RV when you purchased it?

13     A.    **The converter, yes.**

14     Q.    Did the electric cord that you plugged into

15  the 30-amp outlet on the wall connect to the converter?

16     A.    **Yes.**

17     Q.    Have you ever had any problems in terms of

18  maintenance or in terms of use and performance of the

19  converter?

20     A.    **No.**

21     Q.    How long was the Fire Department, or the fire

22  departments, I should say, at your property on that day?

23     A.    **At least a couple hours.**

24     Q.    And did a crowd of neighbors gather outside?

Joseph Jadczak
October 3, 2006

1    Were they outside on that day?

2        A.    Yeah.

3        Q.    Did you speak to any of them personally on

4    that day?

5        A.    Yes.

6        Q.    Who did you speak to?

7        A.    Lou Calafano.  And people were talking to me,

8    but it was like slow motion.  You know, I couldn't tell

9    you exactly who they were.  They were just all in shock.

10   Our next-door neighbors, they had called the Fire

11   Department.  I spoke with them.  The neighbors on the

12   other side, I spoke with him.  Just everybody was just...

13       Q.    So did you and your wife call 9-1-1?

14       A.    No, the neighbors did.

15       Q.    Why didn't --

16       A.    I don't know if my wife did or not.

17              Let me restate that.  She was in the

18   house and I ran out into the hangar.  So what she did in

19   there, I don't know, other than she grabbed a bunch of

20   clothes and documents and threw them in trash bags and

21   thought she was going to have to run out of the house

22   with everything she could.

23       Q.    Oh, because she thought perhaps --

24       A.    Yeah, she was afraid --

Joseph Jadczak
October 3, 2006

1    Q.   -- the house might start on fire?

2    **A.   Yes.  She was afraid that it was going to**

3    **affect the house.**

4    Q.   For the record, again, let's try not to talk

5    over each other because it makes it difficult for her to

6    take it down.

7    **A.   Sorry.**

8    Q.   Was there any damage to the residence?

9    **A.   Yes.**

10    Q.   Can you describe that damage for me?

11    **A.   Soffit damage above the garage.**

12    Q.   Which is attached to the residence?

13    **A.   Yes.**

14    Q.   And, to the best of your knowledge, what kind

15    of damage?

16    **A.   From heat.**

17    **Also, the windows on the garage doors,**

18    **the rubber around that was affected.  It separated the**

19    **seal around the windows.**

20    Q.   The rubber seal on windows?

21    **A.   On the garage doors.**

22    Q.   They separated?

23    **A.   Yeah, there is, like, rubber seals.  We have,**

24    **like, moon-shaped windows in the garage doors, and it's**

Joseph Jadczak
October 3, 2006

1    **surrounded by rubber, and the corners separated.**

2         Q.    Did the rubber melt?

3         A.    **I don't know if -- I guess you could say it**

4    **melted from the heat, since it separated apart.    That I**

5    **haven't repaired yet.    The soffit I did.**

6         Q.    Did you list that as an item of, or element of

7    damage in this insurance claim, sir?

8         A.    **No.**

9         Q.    What other damages to the dwelling, if you can

10   recall?

11        A.    **Landscape.**

12        Q.    Okay.

13        A.    **Not dwelling.**

14        Q.    Yes, we will talk about the landscape, the

15   shrubs and the grass.    We will talk about that.

16              Do you have a brick home?    Is it brick?

17        A.    **It's frame with Dryvit exterior.    It's like a**

18   **stucco.**

19        Q.    No damage to that from the fire?

20        A.    **None that I noticed.**

21        Q.    So we have soffit damage to the garage, which

22   is part of the roof of the garage.    Is that right?

23        A.    **Yes.    It extends about a foot past the garage,**

24   **and the top where the peak comes together.**

Joseph Jadczak
October 3, 2006

Page 80

1      Q.    And rubber seals on the windows on the garage

2    doors separated, perhaps from heat?

3      A.    Yes.

4      Q.    Okay.

5      A.    I didn't even notice that.   The contractor

6    did.

7      Q.    Did you see any damage to your driveway that

8    you described to me earlier?

9      A.    Yeah.

10     Q.    What kind of damage, or can you describe for

11   me the damage that you observed?

12     A.    Stains, gouges, melting of some asphalt.

13     Q.    I think I recall seeing some photos of some

14   damage, some alleged damage to the driveway in the file.

15          Did you take any photographs of the

16   damage you saw on the driveway, on your driveway, sir?

17     A.    No.

18     Q.    Where did you see these damages on the

19   driveway?

20     A.    Oh, from about where the hangar ends and the

21   house ends towards the back, and then in the back of the

22   hangar I have blacktop behind the hangar.

23     Q.    So in-between the house and the hangar?

24     A.    Yes.

Joseph Jadczak
October 3, 2006

Page 81

1      Q.   And then in the back of the hangar?

2      A.   Yes.

3      Q.   You saw stains, gouges, and melting?

4      A.   Yes.

5      Q.   Has any of that been repaired to date?

6      A.   No.

7      Q.   Has anyone told you, like a contractor or

8  somebody that you might have consulted in connection with

9  this driveway, that the entire driveway needs to be

10 replaced?

11     A.   No.  He said it was messed up, for what that's

12 worth.

13     Q.   Who is "he"?

14     A.   The contractor.  EH Custom Homes.

15     Q.   EH said that the driveway was messed up?

16     A.   Yeah.  I guess that means it needs to be

17 fixed.

18     Q.   Is your driveway, is it black asphalt?  Is it

19 the color black?

20     A.   Yes.

21     Q.   How old is the asphalt driveway?

22     A.   Five-and-a-half years.

23     Q.   So shortly after the hangar and the dwelling

24 was constructed, the asphalt driveway was installed?

Joseph Jadczak
October 3, 2006

Page 82

1      A.    Yes.

2      Q.    Now, we've seen numerous pictures of the

3   hangar itself and what the fire did.

4                  Could you just describe to me what you

5   saw?  What kind of damages did you see to the hangar?

6      A.    **Everything was just totally destroyed.  The**

7   **roof caved in.  The 12-by-12 door fell on top of what was**

8   **left of the RV, which was only the hood and the bumper.**

9   **The 40-foot door was burned and buckled.  It fell because**

10  **there was nothing to support it because the frame was all**

11  **burned.  Everything was just in a pile of ash.  You**

12  **couldn't make anything out, because it was so hot it**

13  **just, like, melted everything.**

14     Q.    When you prepared your contents list, did you

15  prepare that contents list based on your memory of what

16  you thought was in there?

17     A.    **For the most part, yeah.**

18     Q.    What do you mean by "for the most part"?

19     A.    **Everything I could remember.  I just closed my**

20  **eyes and just pictured where I had everything in the**

21  **hangar.  I was pretty well organized.  I knew where**

22  **things were at.**

23     Q.    One of these exhibits for this examination

24  under oath is pictures of the hangar and the RV and the

Joseph Jadczak
October 3, 2006

Page 83

1    airplane before the loss.

2              If we reviewed those pictures, would we

3    be able to see some of those items of personal property

4    that were allegedly damaged in the fire?

5         A.   **Not really.  A lot of it was behind.  When I**

6    **was taking the pictures, I was concentrating more on the**

7    **floor and the airplane.**

8         Q.   You said the 12-by-12 door fell on top of the

9    RV?

10        A.   **Yes.**

11        Q.   Did you see the roof cave in, actually fall

12   down?

13        A.   **Yes.**

14        Q.   How long after the fire started did the roof

15   cave in, to the best of your knowledge?

16        A.   **Forty minutes.**

17        Q.   How many square feet would you say the hangar

18   is?  I apologize if I already asked that question.

19        A.   **1936 square feet.**

20        Q.   Sounds familiar.

21        A.   **44-by-44.**

22        Q.   Mr. Jadczak, can you describe for me the

23   damages that you observed to, let's call it the

24   vegetation or the landscaping on your property?  What did

Joseph Jadczak
October 3, 2006

Page 84

1  the fire, or what kind of damages -- do you need to go

2  off the record?

3      A.   I just need to see who.  That can go into

4  voice mail.

5      Q.   Can you describe for me, to the best of your

6  ability, what kind of damage you observed to the

7  landscaping or the vegetation surrounding your property?

8      A.   Everything was crushed or burned.  Trees

9  caught on fire that was next to the hangar.  Bushes

10  caught on fire.

11      Q.   You said crushed.  By what?

12      A.   By falling debris, by hoses, by windows that

13  fell out or were smashed out by the Fire Department.

14  Everything was just right next to the hangar, so

15  everything...

16      Q.   What do you mean by "everything"?  All your

17  landscaping?

18      A.   The landscaping all around the hangar.  Plus

19  coming into the hangar where they came in across the

20  lawn, there was trees there.  Trees on our property line

21  caught fire.

22      Q.   I seem to recall seeing, like, shrubs that

23  were kind of right directly on the outside of the hangar.

24  Does that sound accurate to you?

Joseph Jadczak
October 3, 2006

Page 85

1        A.    Yes.  And the pictures you have for before,

2    they are older pictures.  I had a lot more growth since

3    then and a lot more plants installed since then.  Because

4    you can see the size of the trees from the after pictures

5    compared to the before pictures.

6        Q.    How many trees would you say surrounded your

7    hangar within a proximity of, let's say, 20 feet?

8        A.    Oh, gosh.  The property line one has to be

9    about 12.  Then there is three or four that are right

10   next to the hangar that are -- yeah, those bushes there.

11   And the corner of the other side.

12       Q.    We are looking at a picture of the actual

13   hangar on fire, and looking at a picture of a smaller

14   tree, which looks like it might be about seven or eight

15   feet tall?

16       A.    Yeah.

17       Q.    So numerous trees surround your property.  Is

18   that correct?

19       A.    Yes.  And the property line.

20       Q.    Do you have some evergreens and shrubs as

21   well?

22       A.    Yes.

23       Q.    Were those on fire at the time of the loss?

24       A.    Yes.

Joseph Jadczak
October 3, 2006

1       Q.    It looks like there is one pretty large tree,

2    or maybe I'm looking at a tree overhanging from where the

3    photographer took the picture.

4                 Is this on your property, sir?  This is

5    a picture of leaves, it looks like a large tree?

6       A.    **No, that's a tree across the street.**

7       Q.    Thank you.

8       A.    **You're welcome.**

9       Q.    So things were crushed and burned and the

10   trees were on fire, as far as you could recall?

11      A.    **Yes.**

12      Q.    What about any damages to the lawn, the grass?

13      A.    **There was damage to the lawn.  There was**

14   **grooves.  There was damage to the irrigation.**

15      Q.    What do you mean by damage to the irrigation?

16      A.    **The pipes underneath the lawn were driven**

17   **over.**

18      Q.    By the Fire Department?

19      A.    **Yes.**

20      Q.    Did you say grooves in the grass?

21      A.    **Yes, where the -- tracks.  And some burning,**

22   **too.**

23      Q.    To the best of your knowledge, or your memory,

24   where did you see damage to the lawn?

Joseph Jadczak
October 3, 2006

1    A.    In the front towards the street.  Along the

2    side towards the neighbor's side where the bigger bushes

3    were.

4         Q.    On the other side of your property, if we have

5    the dwelling and the hangar, is this on the, let's say,

6    the east side of the hangar?

7    A.    Yes.

8         Q.    And you said the front of the property, too?

9    A.    Yes.

10        Q.    Tracks?

11   A.    Yes.

12        Q.    So the Fire Department just kind of drove up

13   on the grass?

14   A.    Yes.  And in the back, also, around where the

15   taxiway is, the back of the property.

16        Q.    Fire trucks were in the back of the property

17   as well?

18   A.    They were all around it.

19        Q.    Did you see any burn marks on the front of

20   your property, or was it just track marks?

21   A.    Both.  Also, I think there was some damage

22   from the foam they laid down.  It discolored the grass

23   also.

24        Q.    Did you see the Fire Department use foam?

Joseph Jadczak
October 3, 2006

Page 88

1       A.    Yes.

2       Q.    After the fire was over and the Fire

3   Department leaves and you have spoken presumably to

4   officials about the fire, how did you go about cleaning

5   or removing the debris?

6       A.    **The contractor had a demolition company clean**

7   **everything up.**

8       Q.    The contractor is EH?

9       A.    **EH Custom.**

10      Q.    Are you saying EH hired somebody, a demolition

11  company?

12      A.    **Yes.  He has people he uses for different**

13  **phases of construction.**

14      Q.    Do you know the name of the demolition

15  company?

16      A.    **I don't.**

17      Q.    To the best of your knowledge, this demolition

18  company that EH, the contractor, hired removed debris

19  from your property?

20      A.    **Yes.**

21      Q.    Were you able to still reside in your home

22  after this fire?

23      A.    **Yes.**

24      Q.    You were saying earlier you had no insurance

Joseph Jadczak
October 3, 2006

Page 89

1   on the actual RV itself.  Is that right?

2       A.   No.

3       Q.   So you didn't file a claim in connection with

4   the loss of the RV to anyone else besides AIG/Homesite.

5   Is that right?

6       A.   **That's correct.**

7       Q.   How does the service drop, if you will, which

8   is coming from a local distribution electrical power

9   line, how does the service drop to your property work, if

10  you know?  It connects to the residence premises, the

11  garage, maybe, and also to the hangar.  Is that accurate?

12      A.   **It comes in off of the pole on the street**

13  **underground, underneath of the driveway.  It comes in**

14  **through the back of the garage.  The electrical panel is**

15  **on the back of the garage.  There, in turn, it is**

16  **redistributed from the back of the garage under the**

17  **driveway to the hangar, where there is another panel.**

18      Q.   Okay.  So it's all connected?

19      A.   **Yes, all one.**

20      Q.   Underground wires?

21      A.   **Yes.**

22      Q.   So you don't have a service drop, a physical

23  service drop.  Is that right?

24      A.   **That's right.  Have one underground from the**

Joseph Jadczak
October 3, 2006

1    pole back.  **There is above ground at the pole coming down**

2    **the street, but they dropped the conduit underground.**

3        Q.    Do you know the manufacturer of the converter

4    in the RV?  Do you know the name?

5        A.    **Not the converter.**

6        Q.    Was that converter salvaged after the fire, to

7    your knowledge?

8        A.    **I don't know.**

9        Q.    Is there a third party that has in its

10   possession contents from the fire?

11       A.    **None that I know of.**

12       Q.    To your knowledge, did any individual or

13   entity, business remove items from the hangar after the

14   fire?

15       A.    **Other than the demolition people.  They**

16   **removed what was burnt and melted.**

17       Q.    Okay.

18       A.    **Which was the contents of the RV and**

19   **everything.**

20       Q.    Do you know if that stuff was disposed of?

21       A.    **Oh, it was.**

22       Q.    It was?

23       A.    **Yeah.**

24       Q.    You know that for a fact?

Joseph Jadczak
October 3, 2006

Page 91

1        A.    Oh, yeah.   He had a big Dumpster there.

2    Everything was totally destroyed.

3        Q.    So the demolition company had a Dumpster, and

4    they were throwing things in the Dumpster?

5        A.    Yeah.

6        Q.    At the time of the fire, sir, did you have any

7    problems with your electrical service?

8        A.    Never.

9        Q.    I'm asking about at the time of the fire loss,

10   like did the electricity go out?

11       A.    No.   Actually, I was surprised it was still on

12   where I was able to open up the bifold door.

13       Q.    I would imagine you spent a lot of time

14   outside on that day.

15              When you went inside, everything was

16   okay in the home in terms of electricity?

17       A.    Yes.   There was a short in our intercom

18   system.

19       Q.    On the date of the loss?

20       A.    Yes.   Because it is connected to the hangar.

21   We have an intercom throughout the property, and there is

22   a speaker in the hangar.   So that shorted out.   And our

23   telephone shorted out.

24       Q.    You had telephone in the hangar.   Right?

Joseph Jadczak
October 3, 2006

Page 92

1    **A.    Yeah, the line in the hangar shorted out, so**

2    **Verizon had to come out and disconnect it from the house.**

3        Q.    Just so we're clear, you own the actual

4    structure that was the hangar?  That's right?

5        **A.    Yes.**

6        Q.    All right.  Mr. Jadczak, now we're going to

7    look at the contents portion of this insurance claim, and

8    I'm going to ask you general questions about each item on

9    the inventory list.  I will ask you how you prepared it,

10   how you arrived at some of, perhaps, the values, and when

11   you bought them, things of that nature.  And to the best

12   of your ability and your knowledge and memory, provide an

13   answer.  It's a relatively extensive list.  This might

14   take a little time, but we will try to do our best to

15   move this expeditiously for you.

16                (Brief recess taken.)

17                MR. SMYTHE:  Now, before we start the

18   contents list, let me enter as Exhibit 15 the property

19   inventory for the damage to the items of personal

20   property as a result of the Memorial Day fire.

21                (Jadczak Deposition Exhibit No. 15 was

22   marked for identification.)

23   BY MR. SMYTHE:

24       Q.    Exhibit No. 15 is the property inventory for

Joseph Jadczak
October 3, 2006

Page 93

1    the items that were damaged and/or destroyed by the fire,

2    okay, Mr. Jadczak.  Ultimately, this computer printout,

3    which looks like an MS XL spreadsheet, of items that were

4    lost in the fire were compiled and created based on what

5    you may have recalled was present in the hangar or other

6    locations on your property before the fire.  Is that

7    accurate?

8         A.    Yes.

9         Q.    As we sit here today, do you have any receipts

10   or items of warranty or manuals or any other types of

11   documents reflecting the purchase and/or ownership of

12   these items that are listed on the property inventory?

13        A.    **Unfortunately, 99 percent of my receipts were**

14   **in a filing cabinet in the hangar.**

15        Q.    So you store a lot of -- most of your receipts

16   in the hangar, and they were destroyed by the fire.  Is

17   that right?

18        A.    Yes.

19        Q.    And you were telling me earlier that you

20   closed your eyes and you thought about what you may have

21   had in the hangar shortly before the loss, and you told

22   me that you were a pretty organized man, so you might be

23   able to recall what was in there.  Is that accurate?

24        A.    Yes.

Joseph Jadczak
October 3, 2006

Page 94

1      Q.    What instructions, if any, did Eagle Adjusting

2    give to you in connection with creating an inventory list

3    in general?

4          **A.    Told me to take my time, think about**

5    **everything that I had in there.  And he said, You will**

6    **probably remember things that you won't write down later**

7    **on, but do the best that you can.**

8          Q.    And that's what you did?

9          **A.    Yes.**

10          Q.    It looks like we have close to three full

11    pages of items to go through, so let's begin.

12                It looks like you had some VHS tapes

13    that were in the hangar at the time of the fire.

14                Does that sound familiar to you?

15          **A.    Yes.**

16          Q.    The quantity listed here is 20.

17                It looks like you had a television and a

18    VCR at the time of the fire inside of the hangar.   Is

19    that right?

20          **A.    Yes.**

21          Q.    Did you watch television and use the VCR in

22    the hangar?

23          **A.    Occasionally.**

24          Q.    Did you have, like, seats and couches and

Joseph Jadczak
October 3, 2006

Page 95

1    things of that nature to sit and recline and watch movies

2    and television?

3         A.    I had two desks and two chairs in there.

4         Q.    The VHS tapes, could you just list just a

5    couple of the titles that you recall?

6         A.    They were movies; Officer and a Gentleman, Top

7    Gun, Jazz Singer, Mrs. Doubtfire, Ghost.

8         Q.    Okay.  That's good.  Thank you.

9                   These are movies you have accumulated

10   over the years.  Is that right?

11        A.    Yes.

12        Q.    And you might have purchased these when, in

13   your best estimation?

14        A.    It varied.  Some as little as a year before

15   the fire, or nine months.  Some three to five years

16   before.

17        Q.    Do you have a DVD player?

18        A.    Not in the hangar.

19        Q.    But you do own one?

20        A.    I do.

21        Q.    The next item is a 13-inch television.

22                   Do you know -- and the quantity is two.

23   You had two TV's in the hangar.  Is that right?

24        A.    Three.

Joseph Jadczak
October 3, 2006

Page 96

1      Q.   Okay.  You had three TV's in the hangar.  But

2    it looks like you had two 13-inch TV's in the hangar?

3      **A.   There were two TV's in the RV and one TV on my**

4    **desk.**

5      Q.   Okay.  And, I'm sorry, where were these VHS

6    tapes located in the hangar, if you recall?

7      **A.   Some were in my desk.  Some were in the RV.**

8      Q.   You said you had two desks?

9      **A.   Yes.**

10     Q.   And where were the two 13-inch televisions

11   located in the hangar?

12     **A.   One was on the desk.**

13     Q.   Okay.

14     **A.   Two were in the RV.  One was in the back of**

15   **the RV, one was in the front of the RV.  Had an**

16   **entertainment center on it.**

17     Q.   Do you know the size of the TV on the desk?

18     **A.   That was the 13.**

19     Q.   Okay.  And then there was another 13-inch

20   television in the RV.  Is that right?

21     **A.   Yes.**

22     Q.   Do you know the manufacturer of these

23   televisions?

24     **A.   One was Panasonic, one was Hitachi, and I**

Joseph Jadczak
October 3, 2006

Page 97

1    think the other was a Sanyo.

2        Q.    Were the two 13-inch televisions the Panasonic

3    and the Hitachi?

4        A.    One was a Sanyo, one was Hitachi.

5        Q.    Okay.

6        A.    I'm pretty sure.    I could be wrong, but I'm

7    pretty sure that's what it was.    I know they are the

8    three manufacturers that I had.

9        Q.    The next item is a VCR.

10              Where was this VCR located in the

11   hangar, or the RV?

12       A.    There was one on the desk.    And I don't know

13   if I put one or two on there.    I had one in the RV and

14   one on the desk.

15       Q.    It says one here, which is the third listing,

16   but we might come across another one.

17       A.    Well, I probably skipped one.

18       Q.    You said you had two, though?

19       A.    Yeah.    I don't recall if I marked them down or

20   not, both of them.

21       Q.    I will make a note of it, two VCR's.    The list

22   only says one?

23       A.    Yeah.

24       Q.    And where were these VCR's located?

Joseph Jadczak
October 3, 2006

1    A.    One was in the RV and one was on the desk.

2    Q.    Do you know the brand names?

3    A.    Panasonic and JVC, I think.

4    Q.    Do you remember when you bought them?

5    A.    The one came with the RV, and the other JVC

6    was probably about three, four years ago.

7    Q.    Did you use these televisions and these VCR's

8    often?

9    A.    Yes.

10    Q.    When you were doing things in the hangar, you

11    would have the television on?

12    A.    I would put it on every morning and check the

13    weather before I fly, watch the weather channel.  Or if

14    my wife is busy cleaning the house, I would sit out there

15    and watch TV.

16    Q.    The next item are -- quantity is one.  It says

17    maps.  Does that sound familiar to you?

18    A.    Yes.

19    Q.    Are these aerial maps?

20    A.    I had aerial and I had road maps.

21    Q.    I'm sorry, I should have given you one of

22    these to look at.

23    A.    That's all right.

24    Q.    You had topographical maps and aerial maps.

Joseph Jadczak
October 3, 2006

1    Is that right?

2        **A.    Yes.   I had, they are called Jeppesen's for**

3    **IFR flying.**

4        Q.    For flying?

5        **A.    They are for instrument flying.   They are**

6    **specialized charts.**

7        Q.    How much are these?   How much do these cost?

8        **A.    Well, the set originally is about $600 from**

9    **the Mississippi East, and then you have a renewal every**

10   **year.**

11              MR. SENSOR:   Excuse me.   You have a list

12   later in that, or you have an entry later in that list

13   for the Jeppesen series.

14   BY MR. SMYTHE:

15       Q.    I was just about to make a statement that the

16   maps here, the fourth entry on here look like the unit

17   cost is $20.   I think you're talking about maybe the

18   topographical maps, or I'm asking about the topographical

19   maps.

20              So, to be clear, it looks like we will

21   get to the Jeppesen maps in the future in the contents

22   list.

23              So you said that you had a topographical

24   map, too?

Hanson Renaissance Court Reporting & Video
(313) 567 - 8100   www.hansonreporting.com

Joseph Jadczak
October 3, 2006

Page 100

1     A.   Yes.

2     Q.   And do you know how much these would cost?

3     A.   $30, $20.

4     Q.   And you would use this in connection with when

5   you are traveling in your RV or in your car?

6     A.   Yes.

7     Q.   Was this a map of the United States or the

8   State of Delaware or Pennsylvania?

9     A.   Everything.

10    Q.   Everything?

11    A.   Road atlas; individual maps for individual

12  states.

13    Q.   So it's a book?

14    A.   I had both.  I had a book with maps in it, a

15  road atlas, plus I had individual maps for a lot of

16  states.

17    Q.   Do you know where these maps were located?

18    A.   In the RV.  Above the chair in the front in

19  the cabinet.

20    Q.   The next is directories, and it says new.

21         Do you know what these are?

22    A.   Yeah.  Woodall's directory for camping.

23    Q.   Woodall's directory.

24         What is that, sir?

Joseph Jadczak
October 3, 2006

Page 101

1      A.    It's like a giant phone book of all

2    campgrounds in the United States, and it gives you all

3    their amenities, prices and so forth.

4      Q.    Was that in the RV?

5      A.    Yes.

6      Q.    The next item says clothes.  The quantity says

7    1, and it says age two to five years.

8                Do you know what clothes these are?

9      A.    My wife's and my clothes that are in the RV.

10     Q.    Why were they in the RV versus your home?

11     A.    Because we were going to use the RV again, we

12   put some in there.  And there were some that were left

13   over from when we lived in there that were seasonal that

14   we never took out.

15     Q.    Would you say that, is it safe to say that you

16   store some clothes in the RV?

17     A.    Yes.

18     Q.    And you had recently put clothes in the RV

19   because you intended to use it?

20     A.    Yes.

21     Q.    How recently would you say you put the clothes

22   in the RV before the fire?

23     A.    The day before.

24     Q.    Where do you generally shop for clothing for

Joseph Jadczak
October 3, 2006

Page 102

1    you and your wife?

2         A.    She goes all over.  The malls, Strawbridge's,

3    Sears, Peebles, J.C. Penney.

4         Q.    What about yourself?

5         A.    I don't shop.

6         Q.    Does she buy your clothes?

7         A.    I go sit down and watch a movie.  She goes out

8    and buys everything.

9         Q.    So she buys the clothes that you wear?

10        A.    Yeah, other than my work clothes.  I will go

11   out to Sears and get them, or my work boots, I will go to

12   a work store and buy those.

13        Q.    The next is a vacuum cleaner.

14              Do you know what brand this vacuum

15   cleaner is?

16        A.    No.

17        Q.    Do you know where it was located?

18        A.    In the RV.

19        Q.    So it's a vacuum cleaner used in the RV?

20        A.    Yeah.

21        Q.    Do you know when you bought it?

22        A.    About the time we moved down there in 2000.

23        Q.    Did you use it often in the RV?

24        A.    Oh, yeah.

Joseph Jadczak
October 3, 2006

Page 103

1          Q.    Do you know how old it was?  I'm sorry, 2000.

2    Six years old.

3                Do you know how much you paid for it?

4          A.    No, I would be guessing.

5          Q.    The next item is a clock, and there is a

6    quantity of two.  Do you know what these are referring

7    to?

8          A.    Yes.   There was one in the hangar and there

9    was one in the RV.

10         Q.    Wall clocks?

11         A.    Yes.

12         Q.    Are these standard wall clocks that you might

13   buy at Target or something like that, or were these more

14   expensive clocks?

15         A.    It's a pretty standard clock.

16         Q.    The next item is a toaster.  Where was this

17   toaster located, sir?

18         A.    In the RV.

19         Q.    Do you know the brand name?

20         A.    No, I don't.

21         Q.    Do you know if it came with the RV when you

22   purchased it?

23         A.    No, we bought it.

24         Q.    Do you know how much it would have cost?

Joseph Jadczak
October 3, 2006

Page 104

1      A.    The average cost of a toaster; 20, 30 bucks.

2      Q.    So it wasn't an extravagant toaster or

3    anything like that?

4      A.    No.   Four-slicer, if that helps you.

5      Q.    You don't recall when you bought it?

6      A.    I don't recall when I bought it.

7      Q.    But you recall it being inside the RV?

8      A.    Sure.

9      Q.    Because you used it when you were traveling in

10   it, or when you were living in it?

11     A.    Oh, yeah.

12     Q.    Next is a fire extinguisher.

13                 Where was that located, sir?

14     A.    Next to the door in the RV.

15     Q.    Inside the RV?

16     A.    Yes.

17     Q.    And did this come with the RV when you

18   purchased it?

19     A.    Yes.   I had replaced it about the time we

20   moved down there.

21     Q.    Do you know the manufacturer of the fire

22   extinguisher?

23     A.    No, I don't.

24     Q.    Do you know, how much does the fire

Joseph Jadczak
October 3, 2006

Page 105

1   extinguisher cost?

2        A.    30, $40.

3        Q.    You said the RV came with a fire extinguisher

4   and you have since replaced it?

5        A.    Yes.

6        Q.    Did the other fire extinguisher malfunction or

7   run out of foam, if you will?

8        A.    I didn't feel comfortable with the other one

9   because of the age of it.

10       Q.    Next is six lounge chairs.  Where were these

11  located, sir?

12       A.    In the RV, in the storage.

13       Q.    In storage?

14       A.    In the RV.  We used them when we went camping.

15       Q.    Okay.  Are these fold-up lounge chairs?

16       A.    Yeah, padded.

17       Q.    Do you know where you bought these?

18       A.    At Camping World.

19       Q.    Do you know how much they were?

20       A.    Without looking at the book, no, I don't.  I

21  looked at the book when I made up the list, but I don't

22  have it in front of me now, so I don't want to give you a

23  wrong answer.

24       Q.    What book?

Joseph Jadczak
October 3, 2006

1      **A.     The Camping World book.  They send you a**

2   **magazine with things in there, and I found the one that**

3   **we bought.**

4      Q.   So you can verify it?

5      **A.     Yeah.  Everything that I put down here, I**

6   **either went to Lowe's or to Home Depot and looked and**

7   **duplicated what I had, or I looked in the magazine, the**

8   **Camping World magazine and found what I had and wrote it**

9   **down there.**

10     Q.   So you compiled this list based both on memory

11   and independent research and going to these stores and

12   finding out the value of these items?

13     **A.     Right.**

14     Q.   I apologize if I already asked you this

15   question.

16             When did you buy these lounge chairs?

17     **A.     We updated them maybe about three years prior**

18   **to the fire, four years.  No, about four, four years**

19   **prior to the fire.  I think I bought them right before**

20   **the last time we used the RV.**

21     Q.   And when was the last time you used the RV

22   before the fire?

23     **A.     About three years prior to the fire.**

24     Q.   Was there gasoline in the tank of the RV at

Joseph Jadczak
October 3, 2006

Page 107

1    the time of the fire, as far as you knew?

2        A.    **For the generator.**

3        Q.    For the generator?

4        A.    **Yes.**

5        Q.    What does the generator run?

6        A.    **What does it run?**

7        Q.    Yes.  How does the generator work in the RV?

8        A.    **It's for electricity when you don't have any**

9    **power to hook up to.  It's five kilowatts.**

10       Q.    Thanks.

11                  Next we have a jumper cable.  Where was

12   that located, sir?

13       A.    **In the storage in the RV.  I actually had a**

14   **few.  I had two of them that I had on my bench, my work**

15   **bench, and I had one on the RV, like real, long, extended**

16   **cables.**

17       Q.    These were all for the RV?

18       A.    **They were, yeah.  The others were just for**

19   **general purpose, general use.**

20       Q.    The RV jumper cables, can they be used on any

21   other types of vehicles?

22       A.    **Yes.**

23       Q.    So they are all-purpose?

24       A.    **Yes.**

Joseph Jadczak
October 3, 2006

Page 108

1      Q.   You couldn't use them on a plane, though,

2  could you?

3      A.   No.  I had a separate jumper for that.

4      Q.   So you had multiple jumper cables, even though

5  this lists one?

6      A.   Yeah.  I forgot.

7      Q.   We could come across it again.  I haven't seen

8  it yet.

9              Oh, I see on the back, Piper jumper

10  cables.  That's for the airplane?

11      A.   Yes.  I categorized everything according, like

12  this first list is what I had in the RV.

13      Q.   So this is all in the RV?

14      A.   Yes.  Most all of it.  And then the others,

15  you know, I went, categorized according to what I

16  remembered, starting with the RV and with the workbench.

17      Q.   Good.  Because it didn't say here.  I saw that

18  it says hangar items on the second page of this inventory

19  list.  That's why I keep asking where was this located.

20              But okay.  These items were inside the

21  RV?

22      A.   Right.  As you can see, sheets and glasses and

23  all that.

24      Q.   Let me you ask this.  You said earlier when I

Joseph Jadczak
October 3, 2006

1  asked you where it was located, you said something like

2  storage in RV?

3      A.   Well, they call it a basement model RV.  The

4  bottom doors open up, and that's your storage for things

5  that you carry with you.

6      Q.   Like when you are traveling on a bus?

7      A.   Yes.

8      Q.   And you can open, you have the same type of

9  thing on your RV?

10     A.   Yes.  Not anymore.

11     Q.   The next item after the jumper cable is a

12  spotlight.

13          Was that attached to the RV at the time

14  of the loss?

15     A.   No.  It's one of those that you plug into the

16  cigarette lighter, and it also has a battery.

17          MR. SENSOR:  For spotting deer?

18          THE WITNESS:  No, I didn't do that.

19  BY MR. SMYTHE:

20     Q.   So you would use it at night to presumably, if

21  you are at a camping ground, maybe?

22     A.   Well, you come into a campground, it's late at

23  night, you need a spotlight to set up and so forth.  If

24  you are working on the RV, you need a spotlight.

Joseph Jadczak
October 3, 2006

Page 110

1      Q.    Sure.

2                  How much does a spotlight generally

3      cost?

4      A.    Well, it's one of those Pep Boy jobs.   30,

5      $40, I guess.

6      Q.    And just so we're clear for the record, you

7      did not actually see any of these items after the fire?

8      A.    No.

9      Q.    You didn't see what kind of condition or state

10     they were in?

11     A.    There was nothing to see.   Everything was all

12     just melted together.   It was nothing but ashes and piles

13     of junk.

14     Q.    The next item says tools.

15                  Tools inside the RV?   What kind of tools

16     did you have inside the RV?

17     A.    A little bit of everything.   Drills, hammers,

18     screw drivers, washers, bolts, nuts.   Anything you might

19     need in the RV, you know.   $100, $200 worth of stuff, you

20     know, that's in there.

21     Q.    Do you have a particular brand name that you

22     like to purchase for your tools?

23     A.    Craftsman.

24     Q.    That's Sears?

Joseph Jadczak
October 3, 2006

1      **A.    Yeah.**

2      Q.    Where were these tools inside the RV actually?

3      **A.    In a toolbox, underneath in the storage again.**

4      Q.    Okay.   In the storage.

5             Next is a grill.  Now, was this grill

6    inside the RV?

7      **A.    Yes.**

8      Q.    Would this grill be used when you are camping?

9      **A.    Yes.  You take it out, use it externally, and**

10   **you can hook it up to your propane.**

11     Q.    So you don't use it inside the RV?

12     **A.    No.**

13     Q.    Did that come with the RV when you purchased

14   it?

15     **A.    No.**

16     Q.    Do you know the manufacturer of the grill?

17     **A.    I don't.**

18     Q.    Do you know where you bought it?

19     **A.    Camping World.**

20     Q.    That's just an estimation?

21     **A.    Yeah.  Most of the stuff I bought for the RV**

22   **came from Camping World.**

23     Q.    Where is Camping World located, sir?

24     **A.    They are national.   They are all over the**

Joseph Jadczak
October 3, 2006

Page 112

1    place.  There is one in New Jersey in Bridgeport where I

2    bought a lot of the stuff.  And then you can catalogue

3    order by mail, which I also did.

4         Q.   Did you ever purchase via the web site?

5         A.   No.

6         Q.   Next is perfumes; Pleasures and Estee Lauder.

7              These were inside the RV.  Is that

8    right?

9         A.   Oh, yeah.

10        Q.   Whose perfumes are these?

11        A.   My wife's.  Hey, you never know.  Right?

12        Q.   Right.

13             Okay.  Do you know generally how much

14   this perfume would cost?

15        A.   Those I know are expensive.  You know, 60, $80

16   a bottle, and she had a bunch of them.  She had the

17   cream, she had the powder, she had the perfume, and she

18   always had extras of everything.

19        Q.   Was this in storage?

20        A.   It was in the RV getting ready to go.

21        Q.   So did you or, to the best of your knowledge,

22   did your wife place these in the RV the night before the

23   fire?

24        A.   Some the night before.  Some were already in

Joseph Jadczak
October 3, 2006

Page 113

1    there.

2        Q.    So you are saying besides the fact that it

3    lists perfumes, Pleasures and Estee Lauder, there were

4    lotions and creams as well --

5        A.    Yes.

6        Q.    -- that were burned in the fire?

7        A.    Yes.

8        Q.    And who purchased these items?

9        A.    She did.

10       Q.    Do you know where she purchased these?

11       A.    Strawbridge's.

12       Q.    Strawbridge's?

13       A.    Mm-hmm.

14       Q.    What's Strawbridge's?

15       A.    It's a department store.   They are the only

16   ones who carry the ones that she wanted, the Estee

17   Lauder.

18              MR. SENSOR:   Now known as Macy's.   They

19   swallowed them up.

20              MR. SMYTHE:   Right.  Oh, they got

21   Marshall Fields and Strawbridge's?

22              THE WITNESS:   Yeah.

23   BY MR. SMYTHE:

24       Q.    Where is that Strawbridge's department store

Hanson Renaissance Court Reporting & Video
(313) 567 - 8100  www.hansonreporting.com

Joseph Jadczak
October 3, 2006

1   located?

2       A.   **In Dover, Delaware.**

3       Q.   Is that inside a mall?

4       A.   **Yes.**

5       Q.   Do you know what mall?

6       A.   **Dover Mall.**

7       Q.   Next are 30 cassette tapes inside the RV.

8               Are these cassette tapes, music that you

9   would listen to when driving?

10      A.   **Yes.**

11      Q.   Or when you were in the RV?

12              Can you just list a couple titles for

13  me?

14      A.   **Neil Diamond, Barbara Streisand.  I had a lot**

15  **of oldies.**

16      Q.   What does oldies mean to you, sir?

17      A.   **To me, duwop.**

18      Q.   Fifties?

19      A.   **Like the Duprees and the Platters and, oh,**

20  **gosh, we had Bee Gees and Connie Francis.**

21      Q.   Okay.  All right.  Thank you.

22              And this is basically, this is your

23  preference of music?  This is your collection of music?

24      A.   **I like a little bit of everything.**

Joseph Jadczak
October 3, 2006

Page 115

1    Q.   Did the RV have a CD player?

2    A.   Yes.

3    Q.   It also had a tape player, as well?

4    A.   I'm sorry, not a CD player, just a cassette

5    player.

6    Q.   What year was the RV?

7    A.   1994.

8    Q.   What's the actual name of the RV, the

9    manufacturer?

10   A.   Cobra.

11   Q.   So it's a '94 Cobra RV?

12   A.   Yes.  It's on a Ford chassis, and it had a 7.3

13   International diesel in it.

14   Q.   Diesel engine?

15   A.   Diesel engine.

16   Q.   How many miles were on it at the time of loss,

17   to the best of your knowledge?

18   A.   Between 25 and 26,000, 27,000.

19   Q.   As of the time of the loss, would you

20   generally purchase cassette tapes at stores?  Were you

21   still buying them?

22   A.   Things were starting to switch over to CD's.

23   Once in awhile I would buy a cassette that may catch my

24   eye that I would like the artist.

Joseph Jadczak
October 3, 2006

1      Q.   I'm asking you, let's say about six months

2   before the fire, we are talking 2006, were you still

3   buying cassette tapes sporadically?

4      **A.   Yes.  Yes.**

5      Q.   Presumably, because if you wanted to listen to

6   it in the RV, you would have to buy a cassette tape

7   because there is no CD player.  Right?

8      **A.   Exactly.**

9      Q.   Do you know how much a cassette tapes cost

10  these days?

11     **A.   Anywhere from 8.95 to 14.95.**

12     Q.   Next is a JVC camcorder inside the RV.

13             When did you buy this, sir?

14     **A.   I bought that about four years ago.**

15     Q.   Do you know how much it was?

16     **A.   I want to say 280, 330, something like that.**

17     Q.   Did you use it often?

18     **A.   Yes.**

19     Q.   Do you know where you bought it?

20     **A.   In Myrtle Beach, South Carolina.**

21     Q.   Any particular store that you would recall?

22     **A.   It was a camera store in a strip mall down**

23  **there.  I don't recall the name of the store.**

24     Q.   Was that something that you put in the RV

Joseph Jadczak
October 3, 2006

Page 117

1    shortly before the fire?

2        A.    Yes.

3        Q.    You wouldn't generally keep a camcorder inside

4    the RV to store it, would you?

5        A.    No.    **Normally I kept it in the house, but,**

6    **again, we were trying to get ready to go out with the**

7    **kids.**

8        Q.    Next is a 35-millimeter camera from Nikon.

9                Do you know the value of this camera at

10   the time of the loss?

11       A.    **Again, I want to say 2 to 300.**

12       Q.    All right.    Where was this located in the RV?

13       A.    **In the back next to my bed in a closet.**

14       Q.    Do you know where you bought it?

15       A.    **Yeah.    The camera store in Philadelphia on**

16   **Castor Avenue.**

17       Q.    The next is fuel and oil filters.    The age is

18   six months old.    The quantity is six.    These were -- oh,

19   the fuel inside the generator of the RV.    Is that right?

20       A.    **I had a fuel filter for the generator.    I had**

21   **fuel filters for the oil for the engine.    And I had those**

22   **in the compartments underneath where the cables were and**

23   **all that stuff.**

24       Q.    So it's fuel filters and oil filters?

Joseph Jadczak
October 3, 2006

Page 118

1      A.    Yes.

2      Q.    Sorry.

3                  Next we have electric cables.  Can you

4   describe what these electric cables are?

5      A.    They were extension cables for the electricity

6   when you plug the RV in if you needed anything longer.

7      Q.    So, like, extension cords?

8      A.    Yes.

9      Q.    We also have hoses.  Are these hoses for

10  water?

11     A.    Yes.

12     Q.    Would you put them, attach them to the sink or

13  something?

14     A.    No, you attach them on the outside of the RV,

15  and then to the water supply at the campground or, in our

16  case, in the hangar.

17     Q.    A trailer hitch, presumably for the RV?

18     A.    Slides in the back of the RV that you hitch up

19  the car dolly to.

20     Q.    Is the trailer hitch expensive?  How much

21  would you say it costs?

22     A.    I would be guessing.  I don't recall.

23     Q.    Did it come with the RV when you bought it?

24     A.    It did.  And then I bought another one to

Joseph Jadczak
October 3, 2006

1   adapt to a different ball for the trailer for the car

2   dolly.  I had one that would -- was used to -- you could

3   tow a boat with with a different size ball, and then the

4   other was for the car dolly.

5        Q.   Then we have fans.

6               Are these regular circulating fans?

7        A.   Yes.

8        Q.   Are these box fans?

9        A.   No.  There was a smaller one, 13-inch, and

10   then a bigger one that sat on the floor.

11        Q.   Is this something you could buy at Sears?

12        A.   Yeah, Wal-Mart, something like that.

13        Q.   Then we have dishes.  Dishes inside the

14   kitchen area of the RV?

15        A.   Yes.

16        Q.   Do you have an idea of how many dishes we are

17   talking about?

18        A.   Service for eight.

19        Q.   Service for eight?

20        A.   Mm-hmm.

21        Q.   Do these dishes come with the RV?

22        A.   No, we bought them.

23        Q.   Why service for eight?

24        A.   In case the kids came along or they brought a

Joseph Jadczak
October 3, 2006

1    friend, grandkids, their friends.

2        Q.    So the next entry is silverware.   Silverware

3    for eight?

4        A.    Yes.

5        Q.    Do you know where you bought the dishes and

6    silverware?

7        A.    I want to say Sears.

8        Q.    Do you know when?

9        A.    Oh, early on.   About the time we got the RV.

10   '94.

11       Q.    Then we have glasses.   These are drinking

12   glasses for eight?

13       A.    Yes.   Actually, there was more glasses than

14   eight.   Plastic and stuff like that.

15       Q.    So we are not talking about crystal glasses or

16   anything like that?

17       A.    No.

18       Q.    Something durable that could withstand a bump?

19       A.    RV stuff.

20       Q.    RV stuff.

21             Pots and pans; do you know where you

22   might have bought these pots and pans?

23       A.    Farberware.   Strawbridge's.   That I remember.

24       Q.    Farberware is the brand.   Is that right?

Joseph Jadczak
October 3, 2006

Page 121

1      A.    Yes.

2      Q.    Was it a set?

3      A.    Yes.  It came with a variety of different

4    sizes.

5      Q.    Do you recall about how much they were?

6      A.    Not without looking at the list again, because

7    I don't have all that information in front of me.  At

8    that time I did.

9      Q.    Okay.  Then we have sheets.

10                  Sheets for bedding in the RV?

11      A.    Yes.

12      Q.    How many people could sleep in the RV?

13      A.    Seven.

14      Q.    Does that mean there is seven beds?

15      A.    There was a queen bed, a couch that converted

16    to the bed, the dinette dropped down to a bed, and then a

17    pull-out single right where the entertainment section is.

18    It used to be a queen, but when the entertainment section

19    went in it made it a single.

20      Q.    You said the dinette makes a bed?

21      A.    Yes.  Two there, two people can sleep there,

22    two on the couch and two in the queen and one up on top.

23      Q.    Were these items that, let's say from the

24    trailer hitch on down; fans, dishes, silverware, glasses,

Joseph Jadczak
October 3, 2006

Page 122

1    pots and pans, sheets, and then the towels we are going

2    to talk about, were these in the RV for an extended

3    period of time before the loss?

4        A.    Not all of it.  We have added new sheets and

5    new towels.

6        Q.    Okay.  I guess I should ask it in a different

7    way.

8                    Did you the night before place these

9    items in the RV?

10        A.    No.

11        Q.    So they had been there for a while?

12        A.    Yes.

13        Q.    What kind of condition were these items in?

14        A.    Excellent.

15        Q.    Yeah?

16        A.    Yeah.  Always fussy with everything.

17        Q.    Did you use these items that you listed here

18    from the trailer hitch on down to the end of the page

19    while you were living in the RV for that period of nine

20    months?

21        A.    Well, they were in there while we were living

22    in the RV.

23        Q.    So you used them?

24        A.    Yes.

Joseph Jadczak
October 3, 2006

Page 123

1    Q.   So they got a lot of use.  Is that safe to

2    say?

3        **A.** ` ` **Yes.**

4    Q.   Then we have towels.  Is that towels for

5    drying off, presumably, or hand towels, maybe?

6        **A.   Beach towels, hand towels, shower towels.**

7    Q.   The quantity says 1, but it says towels,

8    plural.

9             So we are talking about numerous towels.

10   Is that right?

11       **A.   Yes.**

12   Q.   Same with the sheets?  Same with the pots and

13   pans?  It says 1.

14       **A.   I had enough to accommodate seven people**

15   **because of how many it slept; seven towels, or eight.**

16   **There might have even been eight because you could buy**

17   **them...**

18   Q.   Okay.  Next page, second page, we have

19   pillows.

20             So this is going to be a similar

21   situation here?  We have pillows to maybe sleep seven or

22   eight?

23       **A.   Mm-hmm.**

24   Q.   Then we have step stools.

Joseph Jadczak
October 3, 2006

Page 124

1          What are these step stools used for,

2    sir?

3          A.    I had a step stool inside the RV, two-step,

4    that my wife used to get up to the top cabinets.

5                I had stools on the outside that I would

6    use when I would pull the awnings out for setting it up.

7          Q.    Okay.  And it says quantity, two, for about a

8    hundred dollars.  These are not cheap?

9          A.    No.

10         Q.    Where do you get these at?

11         A.    Camping World.

12         Q.    Next it says camping sections of plastic grass

13    pads.

14                Can you describe that for me?

15         A.    Yeah.  That's that fake turf that you put

16    outside your camper that looks like grass.

17         Q.    Okay.

18         A.    That was also bought at Camping World.

19         Q.    In New Jersey?

20         A.    I think I ordered them catalogue.

21         Q.    So each time you would go to maybe a camping

22    site you would lay out this grass?

23         A.    You would put that down, you would set up all

24    your stuff, you know, your table.

Joseph Jadczak
October 3, 2006

1        Q.    And it says there is four of them?

2        A.    Yes.

3        Q.    How big are these sections?

4        A.    I want to say about ten feet by about six or

5    eight feet.

6        Q.    Then we have a Motorola low band radio 100

7    watt 44 Hz.

8              This is inside the RV.  Is that right?

9        A.    Yes.

10       Q.    The value is 1150, $1100, $1150.

11             Do you know when you bought this, sir?

12       A.    I think I installed that in the RV right about

13   the time that I moved down there, about six years.

14       Q.    And what do you use this for?

15       A.    For our personal use.  The frequency that I

16   had with the trucks, I incorporated it into our vehicles.

17       Q.    Did you buy it at Camping World?

18       A.    No.  I bought that from the dealer.

19       Q.    A dealer?

20       A.    Town Communications.

21       Q.    Midtown?

22       A.    Town Communications.

23       Q.    T-O-W-N?

24       A.    Yes.  They handle commercial band radios.

Joseph Jadczak
October 3, 2006

Page 126

1        Q.    And you said earlier that you don't have any

2    receipts because the receipts you had were burnt in the

3    fire.  Is that right?

4        **A.    In my filing cabinet.**

5        Q.    What kind of receipts?  Would you keep

6    receipts of everything you purchased in the filing

7    cabinet?

8        **A.    Pretty much.  My MasterCharge receipts, my**

9    **things on different campgrounds, everything was in the**

10   **filing cabinets.**

11       Q.    Next is a hand-held low band Motorola radio,

12   two watts, 44 Hz.

13              Is this used in connection with the

14   other item that we just talked about?

15       **A.    It is.  If I would be walking around the**

16   **campground or my wife would, we can talk to each other.**

17       Q.    Oh.

18       **A.    One of us were in the motor home and one of us**

19   **were out and about.**

20       Q.    So with the hand-held you can connect with the

21   low band radio?

22       **A.    In the RV, yes, or any of our other radios**

23   **that we had it was the same frequency.**

24       Q.    How old were these low band radios?

Joseph Jadczak
October 3, 2006

Page 127

1     A.    That was around the same time, five, six

2   years.

3         Q.    Did you also buy this hand-held from Town

4   Communications?

5     A.    Yes.

6         Q.    Did you have an account, like a credit card

7   account there?

8     A.    No.

9         Q.    Did you have a credit card account at Camping

10  World?

11    A.    No.  I had what they call president's club,

12  where they have you listed as one of their buyers and you

13  get a 10 percent discount when you order something.

14        Q.    Next is a portable AM/FM radio.

15              Do you know who made this?

16    A.    No, I don't.

17        Q.    Inside the RV?

18    A.    Well, it was in the RV, but I took it out when

19  we went camping and just hooked it up outside.

20        Q.    Next is an Ipod, Apple Nano.

21              When did you buy this?

22    A.    About two-and-a-half years ago.

23        Q.    That's the real small one.  Right?

24    A.    Yeah.

Joseph Jadczak
October 3, 2006

1      Q.   Where did you buy that?

2      **A.   At Radio Shack.**

3      Q.   In what state?

4      **A.   In New Jersey.**

5      Q.   You are in New Jersey a lot?

6      **A.   My daughter lives there and my son lives**

7   **there.  We go up a lot.**

8      Q.   Where was this located in the RV?

9      **A.   In the front compartment in the glove box.**

10      Q.   Did you have a converter that would allow you

11   to connect it into the RV system?

12      **A.   No.**

13      Q.   So you just used headphones on it?

14      **A.   Yeah.**

15      Q.   Next is high-powered binoculars.

16          Where did you buy these, sir?

17      **A.   They were given to me by my father when he had**

18   **his boat.  We used them out on the boat.  So I have had**

19   **those.  They are a real nice set.**

20      Q.   Do you know how much they cost?

21      **A.   Originally, no, I don't.**

22      Q.   They were inside the RV.

23          Would you use them when you were

24   camping?

Joseph Jadczak
October 3, 2006

Page 129

1       A.    Yes.  Or if you are looking for a site or

2    something, or a number.

3       Q.    Did you say that your father gave these to

4    you?

5       A.    Yes.

6       Q.    Next is hand-made afghans.

7             These were inside the RV, sir?

8       A.    Yes.

9       Q.    Who made these afghans?

10      A.    My mother.

11      Q.    And she gave them to you as a gift?

12      A.    Yes.

13      Q.    When did she give them to you?

14      A.    She died 15 years ago.  Gosh, had to be about

15   20 years ago.

16      Q.    And you used these when you were in the RV?

17      A.    Yes.

18      Q.    Next is a portable air compressor.

19            Do you know the manufacturer's name?

20      A.    No.  It's the one that you plug into the

21   cigarette lighter.

22      Q.    All right.  Do you know where you bought it?

23      A.    Camping World.

24      Q.    Next is a portable vacuum cleaner, 12 volt.

Joseph Jadczak
October 3, 2006

1                   This was used inside the RV?

2      A.    Mm-hmm.

3      Q.    So you had two vacuum cleaners?

4      A.    Yeah.  One would be for the cigarette lighter

5   and one was electric.  The cigarette lighter one was for

6   smaller, you know, hand-held.

7      Q.    Like a dust buster?

8      A.    Yeah.  If you want to do your couch or your

9   chair or something.

10     Q.    Next we have -- I've never seen this.  Bottle

11  jacks, 10 tons each.

12              Can you describe that for me?

13     A.    Yeah.  They are used -- I use them for the

14  trucks, so I put it on the camper.  It's a jack for

15  jacking your car up, but instead of, like, your standard

16  floor jack, they are round, they look like a bottle, and

17  the piston comes out of the middle and they are made to

18  lift 20, 30, 50,000 pounds.  They are heavy.

19     Q.    So it's a jack that has the capacity to lift

20  10 tons?

21     A.    Yeah.

22     Q.    It's not something that weighs 10 tons?

23     A.    No.  No.

24     Q.    Piston in the middle, you said.  Right?

Joseph Jadczak
October 3, 2006

Page 131

1        A.    Yeah.   If I could lift them, I would be

2    famous.   They are a ten-ton jack.

3        Q.    How much did the RV weigh; do you know?

4        A.    I want to say about 16,500, 17, somewhere in

5    there.

6        Q.    So you had two bottle jacks.   Is that right?

7        A.    Yes.

8        Q.    You stored them in the RV.   Is that right?

9        A.    Yes.

10       Q.    Then we have a garage door remote.   Is this

11   one of the remotes for the hangar?

12       A.    Yes.

13       Q.    It was inside the RV?

14       A.    Yes.

15       Q.    So you could come up from a trip, approaching

16   your hangar, press the button and then go in?

17       A.    Yes.

18       Q.    Did you have to buy this system, this remote

19   system and set it up and attach everything on your hangar

20   at some point in time?

21       A.    For the doors?

22       Q.    For the doors.

23       A.    The remote controls were installed when the

24   doors were installed, when we bought the house.

Joseph Jadczak
October 3, 2006

Page 132

1        Q.    Is there an alarm system on the hangar?    Was

2    there?

3        A.    No.

4        Q.    Do you have an alarm system at your house?

5        A.    No.

6        Q.    Then we have a limo kit for a cell phone.

7              Can you describe that for me?

8        A.    Yes.    It's a handset, and a tray fits under

9    the seat, and the cell phone itself, a rectangular box

10    would snap in and out of the tray, I could move it from

11    my car to the RV, and then just plug in the power to it

12    and the antenna.    So you could use the same telephone

13    number without having to uninstall your mount for your

14    phone, your handset.

15        Q.    Is it like having a land line in your RV?

16        A.    Cellular phone.

17        Q.    Right.

18        A.    Except instead of the case where you wear it

19    on your belt, it was the bigger model.

20        Q.    Is this an older phone?

21        A.    Yes.

22        Q.    Oh, okay.    So this is one of the phones that

23    perhaps my dad had when they first came out and they zip

24    them in a leather case and it's a bigger phone?

Joseph Jadczak
October 3, 2006

Page 133

| | | |
|---|---|---|
| 1 | A. | Yeah. |

2    Q.    And you used it in the RV?

3    A.    And in the car.  I switched it back and forth.

4    Q.    Do you know why it says limo?

5    A.    That's what they called it.  When you buy an

6    extra setup, an extra set of cables and the cradle for

7    your handset to go onto, they call it a limo setup.  That

8    was Verizon's name, not mine.

9    Q.    Next we have miscellaneous cleaners, brushers,

10   etc.

11              Can you describe these for me, sir?

12   A.    Lestoil, Pine-Sol, Spic & Span, you know.

13   Q.    Standard stuff to clean --

14   A.    Ajax, right.

15   Q.    -- the inside of your RV.  Right?

16   A.    Yeah.  She had a bunch of that stuff.

17   Q.    Was it under the sink or something?

18   A.    Yes.

19   Q.    Next we have a Walther P38 9-millimeter gun,

20   World War II.

21              Can you describe this for me?

22   A.    My uncle gave that to me.

23   Q.    He served in World War II?

24   A.    He did.  My mother's brother, who has passed

Joseph Jadczak
October 3, 2006

Page 134

1    away now.

2         Q.    This is obviously an authentic classic

3    firearm?

4         A.    Yes.

5         Q.    Have you ever had this firearm appraised?

6         A.    No.

7         Q.    Do you have a guess as to how much it was

8    worth at the time of the fire?

9         A.    Well, the fellow -- I know a fellow that works

10   on guns, and I had explained it to him, and he told me it

11   would be worth about $500.  This is one of the fellows

12   that come to me for inspection at my garage.

13        Q.    Is that a handgun?

14        A.    It's a 9-millimeter handgun with a clip on the

15   bottom.

16        Q.    So your uncle -- this is your uncle.  Correct?

17        A.    Yes.

18        Q.    He used it in World War II?

19        A.    Yes.

20               Why did I say 9?  I mean 38.

21               No, I don't know if he used it or if he

22   got it off of a -- I don't want to say it.

23        Q.    An enemy combatant?

24        A.    An enemy combatant.  I didn't ask.

Joseph Jadczak
October 3, 2006

Page 135

1      Q.    Interesting.

2            Why was it in the RV?

3      A.    I used it for protection when my wife and I

4    would go on trips.

5      Q.    So it was still operable?

6      A.    Yes.

7      Q.    Was it licensed?

8      A.    I didn't register it down there.

9      Q.    This was totally destroyed?

10     A.    Yes.

11     Q.    You never saw it again?

12     A.    I didn't even bother to look for it.  I'm

13   assuming, the way everything was melted together, it was

14   gone.

15     Q.    And no one told you after the fire, no one

16   came to you and said, Mr. Jadczak, we were able to

17   salvage or save some of these items?

18     A.    No, not a thing.

19     Q.    Next is the car dolly we had mentioned

20   earlier.

21           Can you describe that for me, sir?

22     A.    It's a two-wheel dolly that's on a pivot that

23   hooks to the back of the RV that you drive your car up on

24   top of and you can pull the car with the RV.

Joseph Jadczak
October 3, 2006

Page 136

 1        Q.   Where did you buy this?

 2        A.   **At a place called Load Rite in Levittown,**

 3   **Pennsylvania.  I got it through Pratt Auto Repair.  I was**

 4   **able to get the dealer rate on it.  It's, like, 14,**

 5   **$1500.**

 6                  MR. SENSOR:  Can we go off the record

 7   for two minutes?

 8                  MR. SMYTHE:  Sure.

 9                  (Brief recess taken.)

10   BY MR. SMYTHE:

11        Q.   You said it's from Load Rite?

12        A.   **Yes.**

13        Q.   In Jersey, did you say?

14        A.   **No, it was in Pennsylvania, in Levittown,**

15   **Pennsylvania.**

16        Q.   Do you know how much that would cost?

17        A.   **About 15 -- well, new, someone would probably**

18   **pay 22 to 2500, where I bought it through the dealer for,**

19   **like, 1500.**

20        Q.   Then we have a moped carrier?

21        A.   **Mm-hmm.**

22        Q.   Can you describe that for me?

23        A.   **That is like a, a rail or a tray, for lack of**

24   **a better word, that connects to your hitch on the back of**

Joseph Jadczak
October 3, 2006

Page 137

1    the RV that you put your moped on.  It drops down and has

2    a ramp to it, so you can put a motorcycle, a moped.

3        Q.   Did you actually have a moped?

4        A.   Yes.

5        Q.   Those miniature motorcycles.   Right?

6        A.   Yes.

7        Q.   Is that on this list?

8        A.   Yes.

9        Q.   Where did you buy this moped carrier?

10       A.   From Tom's Motor Sales.

11       Q.   Where is that at?

12       A.   In Mechanicsburg, Pennsylvania.

13       Q.   We saw a receipt or an invoice on one of the

14   exhibits that says Tom's.  Right?

15       A.   Yes.  But I don't think that was on there.   I

16   bought that at the time I bought the --

17       Q.   But the business name was on there?

18       A.   Yes.

19       Q.   Next we are moving on to the hangar items.

20            We have got a 10-horsepower tractor with

21   mower from Sears.  When did you buy this, sir?

22       A.   That was purchased about the time I moved

23   down, about six years.

24       Q.   How much did you pay for it?

Joseph Jadczak
October 3, 2006

Page 138

1        A.    22, 2300.

2        Q.    Do you have a Sears card?

3        A.    I do.

4        Q.    Credit card?

5        A.    Mm-hmm.

6        Q.    That's another one of the cards that you have

7    that has a zero balance because you pay them off?

8        A.    Yes.

9        Q.    Did you use your Sears card for the purchase

10   of this mower?

11       A.    I don't recall.  Some things I paid by check.

12       Q.    Next we have fans.  What kind of fans were

13   these, sir?

14       A.    Floor fans, box type, square, maybe about 12

15   inches or 18 inches.

16       Q.    For residential use?  Not an industrial fan?

17       A.    Well, I used to run the fans in the hangar to

18   circulate the air to keep the moisture from being on the

19   floor, because that Hard Deck floor I had would get very

20   slippery if it got wet.  And in the summertime you get a

21   lot of moisture.  And my mechanic for the airplane told

22   me I should put a fan in there and help circulate the

23   air, it keeps the floor dry so you don't slip or fall.

24       Q.    So there is -- moisture accumulates on the

Joseph Jadczak
October 3, 2006

1    ground even without, you know, using the hose?

2        A.    In the summertime, with the humidity, you can

3    get moisture on this particular floor because it's,

4    like -- it can get slippery when it gets wet.  It's

5    called Hard Deck.

6        Q.    It's not concrete?

7        A.    Well, it's on top of the concrete.  It's a

8    specialized application that -- it's very labor intense.

9    That you, once you put it down you can just wipe oil off

10   with a rag.  But it's like an epoxy, but it does get

11   slippery if it's wet.

12       Q.    Okay.

13       A.    So you have to try and keep it dry.

14       Q.    Why did you put that on the floor of your

15   hangar?

16       A.    For durability.  If I get oil, you can just

17   wipe it off.

18       Q.    Next we have the grill with tank full.

19             Is this a grill for barbecuing?

20       A.    Outside grill.

21       Q.    Do you know where you bought this?

22       A.    At Lowe's.

23       Q.    At Lowe's.

24             And when did you buy it?

Joseph Jadczak
October 3, 2006

Page 140

1    A.    **When we moved down.  Six years.**

2    Q.    Did you use it often?

3    A.    **Actually, not that much.**

4    Q.    This is a propane tank?

5    A.    **Yes.**

6    Q.    And the propane tank was full at the time of

7    the fire?

8    A.    **Yes.  I had a spare tank, too.**

9    Q.    Next is the spare tank, which was also full of

10   propane gas.  Is that right?

11   A.    **Yes.**

12   Q.    And these were both inside the hangar.  Right?

13   A.    **Yes.**

14   Q.    Then we have hoses with reels.

15                Can you tell me what these were used

16   for?

17   A.    **Garden hose, about 100 feet.**

18   Q.    It says $120?

19   A.    **The box itself, the reels.  I had a couple of**

20   **those, two of those.**

21   Q.    So that adds up?

22   A.    **They were, like, $60 apiece.**

23   Q.    Do you know where you bought those at?

24   A.    **At Lowe's.**

Joseph Jadczak
October 3, 2006

Page 141

1    Q.   Any particular Lowe's store in the area?

2    **A.   In Lewes.**

3    Q.   And Lewes, if I recall, is spelled L-E-W-E-S?

4    **A.   Yes.**

5    Q.   Next is a power washer.

6         Where did you buy this at?

7    **A.   At Lowe's.**

8    Q.   In Lewes?

9    **A.   Yes.**

10   Q.   Do you remember when?

11   **A.   About three years prior to the fire.**

12   Q.   Do you know how much you paid for it?

13   **A.   I went in and I saw it and I wrote it down.**

14   **If you allow me to look at it, I could tell you.**

15   Q.   Sure.

16   **A.   Yep, 280.**

17   Q.   So this is one of the items where you went to

18   Lowe's and said, hey, I got that, and how much is it?

19   **A.   Yeah, that's what I did, I went and took**

20   **inventory of everything I had and their prices.**

21   Q.   All right.  The next item on page 2 in the

22   middle of the page is the shop vac.

23         Where did you buy this, sir?

24   **A.   Lowe's.**

Joseph Jadczak
October 3, 2006

Page 142

1     Q.   Do you know how much you paid for it?

2     A.   180.

3     Q.   You bought a lot of items that were in the

4     hangar at Lowe's.  Is that right?

5     A.   Yes.  It was convenient, close to my home.

6     Q.   Do you have a credit account with Lowe's?

7     A.   I do.  But some of the things I bought with my

8     MasterCard, some of the things I bought with their card.

9     Q.   Okay.  Did you ever purchase any of these

10    items that we have been talking about today with cash,

11    just pure cash, paper?

12    A.   Yes.

13    Q.   What other methods of payment would you use?

14    A.   Either check, credit card, or cash.

15    Q.   Next we have the Kobalt air compressor.

16         Did you buy this at Lowe's?

17    A.   I did.

18    Q.   Do you remember when?

19    A.   I would say about two years after I moved in.

20    Q.   Did you use it often?

21    A.   Yeah, I used it for the tires and the tractor

22    and moped and plane.

23    Q.   Next we have the Dewalt drill set with saw,

24    looks like LT for maybe light, and battery.

Joseph Jadczak
October 3, 2006

Page 143

1    A.    Mm-hmm.

2    Q.    Did you buy this at Lowe's?

3    A.    Yes.

4    Q.    This is a larger drill set with bits?

5    A.    Yeah.  That was about a $500 item.

6    Q.    Do you know how you paid for this?

7    A.    That was with my, I think, MasterCard.

8    Q.    Do you know when you bought it?

9    A.    Five years ago.  Four years ago.

10   Q.    Next we have a jump start.

11         What's a jump start?

12   A.    It's a box with cables on it that if you need

13 to jump your battery, turn it on.

14   Q.    Okay.  Would you use it for the RV?

15   A.    Cars, RV.

16   Q.    Can you use it for the plane?

17   A.    No.

18   Q.    In regards to the plane, in terms of your use

19 of the plane, what percentage would you say at the time

20 were you using the plane for your business?

21   A.    Never.

22         MR. SENSOR:  Objection.

23 BY MR. SMYTHE:

24   Q.    You are never using it for business?

Joseph Jadczak
October 3, 2006

Page 144

1       A.   No.

2       Q.   But you fly to work in your plane.  Right?

3       A.   Yes.

4       Q.   The next item is a creeper.

5            Can you tell me what that is?

6       A.   It's a board on wheels on the floor.  You can

7   get underneath a vehicle to work on it.

8       Q.   Where can you buy one of these?

9       A.   CarQuest, Lowe's, Home Depot, Pep Boys.

10      Q.   Then we have a Floro car jack.

11           Is Floro a brand name, sir?

12      A.   It should be a floor car jack.

13      Q.   Oh, okay.  Floor car jack?

14      A.   It's misspelled.

15      Q.   That's just a standard car jack?

16      A.   Yes.

17      Q.   Then we have screwdriver sets, chisel sets,

18  files, wire snips, strippers, channel locks.

19           Where were these located in the hangar,

20  sir?

21      A.   In my toolbox on my workbench.

22      Q.   Do you know what brand name these were?  Were

23  they an assortment, or were they all Craftsman?

24      A.   I have an assortment.  There was some

Joseph Jadczak
October 3, 2006

Page 145

1    Craftsman.

2        Q.    These were inside your toolbox.

3              Where was your toolbox located?

4        A.    **Underneath my workbench in the hangar.**

5        Q.    Next we have some levels.  Are these T squares

6    or just levels?

7        A.    **Yeah, I had a variety.  I had smaller ones,**

8    **the big one.  They are the things with the little glass**

9    **in there with the bubble.**

10       Q.    Socket set of 79 pieces.

11             Can you explain this for me, sir?

12       A.    **3/8 drive socket sets, various sizes.**

13       Q.    Do you know where you bought it?

14       A.    **That I think I got from Sears.  That was a**

15   **Craftsman.**

16       Q.    Do you know how you paid for it?

17       A.    **No.**

18       Q.    We have a workbench and table.

19             If I was to enter your hangar from the

20   front of the property coming up your driveway and I came

21   in through, let's say, if there is not a door, let's say

22   there is an imaginary door I walk in, where would I find

23   the workbench and table?

24       A.    **On the east side of the hangar, which was the**

Joseph Jadczak
October 3, 2006

Page 146

1  opposite side of the 12-by-12 door, more towards the back

2  apron.

3       Q.   Do you remember where you bought these?

4       A.   I want to say Atlantic Millwork.  It was

5  either there -- either Atlantic Millwork or Lowe's.

6       Q.   Where is Atlantic Millwork located?

7       A.   In Lewes, off of Route 9.

8       Q.   Then we have a vice.

9            That's a standard vice that holds things

10 in place.  Is that right?

11      A.   Yes.

12      Q.   Was that connected to the workbench?

13      A.   Yes.

14      Q.   Do you know where you bought that?

15      A.   That one I got at Lowe's.

16      Q.   Next is a grinder.

17           What is a grinder?

18      A.   It looks like a shoe polisher, but it has

19 stone on either end, and the motor runs it so if you want

20 to grind down a piece of metal or something.

21      Q.   What would you use the grinder for?

22      A.   Grinding down maybe a piece of metal, taking

23 the rough edge off of something you may have cut.

24      Q.   Do you know where you bought it?

Joseph Jadczak
October 3, 2006

Page 147

1        A.    That I got at a tool place, I think it was in

2    Granger's in Philadelphia.

3        Q.    That's just to the best of your recollection.

4    You are not entirely sure.  Is that right?

5        A.    I'm 99 percent sure it was Granger's in

6    Philadelphia.

7        Q.    Next we have $2,000 worth of miscellaneous

8    tools, drill bits, and parts.

9              Do you know how you came up with that

10    number, if you came up with that number?

11        A.    Yeah.  I had, oh, gosh, all these extra parts

12    for the cars.  I had filters and bulbs and special

13    wrenches for the tires, special wrenches for the engine,

14    for filters and all that.  At the time I was thinking --

15    I pictured it in my mind what was underneath of the

16    toolbox.  And I'm trying to think of all the parts.  But

17    it was a lot of, variety of parts for the RV, the cars.

18        Q.    Okay.  And, again, you said you liked the

19    brand name Craftsman.  Is that right?

20        A.    Yeah.

21        Q.    Not to say that these were all Craftsman

22    tools, but --

23        A.    Most of them were.

24        Q.    Most of them were?

Joseph Jadczak
October 3, 2006

Page 148

1        A.    Yeah.

2        Q.    Okay.  So you may have bought these at Sears?

3        A.    Yes.  Or there is a truck that comes down to

4   our garage, too, that has Snap-on.  Some of the things

5   were mixed in with that.  Some of them were Snap-on.

6        Q.    What's Snap-on?

7        A.    Snap-on is a tool.  The guy comes around in a

8   truck to our inspection station and he sells tools and

9   parts, sells Snap-on.

10                   MR. SENSOR:  They have the calendars?

11                   THE WITNESS:  Yes.

12   BY MR. SMYTHE:

13        Q.    Is that the name of a company?

14        A.    Snap-on is the name of a tool and a company,

15   yes.

16        Q.    Then we have some step stools.

17                   These look pretty self-explanatory.

18   These are just regular step stools?

19        A.    Yes.

20        Q.    To reach things in elevated places?

21        A.    Yeah.  To wipe the windshield of the plane,

22   put oil in it.

23        Q.    Then we have a 28-foot extension ladder.  It

24   says ladders?

Joseph Jadczak
October 3, 2006

1          A.     I had eight-foots.  I had a 28-foot extension

2     on the wall towards the street next to the RV.

3          Q.     And they all connected with each other to make

4     a 36?

5          A.     No.  I had separate ladders.  I had a 10-foot,

6     I had an 8-foot, I had an extension ladder that went up

7     to 28 feet.

8          Q.     Do you know where you bought it?

9          A.     One I brought down from home.  I don't

10    remember where I bought it.  And Lowe's I believe is

11    the -- where I got the other.

12         Q.     Then we have a hand truck, convertible.

13                Can you tell me what that is?

14         A.     It's a hand truck that has wheels on the top

15    of it, and you can lay it down and you take the handle

16    out and put it upright, then it makes, like, a dolly.

17    Because it's a hand truck/dolly.

18         Q.     Moving things that you can't lift by yourself,

19    maybe?

20         A.     Yeah.  If I have a bunch of boxes that I want

21    to roll from the hangar to the house, or vice versa,

22    boxes of oil or something, I can make a dolly out of this

23    hand truck.

24         Q.     Then we have safety car jacks.

Joseph Jadczak
October 3, 2006

Page 150

1          Can you tell me what those are?

2     A.    **They are tripod jacks that are notched.  And**

3  **you lift the jack up itself and it locks in position, so**

4  **if the car should come down, it would stop it from coming**

5  **down on top of you.**

6     Q.    It sounds like a good thing?

7     A.    **It is when you are under a car.**

8     Q.    Special paints, caulk, etc.

9          Can you describe this for me?

10    A.    **All things I used around the house.  Things I**

11 **used for windows for the plane, for the cars, for the RV.**

12 **I had backup paint for the floor, the Hard Deck, exterior**

13 **of the house, interior of the house, all that.**

14    Q.    Any particular paint brand that you liked?

15    A.    **We liked Duron.**

16    Q.    Duron?

17    A.    **Yeah.  I had some Duron, I had some**

18 **Sherwin-Williams.**

19    Q.    Then we have an attic pull-down ladder, spare

20 unit?

21    A.    **Mm-hmm.**

22    Q.    Was that actually assembled?  So was it a

23 pull-down ladder?

24    A.    **Yeah, when you -- you could pull the ladder**

Joseph Jadczak
October 3, 2006

Page 151

1    down to get into the attic, which I had an access door

2    above the RV, and I had a spare one up in the attic.

3         Q.   So this was the spare in the attic?

4         A.   I had one that was installed and a spare up in

5    the attic.

6         Q.   This says a spare unit, so this must be the

7    one?

8         A.   There must have been the one in the attic

9    that -- okay.  I didn't mark the one that was already on

10   there.

11        Q.   The one that was attached?

12        A.   Yeah.

13        Q.   So the second ladder was attached?

14        A.   I was figuring that in with the building.

15        Q.   Any of these items that we talked about in the

16   hangar, were any of these in the attic at the time of the

17   fire?

18        A.   Some were.

19        Q.   Next, on page 3, we have a scaffold and dolly.

20   What is that, sir?

21        A.   It's a -- scaffold and dolly.  It was a

22   portable dolly that you could put together like a ladder

23   and make a scaffold out of it.

24        Q.   What would you use that for?

Joseph Jadczak
October 3, 2006

Page 152

1      A.    Changing bulbs in the hangar.

2      Q.    In the hangar?

3      A.    Because I had a 13-foot ceiling.  If the

4  bulb's in the middle of the hangar, I couldn't get a

5  ladder up there, so I would have to use the scaffold to

6  get up there.

7      Q.    Then we have the washer and dryer set, Sears

8  Kenmore.

9               This is presumably the washer and dryer

10  set that you and your wife used to do laundry?

11      A.    Yes, but they are wrong.  Actually, they were

12  Maytags.

13      Q.    Did you buy these at Sears?

14      A.    No, we bought them in Dover at a Maytag

15  dealer.

16      Q.    You bought them both together?

17      A.    Yes.

18      Q.    A matching set?

19      A.    Yes.

20      Q.    Do you know how much they were?

21      A.    About 500 a piece.

22      Q.    What kind of condition were they in at the

23  time of the loss?

24      A.    Very good.

Joseph Jadczak
October 3, 2006

Page 153

1          Q.    Did you use them on a daily basis?

2          A.    **Once a week to wash my work clothes in it.**

3          Q.    How often would your wife use it?

4          A.    **Every week.**

5          Q.    Every day or every week?

6          A.    **Well, once or twice a week she would throw my**

7    **dirty work clothes, or towels, maybe, or beach towels**

8    **that would have sand on it she didn't want to wash in the**

9    **house.**

10         Q.    But you had a washer and dryer in the house,

11   too?

12         A.    **Yes.**

13         Q.    Would you use the washer and dryer in the

14   house more often than you would use the ones in the

15   hangar?

16         A.    **Yes.**

17         Q.    Next we have a microwave stand.  That sounds

18   pretty self-explanatory.

19                    You had a microwave in the hangar?

20         A.    **Yes.**

21         Q.    So you would have meals out there?

22         A.    **Occasionally heat something up if I'm working**

23   **out there.**

24         Q.    Do you know where you bought this stand?

Joseph Jadczak
October 3, 2006

Page 154

1        A.    Yes, I put it together.

2        Q.    It's an RTA, or did you make it?

3        A.    No, I didn't make it.  It came disassembled.

4   But I'm trying to think where I bought it.  I don't

5   recall.

6        Q.    But you put it together from scratch?

7        A.    Yes.

8        Q.    It says $170 here.

9              Do you remember how you came up with

10  that amount?

11       A.    Yeah, I saw one like it in Lowe's.

12       Q.    You saw one like it?

13       A.    Yes.

14       Q.    Next is a cabinet with rollers.  That sounds

15  pretty self-explanatory.

16             What was stored in the cabinet?

17       A.    Filters, bulbs, my Jeppesen's, headsets for

18  flying.

19       Q.    Okay.  So airplane stuff?

20       A.    Yeah.

21       Q.    Okay.

22       A.    Actually, a little bit of both.  A little bit

23  of automotive, a little bit of airplane.

24       Q.    Do you know where you bought this cabinet?

Joseph Jadczak
October 3, 2006

Page 155

1      A.    That I bought at -- that I got at Lowe's when

2   we moved down.

3      Q.    Does $560 sound accurate to you?

4      A.    Mm-hmm.   There was a couple of them, so I

5   think that was the total for the two of them.

6      Q.    Was it made out of stainless steel, or steel?

7      A.    Wood.

8      Q.    Oh, wood?

9      A.    Yes.

10     Q.    How large was this cabinet?

11     A.    Maybe six feet.

12     Q.    Six feet?

13     A.    Six feet.

14     Q.    How wide?

15     A.    Double doors.   Two feet.

16     Q.    Next we have the Jeppesen charts with case and

17  map, two sets, updated every year.   Then it says

18  excluded.

19          Do you know why it says excluded, sir?

20     A.    No, I don't.

21     Q.    Did you write that?

22     A.    No.

23     Q.    All right.   Well, you had Jeppesen charts?

24     A.    I did.

Joseph Jadczak
October 3, 2006

Page 156

1      Q.   These are aerial maps.  Is that correct?

2      **A.   That's right.**

3      Q.   And it says that they were updated every year.

4           Does that mean you would purchase

5    different ones?

6      **A.   No, they would send you revisions every couple**

7    **of weeks.  Whenever something was changed on the air**

8    **routes or in an airport, a frequency or a degree or**

9    **anything like that, they would have to update their**

10   **charts for your instrument approaches.**

11     Q.   Does that occur a lot?

12     **A.   Yes.**

13     Q.   Do you have to have, like, a subscription to

14   get these Jeppesen charts?

15     **A.   Yes.**

16     Q.   How much is that subscription?

17     **A.   That's about $330 a year.**

18     Q.   Can only licensed pilots get that

19   subscription, or can the general public get it?

20     **A.   I don't know.**

21     Q.   Next is -- and you had, it says quantity two,

22   two charts.  Is that accurate?  Two map sets?

23          Does that sound right to you?  I'm still

24   on the Jeppesen charts.

Joseph Jadczak
October 3, 2006

Page 157

1      A.    Yeah.   I don't know where they got that.

2    There was four books in a big case.   So I don't know

3    where that came from.

4      Q.    Where was the case located?

5      A.    In the cabinet, one of my cabinets.

6      Q.    The one we just talked about?

7      A.    Yes.

8      Q.    Next is Dave Clark headsets.

9            Is Dave Clark a brand?

10     A.    Yes.

11     Q.    Is this for air flight?

12     A.    Yes.

13     Q.    And where did you buy these at?

14     A.    Sporty's Pilot Shop.   I ordered it by mail.

15   And I bought another one in Lancaster at the pilot shop

16   at the airport there.   Actually, I had about three

17   different types.   Two I bought at the Lancaster one.   No,

18   two I ordered from Sporty's and one at the Lancaster

19   pilot shop.

20     Q.    Headsets enabled you to communicate with

21   others?

22     A.    It's a headset with a boom mic.

23     Q.    Next we have flood lights.   It says new.

24   There is four of them.

Joseph Jadczak
October 3, 2006

Page 158

1              Where were these, sir?

2         A.    I had four cases of outside flood lights for

3    my security lights around my property.  I had them in the

4    hangar next to the workbench.

5         Q.    Are these the light bulbs that you would

6    change?

7         A.    The bulbs, the big 75-watt floodlight, outside

8    ones.

9         Q.    So you already had operating floodlights.

10   These were extras?

11        A.    They were extras.

12        Q.    Are these $75 each?

13        A.    No, it was $75 for the case.

14        Q.    Containing four floodlights?

15        A.    Yeah, there was -- I don't know, there was a

16   dozen or something in a case.

17        Q.    Next -- and this is going to hurt.  Next we

18   have got the Pearl drums with hard cases complete.

19                  Describe this drum set for me?

20        A.    They were blue pearl color.  The

21   manufacturer's name was Pearl.  I had hard cases.

22        Q.    I'm sorry, what does hard cases mean?  I used

23   to play the drums, but I was really young.

24        A.    You put them in the case, and they have the

Joseph Jadczak
October 3, 2006

Page 159

```
 1    canvass ones and they have the hard ones.  I had the hard

 2    ones.

 3                      I had Zildgian cymbals, a complete set.

 4    I had the chrome steel snare, double tom toms, the whole

 5    works.

 6         Q.   You play the drums.  Is that right?

 7         A.   Yes.

 8         Q.   Where did you buy these drums?

 9         A.   At Pat's Music Store in Philadelphia.

10         Q.   Do you have a credit account there?

11         A.   No.

12         Q.   Pat's Music Store?

13         A.   Uh-huh.

14         Q.   When did you buy them?

15         A.   Oh, gosh.  A while ago.  Fifteen years.

16         Q.   What kind of condition were they in?

17         A.   Excellent.

18         Q.   At the time of the fire?

19         A.   Yeah.

20         Q.   Did you play them often?

21         A.   Not recently.

22         Q.   How often would you say you played them in the

23    year leading up to the fire?

24         A.    I took them out maybe twice since we moved
```

1      down there, cleaned them up, played them, put them back.

2          Q.    Were they set up at the time of the fire?

3          A.    No.

4          Q.    Does $4500 sound like an accurate amount for

5      those drums?

6          A.    Yeah.

7          Q.    They were one set, like you bought everything

8      at once?

9          A.    Yes.

10         Q.    Next we have a PA system.

11         A.    Mm-hmm.

12         Q.    Can you describe that for me?

13         A.    That was a Jensen.  I had two big columns,

14     Jensen columns that stood about five feet.  The PA system

15     itself, which was like a mixer/PA, I believe you could

16     take about eight microphones in it.

17         Q.    What did you use this PA system for?

18         A.    When I played in the band.

19         Q.    But the drum set doesn't hook up in any way to

20     the PA system.  Is that right?

21         A.    No, there is no electronics with the drum set.

22         Q.    This would be for a --

23         A.    I had a boom microphone.  I'm sorry.

24         Q.    Go ahead.

Joseph Jadczak
October 3, 2006

Page 161

1          A.    I had a boom microphone that hooked into the

2     PA system.

3          Q.    Where did you buy the PA system at?

4          A.    That was a place called Benny's.  Cintioli's

5     in Philadelphia.

6          Q.    Does $1200 sound accurate to you?

7          A.    Yes.  Yeah.

8          Q.    Do you remember how you paid for it?

9          A.    I think at that time I paid cash.

10         Q.    Is this a long time ago?

11         A.    Yeah.

12         Q.    And you were in a band?

13         A.    Yeah.

14         Q.    Were you in more than one band?

15         A.    Yeah, I was in about three or four.

16         Q.    Did you record your own music?

17         A.    Yeah.

18         Q.    Would you consider yourself a professional

19     musician?

20         A.    Not anymore.

21         Q.    But you were at one time?

22         A.    At one time I played out at clubs, did studio

23     work.

24         Q.    Did you use those drum sets to do that kind of

Joseph Jadczak
October 3, 2006

Page 162

1    work?

2         A.    Sometimes.   In the clubs I used it all the

3    time.

4         Q.    The Pearl drum set?

5         A.    Yes.

6         Q.    What about the PA system, did you transport

7    that to various gigs, if you will?

8         A.    Yes.   Weddings, banquets, clubs, things like

9    that.

10        Q.    And you received compensation for your

11   services?

12        A.    Yes.

13        Q.    You also used them for your own personal use?

14        A.    Yes.

15        Q.    Next we have desks with chairs.

16              Are these the desks we were talking

17   about earlier?

18        A.    Yes.

19        Q.    Are these, like, desks that you might do,

20   like, writing and stuff on, or are these more hard, like

21   industrial type of desks?

22        A.    They are metal desks with wood tops with

23   drawers.   Each desk had two drawers, two or three.

24        Q.    Where did you buy these at?

Joseph Jadczak
October 3, 2006

Page 163

1        A.    One I bought from a store that went out of

2   business, the Doctor's Pet Center.  I don't remember what

3   I paid for it.  The other I had bought from Staples when

4   I moved down there.

5        Q.    Okay.  Did the chairs come with the desks?

6        A.    No.

7        Q.    Where did you buy the chairs?

8        A.    The one was at the store.  Yeah, that came

9   from the one from the store.  And the second one I bought

10  a chair at Staples.

11       Q.    Then we have a console stereo, Panasonic.

12              Can you tell me what this is?

13       A.    Yeah.  That was a big floor model console that

14  used to be my parents'.  That's where I had all my

15  records and stuff.  It was a radio/record player.

16       Q.    Okay.  Radio/record player?

17       A.    Yeah.  It was a big piece of furniture.

18       Q.    Was it enclosed, like, in a case or something?

19       A.    Yeah.  The top lifted up, and you had your

20  turntable and your radio and all in there, storage and

21  all.

22       Q.    How old do you think that was?

23       A.    That was my parents'.  I brought that over

24  from there.  So --

Joseph Jadczak
October 3, 2006

Page 164

 1        Q.    Over 20 years old?

 2        A.    **No, I don't think it was 20 years old.  Maybe**

 3   **15, 14.  Right around when my mom passed away, 15 years.**

 4        Q.    Was it working at the time of the fire?

 5        A.    **Yes.**

 6        Q.    And you used it?

 7        A.    **Yes.**

 8        Q.    Next is a utility cabinet with sink and

 9   fixtures.

10              Can you describe this for me, sir?

11        A.    **That's the -- next to the washer and dryer**

12   **where we had our sink, and she kept all of her cleaning**

13   **stuff underneath there, detergents and all for the washer**

14   **and dryer.**

15        Q.    Do you know what it means by fixtures?

16        A.    **The faucets with the sprayer.**

17        Q.    So it was a sink with a sprayer, and it was

18   also a cabinet?

19        A.    **Yes.**

20        Q.    Was it on wheels?

21        A.    **No, stationary.**

22        Q.    Do you know where you bought it?

23        A.    **When we built the hangar, the builder got it**

24   **for me.**

Joseph Jadczak
October 3, 2006

1      Q.   Wait.  When you bought the new -- I'm sorry.

2   When you built the first hangar?

3      A.   **Yes.**

4      Q.   Okay.  Thanks.

5      A.   **That was included in the building.**

6      Q.   Next we have two boxes of hardwood flooring.

7           What is this hardwood flooring for, sir?

8      A.   **For my home.  It was spare.  Spare flooring**

9   **for the house.**

10     Q.   For the house?

11     A.   **Yes.**

12     Q.   Any particular room in the house?

13     A.   **We had hardwood floors in every room except**

14  **the bedrooms.**

15     Q.   And where did you buy this flooring?

16     A.   **Anderson Flooring in Delaware, in Rehoboth**

17  **Beach.**

18     Q.   Anderson Flooring.

19          Next we have a TV, commercial band radio

20  equipment with scanners and commercial antennas.  Value

21  of $7,000.

22          Can you describe this for me, sir?

23     A.   **That's all the equipment I was showing you on**

24  **that other piece of paper for the business band radio.  I**

Joseph Jadczak
October 3, 2006

1    **call it business band radio.**

2          Q.    It's commercial band radio?

3          A.    **Low band FM.**

4          Q.    Oh.  So is this -- I'm sorry, what document

5    are you referring to?  Something that we were looking at

6    earlier?

7          A.    **The Town Communications.**

8          Q.    And the Town Communications document had a

9    list of things that --

10         A.    **The radio equipment.**

11         Q.    The radio equipment?

12         A.    **There you go.**

13         Q.    I'm looking at Exhibit 2.

14         A.    **I don't think all these prices are accurate on**

15    **here.**

16         Q.    On the contents list?

17         A.    **On this sheet.  Some are under, some are over.**

18    **But, I mean, that's why I got individuals.**

19         Q.    Okay.  So the item I just mentioned on the

20    property inventory list contains some of the individual

21    listings in this Exhibit 2 here as we are looking at it?

22         A.    **Yes.**

23         Q.    Because the total on the exhibit exceeds

24    $16,000, and then there is some handwriting with more on

Joseph Jadczak
October 3, 2006

Page 167

1    there, it says total of 18,000 to $19,000, basically?

2        A.    Yes.

3        Q.    So we're talking about a substantial amount of

4    radio equipment?

5        A.    That's what I was saying, that that's not

6    right.

7        Q.    You are saying that's an underestimation of

8    the value?

9        A.    Yes.

10       Q.    Again, you contacted Town Communications and

11   asked for a document which listed some of these items

12   that you believe you owned at the time of the fire?

13       A.    Yes.

14       Q.    Did you ask Town Communications if they have

15   any documentation showing your purchase of these items?

16       A.    I didn't ask them that.

17       Q.    Next is a Brother fax machine with three spare

18   cartridges.

19             You had a working fax machine in your

20   hangar?

21       A.    Yes.

22       Q.    What did you use this fax machine for?

23       A.    Personal use.

24       Q.    Only personal use?

Joseph Jadczak
October 3, 2006

Page 168

1      A.   Yes.

2      Q.   Where did you buy that at?

3      A.   At OfficeMax in Philadelphia.

4      Q.   It looks like it was relatively new at the

5  time of the fire?

6      A.   Yes.

7      Q.   Then we have utility cabinets, quantity of two

8  at $1800.

9           Do you know where you bought these?

10     A.   I don't recall.  I want to say Lowe's, but I'm

11  not a hundred percent sure.

12     Q.   Let's move on to the small refrigerator.

13          Was that in operation at the time of the

14  fire, sir?

15     A.   Yes.

16     Q.   Where did you buy that at?

17     A.   Fogel's Refrigeration in Philadelphia.  They

18  are no longer there.  They went out of business.

19     Q.   Is this a, as they would say, a college

20  refrigerator, a smaller one?

21     A.   For lack of a better word.

22     Q.   Now, this was operating and it had food and

23  beverages in it?

24     A.   I had Snapples in there.

Joseph Jadczak
October 3, 2006

Page 169

1      Q.   Next is a steel safe.

2           Do you know where you bought this?

3      A.   My parents had it.

4      Q.   So it was from your parents?

5      A.   My parents.

6      Q.   Was there anything inside the safe?

7      A.   No.

8      Q.   As far as you know, the steel safe was totally

9  destroyed?

10     A.   Yes.  I did see that.  The dial on the front

11  was -- looked like it was knocked off or missing, and it

12  was just all rusty looking.

13     Q.   So you didn't use the steel safe in the past

14  for anything?

15     A.   Not in there.  That was used prior to us

16  moving there.

17     Q.   Okay.  And how large are we talking about?

18     A.   Approximately two-and-a-half feet wide and

19  maybe three feet high.  It was on wheels.  It was pretty

20  heavy.

21     Q.   Any particular reason why you didn't put

22  anything in the safe?

23     A.   Didn't have anything to put in it.

24     Q.   Next we have --

Joseph Jadczak
October 3, 2006

Page 170

1      A.    May I?

2      Q.    Yes.

3      A.    **My more important documents, I do have a safe**

4   **at work that I have been putting my things in there.  So**

5   **I didn't need to put them in this safe.**

6      Q.    Next we have microphones and stands?

7      A.    **Mm-hmm.**

8      Q.    Were these used in connection with your band?

9      A.    **Yes.**

10     Q.    Would you take these to venues and play music

11  and use these during these gigs, if you will?

12     A.    **Yes.**

13     Q.    And how many microphones and stands are we

14  talking about?

15     A.    **I think I have about four.**

16     Q.    Four?

17     A.    **Yeah.  Shure microphones.**

18     Q.    Where did you buy these?

19     A.    **Pat's Music and Cintioli's, both.**

20     Q.    How old are these?

21     A.    **Fifteen.**

22     Q.    Were these working at the time of the fire?

23     A.    **Yes.**

24     Q.    And then next we have extra PA speakers.  And

Joseph Jadczak
October 3, 2006

Page 171

1    these were used, again, in connection with the band that

2    you had?

3         A.    Yes.

4         Q.    What was the name of the band, by the way?

5         A.    Prelude.

6         Q.    How many band members?

7         A.    Four.

8                        Prior to that was a band called Four

9    Reasons.

10                       Prior to that was a band called the

11   Gotham City Teens.  And we used to -- did a cut for the

12   Batman show.

13        Q.    Really.

14        A.    Holy, Holy Ravioli.  That was me screaming in

15   the background.

16        Q.    The Batman show with Adam West?

17        A.    Yes.

18        Q.    The Gotham City what?

19        A.    Teens.

20                       Before that was the Manchesters.

21        Q.    So these are totally different bands, or an

22   incarnation of this one band?

23        A.    Totally different band.

24        Q.    What was that last band?

Joseph Jadczak
October 3, 2006

Page 172

1       A.   Manchesters.   That was a high school band.

2       Q.   Did you play any other instruments besides

3    drums?

4       A.   A little bit of piano and organ.

5       Q.   Next is a King aircraft radio 170B.

6            Do you know why it says not covered,

7    excluded?

8       A.   No, I don't.   But they are about $200.

9       Q.   What's 170B mean?

10       A.   That's the model of the radio.   It's a

11   communication/navigation.   It has a radio on one side and

12   a VOR receiver on the other side which is used for

13   navigation.

14       Q.   Can you use it for anything else besides the

15   aircraft?

16       A.   No.

17       Q.   Okay.   Obviously, it wasn't inside the

18   airplane at the time of the fire.   Is that right?

19       A.   It was on my desk.   It was a spare.

20       Q.   It's a spare.

21            Was it working at the time of the fire,

22   as far as you know?

23       A.   Yes.

24       Q.   When did you buy it?

Joseph Jadczak
October 3, 2006

Page 173

1        A.    Well, when we bought the airplane.  And when I

2   updated my equipment in the airplane, that gave me two

3   170B's, so I didn't need the second one.

4        Q.    When did you buy the airplane?

5        A.    January of 1978.

6        Q.    Next, case of aircraft window cleaner.

7              It says excluded.  Do you know why it

8   says excluded?

9        A.    No, I don't.

10             It's called PRIST.  Real expensive, like

11  $13 a can.  I had a whole case of that.

12       Q.    This is for -- is it specifically designed for

13  an aircraft?

14       A.    Cleaning the windows.  You can actually use

15  the same stuff for cleaning car windows.

16       Q.    It's all-purpose?

17       A.    Mm-hmm.  Good for plastic windows.

18       Q.    How much would this case cost?

19       A.    There was a dozen in there, and it's about $13

20  a can.

21       Q.    So, like, over $150?

22       A.    Yeah.

23       Q.    Twelve times twelve is 144?

24       A.    Yeah.

Joseph Jadczak
October 3, 2006

Page 174

1    Q.    Next we have metal two-drawer file cabinets.

2           Where were these located in the hangar?

3    A.    **Next to my desks.**

4    Q.    Is there anything in these file cabinets?

5    A.    **All those receipts I was telling you about.**

6    Q.    Were you able to lock this drawer?

7    A.    **No, they didn't have locks on them.**

8    Q.    Do you know where you bought it?

9    A.    **I don't recall.**

10   Q.    Next we have nine cases of aircraft oil.

11          It says not covered, excluded.  Do you

12   know why it says that?

13   A.    **No, I don't.**

14   Q.    Aircraft engine oil.  Is that right?

15   A.    **Yes.**

16   Q.    How much would a case of aircraft oil cost?

17   A.    **About $60.**

18   Q.    What brand is it, if you know?

19   A.    **AeroShell.**

20   Q.    I'm sorry, how much did you say a case was?

21   A.    **About $60 a case.  There was different grades;**

22   **30, 40, 50.**

23   Q.    Okay.  The final page on the inventory list,

24   first item says tow bar.

Joseph Jadczak
October 3, 2006

Page 175

1               What's a tow bar, sir?

2        A.    It hooks onto the nose of the airplane.  It's

3    for pushing the airplane in and out, pushing it around.

4        Q.    And it was not connected to the airplane at

5    the time of the fire.  Is that right?

6        A.    No.

7        Q.    How much does this cost?

8        A.    I think with shipping and everything it was

9    about 160, $170.

10       Q.    Then we have a wind sock, eight-foot wind sock

11   with outside durable mast.

12              What's a wind sock, sir?

13       A.    It measures the velocity and direction of the

14   wind.  It's an orange tube-like device, it's cloth,

15   bigger on one end, smaller on the other.  You mount it on

16   your roof on a tripod and it rotates.  You've seen them

17   at airports.

18       Q.    Okay.  Do you use it in connection for your

19   air travel?

20       A.    I use it to depict the direction and the

21   velocity of the wind before I fly.

22       Q.    Can you use it as a marker to see when you are

23   descending and landing?

24       A.    I didn't use it for that.  I mean, you could,

Joseph Jadczak
October 3, 2006

Page 176

1    depending on the placement of it.  You don't want to have

2    it close to the runway, because you need a lot of room

3    around the runway.

4         Q.   Okay.  Next we have fuel testers, strainer,

5    etc.

6                   What are those, sir?

7         A.   It's like a tube where you drain your fuel

8    tanks and check for sediment or water.

9         Q.   Do you have any idea why it says, the value

10   says zero?

11        A.   No, I don't.

12        Q.   And what type of fuel do you test?

13        A.   Fuel in the airplane.  It's 100 octane.

14        Q.   Next we have Piper jumper cables.

15                   Are these for the airplane?

16        A.   Yes.

17        Q.   Piper is a manufacturer of the airplane?

18        A.   Yes.

19        Q.   Can you use these jumper cables for anything

20   else?

21        A.   No.

22        Q.   These are just for an airplane.  Right?

23        A.   Yes.

24        Q.   Do you know why it says the value is zero?

Joseph Jadczak
October 3, 2006

Page 177

1        A.    I do not.

2        Q.    Next is a pair of airplane jacks.

3              And you educated me earlier about jacks.

4   So these are pretty self-explanatory.  These are for the

5   airplane.  Is that right?

6        A.    Yes.

7        Q.    It says quantity two, and it looks like the

8   age of these, it might be a couple years old.  Is that

9   accurate.

10       A.    Yes.

11       Q.    Do you know why the value says zero?

12       A.    I do not.

13       Q.    Next is chocks, C-H-O-C-K-S.

14             What are chocks, sir?

15       A.    Pieces of wood to block the wheels so the

16  airplane doesn't roll.

17       Q.    It says there are 15 of them.

18             Do you need a lot of chocks?

19       A.    No, $15.

20       Q.    Okay.  Because under the quantity it also says

21  15?

22       A.    No, I had two of them.

23       Q.    Two chocks.  Okay.  Pieces of wood?

24       A.    That's all.

Joseph Jadczak
October 3, 2006

Page 178

1      Q.   Then we have three pairs of sunglasses?

2      A.   Mm-hmm.

3      Q.   What kind of sunglasses?

4      A.   Ban Ray.

5      Q.   Ray-Ban?

6      A.   Ray-Ban, thank you.

7      Q.   All three of them were Ray-Ban?

8      A.   Yeah.  I think that's the ones that Sporty

9   carries.  I ordered them all through Sporty's catalogue.

10     Q.   These are yours?  They were yours?

11     A.   Yes.

12     Q.   How much would you say a pair of Ray-Ban

13  sunglasses cost?

14     A.   They can be expensive.  120, 150, in that

15  neighborhood.

16     Q.   These were inside the hangar?

17     A.   Yes.

18     Q.   Any particular reason why they were inside the

19  hangar and not in your car or in the house?

20     A.   Well, they were spares.  I had them in the

21  cabinet.  I had a set in the airplane.  These were just

22  extras in case one of them cracked or something.

23     Q.   Next is a Toshiba laptop, 2005?

24     A.   Yeah.

Joseph Jadczak
October 3, 2006

Page 179

1      Q.    This was about six months old at the time of

2   the loss.  Is that accurate?

3      A.    Yeah.  My kids gave it to me for Christmas.

4      Q.    Why was it inside the hangar?

5      A.    I was using it on my desk.

6      Q.    Did you have Internet capability inside the

7   hangar?

8      A.    Well, I had the telephone hookup, and I could

9   get dial-up, yeah.

10     Q.    Personal or business use?

11     A.    Personal.

12     Q.    Exclusively?

13     A.    Yes.

14     Q.    Did your kids tell you how much they paid for

15  it?

16     A.    No.

17     Q.    Did you find out how much a similar laptop

18  costs?

19     A.    Yes.

20     Q.    How much is that?

21     A.    About 1300, 1200, something like that.

22     Q.    Do you know how many, like, gigabits or

23  anything like that?  Do you know that?

24     A.    (Witness shakes head in the negative.)  I'm

Joseph Jadczak
October 3, 2006

Page 180

```
 1    not that computer literate.  I just use it to check

 2    weather and check fuel prices and e-mails.

 3         Q.   Personal e-mails.  Right?

 4         A.   Yes.

 5         Q.   Next is a desk light?

 6         A.   Mm-hmm.

 7         Q.   Pretty self-explanatory.

 8              It's on one of your desks.  Is that

 9    right?

10         A.   Yes.

11         Q.   Where would you might have bought this desk

12    light, sir?

13         A.   From's Electric in Cherry Hill, New Jersey.

14         Q.   F-R-A-M?

15         A.   F-R-O-M-S.

16         Q.   You have a pretty good memory.

17         A.   I try.  I take fish oil.  They say it works.

18    You have to when you fly.  You have to remember your

19    instructions.  You have to remember a lot of things.  I'm

20    good with numbers.

21         Q.   The last item on the personal property

22    inventory list in connection with this insurance claim is

23    a cordless phone.

24              Do you know who made this phone?
```

Joseph Jadczak
October 3, 2006

Page 181

1      A.    I can picture it.  Panasonic.

2      Q.    It's a Panasonic phone?

3      A.    Yes.

4      Q.    How old was this phone?

5      A.    I bought it four years, five years ago.

6      Q.    And it was in use or operational at the time

7  of the fire?

8      A.    Yes.

9      Q.    Why was it in the hangar?

10     A.    I'd use it for calling weather or for personal

11  use.

12     Q.    Would you charge it in the hangar?

13     A.    It stayed plugged in with the charger.

14     Q.    In the hangar?

15     A.    In the hangar, yeah.

16     Q.    You paid a monthly bill on it?

17     A.    It was included with my house bill.

18     Q.    What do you mean by that?

19     A.    It was the same phone number as the house.

20     Q.    Okay.  So it's a cordless unit, but it's your

21  land line?

22     A.    Yes.

23     Q.    Okay.  Thank you.

24            And where would you buy this cordless

Joseph Jadczak
October 3, 2006

Page 182

 1   phone?

 2        A.    Wal-Mart.

 3        Q.    Okay.  And it looks like the total for value,

 4   there is a couple totals here.  $39,025.94, and then per

 5   the -- that's the unit cost.  And then the RCV,

 6   replacement cost value, 45,646.89.  Then we have a couple

 7   other numbers.  14,196.68 for, looks like depreciation

 8   amount.  And then ACV, which presumably means actual cash

 9   value, $31,450.22

10               And you testified earlier, Mr. Jadczak,

11   that some of these numbers may be higher or lower based

12   on, you know, what the actual prices may be.  Is that

13   accurate?

14        A.    Yes.  I wrote down what I perceived to be the

15   right prices, gave them to the adjuster, and he made up

16   this sheet and gave them back to me.

17        Q.    So, to the best of your ability, you submitted

18   prices and values which you thought were --

19        A.    Accurate.

20        Q.    -- as accurate as could be?

21        A.    Yes.

22               MR. SMYTHE:  With that, I think I am

23   done with my questioning for you today, sir.

24               I appreciate your time and your honesty

Joseph Jadczak
October 3, 2006

Page 183

1    and your candor today.

2                    We have a number of exhibits, totaling

3    15 exhibits, that have been entered in connection with

4    this examination under oath.  And at this time it will

5    conclude the examination under oath of Mr. Joseph

6    Jadczak, Jr. that is claim No. 1038220, policy No.

7    30318013.

8                    Thank you for your time, sir.

9                    MR. SENSOR:  And we will read and sign.

10   Thanks.

11                   (Statement concluded at 6:10 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

Joseph Jadczak
October 3, 2006

Page 184

```
 1              I N D E X

 2
     WITNESS:  JOSEPH W. JADCZAK, JR.              PAGE
 3
         Examination by Mr. Smythe                   2
 4

 5             E X H I B I T S

 6   JADCZAK EXHIBITS                            MARKED

 7   1  Deed                                        7

 8   2  Document from Town Communications dated     26
        6/19/06
 9

     3  Seventeen pages of color photocopies        27
10      of photographs

11   4  Eight pages of photocopies of photographs   28

12   5  Professional Landscape Installation Bid,    30
        dated 6/16/06
13

     6  Proposal from EH Custom Homes, L.L.C.,      32
14      dated 6/27/06

15   7  Photocopy of driver's license of Joseph     32
        Jadczak
16

     8  Letter from Mellon Bank regarding loan      33
17      payoff

18   9  Purchase agreement dated 6/25/93 for 1994   34
        Ford Cobra RV
19

     10 Repair invoice from Tom's Motor Sales       36
20

     11 Handwritten document dated 6/3/06 on        40
21      stationery of Delaware Camping Center

22   12 Invoice from Tom's Motor Sales, dated       41
        7/15/05
23

24
```

Joseph Jadczak
October 3, 2006

Page 185

| | | | MARKED |
|---|---|---|---|
| 1 | | JADCZAK EXHIBITS | |
| 2 | 13 | Letter to Marie Loffrado from Joe Jadczak | 42 |
| 3 | 14 | Photocopy of newspaper article in | 63 |
| | | The News Journal | |
| 4 | | | |
| | 15 | Four-page property inventory | 92 |
| 5 | | | |
| 6 | | | |
| 7 | | CERTIFICATE OF REPORTER | PAGE 186 |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Page 186

```
1                    C E R T I F I C A T E

2  STATE OF DELAWARE:

3  NEW CASTLE COUNTY:

4      I, Debra A. Donnelly, the officer before whom the
   foregoing statement under oath was taken, do hereby
5  certify that the witness whose testimony appears in the
   foregoing transcript was duly sworn by me before the
6  commencement of the statement under oath; that the
   testimony of said witness was taken by me, in Wilmington,
7  Delaware, on October 3, 2006, to the best of my ability
   and thereafter reduced to typewriting under my direction;
8  that the said witness requested the opportunity to review
   the transcript, and that I am neither counsel for,
9  related to, nor employed by any of the parties of the
   action in which this statement under oath was taken, and
10 further that I am not a relative or employee of any
   attorney or counsel employed by the parties thereto, nor
11 financially or otherwise interested in the outcome of the
   action.
12     WITNESS my hand and official seal this  17th day of
   October A.D. 2006.
13

14

15

16

17     DEBRA A. DONNELLY, RPR
       CERTIFICATE #151-PS
18     EXPIRATION:  PERMANENT

19

20

21

22

23

24
```

Joseph Jadczak
October 3, 2006

187

**A**

ability 41:6 51:11
74:17 84:6 92:12
182:17 186:7
able 46:23 47:9,14
62:4 83:3 88:21
91:12 93:23
135:16 136:4
174:6
above 31:22 55:10
78:11 90:1 100:18
151:2
Absolutely 69:13
access 71:12 72:22
151:1
accident 20:20
21:17
accommodate
123:14
according 66:3
108:11,15
account 127:6,7,9
142:6 159:10
accountant 37:22
accumulated 95:9
accumulates 138:24
accurate 28:7 33:21
34:7,10 37:17
52:21 58:11 61:10
62:7 66:2 84:24
89:11 93:7,23
155:3 156:22
160:4 161:6
166:14 177:9
179:2 182:13,19
182:20
accused 22:1
ACDC 74:1
achieve 10:1
acres 16:15 58:11
58:12,13
across 26:22 27:10
52:5 84:19 86:6
97:16 108:7
action 186:9,11
actual 43:1 85:12
89:1 92:3 115:8
182:8,12
actually 9:5 18:19
47:20 57:21 63:13
65:15 66:19 70:18
73:10 83:11 91:11
107:13 110:7
111:2 120:13
137:3 140:3
150:22 152:11

154:22 157:16
173:14
ACV 182:8
Adam 171:16
adapt 119:1
add 35:21
added 122:4
additional 53:23
address 14:14
adds 140:21
Adjacent 14:11
adjuster 44:9,16
69:9 182:15
Adjusters 43:5,6
adjuster's 44:10
Adjusting 43:21
94:1
adrenaline 47:8
advise 43:23
aerial 98:19,20,24
156:1
AeroShell 174:19
affect 78:3
affected 31:20 78:18
affirmative 2:19
afghans 129:6,9
afraid 77:24 78:2
after 10:13 12:1
17:10 24:1 26:17
43:7 44:2 45:5
49:19 61:18 66:1
67:11 81:23 83:14
85:4 88:2,22 90:6
90:13 109:11
110:7 135:15
142:19
afternoon 69:20
again 15:16 27:15
41:11 76:6 78:4
101:11 108:7
111:3 117:6,11
121:6 135:11
147:18 167:10
171:1
against 2:8 25:6
33:8 64:24
age 101:7 105:9
117:17 177:8
agency 25:5
ago 20:13 21:18
33:11 64:20 98:6
116:14 127:22
129:14,15 143:9,9
159:15 161:10
181:5
agreement 33:18

184:18
ahead 63:20 67:10
160:24
AIG 20:2,7 21:3,4
AIG/Homesite 89:4
air 51:21,22,24
54:18,21,22
129:18 138:18,23
142:15 156:7
157:11 175:19
aircraft 172:5,15
173:6,13 174:10
174:14,16
airplane 9:14 16:24
18:17 19:1 28:3
45:17 46:3,4,10
46:14,20,23 47:2
47:4,17 48:7,10
48:22 51:20 52:1
52:2 55:4 60:10
62:9 71:8 73:3
83:1,7 108:10
138:21 154:19,23
172:18 173:1,2,4
175:2,3,4 176:13
176:15,17,22
177:2,5,16 178:21
airplanes 46:17
49:9 54:23
airport 9:2 156:8
157:16
airports 175:17
Ajax 133:14
alarm 132:1,4
alleged 80:14
allegedly 42:2,24
83:4
allow 128:10 141:14
allowed 10:10
all-purpose 107:23
173:16
almost 5:23 34:17
along 62:17 87:1
119:24
already 46:19 47:16
83:18 106:14
112:24 151:9
158:9
always 20:7 28:22
59:7 112:18
122:16
amenities 101:3
amount 34:9 50:13
56:2 154:10 160:4
167:3 182:8
amp 68:24

AM/FM 127:14
Anderson 165:16,18
and/or 55:15,18
93:1,11
angle 54:6
annual 18:22
annualize 19:11,12
another 35:2 41:1
64:16 89:17 96:19
97:16 118:24
138:6 157:15
answer 2:15,18 23:8
23:10 92:13
105:23
antenna 132:12
antennas 165:20
anybody 71:2,2
73:10
anymore 109:10
161:20
anyone 58:8 71:11
72:21 73:13 81:7
89:4
anything 43:19 44:6
60:11 66:24 67:1
67:1 68:5 69:14
73:16 75:1,13
82:12 104:3
110:18 118:6
120:16 156:9
169:6,14,22,23
172:14 174:4
176:19 179:23
Anywhere 116:11
apart 79:4
apiece 140:22
apologize 59:4
83:18 106:14
appear 28:3 42:1
APPEARANCES
1:14
appears 33:18 39:3
186:5
Apple 127:20
application 139:8
applied 21:22
appraisal 40:8
appraised 134:5
appreciate 182:24
approaches 156:10
approaching 131:15
approximately 9:21
17:16 18:8 21:18
66:1 169:18
apron 54:8,10 146:2
area 66:9 119:14

141:1
arising 2:8 19:21
around 9:20 17:8
22:8 23:1 29:11
54:11 60:11 66:9
73:8 78:18,19
84:18 87:14,18
126:15 127:1
148:7 150:10
158:3 164:3 175:3
176:3
arrived 63:7 66:1
92:10
article 63:14,15
185:3
artist 115:24
ash 82:11
ashes 110:12
asked 25:22 40:5
83:18 106:14
109:1 167:11
asking 23:8,10
74:18 91:9 99:18
108:19 116:1
asphalt 54:1,3 80:12
81:18,21,24
assembled 150:22
assortment 144:23
144:24
assuming 135:13
Atlantic 146:4,5,6
atlas 100:11,15
attach 118:12,14
131:19
attached 78:12
109:13 151:11,13
attic 55:9,13,19
150:19 151:1,2,3
151:5,8,16
attorney 186:10
authentic 134:2
auto 20:10 21:2,4,17
36:17 37:1,5,6,16
37:20 38:1,4,12
39:5,9,15,18
41:11 136:3
automotive 154:23
Avenue 1:20 117:16
average 104:1
Aviation 8:20,24
49:2,5
await 40:14
aware 49:13 134:1
164:3
awhile 115:23
awnings 124:6

Joseph Jadczak
October 3, 2006

188

**A.D** 186:12
**a.m** 59:5,8 63:4

_____

**B**

**B** 37:3 184:5
**back** 17:24 52:3,4
  52:24 53:4,20
  54:2 60:2,6 62:19
  63:20 65:21 74:4
  75:13 76:3,11
  80:21,21 81:1
  87:14,15,16 89:14
  89:15,16 90:1
  96:14 108:9
  117:13 118:18
  133:3 135:23
  136:24 146:1
  160:1 182:16
**background** 171:15
**backup** 150:12
**bags** 77:20
**balance** 5:10,15,16
  64:21 138:7
**balances** 17:17
**ball** 119:1,3
**Ban** 178:4
**band** 125:6,24
  126:11,21,24
  160:18 161:12,14
  165:19,24 166:1,2
  166:3 170:8 171:1
  171:4,6,8,10,22
  171:23,24 172:1
**bands** 171:21
**Bank** 32:22 184:16
**bankruptcy** 24:22
  25:2
**banquets** 162:8
**bar** 174:24 175:1
**Barbara** 114:14
**barbecuing** 139:19
**based** 82:15 93:4
  106:10 182:11
**basement** 109:3
**basically** 70:2
  114:22 167:1
**basing** 75:7
**basis** 15:16,23 18:1
  48:2 153:1
**bathroom** 35:11,15
  35:17 57:8
**Batman** 171:12,16
**battery** 67:13 73:18
  73:22 76:10
  109:16 142:24
  143:13

**beach** 66:11,13,15
  116:20 123:6
  153:7 165:17
**become** 19:24
**bed** 74:4,6,8,11
  76:12 117:13
  121:15,16,16,20
**bedding** 121:10
**bedrooms** 165:14
**beds** 121:14
**Bee** 114:20
**before** 1:11 2:12
  5:16 20:8 23:8
  24:23 25:2 28:4
  55:2 63:7 66:18
  66:21,24 67:4
  68:15 69:21 70:9
  71:4,5,9 73:9 83:1
  85:1,5 92:17 93:6
  93:21 95:14,16
  98:13 101:22,23
  106:19,22 112:22
  112:24 116:2
  117:1 122:3,8
  171:20 175:21
  186:4,5
**begin** 2:12 3:9 94:11
**beginning** 1:10
**behind** 6:2 25:4,10
  51:19 53:23 54:8
  54:10 76:6 80:22
  83:5
**being** 6:8 64:19
  104:7 138:18
**believe** 20:3 22:18
  28:16 31:24 38:8
  149:10 160:15
  167:12
**belt** 132:19
**bench** 107:14,15
**Benny's** 161:4
**besides** 5:3 6:6 7:2
  15:4 46:13 71:11
  73:10,13 89:4
  113:2 172:2,14
**best** 2:17 17:7 35:24
  41:6 45:6 51:11
  74:17 78:14 83:15
  84:5 86:23 88:17
  92:11,14 94:7
  95:13 112:21
  115:17 147:3
  182:17 186:7
**Bethany** 66:15
**better** 136:24
  168:21

**Betty** 27:9,12
**between** 19:15 59:5
  115:18
**beverages** 168:23
**Bid** 184:12
**bifold** 60:10,21 61:1
  61:21 91:12
**big** 73:4 91:1 125:3
  145:8 157:2 158:7
  160:13 163:13,17
**bigger** 87:2 119:10
  132:19,24 175:15
**bill** 29:18 39:3,13
  50:14 181:16,17
**bills** 15:22
**binoculars** 128:15
**birth** 3:15
**bit** 8:6 11:9 45:17
  56:4 110:17
  114:24 154:22,22
  154:23 172:4
**bits** 143:4 147:8
**black** 26:9 81:18,19
**blacktop** 53:20,23
  54:10 80:22
**blame** 62:20
**block** 177:15
**blue** 158:20
**board** 144:6
**boat** 47:21 119:3
  128:18,18
**body** 59:7
**bolts** 110:18
**book** 40:10,11
  100:13,14 101:1
  105:20,21,24
  106:1
**books** 157:2
**boom** 157:22 160:23
  161:1
**boots** 102:11
**born** 72:16
**borrowed** 34:12
  64:23
**both** 60:15 87:21
  97:20 100:14
  106:10 140:12
  152:16 154:22
  170:19
**bother** 135:12
**bottle** 112:16
  130:10,16 131:6
**bottom** 109:4
  134:15
**box** 60:12 119:8
  128:9 132:9

138:14 140:19
  143:12
**boxes** 149:20,22
  165:6
**Boy** 110:4
**boys** 65:18 144:9
**brake** 47:7
**brand** 98:2 102:14
  103:19 110:21
  120:24 144:11,22
  147:19 150:14
  157:9 174:18
**break** 64:4
**breakers** 73:21
**breakfast** 58:24
  59:11,12
**brick** 79:16,16
**Bridgeport** 112:1
**Brief** 64:5 72:18
  92:16 136:9
**briefly** 25:15 42:5
**bring** 19:8
**broken** 5:21 31:17
**brother** 133:24
  167:17
**brought** 7:14
  119:24 149:9
  163:23
**bruises** 20:23
**brushers** 133:9
**bubble** 145:9
**buckled** 82:9
**bucks** 104:1
**buff** 72:12
**builder** 164:23
**building** 56:17
  151:14 165:5
**built** 51:4,7,23
  164:23 165:2
**built-in** 73:20
**bulbs** 147:12 152:1
  154:17 158:5,7
**bulb's** 152:4
**bump** 120:18
**bumper** 82:8
**bumps** 20:23
**bunch** 51:23 68:8
  77:19 112:16
  133:16 149:20
**bureau** 22:5
**Burlington** 9:2
**burn** 87:19
**burned** 82:9,11 84:8
  86:9 113:6
**burning** 86:21
**burnt** 90:16 126:2

**bus** 109:6
**bushes** 84:9 85:10
  87:2
**business** 7:3,4,5,6
  7:12 11:17 12:8
  12:10 14:14,17,19
  17:1 23:20 31:3
  36:18 37:17,18
  38:5,22 48:22
  50:15,16 90:13
  137:17 143:20,24
  163:2 165:24
  166:1 168:18
  179:10
**businesses** 15:6,9
  37:13
**businessmen** 15:3
**businesswise** 15:24
**buster** 130:7
**busy** 98:14
**button** 60:10,19,22
  61:5,11 71:23
  131:16
**buy** 102:6,12 103:13
  106:16 115:23
  116:6,13 119:11
  123:16 125:17
  127:3,21 128:1,16
  131:18 133:5
  136:1 137:9,21
  139:24 141:6,23
  142:16 143:2
  144:8 152:13
  157:13 159:8,14
  161:3 162:24
  163:7 165:15
  168:2,16 170:18
  172:24 173:4
  181:24
**buyers** 127:12
**buying** 115:21
  116:3
**buys** 102:8,9

_____

**C**

**C** 3:22 186:1,1
**cabinet** 93:14
  100:19 126:4,7
  154:14,16,24
  155:10 157:5
  164:8,18 178:21
**cabinets** 124:4
  126:10 157:5
  168:7 174:1,4
**cable** 16:6 56:11,22
  57:20 68:19 69:2

Joseph Jadczak
October 3, 2006

189

69:11,15,19,23
70:3,6,22 107:11
109:11
cables 107:16,20
108:4,10 117:22
118:3,4,5 133:6
143:12 176:14,19
Calafano 26:19
27:12 77:7
calendars 148:10
call 15:14 77:13
83:23 109:3
127:11 133:7
166:1
called 20:18 25:22
73:23 74:2 77:10
99:2 133:5 136:2
139:5 161:4 171:8
171:10 173:10
calling 66:4 181:10
camcorder 116:12
117:3
came 11:24 60:5
71:7 84:19 98:5
103:21 105:3
111:22 119:24
121:3 132:23
135:16 145:20
147:9,10 154:3,9
157:3 163:8
camera 116:22
117:8,9,15
camp 36:22
camper 40:4,6
124:16 130:14
campground 109:22
118:15 126:16
campgrounds 101:2
126:9
camping 39:22 40:3
100:22 105:14,18
106:1,8 109:21
111:8,19,22,23
124:11,12,18,21
125:17 127:9,19
128:24 129:23
184:21
candor 183:1
canvass 159:1
capability 179:6
capacity 13:22
23:20,21 130:19
car 16:24 17:4,6
20:11,13,24 34:17
40:6 47:6 51:9
71:24 72:1,4,12

100:5 118:19
119:1,4 130:15
132:11 133:3
135:19,23,24
144:10,12,13,15
149:24 150:4,7
173:15 178:19
card 25:5 39:8,11
44:13 127:6,9
138:2,4,9 142:8
142:14
cards 17:12,14,18
138:6
care 16:10 35:13
Carlo 72:14
Carolina 116:20
CarQuest 144:9
carrier 136:20
137:9
carries 178:9
carry 109:5 113:16
cars 13:23 18:24
55:6 72:2,5,13,24
143:15 147:12,17
150:11
cartridges 167:18
case 22:6 24:10
118:16 119:24
132:18,24 155:16
157:2,4 158:13,16
158:24 163:18
173:6,11,18
174:16,20,21
178:22
cases 158:2,18,21,22
174:10
cash 142:10,11,14
161:9 182:8
cassette 114:7,8
115:4,20,23 116:3
116:6,9
CASTLE 186:3
Castor 117:16
catalogue 112:2
124:20 178:9
catch 115:23
categorized 108:11
108:15
Catherine 1:1 3:22
4:2 28:12,14,21
caught 84:9,10,21
caulk 150:8
cause 75:1
caused 29:9 74:19
cave 83:11,15
caved 82:7

CD 115:1,4 116:7
CD's 115:22
ceiling 62:16 152:3
cell 16:7,8 50:10,14
132:6,9
Cellular 132:16
cement 54:8,10
center 36:22 39:22
40:3 96:16 163:2
184:21
certificate 48:8
185:7 186:17
certify 186:5
Chad 44:11
chair 100:18 130:9
163:10
chairs 95:3 105:10
105:15 106:16
162:15 163:5,7
chance 28:22 44:3
Chancellor 44:11
change 17:10 18:21
19:5 158:6
changed 156:7
Changing 152:1
channel 98:13
144:18
characterize 35:14
charge 17:15 181:12
charged 41:9,10
67:13
charger 73:18 76:10
181:13
charges 73:22
charging 49:21,24
charts 99:6 155:16
155:23 156:10,14
156:22,24
chassis 115:12
cheap 124:8
check 57:4 67:7,19
70:2 98:12 138:11
142:14 176:8
180:1,2
checked 18:22 44:7
67:14
Cherry 180:13
children 4:4
children's 4:6
chisel 144:17
chocks 177:13,14,18
177:23
Christmas 179:3
chrome 159:4
chronology 58:15
cigarette 109:16

129:21 130:4,5
cinder 60:12
Cintioli's 161:4
170:19
circuit 73:21
circulate 138:18,22
circulating 119:6
Citi 5:9
City 171:11,18
claim 1:1,4 2:7,8 3:5
19:21 20:8,10,10
20:16 21:7 26:1
42:8 43:11,21
45:24 46:9 79:7
89:3 92:7 180:22
183:6
claims 21:14
Clair 1:20
Clark 157:8,9
classic 72:13 134:2
clean 64:16 67:5,10
88:6 133:13
cleaned 160:1
cleaner 102:13,15
102:19 129:24
173:6
cleaners 130:3
133:9
cleaning 67:16,17
67:19 88:4 98:14
164:12 173:14,15
clear 2:21 92:3
99:20 110:6
clearer 23:9
clip 134:14
clipping 64:2
clock 59:7 103:5,15
clocks 103:10,12,14
close 16:23 61:9
94:10 142:5 176:2
closed 61:14 82:19
93:20
closet 117:13
cloth 175:14
clothes 77:20 101:6
101:8,9,16,18,21
102:6,9,10 153:2
153:7
clothing 101:24
club 127:11
clubs 161:22 162:2
162:8
Cobra 115:10,11
184:18
codes 60:24,24
collection 25:5

114:23
college 168:19
color 26:8 81:19
158:20 184:9
columns 160:13,14
combatant 134:23
134:24
combining 19:8
come 68:8,10 76:12
92:2 97:16 104:17
108:7 109:22
111:13 118:23
119:21 131:15
134:12 150:4
163:5
comes 37:18 53:20
79:24 89:12,13
130:17 148:3,7
comfortable 105:8
coming 51:10 60:1,8
60:16 62:17 84:19
89:8 90:1 145:20
150:4
commencement
186:6
commercial 9:7,13
125:24 165:19,20
166:2
Commission 22:19
23:5
Commissioner's
22:21
common 23:12
communicate
157:20
Communications
25:13,22 125:20
125:22 127:4
166:7,8 167:10,14
184:8
communication/n...
172:11
community 54:22
commuting 48:23
48:24
companies 63:10
65:24
company 1:21 11:12
11:15,21,23 12:9
15:4 22:1 29:5
30:1 37:14,21
38:1,2 44:17 49:7
88:6,11,15,18
91:3 148:13,14
compared 85:5
compartment 128:9

190

compartments
 117:22
compensation
 162:10
compiled 93:4
 106:10
complaint 22:4,7,24
complaints 23:2
complete 5:23
 158:18 159:3
compressor 129:18
 142:15
computer 42:15
 43:10 93:2 180:1
concentrating 83:6
concept 51:24
conclude 183:5
concluded 183:11
concrete 139:6,7
condition 3:1 110:9
 122:13 152:22
 159:16
conduct 2:11
conduit 90:2
confirm 33:21
confused 39:2
connect 76:15
 126:20 128:11
connected 35:18
 54:15 57:14 68:5
 89:18 91:20
 146:12 149:3
 175:4
connection 7:12
 24:2 36:18 41:15
 42:8 43:11,21
 73:19 81:8 89:3
 94:2 100:4 126:13
 170:8 171:1
 175:18 180:22
 183:3
connects 89:10
 136:24
Connie 114:20
consider 37:16
 161:18
considerable 56:2
consideration 40:16
consists 32:24
console 163:11,13
constantly 28:24
construct 4:22
constructed 4:23
 81:24
construction 4:16
 4:19 30:15 88:13

consulted 81:8
contacted 167:10
containers 76:2
Containing 158:14
contains 166:20
contents 26:1 34:18
 42:1,7,11 43:11
 45:24 55:20 75:14
 82:14,15 90:10,18
 92:7,18 99:21
 166:16
contest 2:13
continuous 69:12
continuously 70:22
contract 31:13
contractor 30:13,17
 31:3 80:5 81:7,14
 88:6,8,18
contractors 15:3
control 61:2,3,9
controls 71:16,19,20
 131:23
convenient 142:5
conversations 43:20
converted 121:15
converter 73:20,24
 74:2 76:13,15,19
 90:3,5,6 128:10
convertible 149:12
copies 26:8
copy 7:15 8:3 32:17
 63:14,18 64:1
CORBETT 1:23
cord 76:14
cordless 180:23
 181:20,24
cords 118:7
corner 53:8 85:11
corners 79:1
corporation 14:23
correct 7:15 12:14
 13:17 19:22 26:1
 29:24 31:5 33:5
 34:8,19 37:5
 41:14,16 53:5
 85:18 89:6 134:16
 156:1
cost 18:4 25:18,23
 34:14,15 99:7,17
 100:2 103:24
 104:1 105:1 110:3
 112:14 116:9
 128:20 136:16
 173:18 174:16
 175:7 178:13
 182:5,6

costs 118:21 179:18
couch 121:15,22
 130:8
couches 94:24
counsel 186:8,10
counter 35:16
countertop 35:12
counting 34:17
 51:14
County 9:2 186:3
couple 19:2,3,20
 35:22 50:18 76:23
 95:5 114:12
 140:19 155:4
 156:6 177:8 182:4
 182:6
course 40:9
court 2:20 25:6
covered 172:6
 174:11
cracked 178:22
cradle 133:6
Craftsman 110:23
 144:23 145:1,15
 147:19,21
crashing 62:18
cream 112:17
creams 113:4
created 93:4
creating 94:2
credentials 11:3
credit 17:12,14 25:5
 127:6,9 138:4
 142:6,14 159:10
credits 11:3,5
creeper 144:4
Crest 4:10 5:5 6:6,7
 6:8 7:2 8:4 16:14
 20:6 45:19 50:20
 53:17,19
crib 58:5
crowd 76:24
crushed 84:8,11
 86:9
crystal 120:15
currently 4:9 7:1
 11:11 15:10 17:17
 52:22
Custom 30:18 31:1
 81:14 88:9 184:13
customer 39:5
cut 146:23 171:11
cutting 16:10
cymbals 159:3
C-A-L-A-F-A-N-O
 26:19

C-H-O-C-K-S
 177:13
C-I-T-I 5:9

_____ D _____

D 184:1
dad 132:23
daily 18:1 48:2
 153:1
damage 29:10 46:9
 46:14,19 74:14
 78:8,10,11,15
 79:7,19,21 80:7
 80:10,11,14,14,16
 84:6 86:13,14,15
 86:24 87:21 92:19
damaged 42:24
 43:16 55:15,18
 75:16 83:4 93:1
damages 29:8 79:9
 80:18 82:5 83:23
 84:1 86:12
dangerous 45:2
dark 45:12
date 1:5 2:6,9 3:15
 5:11 27:15 33:7
 58:15 65:21 81:5
 91:19
dated 41:3 184:8,12
 184:14,18,20,22
dates 64:23
daughter 128:6
daughter's 28:23
 58:5
Dave 157:8,9
day 27:18 42:3,24
 45:13 55:2 58:17
 59:9 63:2 66:5,18
 66:21,24 67:4
 68:15 69:20 74:16
 76:22 77:1,4
 91:14 92:20
 101:23 153:5
 186:12
days 67:24 116:10
DE 1:17
dealer 125:18,19
 136:4,18 152:15
Debra 1:11 186:4,17
debris 84:12 88:5,18
December 6:24
decentralized 13:8
Deck 138:19 139:5
 150:12
declared 24:22 25:1
deed 7:15,20 8:4

52:14 184:7
deer 109:17
defendant 23:17,23
 24:20
degree 156:8
Delaware 1:9,24
 4:10 6:9 8:20,24
 13:9 21:19 22:5
 22:16,18 23:3
 39:22 40:3 49:2,4
 49:5 100:8 114:2
 165:16 184:21
 186:2,7
Delran 6:12,15,16
Delray 6:14 49:3
demolition 88:6,10
 88:14,17 90:15
 91:3
denial 3:5
denied 21:23
Denise 4:7,8
department 22:16
 22:18 44:23 63:7
 76:21 77:11 84:13
 86:18 87:12,24
 88:3 113:15,24
departments 65:23
 76:22
depend 18:18
depending 176:1
depict 175:20
Deposition 7:24
 26:5 27:23 28:19
 30:21 32:14,18
 33:14 34:23 36:10
 40:22 41:21 42:19
 63:23 92:21
Depot 106:6 144:9
depreciation 182:7
descending 175:23
describe 78:10
 80:10 82:4 83:22
 84:5 118:4 124:14
 130:12 132:7
 133:11,21 135:21
 136:22 150:9
 158:19 160:12
 164:10 165:22
described 80:8
description 45:18
 45:19 52:21
designed 173:12
desk 96:4,7,12,17
 97:12,14 98:1
 162:23 172:19
 179:5 180:5,11

Joseph Jadczak
October 3, 2006

191

desks 95:3 96:8
  162:15,16,19,21
  162:22 163:5
  174:3 180:8
destroyed 43:17
  55:15,19 75:15
  82:6 91:2 93:1,16
  135:9 169:9
detail 59:4
detergents 164:13
develop 2:21
device 175:14
Dewalt 142:23
dial 169:10
dial-up 179:9
Diamond 114:14
Diane 27:2,12 50:3
died 24:1 129:14
diesel 115:13,14,15
difference 38:23
different 14:3 25:19
  65:10 88:12 119:1
  119:3 121:3 122:6
  126:9 156:5
  157:17 171:21,23
  174:21
difficult 78:5
dinette 121:16,20
direction 175:13,20
  186:7
directly 84:23
directories 100:20
directory 100:22,23
dirty 153:7
disassembled 154:3
discolored 87:22
disconnect 92:2
discount 127:13
discuss 45:24
discussing 76:11
dishes 119:13,13,16
  119:21 120:5
  121:24
disposed 90:20
distance 76:7,8
distribution 89:8
Doctor's 163:2
document 25:12,14
  25:15,21 29:3
  30:24 31:9,10,12
  32:22,23,24 33:23
  35:2,3 39:21 40:1
  40:2 41:2,4,6,12
  42:12 52:20 166:4
  166:8 167:11
  184:8,20

documentation
  167:15
documents 29:6
  32:21 42:1,4,17
  77:20 93:11 170:3
doing 31:3 60:2
  98:10
dollars 19:2,3 124:8
dolly 34:17 40:6
  118:19 119:2,4
  135:19,22 149:16
  149:22 151:19,21
  151:22
done 13:10 18:22
  30:16 35:5,7 40:4
  40:15 41:7 59:20
  182:23
Donnelly 1:11 186:4
  186:17
door 54:9,13 60:10
  60:19,21 61:1,2
  61:21,22,24 62:5
  62:6 73:5,6 82:7,9
  83:8 91:12 104:14
  131:10 145:21,22
  146:1 151:1
doors 49:13 60:23
  61:9 78:17,21,24
  80:2 109:4 131:21
  131:22,24 155:15
double 43:18 155:15
  159:4
Doubtfire 95:7
Dover 114:2,6
  152:14
down 26:24 59:15
  68:8,10 78:6
  83:12 87:22 90:1
  94:6 97:19 102:7
  102:22 104:20
  106:5,9 116:22
  121:16,24 122:18
  124:23 125:13
  135:8 137:1,23
  139:9 140:1
  141:13 146:20,22
  148:3 149:9,15
  150:4,5 151:1
  155:2 160:1 163:4
  182:14
dozen 158:16
  173:19
drag 66:10
drain 176:7
drawer 174:6
drawers 162:23,23

drawing 52:21
  53:15
dressed 59:15,21
drill 142:23 143:4
  147:8
Drills 110:17
drinking 120:11
drive 45:20 50:21
  135:23 145:12
driven 86:16
drivers 110:18
driver's 32:17
  184:15
driveway 30:8,12
  51:10 52:8 53:15
  53:18,18,19 54:1
  54:3 80:7,14,16
  80:16,19 81:9,9
  81:15,18,21,24
  89:13,17 145:20
driving 51:9 114:9
drop 89:7,9,22,23
dropped 90:2
  121:16
drops 137:1
drove 87:12
drum 158:19 160:19
  160:21 161:24
  162:4
drums 10:21 158:18
  158:23 159:6,8
  160:5 172:3
dry 138:23 139:13
dryer 56:5,12 70:15
  152:7,9 153:10,13
  164:11,14
drying 123:5
Dryvit 79:17
dual 73:21
duly 186:5
dumping 57:17
Dumpster 91:1,3,4
duplicated 106:7
Duprees 114:19
durability 139:16
durable 120:18
  175:11
during 18:2 42:3
  70:21 170:11
Duron 150:15,16,17
dust 130:7
duwop 114:17
DVD 95:17
dwelling 51:7 56:17
  79:9,13 81:23
  87:5

D-E-L-R-A-N 6:18
_____
E
E 184:1,5 186:1,1
each 10:2 71:24
  72:1 78:5 92:8
  124:21 126:16
  130:11 149:3
  158:12 162:23
Eagle 43:5,6,20 69:9
  94:1
Eagles 4:10 5:5 6:6
  6:7,8 7:2 8:4
  16:14 20:5 45:19
  50:20 53:17,19
earlier 25:9 28:12
  28:15 29:4 31:17
  38:7 50:4 54:18
  64:7 65:15 68:16
  70:17 71:15 72:20
  72:21 80:8 88:24
  93:19 108:24
  126:1 135:20
  162:17 166:6
  177:3 182:10
early 38:3 45:11
  120:9
easement 53:10
east 87:6 99:9
  145:24
edge 146:23
educated 177:3
educational 8:6
effectively 3:4
EH 30:18 31:1
  81:14,15 88:8,9
  88:10,18 184:13
eight 85:14 119:18
  119:19,23 120:3
  120:12,14 123:15
  123:16,22 125:5
  160:16 184:11
eight-foot 175:10
eight-foots 149:1
EIN 37:19 38:7,9
either 40:14 43:16
  106:6 142:14
  146:5,5,19
electric 16:5 56:11
  57:19 68:19 69:2
  69:10,15,19,23
  70:6 73:18 76:10
  76:14 118:3,4
  130:5 180:13
electrical 74:20,21
  75:5,12 89:8,14

91:7
electricity 56:7 68:1
  69:24 91:10,16
  107:8 118:5
electronics 160:21
element 79:6
elevated 148:20
emissions 13:24
  14:1
employed 11:11
  37:4 186:9,10
employee 186:10
employees 12:17
employment 11:10
enabled 157:20
enclosed 163:18
encountered 66:2
end 6:1 22:9 61:17
  122:18 146:19
  175:15
ends 54:4,6 55:6
  80:20,21
enemy 134:23,24
engine 49:10,11
  115:14,15 117:21
  147:13 174:14
engines 29:9
enough 15:8 123:14
entail 67:15
enter 45:3 92:18
  145:19
entered 183:3
entertainment
  96:16 121:17,18
entire 81:9
entirely 147:4
entirety 43:15
entities 15:6 37:12
  37:13
entity 37:9,9 90:13
entry 99:12,16
  120:2
epoxy 139:10
equipment 25:16,20
  165:20,23 166:10
  166:11 167:4
  173:2
equipped 56:6
Erin 21:12
ESQUIRE 1:15,19
estate 24:3,4,8,11
  24:12,16
Estee 112:6 113:3
  113:16
estimate 5:11 16:3
  29:18,19,22 30:7

Joseph Jadczak
October 3, 2006

192

30:11,13 35:24
40:5,11 47:24
estimation 2:17 17:7
74:18 95:13
111:20
etc 133:10 150:8
176:5
even 44:19 59:6
80:5 108:4 123:16
135:12 139:1
evening 45:11
evenly 52:5
event 2:24
eventually 65:5
ever 6:2 9:22 20:8
21:22 22:1,4 23:2
23:15,17 24:22
25:1,4 76:17
112:4 134:5 142:9
evergreens 85:20
every 17:21 19:4,6
57:4 98:12 99:9
153:4,5,5 155:17
156:3,6 165:13
everybody 77:12
everyone 23:11 66:4
everything 13:24
18:21 29:11 36:3
37:22 44:7 56:8,9
56:10 67:8,9,14
70:2 77:22 82:6
82:11,13,19,20
84:8,14,15,16
88:7 90:19 91:2
91:15 94:5 100:9
100:10 102:8
106:5 108:11
110:11,17 112:18
114:24 122:16
126:6,9 131:19
135:13 141:20
160:7 175:8
Ex 9:9
exact 19:9 33:7
64:23
exactly 4:22 21:17
68:18 77:9 116:8
examination 1:7 2:4
2:6,11 82:23
183:4,5 184:3
examinations 15:18
examined 2:3
exceeds 166:23
Excellent 122:14
159:17
except 132:18

165:13
excluded 46:13
155:18,19 172:7
173:7,8 174:11
Exclusively 179:12
excruciating 59:4
Excuse 99:11
executor 24:13
exercise 60:2
exhibit 7:23,24 8:3
26:4,5 27:22,23
28:17,19 30:19,21
32:12,14,16,18
33:12,14 34:21,23
36:9,10,13 40:18
40:21,22 41:19,21
42:13,17,18,19,22
43:15 52:14 63:22
63:23 92:18,21,24
166:13,21,23
exhibits 82:23
137:14 183:2,3
184:6 185:1
expeditiously 92:15
expense 50:15
expenses 15:15
16:18 17:22 18:16
expensive 103:14
112:15 118:20
173:10 178:14
expert 74:24
EXPIRATION
186:18
explain 36:20 39:7
51:12 145:11
explained 134:10
explanation 41:12
extended 107:15
122:2
extends 79:23
extension 118:5,7
148:23 149:1,6
extensive 92:13
exterior 79:17
150:12
externally 111:9
extinguisher 104:12
104:22 105:1,3,6
extra 133:6,6
147:11 170:24
extras 112:18
158:10,11 178:22
extravagant 104:2
eye 115:24
eyes 82:20 93:20
e-mails 180:2,3

F

F 186:1
FAA 48:9
face 74:6,8
facing 62:15
fact 30:9 46:13
90:24 113:2
fake 124:15
fall 4:16,19 6:23
83:11 138:23
fallen 6:2 25:4,9
falling 84:12
false 2:24
familiar 13:21 83:20
94:14 98:17
Family 59:18
famous 131:2
fan 138:16,22
fans 119:5,6,8
121:24 138:12,12
138:14,17
far 8:6 18:10 27:12
40:12,13 43:6
44:16 60:13 86:10
107:1 169:8
172:22
Farberware 120:23
120:24
FARNEN 1:19
fast 60:12
father 11:24 128:17
129:3
faucets 164:16
fax 167:17,19,22
February 3:16
Fed 9:9
federal 1:9,16 38:11
feel 2:15 45:2 105:8
feet 51:14,15,15,17
53:1 76:9,9 83:17
83:19 85:7,15
125:4,5 140:17
149:7 155:11,12
155:13,15 160:14
169:18,19
fell 82:7,9 83:8
84:13
fellow 134:9,9
fellows 134:11
few 2:12 35:13
107:14
Fields 113:21
Fifteen 159:15
170:21
Fifties 114:18
fifty 76:9

figures 37:22
figuring 151:14
file 20:16,16 22:7
25:6 46:22 48:8
80:14 89:3 174:1
174:4
filed 20:8,12,18 22:4
23:2,15
files 144:18
filing 93:14 126:4,6
126:10
filter 117:20
filters 117:17,21,24
117:24 147:12,14
154:17
final 174:23
financially 186:11
financials 15:14
find 145:22 179:17
finding 106:12
fine 17:3 35:24
finish 23:8 30:14
firearm 134:3,5
first 1:9,16 2:2 4:23
6:23 7:23 27:9
30:16 51:4 58:22
66:1 108:12
132:23 165:2
174:24
fish 180:17
fits 132:8
five 33:11 63:9
65:18 72:3,4
95:15 101:7 107:9
127:1 143:9
160:14 181:5
Five-and-a-half
81:22
fixed 67:10 81:17
fixtures 164:9,15
flames 60:16
flight 8:17 10:4
18:10 48:5 157:11
flood 157:23 158:2
floodlight 158:7
floodlights 158:9,14
floor 62:2 83:7
119:10 130:16
138:14,19,19,23
139:3,14 144:6,12
144:13 150:12
163:13
flooring 165:6,7,8
165:15,16,18
floors 165:13
Floro 144:10,11

flowers 29:11
fly 9:8,13 18:1,20
48:2,18,20 49:19
98:13 144:2
175:21 180:18
flying 8:16 17:24
99:3,4,5 154:18
FM 166:3
foam 29:10,13,14,15
87:22,24 105:7
fog 9:9
Fogel's 168:17
fold-up 105:15
following 15:20
follows 2:3
food 168:22
foot 74:11 76:11
79:23
Ford 115:12 184:18
foregoing 186:4,5
forgot 50:10 64:7
108:6
forth 17:24 101:3
109:23 133:3
Forty 76:9 83:16
forward 62:15
found 67:21 106:2,8
four 12:16 26:24
58:10 85:9 98:6
106:18,18,18
116:14 125:1
143:9 157:2,24
158:2,14 161:15
170:15,16 171:7,8
181:5
fourth 99:16
four-and-a-half
58:11
Four-page 185:4
Four-slicer 104:4
frame 79:17 82:10
Francis 114:20
fraud 22:2
fraudulent 3:2
free 2:15
frequency 125:15
126:23 156:8
Friday 4:8
friend 120:1
friends 73:16 120:1
From's 180:13
front 35:3 39:21
41:1 52:5 87:1,8
87:19 96:15
100:18 105:22
121:7 128:9

Joseph Jadczak
October 3, 2006

193

145:20 169:10
fuel 17:24 117:17,19
    117:20,21,24
    176:4,7,12,13
    180:2
fuels 75:13
full 3:10 57:21
    94:10 139:18
    140:6,9
full-blown 63:15
fun 68:13
furniture 163:17
further 8:15 186:10
fussy 122:16
future 65:7 99:21
F-R-A-M 180:14
F-R-O-M-S 180:15

_____
            **G**
_____

garage 13:14 31:22
    32:1,6,9 51:14
    53:2 54:15 78:11
    78:17,21,24 79:21
    79:22,23 80:1
    89:11,14,15,16
    131:10 134:12
    148:4
garages 13:10
garden 75:22
    140:17
gas 140:10
gasoline 75:15,17,19
    75:23 106:24
gather 76:24
gave 29:4 41:13
    129:3,11 133:22
    173:2 179:3
    182:15,16
Gees 114:20
general 15:2 92:8
    94:3 107:19,19
    156:19
generally 61:17
    64:18 101:24
    110:2 112:13
    115:20 117:3
generator 75:19
    107:2,3,5,7
    117:19,20
Gentleman 95:6
geographic 45:18
gets 59:7 139:4
getting 45:12 59:20
    112:20
Ghost 95:7
giant 101:1

gift 129:11
gigabits 179:22
gigs 162:7 170:11
girl 21:11
give 2:16,24 3:3
    16:3 19:9 30:7,14
    39:23 40:5 74:18
    94:2 105:22
    129:13
given 19:1 25:17
    26:9 98:21 128:17
gives 101:2
glass 145:8
glasses 108:22
    120:11,12,13,15
    121:24
glove 128:9
go 44:21 54:9 63:20
    64:15 65:10,21
    67:6,10 72:17
    84:1,3 88:4 91:10
    94:11 102:7,10,11
    112:20 117:6
    124:21 128:7
    131:16 133:7
    135:4 136:6
    160:24 166:12
goes 47:20 53:21,24
    54:1,14 61:3
    102:2,7
going 19:19 26:11
    27:21 30:14 31:8
    39:23 41:3 45:16
    45:18 51:11 58:4
    62:18 67:5,18,19
    77:21 78:2 92:6,8
    101:11 106:11
    122:1 123:20
    158:17
gone 135:14
good 50:19 95:8
    108:17 150:6
    152:24 173:17
    180:16,20
goodness 62:8
goods 12:13
gosh 85:8 114:20
    129:14 147:11
    159:15
Gotham 171:11,18
gouges 80:12 81:3
grabbed 77:19
grade 8:8
grades 174:21
graduate 8:11
graduated 8:9

grandchildren 65:9
    65:13 67:6
grandkids 28:23
    120:1
grandsons 65:6
Granger's 147:2,5
Granite 14:15
Granoff's 10:17
grass 53:6,22 79:15
    86:12,20 87:13,22
    124:12,16,22
great 23:11 59:15
    59:17,18 66:16
grill 111:5,5,8,16
    139:18,19,20
grind 146:20
grinder 146:16,17
    146:21
Grinding 146:22
grooves 86:14,20
gross 19:7,9 47:3,10
ground 2:12 4:15
    5:21 31:18 90:1
    109:21 139:1
growth 85:2
guess 2:16,17 39:2
    79:3 81:16 110:5
    122:6 134:7
guessing 103:4
    118:22
guitar 10:23
gun 95:7 133:19
guns 134:10
guy 148:7
G-R-A-N-O-F-F-S
    10:17

_____
            **H**
_____

H 184:5
hair 70:15
hammers 110:17
hand 26:11 31:8
    41:3 123:5,6
    149:12,14,17,23
    186:12
handgun 134:13,14
handle 125:24
    149:15
handling 21:11
handset 132:8,14
    133:7
handwriting 33:23
    34:5 39:22 166:24
Handwritten
    184:20
hand-held 126:11

126:20 127:3
    130:6
hand-made 129:6
happen 21:7 33:6
happened 33:10
    44:20
hard 138:19 139:5
    150:12 158:18,21
    158:22 159:1,1
    162:20
hardwood 165:6,7
    165:13
hard-wire 60:21
    61:11
hat 14:9
having 2:2 132:13
    132:15
head 2:20 21:8
    45:22 179:24
headphones 128:13
headset 157:22
headsets 154:17
    157:8,20
heard 46:19 62:17
heat 56:11 61:23
    69:15 78:16 79:4
    80:2 153:22
heavy 66:5 130:18
    169:20
help 50:19 52:11,12
    138:22
helpful 63:14
helping 28:23
helps 104:4
her 20:13,19 22:14
    27:3,9,9 50:4,8
    67:9 78:5 164:12
hey 112:11 141:18
high 8:8,9,11 10:13
    65:1 169:19 172:1
higher 182:11
high-powered
    128:15
Hill 180:13
him 12:1 39:12
    44:12 58:1 77:12
    134:10
hire 71:2
hired 88:10,18
history 8:6 11:10
    19:20
hit 60:9
Hitachi 96:24 97:3,4
hitch 118:17,18,20
    121:24 122:18
    136:24

holds 146:9
holiday 59:6
Holy 171:14,14
home 5:1 6:23,24
    7:15 21:5 28:24
    33:2,3 35:6 41:8
    49:19 51:10 52:1
    52:1,5 54:23 59:1
    79:16 88:21 91:16
    101:10 106:6
    126:18 142:5
    144:9 149:9 165:8
homes 6:5,22 30:18
    31:1 51:23 54:22
    81:14 184:13
Homesite 1:21 3:1
    19:21,24 20:3
    44:17
honestly 38:24
honesty 182:24
hood 82:8
hook 107:9 111:10
    160:19
hooked 68:3 127:19
    161:1
hooks 135:23 175:2
hookup 57:19,19
    179:8
hose 57:18 139:1
    140:17
hoses 84:12 118:9,9
    140:14
hot 82:12
hours 10:2,2,4
    18:19 47:20 48:1
    76:23
house 31:20 33:8
    49:14 51:19 52:8
    54:6 57:14 60:3,4
    64:16,24 77:18,21
    78:1,3 80:21,23
    92:2 98:14 117:5
    131:24 132:4
    149:21 150:10,13
    150:13 153:9,10
    153:14 165:9,10
    165:12 178:19
    181:17,19
Hudson 52:16
humidity 139:2
hundred 19:2 20:4
    124:8 168:11
hurt 158:17
hypothesis 75:11
Hz 125:7 126:12

Joseph Jadczak
October 3, 2006

194

**I**

ID 38:11
idea 75:10 119:16
  176:9
identification 8:1
  26:6 27:24 28:20
  30:22 32:15,19
  33:15 34:24 36:11
  40:23 41:22 42:20
  63:24 92:22
IFR 99:3
II 133:20,23 134:18
III 4:7
imaginary 145:22
imagine 91:13
important 170:3
importantly 3:1
incarnation 171:22
inches 138:15,15
included 165:5
  181:17
including 12:19
income 15:15 19:7,8
incorporated 11:12
  11:15,17 37:14
  41:2 125:16
incur 15:16,22
  17:23 18:16
independent 75:10
  106:11
indicate 53:17
individual 90:12
  100:11,11,15
  166:20
individuals 166:18
industrial 138:16
  162:21
info 13:12
information 3:3
  19:17 34:12 121:7
informed 75:4
initial 75:2
initially 60:14 66:2
inside 56:21 61:11
  61:12 70:18 71:8
  73:10,14 75:21
  91:15 94:18 104:7
  104:15 108:20
  110:15,16 111:2,6
  111:11 112:7
  114:3,7 116:12
  117:3,19 119:13
  124:3 125:8
  127:17 128:22
  129:7 130:1
  131:13 133:15

140:12 145:2
  169:6 172:17
  178:16,18 179:4,6
inspect 13:23 44:3
inspection 12:21,22
  13:3,3,8,14,16
  15:5 18:23 134:12
  148:8
inspector 13:5,6
Installation 184:12
installed 81:24 85:3
  125:12 131:23,24
  151:4
instead 39:13
  130:15 132:18
institution 8:19
instruction 49:8
instructions 94:1
  180:19
instrument 9:6,7
  99:5 156:10
instruments 172:2
instrument/comm...
  9:3
insurance 1:1,21 3:2
  16:24,24 17:1,6
  19:20,22 20:8
  21:14,23 22:1,5
  22:16,19,20 23:5
  42:8 43:11,21
  44:17 64:8 79:7
  88:24 92:7 180:22
insured 19:24
insurer 20:5 21:2
intend 68:7
intended 101:19
intense 139:8
intent 65:7
interact 66:20
intercom 57:11,13
  91:17,21
interest 65:1
interested 186:11
Interesting 135:1
interior 150:13
International
  115:13
Internet 179:6
Interstate 12:13
inventory 92:9,19
  92:24 93:12 94:2
  108:18 141:20
  166:20 174:23
  180:22 185:4
invoice 41:2 137:13
  184:19,22

involved 20:20
  26:16
in-between 80:23
Ipod 127:20
irrigation 16:12,16
  30:6 86:14,15
issue 46:12
item 34:18 79:6 92:8
  95:21 97:9 98:16
  101:6 103:5,16
  109:11 110:14
  126:14 141:21
  143:5 144:4
  166:19 174:24
  180:21
items 42:2,23 43:2
  43:16,23 55:7,8
  55:12,18,23 57:23
  83:3 90:13 92:19
  93:1,3,10,12
  94:11 106:12
  108:18,20 110:7
  113:8 121:23
  122:9,13,17
  135:17 137:19
  141:17 142:3,10
  151:15 167:11,15

**J**

jack 130:14,16,19
  131:2 144:10,12
  144:13,15 150:3
jacking 130:15
jacks 130:11 131:6
  149:24 150:2
  177:2,3
January 47:11
  173:5
Jazz 95:7
Jefferson 1:20
JEFFREY 1:19
Jensen 160:13,14
Jeppesen 99:13,21
  155:16,23 156:14
  156:24
Jeppesen's 99:2
  154:17
Jersey 6:13 112:1
  124:19 128:4,5
  136:13 180:13
Joanne 22:13
jobs 110:4
Joe 185:2
Joseph 1:1,18 2:1,7
  3:11 4:7,7 38:20
  48:14,15 52:16

183:5 184:2,15
Journal 185:3
Jr 2:1,7 3:11 48:15
  183:6 184:2
July 23:1 35:8 41:3
  67:5,6
jump 143:10,11,13
jumper 107:11,20
  108:3,4,9 109:11
  176:14,19
June 6:1,1
junk 110:13
JVC 98:3,5 116:12
J&J 14:20 15:6
J.C 102:3

**K**

keep 51:24 108:19
  117:3 126:5
  138:18 139:13
keeps 138:23
Kenmore 152:8
kept 117:5 164:12
kicked 47:8
kids 68:9 117:7
  119:24 179:3,14
kilowatts 107:9
kind 15:22 16:18
  46:4 54:11 61:23
  78:14 80:10 82:5
  84:1,6,23 87:12
  110:9,15 122:13
  126:5 138:12
  152:22 159:16
  161:24 178:3
King 1:8,17 172:5
kit 132:6
kitchen 35:12,15,17
  60:6 119:14
knew 82:21 107:1
knocked 169:11
knowing 74:24
knowledge 25:1
  73:8 78:14 83:15
  86:23 88:17 90:7
  90:12 92:12
  112:21 115:17
known 113:18
Kobalt 142:15

**L**

L 1:15
labor 139:8
lack 136:23 168:21
ladder 148:23 149:6
  150:19,23,24

151:13,22 152:5
ladders 148:24
  149:5
laid 87:22
Lancaster 157:15
  157:17,18
land 4:17,22 16:8
  50:23 52:18
  132:15 181:21
landing 175:23
Lands 52:15
landscape 79:11,14
  184:12
landscaping 16:9,11
  29:5 30:5,6 83:24
  84:7,17,18
land-line 16:7
laptop 178:23
  179:17
large 16:13 47:2
  86:1,5 155:10
  169:17
larger 37:21 38:2
  143:4
last 20:4 27:9
  106:20,21 171:24
  180:21
late 109:22
later 63:8 94:6
  99:12,12
Lauder 112:6 113:3
  113:17
laundry 152:10
law 1:8
lawn 16:10 29:10
  84:20 86:12,13,16
  86:24
lawsuit 23:15,18
  24:20 25:6
lay 124:22 149:15
laying 62:2
lead 3:4 76:1
leading 67:24
  159:23
least 45:11 56:7
  64:19 76:23
leather 132:24
leave 70:3,6,10,22
leaves 86:5 88:3
left 24:17 39:12
  51:10 65:22 67:12
  82:8 101:12
legal 37:9,12 38:4
Lestoil 133:12
let 2:11 23:22 45:5
  46:8 66:23 67:23

195

71:19 74:13 77:17
92:18 108:24
**letter** 33:1 42:9,10
184:16 185:2
**letterhead** 30:2
**let's** 3:9 11:9 25:4
28:17 30:19 32:12
33:12 34:21 36:9
40:21 51:9 63:22
64:4 65:21 66:18
67:9,24 71:4,8
73:9 78:4 83:23
85:7 87:5 94:11
116:1 121:23
145:21,21 168:12
**levels** 145:5,6
**Levittown** 136:2,14
**Lewes** 141:2,3,8
146:7
**license** 9:1,4,18
32:17 184:15
**licensed** 9:22 135:7
156:18
**lift** 130:18,19 131:1
149:18 150:3
**lifted** 163:19
**light** 70:13 142:24
158:5 180:5,12
**lighter** 109:16
129:21 130:4,5
**lights** 67:7,11 70:1
157:23 158:2,3
**liked** 147:18 150:14
150:15
**limo** 132:6 133:4,7
**line** 16:8 53:22
84:20 85:8,19
89:9 92:1 132:15
181:21
**list** 25:18 34:19 42:1
42:7 43:2,7,8,14
43:23 55:20 75:14
79:6 82:14,15
92:9,13,18 94:2
95:4 97:21 99:11
99:12,22 105:21
106:10 108:12,19
114:12 121:6
137:7 166:9,16,20
174:23 180:22
**listed** 34:18 55:19
93:12 94:16
122:17 127:12
167:11
**listen** 114:9 116:5
**listing** 97:15

**listings** 166:21
**lists** 43:11 108:5
113:3
**literate** 180:1
**little** 8:5 9:20,24
11:9 39:2 45:17
75:23 92:14 95:14
110:17 114:24
145:8 154:22,22
154:23 172:4
**live** 26:22 27:5
56:13,15,19 66:12
**lived** 56:20 64:16
70:17 101:13
**lives** 27:10 128:6,6
**living** 51:3 70:8
104:10 122:19,21
**Load** 136:2,11
**loaded** 47:10
**loan** 33:2,3,7,8
34:11 64:21,24
184:16
**local** 41:8 64:1 89:8
**located** 7:8 8:4
13:19 14:10 74:3
96:6,11 97:10,24
100:17 102:17
103:17 104:13
105:11 107:12
108:19 109:1
111:23 114:1
117:12 128:8
144:19 145:3
146:6 157:4 174:2
**locations** 93:6
**lock** 61:17 174:6
**locked** 61:14
**locks** 62:4 144:18
150:3 174:7
**Loffrado** 185:2
**long** 3:23 9:16 11:5
11:23 38:1 45:6,8
59:19 76:21 83:14
107:15 161:10
**longer** 9:24 118:6
168:18
**look** 28:6 33:20 41:4
43:18 51:12 92:7
98:22 99:16
130:16 135:12
141:14 148:17
**looked** 105:21 106:6
106:7 169:11
**looking** 25:12 28:2
29:3 30:24 32:21
33:17 36:13 41:24

52:14 85:12,13
86:2 105:20 121:6
129:1 166:5,13,21
169:12
**looks** 29:4 41:2
42:22 53:10,16,18
85:14 86:1,5 93:3
94:10,12,17 96:2
99:20 124:16
142:24 146:18
168:4 177:7 182:3
182:7
**loss** 1:5 2:9 28:4
40:12 55:2 58:15
58:17 64:9 65:21
71:4,5,9 73:9,9
83:1 85:23 89:4
91:9,19 93:21
109:14 115:16,19
117:10 122:3
152:23 179:2
**lost** 25:17 42:2 93:4
91:13 93:15
100:15 112:2
114:14 123:1
128:5,7 138:21
142:3 147:17
156:11 176:2
177:18 180:19
**lotions** 113:4
**Lou** 26:19 77:7
**lounge** 105:10,15
106:16
**low** 125:6 126:11,21
126:24 166:3
**lower** 182:11
**Lowe's** 106:6
139:22,23 140:24
141:1,7,18,24
142:4,6,16 143:2
144:9 146:5,15
149:10 154:11
155:1 168:10
**LT** 142:24
**L-E-W-E-S** 141:3
**L.L.C** 31:1 184:13

_____

**M**

**M** 1:19
**machine** 167:17,19
167:22
**Macy's** 113:18
**made** 29:20 36:14
40:17 63:16
105:21 121:19

127:15 129:9
130:17 155:6
180:24 182:15
**magazine** 106:2,7,8
157:14
**mail** 84:4 112:3
157:14
**main** 66:8,9,10
**maintenance** 18:17
18:24 19:1 35:9
35:18 66:20,22
71:3 76:18
**make** 22:24 23:7,23
72:4 82:12 97:21
99:15 149:3,22
151:23 154:2,3
**makes** 23:8 61:23
78:5 121:20
149:16
**making** 68:6
**malfunction** 105:6
**mall** 114:3,5,6
116:22
**malls** 102:2
**man** 93:22
**Manchesters** 171:20
172:1
**manuals** 93:10
**manufacturer** 46:6
46:17 90:3 96:22
104:21 111:16
115:9 176:17
**manufacturers** 97:8
129:19 158:21
**manufacturer's**
129:19 158:21
**many** 6:5 7:10 12:15
12:17 17:14 37:12
47:19 66:15 71:20
72:2 83:17 85:6
115:16 119:16
121:12 123:15
170:13 171:6
179:22
**map** 99:24 100:7
155:17 156:22
**maps** 98:17,19,20
98:24,24 99:16,18
99:19,21 100:11
100:14,15,17
156:1
**Marie** 185:2
**mark** 7:22 26:4
27:19,21 28:17
30:19 32:12 33:12
34:21 36:9 40:21
41:19 42:13,18
63:20,22 151:9

**marked** 8:1,3 26:6
27:24 28:20 30:22
32:15,19 33:15
34:24 36:11 40:23
41:22 42:20 63:24
92:22 97:19 184:6
185:1
**marker** 175:22
**MARKET** 1:24
**marks** 87:19,20
**marriage** 4:2,4
**married** 3:19,23 4:1
**Marshal** 44:7 75:3
**Marshall** 113:21
**mast** 175:11
**Master** 17:5
**MasterCard** 142:8
143:7
**MasterCharge**
126:8
**matching** 152:18
**material** 3:3
**matter** 30:9
**may** 9:19 15:22 19:8
23:9 27:16 58:18
71:12 72:22 75:5
75:11 93:5,20
115:23 146:23
148:2 170:1
182:11,12
**maybe** 33:11 45:2
75:18 86:2 89:11
99:17 106:17
109:21 123:5,21
124:21 138:14
142:24 146:22
149:19 153:7
155:11 159:24
164:2 169:19
**Maytag** 152:14
**Maytags** 152:12
**meals** 153:21
**mean** 9:13 10:4
39:20 54:21 56:10
67:15 82:18 84:16
86:15 114:16
121:14 134:20
156:4 158:22
166:18 172:9
175:24 181:18
**Meaning** 18:20
**means** 9:8 54:22
81:16 164:15
182:8
**meant** 13:1
**measures** 175:13

mechanic 138:21
Mechanicsburg
  137:12
mechanism 61:23
medical 16:20
Mellon 32:22 33:2
  184:16
melt 79:2
melted 31:22 79:4
  82:13 90:16
  110:12 135:13
melting 80:12 81:3
members 171:6
Memorial 27:18
  42:3,24 45:13
  55:2 58:17 66:5
  92:20
memory 2:13 82:15
  86:23 92:12
  106:10 180:16
mention 2:11
mentioned 2:14 5:3
  5:18 27:11 28:11
  28:15 50:4 135:19
  166:19
MERRY 1:19
mess 44:22
messed 81:11,15
metal 146:20,22
  162:22 174:1
methods 142:13
MI 1:20
mic 157:22
MICHAEL 1:15
microphone 160:23
  161:1
microphones 160:16
  170:6,13,17
microwave 153:17
  153:19
mid 45:11
middle 3:12 22:8
  130:17,24 141:22
  152:4
Midtown 125:21
might 23:10 33:9
  50:14 78:1 81:8
  85:14 92:13 93:22
  95:12 97:16
  103:12 110:18
  120:22 123:16
  162:19 177:8
  180:11
miles 18:11 47:19
  115:16
Millwork 146:4,5,6

Milton 4:10
mind 147:15
mine 133:8
miniature 137:5
Minimum 10:2
minutes 18:11,12
  48:6 63:8 66:1,4
  83:16 136:7
miscellaneous 133:9
  147:7
miscommunication
  69:6,8
misrepresentation
  3:3
missed 43:19
missing 169:11
mission 67:16,17
Mississippi 99:9
misspelled 144:14
mistake 75:18
mixed 148:5
mixer/PA 160:15
Mm-hmm 20:15
  39:20 42:14
  113:13 119:20
  123:23 130:2
  136:21 138:5
  143:1 150:21
  155:4 160:11
  170:7 173:17
  178:2 180:6
model 109:3 132:19
  163:13 172:10
moisture 138:18,21
  138:24 139:3
mom 164:3
Monday 27:18
  45:13 58:20
money 24:11,15
Monte 72:14
month 15:22 16:4
  16:10,21 17:21
  18:4,6 19:2 50:1
monthly 15:15,16
  15:22 16:18 17:22
  18:15 19:7,9
  50:14 72:4 181:16
months 9:20 64:17
  70:8,18,21 71:4,9
  95:15 116:1
  117:18 122:20
  179:1
moon-shaped 78:24
moped 40:7 75:23
  136:20 137:1,2,3
  137:9 142:22

more 2:24 10:2 16:8
  16:11 24:17,18
  35:14 45:10 67:16
  83:6 85:2,3
  103:13 120:13
  146:1 153:14
  161:14 162:20
  166:24 170:3
Morgan 27:2,12
  50:3
morning 45:15 57:5
  58:23 98:12
mortgage 5:6,9,11
  6:2 17:9 25:10
mortgagee 5:8
most 43:18 82:17,18
  93:15 108:14
  111:21 147:23,24
Mostly 15:3
mother 28:24
  129:10
mother's 133:24
motion 77:8
motor 13:4 33:2,3
  35:5 39:3 41:7,8
  75:15,17 126:18
  137:10 146:19
  184:19,22
motorcycle 137:2
motorcycles 137:5
Motorola 125:6
  126:11
mount 132:13
  175:15
move 39:12 47:9,15
  92:15 132:10
  168:12
moved 39:17 102:22
  104:20 125:13
  137:22 140:1
  142:19 155:2
  159:24 163:4
movement 37:2
movie 102:7
movies 95:1,6,9
moving 137:19
  149:18 169:16
mower 137:21
  138:10
much 4:17 16:4,8
  17:9 18:4 19:7
  28:21 34:14,15
  35:19 49:24 99:7
  99:7 100:2 103:3
  103:24 104:24
  105:19 110:2

112:13 116:9,15
  118:20 121:5
  126:8 128:20
  131:3 134:7
  136:16 137:24
  140:3 141:12,18
  142:1 152:20
  156:16 173:18
  174:16,20 175:7
  178:12 179:14,17
  179:20
muffler 35:12 41:9
multiple 108:4
multi-engine 9:3
music 10:9,13 114:8
  114:23,23 159:9
  159:12 161:16
  170:10,19
musician 10:19
  161:19
must 75:12 151:6,8
Myrtle 116:20
myself 45:20

_____

N

N 1:8,17,24 184:1
name 3:10,12,21 5:8
  7:6,7,8 8:19 10:16
  14:16,19 27:9,9
  30:1,14,17 36:17
  38:4,19,20,21,24
  39:4,13 44:10
  48:10,12,16 50:2
  50:4 88:14 90:4
  103:19 110:21
  115:8 116:23
  129:19 133:8
  137:17 144:11,22
  147:19 148:13,14
  158:21 171:4
named 23:17 24:10
  24:19
names 4:6 7:19
  26:18 38:22 98:2
Nano 127:20
national 111:24
nature 12:8 75:5
  92:11 95:1
navigation 172:13
Navy 12:1,2,4
near 66:12
nearby 27:5
necessarily 56:19
need 84:1,3 109:23
  109:24 110:19
  143:12 170:5

173:3 176:2
  177:18
needed 35:13 36:22
  70:16 118:6
needs 81:9,16
negative 2:19
  179:24
neighbor 27:8
neighborhood 16:5
  19:4,13 178:15
neighbors 26:16,17
  26:18 27:1,11
  28:11 49:21 50:2
  53:12 66:3 76:24
  77:10,11,14
neighbor's 49:13,20
  87:2
Neil 114:14
neither 186:8
neutral 47:5,7
never 25:8,9 45:20
  58:7 70:8,24 71:1
  91:8 101:14
  112:11 130:10
  135:11 143:21,24
new 6:12 100:20
  112:1 122:4,5
  124:19 128:4,5
  136:17 157:23
  165:1 168:4
  180:13 186:3
Newman 22:13
News 185:3
newspaper 63:14
  64:2 185:3
Nextel 25:13
next-door 26:22
  77:10
nice 128:19
night 9:9 61:18
  109:20,23 112:22
  112:24 122:8
Nikon 117:8
nine 64:17 70:8,18
  70:21 95:15
  122:19 174:10
nodding 2:20
None 79:20 90:11
Normally 117:5
north 66:17
northeast 8:18
  18:13,14 49:6,16
  53:8
nose 175:2
Notary 1:12
notched 150:2

Joseph Jadczak
October 3, 2006

197

note 8:3 46:8 97:21
nothing 82:10
  110:11,12
notice 1:7 69:14
  80:5
noticed 79:20
number 3:17 19:10
  21:7 26:20 27:3
  37:19 38:7,9,11
  50:8 63:10 129:2
  132:13 147:10,10
  181:19 183:2
numbers 28:14
  35:22 180:20
  182:7,11
numerous 65:23
  82:2 85:17 123:9
nuts 110:18

_____ O _____
oath 1:7 2:2,11,23
  15:18 82:24 183:4
  183:5 186:4,6,9
Objection 143:22
observed 80:11
  83:23 84:6
obtain 25:21
obviously 134:2
  172:17
Occasionally 94:23
  153:22
occur 21:17 156:11
occurred 58:17
  75:11
octane 176:13
October 1:10 4:8
  8:22 9:18 186:7
  186:12
odds 55:5
off 2:14 17:20,21
  21:8 30:15 33:3,8
  44:24 47:7 64:20
  64:22,24 65:16,22
  67:9,11,11 72:7
  72:17 84:2 89:12
  123:5 134:22
  136:6 138:7 139:9
  139:17 146:7,23
  169:11
office 22:21
OfficeMax 168:3
officer 95:6 186:4
offices 1:8
official 186:12
officials 88:4
often 18:20,21 98:8

102:23 116:17
  140:2 142:20
  153:3,14 159:20
  159:22
oh 6:16 13:11 20:14
  37:8 55:1 57:4
  58:9 65:8,11 66:6
  73:6 77:23 80:20
  85:8 90:21 91:1
  102:24 104:11
  108:9 112:9
  113:20 114:19
  117:18 120:9
  126:17 132:22
  144:13 147:11
  155:8 159:15
  166:4
oil 18:21 19:5,5
  75:15,17 117:17
  117:21,24 139:9
  139:16 148:22
  149:22 174:10,14
  174:16 180:17
old 81:21 103:1,2
  117:18 126:24
  163:22 164:1,2
  170:20 177:8
  179:1 181:4
older 85:2 132:20
oldies 114:15,16
once 115:23 139:9
  153:2,6 160:8
ones 71:22 113:16
  113:16 145:7
  153:14 156:5
  158:8 159:1,1,2
  178:8
one-and-three-qu...
  16:15 58:12
only 7:19 31:15
  38:21,23 61:8
  67:19 82:8 97:22
  113:15 156:18
  167:24
onto 51:10 54:12
  71:7 133:7 175:2
open 60:19,22 61:8
  61:22,24 62:4
  71:16,23 91:12
  109:4,8
opened 61:20 62:6
opens 54:9 62:3
operable 135:5
operate 15:7
operated 15:10
operating 158:9

168:22
operation 71:16
  168:13
operational 68:6
  181:6
opportunity 186:8
opposed 68:11
opposite 146:1
orange 175:14
order 25:24 36:21
  112:3 127:13
ordered 124:20
  157:14,18 178:9
organ 172:4
organized 82:21
  93:22
origin 74:24 75:1
original 33:8 64:24
originally 20:2 99:8
  128:21
originals 42:11
OSHA 61:24
other 5:2 7:1 8:15
  9:24 14:9 15:6
  16:18 17:22 18:15
  21:14 23:2 24:19
  27:1 35:13,18
  37:12 43:10 55:23
  57:23 58:1 73:6
  77:12,19 78:5
  79:9 85:11 87:4
  90:15 93:5,10
  97:1 98:5 102:10
  105:6,8 107:21
  119:4 126:14,16
  126:22 142:13
  149:3,11 163:3
  165:24 172:2,12
  175:15 182:7
others 26:15 107:18
  108:14 157:21
otherwise 186:11
outcome 186:11
outlet 68:21,23 69:2
  69:11,15,23 76:15
outside 61:20 76:24
  77:1 84:23 91:14
  118:14 124:5,16
  127:19 139:20
  158:2,7 175:11
outstanding 30:11
over 20:3 27:6
  50:13 69:3 78:5
  86:17 88:2 95:10
  101:13 102:2
  111:24 115:22

163:23 164:1
  166:17 173:21
overhanging 86:2
overnight 70:3,6,10
owed 24:11,15
own 4:12 6:21 7:1
  14:6,7 15:7 16:13
  16:20 17:14 25:19
  36:18 37:4,6
  38:13 45:17,19
  46:3 48:11 50:20
  52:22 53:12 72:24
  92:3 95:19 161:16
  162:13
owned 6:5 11:23
  14:24 15:10 28:4
  28:4 33:19 38:16
  62:10 167:12
owner 11:21
ownership 93:11
owner's 39:8,10
o'clock 59:21,22

_____ P _____
PA 160:10,14,17,20
  161:2,3 162:6
  170:24
package 21:4
padded 105:16
pads 124:13
page 42:12,22 43:15
  52:15 108:18
  122:18 123:18,18
  141:21,22·151:19
  174:23 184:2
  185:7
pages 94:11 184:9
  184:11
paid 33:3 64:22 72:7
  103:3 138:11
  141:12 142:1
  143:6 145:16
  161:8,9 163:3
  179:14 181:16
paint 150:12,14
paints 150:8
pair 177:2 178:12
pairs 178:1
Panasonic 96:24
  97:2 98:3 163:11
  181:1,2
panel 89:14,17
pans 120:21,22
  122:1 123:13
paper 142:11
  165:24

papers 63:16
Pardon 57:12
parents 24:1,13
  163:14,23 169:3,4
  169:5
park 51:21,22,24
  54:18,21,22
parking 55:4,4
part 31:23 37:6 38:2
  43:18 45:4 52:1
  74:7 79:22 82:17
  82:18
particular 32:22
  64:13 65:3 110:21
  116:21 139:3
  141:1 150:14
  165:12 169:21
  178:18
parties 186:9,10
parts 147:8,11,16
  147:17 148:9
party 90:9
passed 133:24 164:3
past 6:5 15:9 21:15
  53:21,22 79:23
  169:13
Pat's 159:9,12
  170:19
pay 16:4,20 17:6,20
  17:21 33:8 37:20
  64:20,24 136:18
  137:24 138:7
payment 6:3 25:5
  142:13
payments 25:10
  72:4
payoff 33:1 184:17
peak 79:24
pearl 158:18,20,21
  162:4
Peebles 17:15 102:3
penalties 2:23
Penney 102:3
Penney's 17:15
Pennsylvania 6:12
  11:18 12:22 13:3
  13:8,10,14 100:8
  136:3,14,15
  137:12
people 28:15 49:8
  57:23 68:8 77:7
  88:12 90:15
  121:12,21 123:14
Pep 110:4 144:9
per 16:4 182:4
perceived 182:14

Joseph Jadczak
October 3, 2006

198

percent 20:4 93:13
  127:13 147:5
  168:11
percentage 143:19
perform 71:2
performance 76:18
perfume 112:14,17
perfumes 112:6,10
  113:3
perhaps 72:21
  77:23 80:2 92:10
  132:23
period 69:12 70:18
  70:21 71:4 122:3
  122:19
perjury 2:23
PERMANENT
  186:18
Perry 1:8,16
person 52:17
personal 7:7 16:1
  17:2,3,4 23:20
  24:7 32:9 38:20
  42:2,23 43:7,8,16
  43:24 48:12 55:5
  55:7,12,23 57:23
  58:9 72:9 83:3
  92:19 125:15
  162:13 167:23,24
  179:10,11 180:3
  180:21 181:10
personally 38:14
  77:3
Personalwise 15:24
Pet 163:2
phases 88:13
Philadelphia 6:12
  7:9 8:12,18 10:18
  13:20 18:13,14
  21:21 49:6,16
  117:15 147:2,6
  159:9 161:5 168:3
  168:17
Philly 14:12
phone 16:6,7,7
  26:20 27:3 28:14
  50:8,10,14 56:11
  57:20 101:1 132:6
  132:9,14,16,20,24
  180:23,24 181:2,4
  181:19 182:1
phones 16:8 132:22
photocopies 184:9
  184:11
Photocopy 184:15
  185:3

photographer 86:3
photographs 26:14
  27:1 28:2 64:2
  80:15 184:10,11
photos 26:8,9,12,12
  27:20,22 50:6
  63:15 80:13
physical 89:22
physically 74:3
piano 172:4
picture 50:20 85:12
  85:13 86:3,5
  181:1
pictured 82:20
  147:15
pictures 28:3,9 52:9
  82:2,24 83:2,6
  85:1,2,4,5
piece 146:20,22
  152:21 163:17
  165:24
pieces 145:10
  177:15,23
pile 82:11
piles 110:12
pillows 123:19,21
pilot 9:22 157:14,15
  157:19
pilots 156:18
Pine-Sol 133:12
Piper 46:5,17 108:9
  176:14,17
pipes 57:16 86:16
piston 130:17,24
pivot 135:22
place 66:8 112:1,22
  122:8 136:2
  146:10 147:1
  161:4
placement 176:1
places 65:10 148:20
plane 9:9 18:1 48:2
  49:1,12 54:9 55:6
  55:22 63:3 74:15
  108:1 142:22
  143:16,18,19,20
  144:2 148:21
  150:11
planes 53:13
plans 5:18 67:6
plants 85:3
plastic 120:14
  124:12 173:17
plat 52:10
Platters 114:19
play 10:21,23

158:23 159:6,20
  170:10 172:2
played 159:22 160:1
  160:18 161:22
player 95:17 115:1
  115:3,4,5 116:7
  163:15,16
Plaza 1:9,16
please 2:19 3:9 7:23
  31:9 33:20 39:24
  40:21 41:4,19
Pleasures 112:6
  113:3
plug 66:24 68:18,20
  70:5 109:15 118:6
  129:20 132:11
plugged 57:20 67:12
  68:16 69:1,2,11
  69:14,18 70:3,22
  76:14 181:13
plugging 69:22
plumbing 57:6,15
  68:3
plural 123:8
plus 64:16 84:18
  100:15
point 37:2,3 131:20
pole 89:12 90:1,1
police 44:23
policy 1:3 2:8 3:1,2
  3:4 19:22 46:13
  183:6
polisher 146:18
popping 62:18
portable 127:14
  129:18,24 151:22
portion 92:7
position 11:19 22:14
  150:3
possession 90:10
possible 2:17
pots 120:21,22
  122:1 123:12
pounds 47:9 130:18
powder 112:17
power 73:22 89:8
  107:9 132:11
  141:5
practice 70:5
Pratt 11:12,13,14
  11:15 12:9 15:4
  36:17 37:5,6,6,13
  37:16,19,20,21
  38:1,2,4,12 39:5,9
  39:15,18 41:11
  136:3

preference 114:23
Prelude 171:5
premises 89:10
prep 67:5
prepare 42:7 43:1,7
  43:23 82:15
prepared 42:9
  82:14 92:9
present 93:5
President 11:20
president's 127:11
press 71:22 131:16
presumably 39:5
  88:3 109:20 116:5
  118:17 123:5
  152:9 182:8
presume 48:23
pretty 23:12 82:21
  86:1 93:22 97:6,7
  103:15 126:8
  148:17 153:18
  154:15 169:19
  177:4 180:7,16
previous 4:1 20:5
  38:16 41:12 75:7
previously 40:4
prices 101:3 141:20
  166:14 180:2
  182:12,15,18
printout 93:2
prior 5:14 6:7,21
  64:22 106:17,19
  106:23 141:11
  169:15 171:8,10
PRIST 173:10
private 9:1,18 13:10
  49:7
privately 14:24
probably 59:21 94:6
  97:17 98:6 136:17
problem 70:9
problems 70:24
  76:17 91:7
process 5:13
professional 1:11,23
  161:18 184:12
professionally 10:24
program 11:6
propane 67:12
  75:13 111:10
  140:4,6,10
properties 7:1,8,10
  26:24 27:6
Proposal 184:13
proposed 52:24
  53:2

protection 135:3
provide 3:2 92:12
proximity 85:7
public 1:12 15:2
  156:19
pull 124:6 135:24
  150:24
pull-down 150:19
  150:23
pull-out 121:17
purchase 4:14,17
  33:18 47:17,23
  49:1 93:11 110:22
  112:4 115:20
  138:9 142:9 156:4
  167:15 184:18
purchased 4:15 6:24
  25:18 34:6,16
  50:23 52:17 76:12
  95:12 103:22
  104:18 111:13
  113:8,10 126:6
  137:22
pure 142:11
purely 50:15
purpose 69:22
  73:21 107:19
pursuant 1:7
push 46:23 47:6
  60:22 61:5
pushed 60:10,19
pushing 175:3,3
put 14:9 36:6,22
  39:11,13 44:2
  45:8 47:5 67:7
  97:13 98:12
  101:12,18,21
  106:5 116:24
  118:12 124:15,23
  130:14 137:1,2
  138:22 139:9,14
  148:22 149:16
  151:22 154:1,6
  158:24 160:1
  169:21,23 170:5
putting 170:4
P.C 1:19
p.m 1:10 183:11
P38 133:19

_____

**Q**

quantity 94:16
  95:22 98:16 101:6
  103:6 117:18
  123:7 124:7
  156:21 168:7

199

177:7,20
queen 121:15,18,22
question 2:15,18
  23:8 66:23 71:9
  83:18 106:15
questioning 72:21
  182:23
questions 15:17
  19:20 50:19 92:8
quickly 62:24
quite 11:8 56:4 76:7
  76:8

_____
          R
_____
R 52:16 186:1
radio 25:16,19
  125:6 126:11,21
  127:14 128:2
  163:20 165:19,24
  166:1,2,10,11
  167:4 172:5,10,11
radios 25:23 125:24
  126:22,24
radio/record 163:15
  163:16
rag 139:10
rail 136:23
ramp 137:2
ran 60:9,9 61:20
  77:18
rancher 51:13
rate 136:4
rated 9:15,16
rather 2:20
rating 9:3 10:3
ratings 9:5,11,24
Ravioli 171:14
Ray 178:4
Ray-Ban 178:5,6,7
  178:12
RCV 182:5
RE 1:1
reach 148:20
read 30:2 46:22
  183:9
ready 112:20 117:6
real 107:15 127:23
  128:19 173:10
realized 67:8
really 20:14 83:5
  158:23 171:13
rear 62:14,22
reason 37:3 64:13
  65:3 169:21
  178:18
Reasons 171:9

rebuild 5:13,19
rebuilding 5:24
  31:13,18
recall 11:7 20:1 33:7
  79:10 80:13 84:22
  86:10 93:23 95:5
  96:6 97:19 104:5
  104:6,7 116:21,23
  118:22 121:5
  138:11 141:3
  154:5 168:10
  174:9
recalled 93:5
receipt 137:13
receipts 93:9,13,15
  126:2,2,5,6,8
  174:5
receive 11:3
received 162:10
receiver 172:12
Receivers 71:21
recently 101:18,21
  159:21
recess 64:5 72:18
  92:16 136:9
recline 95:1
recognize 26:12
  31:9 39:24 41:5
  42:5
recollection 25:19
  45:7 147:3
record 2:14,21 3:10
  13:7 23:7,9 46:9
  65:16,16 72:17
  78:4 84:2 110:6
  136:6 161:16
records 163:15
recreation 48:23,24
recreational 34:6
  39:4 40:9 47:15
  64:8 66:21
rectangular 132:9
redistributed 89:16
reduced 187:7
reels 140:14,19
referring 103:6
  166:5
reflecting 93:11
Refrigeration
  168:17
refrigerator 67:8,10
  67:12,20 70:1
  168:12,20
regard 28:11 35:15
  46:3
regarding 184:16

regards 143:18
register 135:8
registered 1:11,23
  48:9
registration 13:9
  39:11,14,16,17
  41:15
regular 119:6
  148:18
Rehoboth 165:16
related 17:1 186:9
relative 186:10
relatively 92:13
  168:4
relatives 73:16
relevant 10:13
  31:19
relying 75:8
remaining 5:10,15
  5:16
remember 20:6
  22:12 33:9 39:1
  43:13 82:19 94:6
  98:4 120:23
  141:10 142:18
  146:3 149:10
  154:9 161:8 163:2
  180:18,19
remembered 108:16
remind 2:22
remortgage 5:17
  17:11,11
remortgaging 5:13
remote 61:1,3,9
  71:16,19,20
  131:10,18,23
remotely 60:20
remotes 72:23
  131:11
remove 90:13
removed 62:9 74:15
  88:18 90:16
removing 63:3 88:5
renewal 99:9
rent 14:7 15:2 49:22
rented 58:7
repair 29:8 31:19
  36:17 37:1,2,3,5,6
  37:16,20 38:1,4
  38:12 39:5,9,15
  39:18 41:8,9,11
  136:3 184:19
repaired 86:22 79:5
  81:5
repairing 30:7
repairs 29:19,20

30:12 31:6 35:5,7
  35:10,12,14,19
  36:2,14 38:13
  40:15 41:7
replaced 81:10
  104:19 105:4
replacement 35:11
  182:6
reporter 1:12 2:20
  185:7
REPORTERS 1:23
represent 29:7
representative 24:7
represented 40:17
represents 25:15
  43:15
requested 186:8
requires 2:18
research 106:11
reside 4:9 88:21
residence 54:16
  68:11 78:8,12
  89:10
residence/garage
  53:1
residential 138:16
respect 68:6
responded 63:10
  65:24
rest 34:5
restate 77:17
result 92:20
review 25:14 29:6
  32:23 42:4 44:3
  52:20 186:8
reviewed 83:2
reviewing 26:8
revisions 156:6
Rite 136:2,11
road 4:10 5:5 6:6
  7:2 8:4 53:17,19
  66:9 98:20 100:11
  100:15
roll 47:12 149:21
  177:16
rollers 154:14
rolls 47:11
roof 31:23 79:22
  82:7 83:11,14
  175:16
room 59:15,17,18
  59:18 60:2,2
  165:12,13 176:2
rotates 175:16
rough 5:11 47:24
  146:23

Roughly 23:1
round 130:16
route 66:7,8 146:7
routes 156:8
RPR 186:17
RT 36:23,24 39:12
RTA 154:2
rubber 78:18,20,23
  79:1,2 80:1
rules 2:12
run 13:13,16 62:4
  62:18 69:23 70:1
  77:21 105:7 107:5
  107:6 138:17
running 15:11
  28:24 29:9
runs 146:19
runway 54:24 176:2
  176:3
rusty 169:12
RV'd 64:17
RYAN 1:19

_____
          S
_____
S 184:5
safe 101:15 123:1
  169:1,6,8,13,22
  170:3,5
safety 13:23 149:24
Sales 39:3 41:8
  137:10 184:19,22
salvage 62:11
  135:17
salvaged 90:6
same 13:20 14:11
  37:19 38:7 49:8
  109:8 123:12,12
  126:23 127:1
  132:12 173:15
  181:19
sand 153:8
Sanyo 97:1,4
sat 59:15 119:10
save 60:11 135:17
saw 60:16 62:14,21
  74:14,15 75:14
  80:16 81:3 82:5
  108:17 135:11
  137:13 141:13
  142:23 154:11,12
saying 23:10 38:12
  39:14 44:19 88:10
  88:24 113:2 167:5
  167:7
says 3:2 36:17 39:15
  41:11 52:24 53:2

Joseph Jadczak
October 3, 2006

200

97:15,22 98:16
100:20 101:6,6,7
108:18 110:14
123:7,7,13 124:7
124:12 125:1
133:4 137:14
140:18 148:24
151:6 154:8
155:17,19 156:3
156:21 157:23
167:1 172:6 173:7
173:8 174:11,12
174:24 176:9,10
176:24 177:7,11
177:17,20
scaffold 151:19,21
151:23 152:5
scanners 165:20
school 8:7,8,9,11,17
10:9,13,14,16
172:1
schooling 8:15 10:7
11:2,4
scrambled 69:4
scratch 154:6
screamed 59:24
screaming 171:14
screw 110:18
screwdriver 144:17
seal 78:19,20 186:12
seals 78:23 80:1
Sears 17:15 102:3
102:11 110:24
119:11 120:7
137:21 138:2,9
145:14 148:2
152:7,13
season 18:18
seasonal 101:13
seat 132:9
seats 94:24
second 6:24 42:12
108:18 123:18
151:13 163:9
173:3
section 121:17,18
sections 124:12
125:3
security 3:17 60:24
158:3
sediment 176:8
see 14:2 43:19 44:20
45:21 51:11 60:5
60:11,13 62:10,13
65:9 67:20 80:7
80:18 82:5 83:3

83:11 84:3 85:4
86:24 87:19,24
108:9,22 110:7,9
110:11 169:10
175:22
seeing 40:9 80:13
84:22
seem 84:22
seen 45:20 82:2
108:7 130:10
175:16
self-explanatory
148:17 153:18
154:15 177:4
180:7
self-storage 14:4,5,7
14:17 15:5
sell 65:3
sells 148:8,9
Semi-trucks 12:11
send 25:23 106:1
156:6
sensation 69:15
Sensor 1:8,15,16
7:16 9:8 10:10
13:7,13 19:11
21:9 22:20 27:19
44:12 46:8,12
52:10 58:1 63:13
63:19 64:4 66:10
99:11 109:17
113:18 136:6
143:22 148:10
183:9
Sensor's 13:13
sent 39:3
separate 14:17 32:3
37:9,12,17,18
71:9 108:3 149:5
separated 78:18,22
79:1,4 80:2
separately 37:20
series 99:13
served 133:23
service 89:7,9,22,23
91:7 119:18,19,23
services 71:3,3
162:11
set 15:17 42:1,17
57:21 99:8 109:23
121:2 124:23
128:19 131:19
133:6 142:23
143:4 145:10
152:7,10,18
158:19 159:3

160:2,7,19,21
162:4 178:21
sets 144:17,17
145:12 155:17
156:22 161:24
setting 124:6
setup 57:17 133:6,7
seven 85:14 121:13
121:14 123:14,15
123:21
Seventeen 184:9
sewer 56:11 57:18
57:18
Shack 128:2
shakes 179:24
share 54:23
shed 5:4 53:7,9
54:11 76:2,4
sheet 166:17 182:16
sheets 108:22 121:9
121:10 122:1,4
123:12
Sherwin-Williams
150:18
shipping 175:8
shock 77:9
shoe 146:18
shop 41:8 101:24
102:5 141:22
157:14,15,19
shops 37:2
Shores 1:20
short 91:17
shorted 91:22,23
92:1
shortly 59:13,14
71:3 81:23 93:21
117:1
show 44:12 53:15
171:12,16
shower 59:2,14,20
123:6
showing 165:23
167:15
showroom 72:15
shrubbery 29:11
shrubs 16:12 79:15
84:22 85:20
Shure 170:17
shy 58:13
side 62:17 77:12
85:11 87:2,2,4,6
145:24 146:1
172:11,12
sight 40:10
sign 183:9

signature 34:1,2
silverware 120:2,2,6
121:24
similar 14:2 42:23
123:20 179:17
simplify 23:22
since 9:23 47:24
79:4 85:2,3 105:4
159:24
Singer 95:7
single 49:10,11
121:17,19
single-engine 47:4
53:13
sink 56:12 118:12
133:17 164:8,12
164:17
sister 23:22,24 24:7
24:15
sit 93:9 95:1 98:14
102:7
site 112:4 124:22
129:1
sitting 57:21 59:21
situation 123:21
six 9:20 17:16 20:13
21:18 33:11 71:4
71:8 103:2 105:10
116:1 117:18,18
125:4,13 127:1
137:23 140:1
155:11,12,13
179:1
six-passenger 47:4
size 85:4 96:17
119:3
sizes 121:4 145:12
skipped 97:17
sleep 52:2 68:8,9
121:12,21 123:21
sleeping 70:13
slept 123:15
Slides 118:18
slip 138:23
slippery 138:20
139:4,11
slow 77:8
small 127:23 168:12
smaller 85:13 119:9
130:6 145:7
168:20 175:15
smashed 84:13
smell 69:16
smoke 45:7,8,10
60:1,7,14,16
61:22 62:3,6

74:15
smoldering 45:9
snap 132:10
Snapples 168:24
Snap-on 148:4,5,6,7
148:9,14
snare 159:4
snips 144:18
Social 3:17
socialize 28:22
sock 175:10,10,12
socket 145:10,12
soffit 31:19,21,22
32:1 78:11 79:5
79:21
sold 49:9
some 13:9 15:15
20:23 26:9,15
32:21 39:22 45:21
53:14 60:24 61:23
75:15 80:12,13,13
80:14 83:3 85:20
86:21 87:21 92:10
94:12 95:14,15
96:7,7 101:12,12
101:16 112:24,24
131:20 135:17
138:11 142:7,8
144:24 145:5
148:4,5,16 150:17
150:17 151:18
166:17,17,20,24
167:11 182:11
somebody 22:10
61:4 65:3 75:4,8
81:8 88:10
someone 13:24
30:14 56:13 68:7
136:17
something 23:10
46:8 68:9,16
74:20,21 103:13
109:1 116:16,24
118:13 119:11,12
120:18 127:13
129:2 130:9,22
133:17 146:20,23
149:22 153:22
156:7 158:16
163:18 166:5
178:22 179:21
Sometimes 162:2
somewhere 46:22
131:4
son 128:6
soon 63:7 67:21

Joseph Jadczak
October 3, 2006

201

| | | | | |
|---|---|---|---|---|
| sorry 6:7 9:5 11:7 | square 51:13,15,17 | storage 105:12,13 | Sunday 69:20 | 122:2 126:16 |
| 13:1,21 23:13 | 83:17,19 138:14 | 107:13 109:2,4 | sunglasses 178:1,3 | talked 20:18 126:14 |
| 27:4 28:10 49:16 | squares 145:5 | 111:3,4 112:19 | 178:13 | 151:15 157:6 |
| 59:3 78:7 96:5 | St 1:20 | 163:20 | supplies 73:22 | talking 7:10 14:12 |
| 98:21 103:1 115:4 | stack 26:12 28:2 | store 32:9 55:8 | supply 118:15 | 19:2 47:22 65:16 |
| 118:2 158:22 | stainless 155:6 | 57:23 58:4 75:23 | support 25:24 82:10 | 65:22 72:20 77:7 |
| 160:23 165:1 | stains 80:12 81:3 | 93:15 101:16 | suppressant 29:16 | 99:17 116:2 |
| 166:4 174:20 | stand 153:17,24 | 102:12 113:15,24 | sure 20:4 23:7 37:23 | 119:17 120:15 |
| sort 60:24 | standard 15:17 35:9 | 116:21,22,23 | 37:24 97:6,7 | 123:9 142:10 |
| sound 34:10 84:24 | 70:5 103:12,15 | 117:4,15 141:1 | 104:8 110:1 136:8 | 162:16 167:3 |
| 94:14 98:17 155:3 | 130:15 133:13 | 159:9,12 163:1,8 | 141:15 147:4,5 | 169:17 170:14 |
| 156:23 160:4 | 144:15 146:9 | 163:9 | 168:11 | tall 85:15 |
| 161:6 | stands 170:6,13 | stored 67:23 131:8 | surprised 91:11 | tank 75:21 106:24 |
| sounds 56:6 83:20 | Staples 163:3,10 | 154:16 | surround 85:17 | 139:18 140:4,6,8 |
| 150:6 153:17 | start 5:24 67:19 | stores 106:11 | surrounded 79:1 | 140:9 |
| 154:14 | 78:1 92:17 143:10 | 115:20 | 85:6 | tanks 176:8 |
| South 116:20 | 143:11 | straight 53:21 | surrounding 84:7 | tansmitter 73:3 |
| space 58:7 | started 4:15,19 8:22 | strainer 176:4 | swallowed 113:19 | tape 44:24 115:3 |
| span 47:3 133:12 | 11:24 20:2 59:15 | Strawbridge's | switch 70:13 115:22 | 116:6 |
| spare 140:8,9 | 62:17 67:21 83:14 | 102:2 113:11,12 | switched 133:3 | tapes 94:12 95:4 |
| 150:19 151:2,3,4 | starting 108:16 | 113:14,21,24 | switches 73:23 | 96:6 114:7,8 |
| 151:6 165:8,8 | 115:22 | 120:23 | sworn 2:2 186:5 | 115:20 116:3,9 |
| 167:17 172:19,20 | Starts 53:20 | street 1:8,17,24 | system 91:18 128:11 | Target 103:13 |
| spares 178:20 | state 3:9 6:9 12:21 | 10:18 14:15 26:23 | 131:18,19 132:1,4 | taxes 37:20 |
| spark 69:16 | 12:22 13:3,6,9,14 | 27:10 53:16 62:15 | 160:10,14,17,20 | taxiway 51:19 52:4 |
| speak 5:21 77:3,6 | 15:5 38:17 66:16 | 86:6 87:1 89:12 | 161:2,3 162:6 | 53:4,7,10,24 54:2 |
| speaker 91:22 | 100:8 110:9 128:3 | 90:2 149:2 | S's 54:11 | 54:12,18,24 87:15 |
| speakers 170:24 | 186:2 | Streisand 114:14 | S-P-O-S-A-T-O | taxwise 37:22 |
| special 68:24 147:12 | statement 28:7 | strip 116:22 | 30:3 | Teens 171:11,19 |
| 147:13 150:8 | 33:21 75:7 99:15 | strippers 144:18 | | telephone 22:10 |
| specialized 99:6 | 183:11 186:4,6,9 | structure 92:4 | ————— T ————— | 91:23,24 132:12 |
| 139:8 | states 6:11 13:9 | structures 5:2 | T 145:5 184:5 186:1 | 179:8 |
| specifically 173:12 | 100:7,12,16 101:2 | stucco 79:18 | 186:1 | television 56:22 |
| spelled 141:3 | station 12:21 13:14 | student 8:23 | table 124:24 145:18 | 57:3 59:16 70:15 |
| spend 56:2 | 13:16 14:3 15:5 | studio 161:22 | 145:23 | 94:17,21 95:2,21 |
| spent 66:15 91:13 | 148:8 | stuff 57:11 90:20 | tag 36:24 39:9,10,12 | 96:20 98:11 |
| Spic 133:12 | stationary 164:21 | 110:19 111:21 | 39:17 41:15 | televisions 96:10,23 |
| splitting 52:8 | stationery 184:21 | 112:2 117:23 | tags 36:23 | 97:2 98:7 |
| spoke 22:10,12 | stay 11:5 | 120:14,19,20 | take 9:16 15:13,21 | tell 8:5 13:22 25:15 |
| 77:11,12 | stayed 181:13 | 124:24 133:13,16 | 25:6 27:1 28:6 | 26:14 28:7 29:7 |
| spoken 88:3 | steel 155:6,6 159:4 | 154:19 162:20 | 33:20 58:14 64:4 | 31:9,12 32:23 |
| sporadically 116:3 | 169:1,8,13 | 163:15 164:13 | 65:11 67:5 78:6 | 35:3 39:24 40:1 |
| Sporty 178:8 | step 123:24 124:1,3 | 173:15 | 80:15 92:14 94:4 | 41:4 42:5 52:21 |
| Sporty's 157:14,18 | 148:16,18 | subject 2:23 5:5 | 111:9 149:15 | 58:22 77:8 140:15 |
| 178:9 | stereo 163:11 | submit 25:24 | 160:16 170:10 | 141:14 144:5 |
| Sposato 30:3,4 | still 88:21 91:11 | submitted 42:8 43:8 | 180:17 | 149:13 150:1 |
| spotlight 109:12,23 | 115:21 116:2 | 182:17 | taken 1:7 26:15,15 | 163:12 179:14 |
| 109:24 110:2 | 135:5 156:23 | subscription 156:13 | 28:4 35:13 64:5 | telling 71:15 93:19 |
| spotting 109:17 | stone 146:19 | 156:16,19 | 72:18 92:16 136:9 | 174:5 |
| sprayed 29:10,14 | stood 160:14 | substance 40:1 41:5 | 186:4,6,9 | ten 125:4 |
| sprayer 164:16,17 | stool 124:3 | substantial 167:3 | takes 18:11 | ten-ton 131:2 |
| spread 62:14,15,21 | stools 123:24 124:1 | sued 23:22,24 | taking 40:16 83:6 | terms 50:14 68:5 |
| 62:24 | 124:5 148:16,18 | Suite 1:9,16 | 146:22 | 76:17,18 91:16 |
| spreadsheet 42:23 | stop 150:4 | summer 22:9,9 | talk 10:10 11:9 | 143:18 |
| 43:2 93:3 | stopped 45:9 67:22 | summertime 138:20 | 45:16,18 66:18 | test 70:1 176:12 |
| Spruce 10:18 | stops 54:3 | 139:2 | 78:4 79:14,15 | testers 176:4 |

202

testified 2:3 182:10
testimony 2:24
  45:21 69:10 186:5
  186:6
thank 3:8,14 6:20
  7:17 10:6 14:8
  19:17 24:14 26:3
  27:7 36:5,8 39:19
  40:20 41:17 46:15
  51:18 58:3 62:8
  63:21 65:19 74:12
  86:7 95:8 114:21
  178:6 181:23
  183:8
Thanks 13:11
  107:10 165:4
  183:10
their 54:23 101:3
  120:1 127:12
  141:20 142:8
  156:9
thereto 186:10
thing 4:23 50:15
  61:24 67:19 109:9
  135:18 150:6
things 16:12 35:13
  35:18 62:18 82:22
  86:9 91:4 92:11
  94:6 95:1 98:10
  106:2 109:4
  115:22 126:9
  138:11 142:7,8
  145:8 146:9 148:4
  148:20 149:18
  150:10,10 162:8
  166:9 170:4
  180:19
think 16:19 17:22
  18:5,15 21:14
  28:10 45:8 46:22
  47:19 53:1 59:8
  59:19 64:17,22
  65:16 72:23 74:18
  74:19 80:13 87:21
  94:4 97:1 98:3
  99:17 106:19
  124:20 125:12
  137:15 143:7
  145:14 147:1,16
  154:4 155:5 161:9
  163:22 164:2
  166:14 170:15
  175:8 178:8
  182:22
thinking 147:14
third 6:8 27:8 42:22

90:9 97:15
Thirty-eight 48:6
Thirty-seven 3:24
though 97:18 108:1
  108:4
thought 40:5 75:2
  75:14 77:21,23
  82:16 93:20
  182:18
thousand 16:21,23
  19:3
threatened 25:6
three 6:7 19:6 28:15
  47:11 64:12,14,20
  64:22 65:2 69:3,5
  69:12 85:9 94:10
  95:15,24 96:1
  97:8 98:6 106:17
  106:23 141:11
  157:16 161:15
  162:23 167:17
  169:19 178:1,7
threw 77:20
through 7:4 15:13
  15:21 50:16 58:14
  62:4,15,16 89:14
  94:11 136:3,18
  145:21 178:9
throughout 91:21
throw 153:6
throwing 91:4
times 24:19 173:23
tires 36:6 142:21
  147:13
title 38:19,21 48:8
  48:16
titled 38:17 48:7
titles 95:5 114:12
toaster 103:16,17
  104:1,2
today 2:10,24 7:15
  69:10 93:9 142:10
  182:23 183:1
today's 5:11
together 79:24
  110:12 135:13
  151:22 152:16
  154:1,6
told 3:6 44:6,8 66:3
  69:4 72:23 75:8
  81:7 93:21 94:4
  134:10 135:15
  138:21
tom 159:4
toms 159:4
Tom's 39:3 41:8,9

137:10,14 184:19
  184:22
tons 130:11,20,22
tool 147:1 148:7,14
toolbox 111:3
  144:21 145:2,3
  147:16
tools 55:5 110:14,15
  110:15,22 111:2
  147:8,22 148:8
top 21:8 79:24 82:7
  83:8 95:6 121:22
  124:4 135:24
  139:7 149:14
  150:5 163:19
topographical 98:24
  99:18,18,23
tops 162:22
Toshiba 178:23
total 3:5 34:9 36:2
  71:20 155:5
  166:23 167:1
  182:3
totaled 20:13,24
totaling 183:2
totally 82:6 91:2
  135:9 169:8
  171:21,23
totals 182:4
touch 30:4 44:6,8
tow 119:3 174:24
  175:1
towards 60:6 80:21
  87:1,2 146:1
  149:2
towels 122:1,5
  123:4,4,5,6,6,6,7
  123:9,15 153:7,7
towing 37:1
Town 25:13,22
  125:20,22 127:3
  166:7,8 167:10,14
  184:8
track 87:20
tracks 86:21 87:10
tractor 75:20,22,22
  137:20 142:21
traffic 66:5
trailer 118:17,20
  119:1 121:24
  122:18
trailers 13:23
transcript 186:5,8
transmitters 71:21
  71:22 72:24
transport 162:6

transportation
  11:12,15 12:9,13
  15:4 37:7,14,19
trash 77:20
travel 12:13 65:9
  175:19
traveling 100:5
  104:9 109:6
tray 132:8,10
  136:23
treadmill 60:2
tree 16:11 85:14
  86:1,2,5,6
trees 84:8,20,20
  85:4,6,17 86:10
tried 62:10 67:7
trip 67:5 131:15
tripod 150:2 175:16
trips 135:4
truck 16:24 148:3,8
  149:12,14,23
trucking 12:10
trucks 12:15 13:23
  87:16 125:16
  130:14
truck/dolly 149:17
true 69:1
try 78:4 92:14
  139:13 180:17
trying 117:6 147:16
  154:4
tube 176:7
tube-like 175:14
Tuesday 1:10 27:17
turf 124:15
turn 41:10 51:10
  70:13 89:15
  143:13
turned 20:3 60:11
  67:9,11,11
turntable 163:20
TV 59:19,24 60:7
  96:3,17 98:15
  165:19
TV's 95:23 96:1,2,3
twelve 173:23,23
twice 153:6 159:24
twins 53:14
two-and-a-half
  127:22 169:18
two-drawer 174:1
two-step 124:3
two-wheel 135:22
two-year 11:6
type 9:15 20:10 35:9
  43:10 49:21 64:8

109:8 138:14
  162:21 176:12
typed 42:15
types 93:10 107:21
  157:17
typewriting 186:7
T-O-W-N 125:23

_____ U _____

Uh-huh 159:13
ultimately 34:14,15
  93:2
uncle 133:22 134:16
  134:16
under 1:7 2:11,23
  9:20 15:18 37:18
  48:10 82:24 89:16
  132:8 133:17
  150:7 166:17
  177:20 183:4,5
  186:4,6,7,9
underestimation
  167:7
underground 89:13
  89:20,24 90:2
underneath 74:4,10
  86:16 89:13 111:3
  117:22 144:7
  145:4 147:15
  164:13
understand 3:6 7:14
  13:1 24:9 31:2
  47:14 51:3
understanding 38:9
Unfortunately
  93:13
uninstall 132:13
unit 99:16 150:20
  151:6 181:20
  182:5
United 100:7 101:2
units 14:4,5,7,17
  15:1,5
unless 2:16 50:15
  68:7
unseen 40:10
until 9:19 23:7 44:6
  45:9 59:22
update 156:9
updated 106:17
  155:17 156:3
  173:2
upgrades 35:15,19
  36:2 38:13 40:14
  40:17
upright 149:16

Joseph Jadczak
October 3, 2006

203

used 37:1 57:3
64:12 69:5 73:19
102:19 104:9
105:14 106:20,21
107:20 111:8
119:2 121:18
122:23 124:1,4
126:13 128:13,18
129:16 130:1,13
133:2 134:18,21
135:3 138:17
140:15 142:21
150:10,11 152:10
158:22 162:2,13
163:14 164:6
169:15 170:8
171:1,11 172:12
uses 88:12
using 39:13 49:20
65:2 139:1 143:20
143:24 179:5
usually 19:4 59:5
Utilities 16:2
utility 5:4 53:6,9
54:11 56:12 76:4
164:8 168:7

_____ V _____

vac 141:22
vacations 66:15
vacuum 102:13,14
102:19 129:24
130:3
value 40:10,11
106:12 117:9
125:10 165:20
167:8 176:9,24
177:11 182:3,6,9
values 92:10 182:18
varied 95:14
varies 16:10 18:17
variety 121:3 145:7
147:17
various 40:17
145:12 162:7
VCR 94:18,21 97:9
97:10
VCR's 97:21,24
98:7
vegetation 83:24
84:7
vehicle 34:6 37:2
39:4,12,18,18
40:9 47:15 64:8
66:21 144:7
vehicles 13:4 17:8

32:10 107:21
125:16
velocity 175:13,21
venues 170:10
Verbally 22:8
verify 106:4
verifying 33:1
Verizon 92:2
Verizon's 133:8
versa 149:21
versus 101:10
very 63:1 66:5
138:19 139:8
152:24
VHS 94:12 95:4
96:5
via 40:10 112:4
vice 146:8,9 149:21
view 44:19
viewed 44:21
voice 84:4
voids 3:4
volt 73:23,23 129:24
VOR 172:12

_____ W _____

W 2:1 184:2
wait 23:7 165:1
waiting 30:15
wake 59:3,5 70:12
walk 61:4 145:22
Walker 3:12
walking 126:15
wall 62:15 68:23
69:3,11 76:15
103:10,12 149:2
walls 62:17
Walter 3:11,13,14
Walther 133:19
Wal-Mart 119:12
182:2
want 2:16 15:13
17:2 27:19 50:18
50:19 64:15,18
105:22 116:16
117:11 120:7
125:4 130:8 131:4
134:22 146:4,19
149:20 153:8
168:10 176:1
wanted 24:17 63:17
65:5 113:16 116:5
War 133:20,23
134:18
warranty 93:10
wash 56:4 153:2,8

washer 56:5,12
141:5 152:7,9
153:10,13 164:11
164:13
washers 110:18
wasn't 40:14 62:18
67:8,21 104:2
172:17
watch 94:21 95:1
98:13,15 102:7
watching 59:15,19
59:24 60:7
water 29:10 56:7,11
57:19,19 118:10
118:15 176:8
watt 125:7
watts 126:12
way 54:2,14 61:4,8
122:7 135:13
160:19 171:4
wear 102:9 132:18
weather 57:4 98:13
98:13 180:2
181:10
Weaver 21:12
web 112:4
Weddings 162:8
week 18:2,8 73:9
153:2,4,5,6
weeks 19:6 20:13
21:18 156:7
weigh 14:2 131:3
weighs 130:22
weight 47:3,10
welcome 19:18
39:20 41:18 65:20
86:8
well 16:20 20:2 26:9
35:21 36:21 39:8
44:21 45:5 46:1
47:7 48:23 51:13
53:13 56:20 67:16
73:4 74:13 82:21
85:21 87:17 97:17
99:8 109:3,22
110:4 113:4 115:3
122:21 127:18
134:9 136:17
138:17 139:7
153:6 155:23
173:1 178:20
179:8
went 8:7 9:1 10:13
40:3,13 45:9
50:13 57:18 60:12
91:15 105:14

106:6 108:15
121:19 127:19
141:13,17,19
149:6 163:1
168:18
weren't 65:2
West 171:16
wet 138:20 139:4,11
we're 14:12 70:7
92:3,6 110:6
167:3
we've 82:2
wheels 47:11 144:6
149:14 164:20
169:19 177:15
while 56:17 122:11
122:19,21 159:15
white 26:9
whole 62:16 159:4
173:11
wide 155:14 169:18
wife 7:19 16:22 19:8
19:15 20:16 25:1
28:12 56:4 58:2
59:24 60:13 64:15
67:4 71:12 72:17
73:10,13 77:13,16
98:14 102:1
112:22 124:4
126:16 135:3
152:10 153:3
wife's 3:21 20:11
38:24 48:16 101:9
112:11
WILCOX 1:23
Wilmington 1:9,17
1:24 186:6
wind 175:10,10,12
175:14,21
window 173:6
windows 78:17,19
78:20,24 80:1
84:12 150:11
173:14,15,17
windshield 148:21
wing 47:3
wipe 139:9,17
148:21
wire 144:18
wires 89:20
withstand 120:18
witness 10:12 19:12
21:11 22:22 28:21
44:14 58:4 63:16
66:12 109:18
113:22 148:11

179:24 184:2
186:5,6,8,12
witnessed 27:13
woke 58:23
wood 155:7,8
162:22 177:15,23
Woodall's 100:22
100:23
word 6:19 136:24
168:21
words 6:18
work 17:24 18:2,2,9
18:10,13 39:4
40:4 48:3,24
49:18,19 55:6,22
70:14 71:7 89:9
102:10,11,12
107:7,14 144:2,7
153:2,7 161:23
162:1 170:4
workbench 108:16
144:21 145:4,18
145:23 146:12
158:4
working 67:8,20,22
70:7 109:24
153:22 164:4
167:19 170:22
172:21
works 134:9 159:5
180:17
World 105:18 106:1
106:8 111:19,22
111:23 124:11,18
125:17 127:10
129:23 133:20,23
134:18
worry 23:12
worth 40:6 81:12
110:19 134:8,11
147:7
wouldn't 21:7 29:17
117:3
wrenches 147:13,13
write 94:6 155:21
writing 162:20
wrong 97:6 105:23
152:11
wrote 106:8 141:13
182:14

_____ X _____

X 184:1,5
XL 93:3

_____ Y _____

Joseph Jadczak
October 3, 2006

204

year 6:1 8:13 12:6
   17:8 20:4 33:9
   42:3 72:16 95:14
   99:10 115:6
   155:17 156:3,17
   159:23
yearly 18:22
years 3:24 33:11
   64:12,14,20,23
   65:2 69:3,5,12
   81:22 95:10,15
   98:6 101:7 103:2
   106:17,18,18,23
   116:14 125:13
   127:2,22 129:14
   129:15 137:23
   140:1 141:11
   142:19 143:9,9
   159:15 164:1,2,3
   177:8 181:5,5
yelled 60:7
Yep 141:16
young 158:23

_____ Z _____
zero 138:7 176:10
   176:24 177:11
Zildgian 159:3
zip 132:23

_____ $ _____
$1,106 17:10
$100 110:19
$1100 125:10
$1150 125:10
$120 140:18
$1200 161:6
$13 173:11,19
$15 177:19
$150 173:21
$1500 136:5
$16,000 166:24
$170 154:8 175:9
$1800 168:8
$19,000 167:1
$2,000 147:7
$20 99:17 100:3
$200 19:4 110:19
   172:8
$21,772 29:22
$2800 17:8
$30 100:3
$31,450.22 182:9
$330 156:17
$39,025.94 182:4
$40 105:2 110:5

$400 50:1
$41,000 4:18
$4500 36:1 160:4
$500 134:11 143:5
$560 155:3
$59,000 34:16
$60 140:22 174:17
   174:21
$600 99:8
$7,000 165:21
$75 158:12,13
$80 112:15
$93,000 34:9

_____ # _____
#151-PS 186:17

_____ 1 _____
1 7:24 8:3 52:14
   66:7 101:7 123:7
   123:13 184:7
10 36:9,10,13 40:18
   127:13 130:11,20
   130:22 184:19
10-foot 149:5
10-horsepower
   137:20
100 125:6 140:17
   176:13
1038220 1:4 2:7
   183:6
11 40:21,22 59:22
   184:20
11:00 45:14
11:10 63:4,5
11:30 63:8
11:35 63:8
1150 125:10
12 41:20,21 73:23
   85:9 129:24
   138:14 184:22
11th 8:8
12-by-12 54:13 61:2
   61:22 62:4 82:7
   83:8 146:1
120 73:23 178:14
1200 179:21
13 42:13,18,19,22
   43:15 96:18 185:2
13-foot 152:3
13-inch 95:21 96:2
   96:10,19 97:2
   119:9
1300 179:21
14 63:22,23 136:4
   164:3 185:3

14,196.68 182:7
14.95 116:11
144 173:23
15 92:18,21,24
   129:14 136:17
   164:3,3 177:17,21
   183:3 185:4
15th 41:3
150 178:14
1500 136:19
1523 17:11
16,500 131:4
160 175:9
17 131:4
170B 172:5,9
170B's 173:3
18 138:15
18,000 167:1
180 142:2
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 3:18
186 185:7
1900 51:16
1936 51:15,17 83:19
1948 3:16 11:24
1967 8:14 11:2
1968 12:1,5
1969 6:23
1970s 38:3
1972 38:3
1976 8:22
1977 9:19 72:14
1978 47:18,24 173:5
1980 6:24
19801 1:17,24
1993 34:7
1994 115:7 184:18
19968 4:11
1997 4:15 51:1,2
1998 24:6
1999 4:16,20 50:24

_____ 2 _____
2 26:4,5 43:15
   117:11 141:21
   166:13,21 184:3,8
2:00 69:20
2:12 1:10
20 85:7 94:16 104:1
   129:15 130:18
   164:1,2
2000 102:22 103:1
2005 35:8 36:15
   41:3 178:23
2006 1:10 27:16
   58:18 116:2 186:7
   186:12

22 136:18 138:1
2224 14:15
230 1:24
2300 138:1
25 14:24 63:8 66:1,4
   115:18
250 16:5
2500 136:18
26 184:8
26th 3:16
26,000 115:18
27 184:9
27,000 115:18
27739 1:20
28 149:7 184:11
28-foot 148:23
   149:1
280 116:16 141:16
29th 27:16 58:18
29555 4:10

_____ 3 _____
3 1:10 27:22,23
   151:19 184:9
   186:7
3/8 145:12
30 68:24 104:1
   105:2 110:4 114:7
   130:18 174:22
   184:12
30-amp 76:15
30-minute 48:5
300 117:11
30318013 1:3 2:8
   183:7
3100 47:3,9
32 184:13,15
32-foot 47:3
33 184:16
330 116:16
34 184:18
35-millimeter 117:8
36 4:8 149:4 184:19
37 4:7
38 16:6 18:12
   134:20
380 16:10
39 18:11

_____ 4 _____
4 28:18,19 184:11
4th 67:6
4,600 48:1
40 174:22 184:20
40-foot 82:9
41 184:22

42 185:2
4200 36:1
43,000 34:12
44 125:7 126:12
44-by-44 83:21
4400 51:13
45,646.89 182:6
48081 1:20

_____ 5 _____
5 30:20,21 184:12
5/29/06 1:5 28:5
5/29/2006 2:9
5:00 59:5
50 51:15 53:1
   174:22
50,000 130:18
500 152:21
550 18:8
560 1:9,16
59 16:6
59,605 34:11

_____ 6 _____
6 32:13,14 184:13
6th 4:8
6/16/06 184:12
6/19/06 184:8
6/25/93 184:18
6/27/06 184:14
6/3/06 184:20
6:00 59:5,8
6:10 183:11
60 112:15
60,000 19:13 34:17
63 185:3

_____ 7 _____
7 32:16,18 184:7,15
7.3 115:12
7/15/05 184:22
7:30 59:21
704 1:8,17
71,000 5:14
73 38:3
75-watt 158:7
76 9:18
78.8 18:11
79 145:10

_____ 8 _____
8 33:13,14 59:21
   184:16
8-foot 149:6
8.95 116:11

Hanson Renaissance Court Reporting & Video
(313) 567 - 8100   www.hansonreporting.com

205

**9**

**9** 34:22,23 134:20
146:7 184:18
**9-millimeter** 133:19
134:14
**9-1-1** 77:13
**900** 16:23
**92** 185:4
**94** 115:11 120:10
**99** 93:13 147:5

# EXHIBIT C

**AIG Homeowners Insurance Program**
99 Bedford Street
Boston, MA 02111-2217
Tel. (866) 342-2045 Fax (866) 360-3202
Underwritten by HOMESITE INSURANCE COMPANY

*RECEIVED* JUL 1 2 2006

JOSEPH W JADCZAK JR.
CATHERINE JADCZAK
29555 EAGLES CREST RD
MILTON, DE  19968

*Replacement Cost Questionnaire*

*Policy Number:  30318013*

What year was your home Built?  _2 0 0 1_  (Please list the original year of construction, not the year of renovation)

What type of dwelling is your home? (Please fill in one box)

☒ Single Family    ☐ Multi-Family   *Change To 850,000*
☐ Townhouse        ☐ Row House

How many families is your home? (Please fill in one box)

☒ One Family    ☐ Two Family    ☐ Three Family
☐ Four Family   ☐ Five or more Family

What is the Style of your Home? (Please fill in one box)

☐ Adobe                    ☐ Queen Anne
☐ Back-Split/Split Level   ☐ Cape Cod
☐ Colonial                 ☐ Contemporary
☐ Mediterranean            ☒ Ranch
☐ Raised Ranch             ☐ Row/Townhouse-End
☐ Row/Townhouse-Center     ☐ Tri-Level
☐ Victorian                ☐ Victorian Ornate

How many stories is your home? (Please fill in one box)

☒ 1  ☐ 1.5  ☐ 2  ☐ 2.5  ☐ 3  ☐ 3.5  ☐ 4

What is the primary exterior wall covering of your home? (Please fill in one box)

☐ Adobe                ☐ Aluminum Siding
☐ Asbestos Shingle     ☐ Block
☐ Brick and Block      ☐ Brick Veneer
☐ Clapboard Siding     ☐ EIFS/Synthetic Stucco
☒ Hardy Plank          ☐ Logs
☐ Poured Concrete      ☐ Solid Brick
☐ Solid Stone          ☐ Stone & Block
☐ Stone Veneer         ☐ Stucco on Block
☒ Stucco on Frame      ☐ Vinyl Siding
☐ Wood Shakes          ☐ Wood Siding

What is the primary foundation type your home is built on? (Please fill in one box)

☐ Slab                    ☒ Crawlspace
☐ Closed Basement         ☐ Stilts
☐ Walkout Basement

What is the total living area of your home in square feet? _3685_
   *(Do not include Basement, Garages, Porches or Decks)*
   8a. If you have a finished basement how many square feet are finished? _NA_
   *(Do not include this figure in your total living area)*

What is the primary type of roof on your home? (Please fill in one box)

☒ Composition Shingle     ☐ Asphalt
☐ Concrete Tile           ☐ Rubber/Steel/Metal/Tin
☐ Wood Shingle            ☐ Wood Shake
☐ Clay Tile               ☐ Spanish Tile
☐ Slate Shingle           ☐ Built-Up / Tar & Gravel
☐ Foam                    ☐ Plexi-glass

What year was the oldest portion of your roof installed? _2001_

What type of garage do you own? (Fill in all that apply. If none proceed to next question)

☒ Attached    # Cars  _3_
☐ Built-In    # Cars  _____
☒ Detached    # Cars  _____  – Change From 82200 To 200,000

Do you have any of the Following Features? (Fill in all that apply)

☒ Central Air Conditioning
☒ Fireplace (wood burning)   How Many?  _2_   1 Gas (Propane)
☐ Woodstove                  How Many?  _____
☒ Porch                      How Many?  _2_
☐ Breezeway                  How Many?  _____
☐ Deck                       How Many?  _____

What is your primary heating system? (Fill in one box)

☐ Electric           ☐ Gas / Hot Water
☒ Oil / Hot Water    ☐ Gas / Hot Air
☐ Oil / Hot Air      ☐ Wood

Is there an ⊙active inactive or abandoned oil tank on your property?
   (Fill in all that apply. If none proceed to next question)

☒ Underground (Buried Underground)  (2)
☐ Above Ground on Masonry
☐ Above Ground not on Masonry

How many full bathrooms are in the home? _2_  (3 or more fixtures)

How many half bathrooms are in the home? _1_  (2 fixtures)

Signature _Joseph W Sadupski_          Date _7-7-06_

# EXHIBIT D

# AIG Homeowners Insurance Program
99 Bedford Street
Boston, MA 02111-2217
Tel. (866) 342-2045 Fax (866) 360-3202
Underwritten by HOMESITE INSURANCE COMPANY

JOSEPH W JADCZAK JR.
CATHERINE JADCZAK
29555 EAGLES CREST RD                    ***Policy Change for Policy Number 30318013***
MILTON, DE   19968

September 1, 2006

Dear JOSEPH JADCZAK & CATHERINE JADCZAK,

The following changes have been made to your insurance policy effective August 29, 2006:

* ADDED HO 04 48 OTHER STRUC-INCR LM

Any adjustments to your premium balance or future installments will be reflected on your next bill.

A declarations page reflecting the policy change and any premium adjustments is attached.

Should you have any questions regarding this change or your policy, please contact our Customer Service Center at your convenience.   Please call us at 1-866-342-2045.

Sincerely,

Customer Care Department
AIG Homeowners Insurance Program

Policies are underwritten by member companies of the Homesite Insurance Group.   Member companies include: Homesite Insurance Company of California (Certificate of Authority #6940), Homesite Indemnity Company, Homesite Insurance Company of Illinois, Homesite Insurance Company of the Midwest, Homesite Insurance Company of New York, Homesite Insurance Company of Pennsylvania, Homesite Insurance Company, Ranchers and Farmers Mutual Insurance Company, and Homesite Lloyds's of Texas.

Policy Number 30318013  AHI902-0505

# AIG Homeowners Insurance Program

99 Bedford Street
Boston, MA 02111-2217
Tel. (866) 342-2045 Fax (866) 360-3202
Underwritten by HOMESITE INSURANCE COMPANY

*Policy Change Declarations*
*For Policy Number 30318013*

**Policy Period** This policy covers the listed location(s)
**From** 12:01 AM August 16, 2006
**Through** 12:01 AM August 16, 2007 (local time)

JOSEPH W JADCZAK JR.
CATHERINE JADCZAK
29555 EAGLES CREST RD
MILTON, DE   19968

*Issued by Homesite Insurance Company*

*Tier 001*

**Insured Location**
29555 EAGLES CREST RD  MILTON DE 19968-3621

**Description of Dwelling**
2001 Stucco on frame, Single family home, Primary residence, Partially Protected, territory code 0002, over 1000ft. from hydrant, within 5 miles from fire station

Deductible  $250
Windstorm or Hail Deductible 2%

In case of loss under Section I, we cover only that part of the loss over the deductible stated.  For Wind or Hail deductible, see endorsement.

| Coverage | Limit | Premium |
|---|---|---|
| **Section I - Property** | | |
| Coverage A - Dwelling | | |
| Coverage B - Other Structures | | |
| Coverage C - Personal Property | | |
| Coverage D - Loss of Use | | |
| **Section II - Liability** | | |
| Coverage E - Personal Liability | | |
| Coverage F - Medical Payments to Others | | |
| **Additional Coverages** | | |
| See **Additional Coverages** on reverse side for details | | |
| **Surcharges** | | |
| See **Surcharges** on reverse side for details | | |
| **Discounts** | | |
| See **Discounts** on reverse side for details | | |
| **Total** | | $2,172.00 |

**Authorized Representative**

## Additional Coverages $508.00

| | | Limit | Premium |
|---|---|---|---|
| HO 04 20 0694 | Specified Additional Amount Insurance for Cov A | | |
| HO 04 48 0491 | Other Structures - Increased Limits | | |
| HO 04 90 0491 | Personal Property Replacement Cost | | |



## Surcharges $0.00

| | Limit | Premium |
|---|---|---|

## Discounts -$276.00

| | Limit | Premium |
|---|---|---|

## Contracts and Amendments

| **HO 00 03 0491** | **Special Form (HO 00 03 0491)** |
|---|---|
| HO 01 07 1298 | Special Provisions - Delaware |
| HO 04 32 0502 | Limited Fungi, Wet or Dry Rot, or Bacteria Coverage |
| HO 04 96 0491 | No Section II Coverage - Home Day Care Business |

## Mortgagees

## Important Messages

**These Declarations are not the entire insurance policy.   All information contained in the Declarations regarding the insured, covered property, coverage limits, deductibles, and premium charges is subject to the specific terms and conditions of the policy contract.   Please read your policy contract and amendments carefully.**

**The limit of liability for this structure (Coverage A) is based on an estimate of the cost to rebuild your home, including an approximate cost for labor and materials in your area, and specific information that you have provided about your home.**

HOMEOWNERS
HO 04 20 06 94

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**SPECIFIED ADDITIONAL AMOUNT OF INSURANCE FOR
COVERAGE A - DWELLING
Forms HO 00 02 and HO 00 03 Only**

**(Applies only when loss to dwelling building exceeds the
Coverage A Limit of Liability shown in the Declarations)**

To the extent that coverage is provided, we agree to provide an additional amount of insurance in accordance with the following provisions:

**A.** If you have:

**1.** Allowed us to adjust the Coverage A limit of liability and the premium in accordance with:

**a.** The property evaluations we make; and

**b.** Any increases in inflation; and

**2.** Notified us, within 30 days of completion, of any improvements, alterations or additions to the dwelling building which increase the replacement cost of the dwelling building by 5% or more;

the provisions of this endorsement will apply after a loss, provided you elect to repair or replace the damaged or destroyed dwelling building.

**B.** If there is a loss to the dwelling building that exceeds the Coverage A limit of liability shown in the Declarations, for the purpose of settling that loss only:

**1.** We will provide an additional amount of insurance, up to 25%* of the Coverage A limit of liability; and

**2.** The Section I Condition **3.** Loss Settlement paragraph **b.** is deleted and replaced by paragraphs **b.**, **c.**, and **d.** as follows:

**b.** The dwelling building under Coverage A at replacement cost without deduction for depreciation. We will pay no more than the smallest of the following amounts for like construction and use on the same premises:

**(1)** The replacement cost of that part of the dwelling building damaged or destroyed;

**(2)** The necessary amount actually spent to repair or replace the damaged or destroyed dwelling building; or

**(3)** The limit of liability under this policy that applies to the dwelling building, plus any additional amount provided by this endorsement.

**c.** We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.

**d.** You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to the dwelling building on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability on a replacement cost basis.

*Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

 Copyright, Insurance Services Office, Inc., 1994

HOMEOWNERS
HO 04 90 04 91

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PERSONAL PROPERTY REPLACEMENT COST

**SECTION I**

For an additional premium, covered losses to the following property are settled at replacement cost at the time of loss:

**a.** Coverage C - Personal Property;

**b.** If covered in this policy, awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings.

Personal Property Replacement Cost coverage will also apply to the following articles or classes of property if they are separately described and specifically insured in this policy:

**a.** Jewelry;

**b.** Furs and garments trimmed with fur or consisting principally of fur;

**c.** Cameras, projection machines, films and related articles of equipment;

**d.** Musical equipment and related articles of equipment;

**e.** Silverware, silver-plated ware, goldware, gold-plated ware and pewterware, but excluding pens, pencils, flasks, smoking implements or jewelry; and

**f.** Golfer's equipment meaning golf clubs, golf clothing and golf equipment.

Personal Property Replacement Cost coverage will not apply to other classes of property separately described and specifically insured.

**1. PROPERTY NOT ELIGIBLE**

Property listed below is not eligible for replacement cost settlement.  Any loss will be settled at actual cash value at the time of loss but not more than the amount required to repair or replace.

**a.** Antiques, fine arts, paintings and similar articles of rarity or antiquity which cannot be replaced.

**b.** Memorabilia, souvenirs, collectors items and similar articles whose age or history contribute to their value.

**c.** Articles not maintained in good or workable condition.

**d.** Articles that are outdated or obsolete and are stored or not being used.

**2. REPLACEMENT COST**

The following loss settlement procedure applies to all property insured under this endorsement:

**a.** We will pay no more than the least of the following amounts:

**(1)** Replacement cost at the time of loss without deduction for depreciation;

**(2)** The full cost of repair at the time of loss;

**(3)** The limit of liability that applies to Coverage C, if applicable;

**(4)** Any applicable special limits of liability stated in this policy; or

**(5)** For loss to any item separately described and specifically insured in this policy, the limit of liability that applies to the item.

**b.** When the replacement cost for the entire loss under this endorsement is more than $500, we will pay no more than the actual cash value for the loss or damage until the actual repair or replacement is complete.

**c.** You may make a claim for loss on an actual cash value basis and then make claim within 180 days after the loss for any additional liability in accordance with this endorsement.

All other provisions of this policy apply.

    Copyright, Insurance Services Office, Inc., 1990

# EXHIBIT E

**HOMEOWNERS**
**HO 04 48 04 91**

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

## OTHER STRUCTURES
### INCREASED LIMITS

For an additional premium, we cover each structure described below, on the "residence premises," for the additional limit of liability shown for that structure.

The limit shown below is in addition to the amount which is applicable to that described structure under Coverage B, Other Structures.

Each additional limit of liability shown below applies only to that described structure.

| Description of Structure* | Additional Limit of Liability* |
|---|---|
| 1.   HANGER | 1.   $82,000 |
| 2. | 2. |
| 3. | 3. |
| 4. | 4. |
| 5. | 5. |
| 6. | 6. |
| 7. | 7. |
| 8. | 8. |
| 9. | 9. |
| 10. | 10. |

*Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

# EXHIBIT F

# Vehicles Used to Service the Insured Premises

## Q

We insure a home under AAIS form 3, edition 2.0. The insured owns a go-kart that was damaged by one of the named perils. The insurer has denied the claim, because this vehicle is not used to "service the insured premises."

In reviewing this issue, we have found two different opinions on what it means to "service the insured premises." The first is a more conservative interpretation that says that in order to be covered under the homeowners policy the vehicle must be physically used for things such as moving dirt, hauling wood, pulling a wagon, etc. The other opinion includes "recreational use" within the parameters of "servic[ing] the insured premises." In other words, just riding the go-kart for fun would constitute "servic[ing] the insured premises."

May we have your opinion?

Missouri Subscriber

## A

The homeowners policy specifies that it does not cover motor vehicles, because they are more appropriately covered on a personal auto policy. However, it does recognize that a homeowner may have certain types of "vehicles" around the home that are used to "service" it (such as a lawn tractor). The policy provides an exception for such vehicles.

Mere use of a go-kart for one's own enjoyment cannot be interpreted as using it to "service the residence premises." *Webster's Ninth New Collegiate Dictionary* says that to service means to "repair or provide maintenance."

The Pennsylvania Supreme Court agreed with this interpretation in *Tenos v. State Farm*, 716 A.2d 626 (1998). That court concluded that "the common usage of 'service', in this context, contemplates some sort of maintenance or repair to the premises. In fact, the plain, ordinary and everyday meaning of the term 'service' simply does not conjure thoughts of recreation."

When writing the exception for certain vehicles, the policywriters had in mind things such as riding lawn mowers. We don't believe that this exception can be stretched to include a go-kart. The insurer was correct to deny the claim.

# EXHIBIT G

## LAWRENCE J. DOVE ASSOCIATES

6860 NEW STATE ROAD

PHILADELPHIA, PA 19135



| fire origin | • | electrical |
|---|---|---|
| fire cause | • | mechanical |
| fire spread | • | materials |

**REPORT NARRATIVE**

Report

**LAWRENCE J. DOVE ASSOCIATES**

| 7118 STATE ROAD, PHILADELPHIA, PA 19135-1433 · 215-331-9220 | | **FIRE INVESTIGATIONS** |
|---|---|---|
| FAX 215-331-0707 | 1-800 441-DOVE | **PROFESSIONAL ENGINEERS** |

July 20, 2006

Chap Chancellor
Eagle Adjusting
136 W. Lancaster Avenue
Suite 3
Paoli, PA 19301

RE:    29555 EAGLE CREST ROAD
Milton, Delaware
Date of Fire Loss: 5/29/06
Insured/Owner: Joseph Jadczak
Our File #: 06-13316
Homesite Insurance Claim #: 1038220

Dear Mr. Chancellor:

We have conducted an investigation into the origin and cause of the fire which reportedly occurred at the subject premises, 29555 Eagle Crest Road, Milton, DE, during the late morning hours (11:27 am) of May 29, 2006. Our investigation was conducted in accordance with National Fire Protection Association (NFPA) 921 and American Society for Testing and Materials (ASTM) E 678-98, which outline fire investigation methodology and scientific practice intended to determine the most logical explanation for this fire incident and its damage accounting for all significant data and information.

I have prepared this correspondence as a formal report setting forth a summary of the results of our investigation at this date, which has included consideration of:

–    inspection of the subject premises on June 4, 2006;

–    informal discussion with Randy Lee of the Sussex County Fire Marshal's Office;

–    informal discussion with owner Joseph Jadczak;

| fire origin | • | electrical |
|---|---|---|
| fire cause | • | mechanical |
| fire spread | • | materials |
| fire safety | • | chemistry |

**DOVE ASSOCIATES**

File: 06-13316                    Page 2

– National Fire Protection Association (NFPA) 921 and other
  references; and

• related file materials and information.

<u>DISCUSSION</u>

<u>Report Appendices</u>

'A'     Photographs #1-10, including narratives. General reference is made to these
photographs for visual orientation of the fire scene and accompanying comment (the
details of which are not repeated in this discussion).

The structure located at 29555 Eagle Crest Road, Milton, DE, faces south and is a
one like two story NFPA Type 5 structure of wood frame utilized as a garage and airplane
hanger. This structure used stucco over plywood for the exterior siding. The structure's
gable roof configuration was protected by exterior weather covering of composite
shingles. The structure was constructed slab on grade and interior partition wall supports
consisted of vertical wood wall studs with sheetrock wall surfaces.

The fire structure has several means of access, single entry doors on the east and
west side, a roll-up door on the west side and a rolling door on the north end (the hanger
side).

At the time of the fire, the garage contained a 1994 Cobra 32' motor home and a
Piper Cherokee Six airplane.

The electric service entered from the main dwelling through a service lateral.
Wiring for general lighting and power throughout the structure contained copper
conductors of #10 #12 and #14 AWG in plastic Romex sheathing.

**DOVE ASSOCIATES**

File: 06-13316                              Page 3

　　Informal discussion with structure owner, Joseph Jadczak, revealed that the garage was built in 1999 and the dwelling was built in 2001. The family had resided in the motor home for a year before the dwelling was built. Mr. Jadczak related that his wife was exercising when she observed smoke coming from the garage. Mr. Jadczak went to the garage and was able to remove his airplane. He observed fire in the motor home. Mr. Jadczak stated that the motor home was constructed on a 1994 Ford chassis. The vehicle had approximately 25,000 miles and a 5KW generator. The vehicle had an onboard battery charger. This charger was powered from a 30 amp outlet, and Mr. Jadczak estimated that it had been plugged in for at least three years (during the period prior to this fire).

　　My site investigation established that the fire originated within the 1994 Cobra motor home at the location of the charging unit. The fire progressed naturally (horizontally and vertically) with typical heat conditions that went undetected and spread to involve the entire garage/hangar. Direct flame attack was confined to the garage/hangar and motor home. The family dwelling was not affected.

　　Fire patterns within the motor home were consistent with a malfunction of the charging unit. The charging unit is composed of the charger circuits, associated wire and battery connections. It is significant to note that the charger unit had been plugged in for at least three years. It was not known when the batteries were last serviced or the fluid level checked during the period of years prior to this fire. It is also significant that no information existed to indicate that this charger unit had been serviced by independent contractor or was causing problems prior to the fire.

　　Finally, it is noted that during informal discussion with investigating Deputy Fire Marshal Randy Lee it was learned that he was on the scene with assigned Deputy Fire Marshal John Galaska. Deputy Fire Marshal Galaska has not completed his investigation as of July 17, 2006. The preliminary investigation determined that the fire started in the

**DOVE ASSOCIATES**

File: 06-13316                                    Page 4

motor home and was of accidental origin, and reportedly that will be the final cause determination. The exact mechanism of fault malfunction was not determined. The incident # is 9006040919.

<u>Conclusions</u>

In summary, it is my opinion with reasonable scientific certainty at this date using NFPA 921 as a guide that all available data and information is consistent and supportive that the cause of the fire was accidental in nature and involved the failure of an older battery charger system which had been left on and unattended for a significant period of time (years) (as discussed above).

Given my findings to date, the known circumstances of this fire and as discussed, we now consider our file closed.

I do reserve the right to supplement this report if further detail or comment is requested at this time or a later date, and if any additional information becomes available. File materials including fire scene photographs to be considered a supplement to this report, and may be utilized by me in support of my conclusions.

This is,

Respectfully submitted,

LAWRENCE J. DOVE ASSOCIATES

By
KENNETH A. KANDRAC, C.F.I.

KAK:wk

**DOVE ASSOCIATES**

## KENNETH A. KANDRAC, C.F.I.

**PERSONAL DATA**

> Retired (2001) Battalion Chief, North Hudson Fire District after more than 30 years of fire service.

**EXPERIENCE**

> Lawrence J. Dove Associates: Senior fire and explosion expert of Dove Associates, a nationally known forensic consulting firm specializing in fire and explosion investigations of industrial, commercial and residential sites, marine vessels and shore facilities as well as forensic engineering and materials-environmental chemistry. In addition to structural fires and explosions, Mr. Kandrac and staff conduct investigations of marine fire losses of ocean-going vessels, pleasure craft and docking facilities. Mr. Kandrac and other staff fire experts possesses many years of urban firefighting and investigation experience including marine fire losses. Dove certified fire protection specialists analyze building, fire and life safety code requirements relating to major industrial, commercial and residential losses. Forensic investigation by firm Professional Engineers, members of various national engineering organizations, includes biomechanical, civil, electrical, mechanical, marine and material-metallurgical analysis of personal injury and property losses. Our staff chemist specializes in claims involving toxic materials, and industrial and environmental hazards.

> Battalion Chief, North Hudson Regional Fire & Rescue (2000-2001): Assigned to Office of Chief of Department. Responsible for determining origin and cause of fires and explosions occurring in the North Hudson Fire District, reporting directly to the Director and Chief of Department. Staff chief responsibilities including day to day operations, manning, SOP, evaluation of equipment and procedures, maintaining computer databases for personnel and equipment. Also Shift Commander, directed fire fighting operations of assigned personnel, fire rescue, fire suppression and tactics.

> Captain, Union City/North Hudson Regional Fire & Rescue (1984-2000). Directed fire fighting operations of assigned personnel, fire rescue, fire suppression and tactics. Also assigned to act as Battalion Chief shift commander in the absence of regularly assigned officer. Responsible for determining origin and cause of fires and explosions in jurisdiction.

Kenneth A. Kandrac                                                          Page 2

Firefighter, Union City Fire Department (1973-1984). Duties include tactical fire attack unit, search and rescue above fire floor.

Lawrenceville Volunteer Fire Company (1965-1990). Firefighter, First Assistant Chief.

United States Navy (1967-1970). United States Navy – USS Oriskany (CVA 34) (1968-1970) Tour of Duty South East Asia, Republic of Viet Nam.

## EDUCATION

Associate Degree Fire Science Mercer County Community College, Trenton, New Jersey 1981
Certified Fire Investigator (CFI) International Association Arson Investigators
University of Wisconsin-Madison college of Engineering Technical Fundamentals Fire Investigator
The State of New Jersey Division of State Police Hazardous Materials Emergency Response Course
Hazardous Materials Operational & Technician Instructor Qualification State of New Jersey

## INSTRUCTOR/SPECIALIZATION

New Jersey State Certified Fire Instructor
Certified Fire Investigator (CFI), International Association of Arson Investigators
Instructor New Jersey Attorney General Department of Law and Public Safety
        Fire Arson Course  Chemistry of Fire
New Jersey Attorney General Department of law and Public Safety
        Fire Arson Course Building Construction
Live Burn-Level I and II Instructor

## COURT QUALIFIED EXPERT

US District Court Eastern District of Pennsylvania
US District Court Western District of New Jersey
US District Court Southern District of New York
US District Court Southern District of New York (Maritime)
US District Court Western District of Pennsylvania
Pennsylvania, New Jersey and New York State Court Systems

Kenneth A. Kandrac                                                            Page 3

**FIRE DEPARTMENT AWARDS**

     Class II Valor Award Rescue of Emotional Disturbed Person from Bridge Overpass 1998
     Class III Valor Award Rescue of Entrapped Bus Driver under hazardous conditions 1988

**ASSOCIATION/MEMBERSHIPS**

     National Fire Protection Association (NFPA)
     International Association of Arson Investigators (IAAI)

**REFERENCES**

     Provided upon request.

# EXHIBIT H



# RESERVATION-OF-RIGHTS LETTER

June 27, 2006

Joseph and Catherine Jadczak
29555 Eagles Crest Drive
Milton, Delaware 19968-3621

> **Re:  Claim of Joseph and Catherine Jadczak**
> CLAIM NO. 1038220
> POLICY NO. 30318013
> D/LOSS: 5/29/2006

Dear Mr. and Mrs. Jadczak:

We have identified several issues during our investigation of this claim which may preclude some or all insurance coverage for this loss. We therefore write now to bring these issues to your attention.

We write to you now to specifically reserve our right to raise any and all policy terms, conditions, and exclusions to contest coverage for insurance proceeds you request for this claim. We do not intend the coverage issues and potential defenses identified in this letter to be exhaustive or exclusive. You should not construe anything that either does, or does not, appear in this letter as a waiver by Homesite of any of its rights to contest coverage for this matter. Homesite will provide you with a coverage determination upon completion of our investigation.

Please allow me to explain the basis for this Reservation-of-Rights letter.

## THE MAY 29, 2006 LOSS

This claim arises from an alleged fire which occurred in a hangar located on your property on 5/29/06. The fire allegedly damaged the hangar and property contained inside the structure. Your house and driveway may have also been damaged as a result of the fire. You reported this loss to us on 5/30/06.

We have been advised that a recreational vehicle and a small aircraft were inside the hangar. We understand that you removed the aircraft from the hangar, but the recreational vehicle was allegedly damaged by the fire.

**Reservation-of-Rights Letter**

Claim No. 1038220
April 10, 2008
Page 2 of 10

The cause of the fire is unknown at this point.  We have been advised that local and state fire marshals are currently involved in an investigation surrounding the circumstances of the fire.  We understand, however, that an old battery charger was plugged into the recreational vehicle at the time of the fire.  We also understand that the battery charger may have been plugged into the recreational vehicle for at least three (3) years.

## THE HOMESITE POLICY

### A.   Exclusions.

As you know, we insured you under a standard homeowner's policy (HO-3), being policy number 30318013.  Although this is a so-called all-risk policy, there are certain exclusions to coverage.  These exclusions begin on page 6 of your policy.  These exclusions say, in relevant part, that we insure against risk of direct loss to property described in **Coverages A** and **B** only if that loss is a physical loss to property.  We do not insure for loss involving collapse caused by:

> **e.**  Any of the following:
>
> > **(1)**  Wear and tear, marring, deterioration;
> >
> > **(2)**  Inherent vice, latent defect, mechanical breakdown;

See **SECTION I – PERILS INSURED AGAINST, COVERAGE A – DWELLING and COVERAGE B – OTHER STRUCTURES, ¶ 2.e.(1)-(2)**, p. 7 of policy.

We must reserve the right to rely upon these exclusions in response to your request for coverage for this claim.

We must now direct your attention to the exclusions that begin on p. 8 of your policy.  These exclusions say, in relevant part, that we do not insure against loss caused directly or indirectly by any of the following.  Such loss is excluded, regardless of any other cause or event contributing concurrently or in any sequence to the loss:

> **e.**  **Neglect,** meaning neglect of the 'insured' to use all reasonable means to save and preserve property at and after the time of a loss.

**Reservation-of-Rights Letter**

Claim No. 1038220
April 10, 2008
Page 3 of 10

---

See **SECTION I – EXCLUSIONS, ¶ 1.e.,** p. 9 of policy.

If we find that your neglect caused a loss either directly or indirectly, we will deny all coverage for this claim under every section of the insurance policy. We must therefore reserve our right to raise this exclusion in response to your request for coverage for this claim.

Similar to the neglect exclusion, the intentional loss exclusion bars coverage for an intentional act committed by an insured with the intent to cause a loss. The exclusions say that we do not insure for:

> **h. Intentional Loss,** meaning any loss arising out of any act committed:
>
> **(1)** By or at the direction of an 'insured'; and
>
> **(2)** With the intent to cause a loss.

See **SECTION I – EXCLUSIONS, ¶ 1.h.,** p. 9 of policy.

If we discover that you played a role in the intentional destruction of the insured property, we will, pursuant to this provision, deny all insurance coverage for this claim under every section of the insurance policy. We must therefore specifically reserve the right to raise these policy exclusions in response to your request for coverage for this claim.

We are also reserving our right to deny coverage for this loss pursuant to the faulty, inadequate, or defective-maintenance exclusion found on page 9 of your policy. This exclusion says:

> **c. Faulty, inadequate or defective:**
>
> **(1)** Planning, zoning, development, surveying, siting;
>
> **(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
>
> **(3)** Materials used in repair, construction, renovation or remodeling; or
>
> **(4)** Maintenance;
>
> Of part or all of any property whether on or off the

**Reservation-of-Rights Letter**

Claim No. 1038220
April 10, 2008
Page 4 of 10

'residence premises.'

See **SECTION I – EXCLUSIONS, ¶ 2.c.,** p. 9 of policy.

If we discover that the property losses claimed under **COVERAGES A** or **B** were caused by poor maintenance by you, or faulty materials in repair or construction of the property, coverage will be denied.

### B.    Other Structures – Coverage B.

We must now advise you of our property coverage under **Coverage B** of the policy.  The policy says:

> We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.
>
> This coverage does not apply to land, including land on which the other structures are located.
>
> We do not cover other structures:
>
> 1. Used in whole or in part for "business"; or
>
> 2.  Rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.
>
> This limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A.  Use of this coverage does not reduce the Coverage A limit of liability.

See **SECTION I – Property Coverages – COVERAGE B – Other Structures,** p 2 of policy.

The facts indicate that on 5/29/06, a fire allegedly occurred in a hangar located on your property.  The fire allegedly caused damage to the hangar and other property.  It is unclear at this time whether the hangar is used in whole or in part for "business".  Your policy defines "Business" as including trade, profession or occupation. See **DEFINITIONS, ¶2,** pg. 1 of policy.

It is also unclear at this time whether the hangar is rented or held for rental to any person not a tenant of the dwelling.   We must therefore reserve our right to raise these policy provisions in response to your request for coverage for this claim.

### C.   **Personal Property Loss.**

We must now advise you of our personal property coverages.  Your policy contains special limits of liability under **Coverage C** which begin on page 2 of your policy.  The policy says that these limits do not increase the **Coverage C** limit of liability.  The special limit for each numbered category below is the total limit for each loss for all property in that category:

> **8.**   $2500 on property, on the "residence premises," used at any time or in any manner for any "business" purpose.

**See SECTION I – PROPERTY COVERAGES, COVERAGE C, Special Limits of Liability, ¶8**, pg. 2 of policy.

Because it is unclear at this time whether any of the allegedly-damaged property is used for a business purpose, we must reserve the right to raise this policy provision in response to your request for coverage for this claim.

The policy also provides a special limit of liability for the following personal property:

> **10.**   $1000 for loss to electronic apparatus, while in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power.   Electronic apparatus includes:
>
> **a.** Accessories or antennas; or
>
> **b.** Tapes, wires, records, discs or other media

**Reservation-of-Rights Letter**

Claim No. 1038220
April 10, 2008
Page 6 of 10

for use with any electronic apparatus described in this item **10**.

See **SECTION I – PROPERTY COVERAGES, COVERAGE C, Special Limits of Liability,** ¶10., pg. 1 of Special Provisions, Delaware.

We understand that a recreational vehicle was allegedly damaged by the 5/29/06 fire which occurred in a hangar located on your property. The recreational vehicle was allegedly inside the hangar at the time of the alleged fire. We must reserve our right to raise this policy provision in response to your request for coverage for this claim.

Your Homesite policy does not cover articles separately described and specifically insured in this or other insurance. See **SECTION I – PROPERTY COVERAGES, COVERAGE C, Property Not Covered,** ¶1, pg. 3 of policy. We reserve our right to raise this exclusion in response to your request for coverage for this claim.

Your policy also does not cover the following personal property:

**3.** Motor vehicles or all other motorized land conveyances. This includes:

  **a.** Their equipment and accessories; or

  **b.** Electronic apparatus that is designed to be operated solely by use of the power from the electrical system of motor vehicles or all other motorized land conveyances. Electronic apparatus includes:

  (1) Accessories or antennas; or

  (2) Tapes, wires, records, discs or other media;

  for use with any electronic apparatus.

  The exclusion of property described in **3.a.** and **3.b.** above applies only while the

property is in or upon the vehicle or
conveyance.

See **SECTION I – PROPERTY COVERAGES, COVERAGE C, Property Not
Covered, ¶3**, pg. 3 of policy.

Because a recreational vehicle was allegedly damaged by the fire on
5/29/06, we must therefore reserve our right to raise this exclusion in
response to your request for coverage for this claim.

Your policy also does not cover aircraft and parts. Aircraft means any
contrivance used or designed for flight, except model or hobby aircraft not
used or designed to carry people or cargo. See **SECTION I – PROPERTY
COVERAGES, COVERAGE C, Property Not Covered, ¶4**, pg. 3 of policy.

We understand that you own an aircraft which you store in a hangar
located on your property. It is unclear at this time if the aircraft was
damaged by the alleged fire. It is also unclear at this time if any aircraft
parts were damaged by the alleged fire. We must therefore reserve the
right to raise this exclusion in response to your request for coverage for this
claim.

Finally, your policy does not cover "Business" data, including such data
stored in books of account, drawings or other paper records, or electronic
data processing tapes, wires, records, discs or other software media. See
**SECTION I – PROPERTY COVERAGES, COVERAGE C, Property Not
Covered, ¶8**, pg. 3 of policy.

It is unclear at this time if any of the allegedly-damaged property is
"Business" data. We must therefore reserve our right raise this exclusion in
response to your request for coverage for this claim.

### C.   <u>Policy Conditions.</u>

Your policy also contains conditions that apply to this claim. These
conditions set forth the duties after a loss and say in relevant part:

2. **Your Duties After Loss.** In case of a loss to
covered property, you must see that the following
are done:

a.   Give prompt notice to us or our agent;

**Reservation-of-Rights Letter**

Claim No. 1038220
April 10, 2008
Page 8 of 10

---

**b.**   Notify the police in case of loss by theft;

**c.**   Notify the credit card or fund transfer card company in case of loss under Credit Card or Fund Transfer Card coverage;

**d.**   Protect the property from further damage. If repairs to the property are required, you must:

   **(1)**   Make reasonable and necessary repairs to protect property; and

   **(2)**   Keep an accurate record of repair expenses;

**e.**   Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

**f.**   As often as we reasonably require:

   **(1)**   Show the damaged property;

   **(2)**   Provide us with records and documents we request and permit us to make copies; and

   **(3)**   Submit to examination under oath, while not in the presence of any other 'insured,' and sign the same.

See **SECTION I – CONDITIONS, ¶ 2, Your Duties After Loss, ¶ 2.a.-f.,** p. 9 of policy.

We cite these provisions to kindly remind you of your duties under the policy and also to request your compliance with them.

Pursuant to these policy conditions, we respectfully request at this time that you provide proof of ownership of all allegedly-damaged personal property in the form of receipts, statements, invoices, certificates of title, or warranty information. Please also provide any photographs relating to the allegedly-damaged property either before or after the alleged loss.

**Reservation-of-Rights Letter**

Claim No. 1038220
April 10, 2008
Page 9 of 10

Pursuant to these policy conditions, we also now request your examinations under oath. Our attorney will contact you shortly to schedule the exams. Please cooperate with him. We include with this Reservation-of-Rights letter a document entitled "The Rights of An Insured When Providing an Examination under Oath". Please review this document so that you understand your rights prior to providing your examinations under oath.

We must now direct your attention to the conditions found at the end of your policy. The conditions say that the entire policy will be void if:

**2.    Concealment or Fraud**

    **a.**    Under Section **I** – Property Coverages, with respect to all "insureds" covered under this policy, we provide no coverage for loss under Section **I** – Property Coverages if, whether before or after a loss, one or more "insureds" have:

        (1)  Intentionally concealed or misrepresented any material fact or circumstance;

        (2)  Engaged in fraudulent conduct; or

        (3) Made false statements;

        relating to this insurance.

See **SECTION I AND II CONDITIONS, ¶ 2 – Concealment or Fraud**, pg. 3, Special Provisions, Delaware.

If Homesite discovers at any time either before or after this loss that you have violated this condition, the Company very well may deny all insurance coverage in this case. If we discover that you engaged in any fraudulent conduct during the application process, during the policy period, or at the time of or after the loss, we may rely upon these conditions to deny all insurance coverage for this claim.

All coverage may also be denied if Homesite discovers that you made false statements or intentionally concealed or misrepresented any material

**Reservation-of-Rights Letter**

Claim No. 1038220
June 27, 2006
Page 10 of 10

fact or circumstance relating to this insurance. We must also now reserve the right to rescind the insurance policy and grant you a full premium refund.

\* \* \*

In light of the above, we must respectfully reserve our right to raise all policy terms, conditions, exclusions and defenses mentioned in this letter in response to your request for insurance coverage in this case. We must also specifically reserve the right to raise any additional policy terms, conditions, defenses and exclusions, the applicability of which are unknown to us at the present time and which we may discover after additional investigation. We do not waive the right to rely on any such exclusions, terms, conditions, etc. by virtue of this letter, nor do we intend the coverage defenses set forth in this letter to be exclusive or exhaustive.

Because we only recently received first notice of this loss, we must request an additional 60 days in which to investigate this matter. We reiterate our earlier request pursuant to the policy conditions for proof of ownership regarding the damaged property and also respectfully ask that you forward to us any additional documentation, including paperwork, pictures, etc. that you have in your possession that pertain in any way to this loss.

Thank you for your anticipated cooperation in this matter.

Sincerely,

Maria Loffredo
Large Loss Specialist
1-800-550-6375 ext. 1465

A52

# EXHIBIT I



November 16, 2006

## DENIAL LETTER

Michael Sensor, Esq.
704 N. King Street
Wilmington, DE  19899

> **RE:  CLAIM OF JOSEPH AND CATHERINE JADCZAK**
> CLAIM NO. 1038220
> POLICY NO. 30318013
> D/LOSS: 5/29/2006
> MFR FILE: H20 06198

Dear Mr. Sensor:

We write to advise you that we are denying your request for insurance coverage for the recreational vehicle which was destroyed by the 5/29/06 fire.  We have carbon-copied Mr. and Mrs. Jadczak on this letter keep them informed.  Our decision to deny this aspect of the insurance claim does not affect any other aspect of the claim.  You should not construe anything that either does, or does not, appear in this letter as a waiver by Homesite of any of its rights.

Please allow me to explain the basis for this denial letter.

## CLAIM NUMBER 1038220

As you know, this claim arises from a fire which occurred inside a hangar located on the insured property on 5/29/06.  The fire damaged the hangar and personal property contained inside the structure.  The fire also caused damage to vegetation on the insured property.

A 1994 Cobra RV with a Ford chassis and diesel engine was inside the hangar at the time of the fire and was totally destroyed.

**Denial Letter**

Claim No. 1038220

July 30, 2007
Page 2 of 4

According to Mr. Jadczak's examination under oath testimony, the R.V. had approximately 25,000-27,000 miles on it at the time of the loss.

Mr. Jadczak also testified that The R.V. was not insured at the time of the loss because it had not been used in three years. You are requesting over $24,000.00 in coverage for the RV.

### THE HOMESITE POLICY

Coverage for loss of personal property is so-called named peril coverage, which means that we insure against loss caused only by one of the perils specifically identified in the policy. The named perils that apply to personal property coverage are set forth on pp.7-8 of the policy. See **SECTION I – COVERAGE C, Personal Property**.

There are exclusions to coverage, however, for loss of personal property. Please refer to page 3 of the Homesite policy. The policy says that we do not cover the following:

**3.** Motor vehicles or all other motorized land conveyances. This includes

**a.** Their equipment and accessories; or

**b.** Electronic apparatus that is designed to be operated solely by use of the power from the electrical system of motor vehicles or all other motorized land conveyances. Electronic apparatus includes:

(1) Accessories, or antennas; or

(2) Tapes, wires, records, discs, or other media;

for use with any electronic apparatus.

The exclusion of property described in 3.a. and 3.b. above applies only while the property is in or upon the vehicle or conveyance.

See **SECTION I – COVERAGE C – PERSONAL PROPERTY,**

**Denial Letter**

Claim No. 1038220

July 30, 2007
Page 3 of 4

**Property Not Covered, ¶3**, p. 3 of policy.

The RV in question is a motor vehicle and is therefore not subject to coverage under the Homesite policy. We must therefore respectfully deny your request for insurance coverage for the RV on the basis that this exclusion defeats coverage in this case.

\* \* \*

We therefore respectfully deny your request for insurance coverage for the RV. This denial letter does not, however, affect coverage decisions for other aspects of this claim. We also rely upon the defenses, exclusions and conditions raised in our original Reservation-of-Rights letter.

We must also specifically reserve the right to raise any additional policy terms, conditions, defenses and exclusions, the applicability of which are unknown at the present time and which may be discovered after additional investigation. We do not waive the right to rely on any such exclusions, terms, conditions, etc. by virtue of this letter, nor do we intend the coverage defenses set forth in this letter to be exclusive or exhaustive.

Sincerely,


Maria Loffredo
Large Loss Specialist
Homesite Insurance
1-800-550-6375 x 1465


*Underwritten by member companies of the Homesite Insurance Group. Member companies include: Homesite Insurance Company, Homesite Indemnity Company, Homesite Insurance Company of California, Homesite Insurance Company of Florida, Homesite Insurance Company of Illinois, Homesite Insurance Company of the Midwest, Homesite Insurance Company of New York, Homesite Lloyd's of Texas and Ranches and Farmers Mutual Insurance Company, and Homesite Insurance Company of Pennsylvania.

"Any person who knowingly and with the intent to defraud any insurance company submits an application or statement of claim containing any materially false information, or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime."
ClaimsDenialGMACNSP-00103

**Denial Letter**

Claim No. 1038220

July 30, 2007
Page 4 of 4

Cc: Joseph and Catherine Jadczak

# EXHIBIT J

.

LAW OFFICES OF

## MERRY, FARNEN & RYAN

A PROFESSIONAL CORPORATION
27739 JEFFERSON AVENUE
ST. CLAIR SHORES, MICHIGAN 48081-1309

TELEPHONE (586) 776-6700
TELECOPIER (586) 776-1501

DIRECT DIAL: (586) 585-2406
jsmythe@mfr-law.comt

JEFFREY M. SMYTHE

July 30, 2007

### *Via Fax & U.S. Mail*
Fax: 302-655-4043

Michael L. Sensor, Esq.
704 N. King Street
PO Box 1568
Wilmington, DE  19899-1568

RE:   **CLAIM OF JOSEPH AND CATHERINE JADCZAK**
      CLAIM NO. 1038220
      POLICY NO. 30318013
      D/LOSS: 5/29/2006
      MFR FILE:  H20 06198

Dear Mr. Sensor:

Thank you for your e-mail correspondence dated March 14, 2007.  I write to you now, on behalf of Homesite, to address the points you raised in your e-mail message.  As you know, Homesite is offering in good faith the following payments toward resolution of this disputed claim.  I now provide you once again with a description of the offer of payment for this claim:

Coverage A –Dwelling: building repairs-  $3,584.74 (RCV)
                      Landscaping -   $21,772.00 (RCV)

#### Total-Coverage A:    $25,356.74

Coverage B -Other Structures:    Limit        $62,200.00
                                 5% debris    $3,110.00

#### Total-Coverage B    $65,310.00

Coverage C -Personal Property:

**MERRY, FARNEN & RYAN, P.C.**

July 30, 2007
Page 2 of 5

_____

RCV          $45,646.89
Depreciation   $14,196.68

**ACV of Coverage C:    $31,450.22**

Total of Coverages A, B and C=$136,313.63

Total of Coverages A, B and C (ACV) to be issued= $122,116.96

As you can see, Homesite is willing to pay the limits of coverage on Coverage B—Other Structures to the Jadczaks for the damage to the hanger caused by the fire. While Homesite acknowledges that your position is that the hanger should be covered under Coverage A—Dwelling of the policy, it respectfully disagrees with your position. Please refer to the Jadczaks' policy which states in pertinent part that we cover:

> 1. The dwelling on the "residence premises" shown in the Declaration, including structures attached to the dwelling; and
>
> 2. Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling of other structures on the "residence premises."

### Section I—Property Coverage, Coverage A—Dwelling, p. 2 of policy.

Please note that the Jadczaks' dwelling is in fact the residence premises where they reside. Coverage A does not include the hanger which I note is set apart from the dwelling by clear space. Moreover, Mr. Jadczak testified that the hangar is set apart from the actual house. Fire damage to the hanger is therefore appropriately valuated under Coverage B—Other Structures of the Homesite policy which says:

> We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.
>
> This coverage does not apply to land, including land on which the other structures are located.
>
> We do not cover other structures:
>
> 1. Used in whole or in part for "business," or

**MERRY, FARNEN & RYAN, P.C.**

July 30, 2007
Page 3 of 5

---

2.    Rented or held for rental to any person not a ten-
      ant of the dwelling, unless used solely as a private
      garage.

The limit of liability for this coverage will not be more than
10% of the limit of liability that applies to Coverage A.
Use of this coverage does not reduce the Coverage A limit
of liability.

**Section I—Property Coverages, Coverage B—Other Structures**, p. 2 of
the policy.

I must also point out that Coverage B-Other Structures includes
structures connected to the dwelling by a utility line or other connection. Mr.
Jadczak testified that the dwelling and hangar are connected by utility lines.
It is therefore the Company's position that the hangar is appropriately
categorized under Coverage B-Other Structures.

I must also reiterate to you at this time Homesite's denial of coverage
for fire damage to the recreational vehicle located in the hanger at the time
of the fire.  Please refer to Homesite's previous denial letter which cites the
following exclusion:

**3.**    Motor vehicles or all other motorized land conveyances.
This includes

**a.**    Their equipment and accessories; or

**b.**    Electronic apparatus that is designed to be
          operated solely by use of the power from the
          electrical system of motor vehicles or all
          other    motorized    land    conveyances.
          Electronic apparatus includes:

          (1) Accessories, or antennas; or

          (2) Tapes, wires, records, discs, or other
          media;

          for use with any electronic apparatus.

          The exclusion of property described in 3.a.
          and 3.b. above applies only while the
          property is in or upon the vehicle or
          conveyance.

**MERRY, FARNEN & RYAN, P.C.**

July 30, 2007
Page 4 of 5

---

> We do cover motor vehicles or conveyances not subject to motor
> vehicle registration which are:
>
>     a.    Used to service an "insured's" residence; or
>
>     b.    Designed for assisting the handicapped;

See **SECTION I – COVERAGE C – PERSONAL PROPERTY, Property Not Covered, ¶3**, p. 3 of policy.

This exclusion acts to bar coverage for any damage sustained by the RV. Your argument is that the motor vehicle exclusion does not apply to the RV because it was not subject to registration at the time of the loss as it was not covered by any automobile insurance. This argument unfortunately misses the mark. It does not matter whether the RV is currently being used as a vehicle or whether it has ever been used as a vehicle in the past.

Moreover, it does matter whether the RV was or was not insured by automobile insurance at the time of the loss for purposes of this exclusion. The relevant point is whether the conveyance is **subject to registration**— not whether it is **in fact** registered. Just because the Jadczaks had not used the RV for quite some time does not mean that the RV is no longer subject to registration. I must also point out that the RV is not used to service the insured residence, nor is it designed for assisting the handicapped. Homesite now reaffirms its previous denial of coverage for the RV Coverage under Coverage C pursuant to the above-cited exclusion.

I also note that Mr. Jadczak testified during his EUO that the RV was not covered by automobile insurance at the time of the loss, however, the failure of the Jadczaks to secure auto insurance for the RV does not act to create coverage under the Homesite policy.

Although your position is that the amounts offered by Homesite will be the minimum responsibility owed to your clients, Homesite must respectfully disagree with your assessment. I am advising you now, however, that Homesite does not object to the Jadczaks' cashing the offer of payment issued without prejudice to their right to litigate the remainder of their claim. You are agreeing, however, that upon acceptance by the Jadczaks the payments outlined above will act as a credit against any future judgment regarding coverage which may be entered in the future against Homesite. I also now provide a copy of the personal property inventory list once again which was attached to Homesite's initial offer of settlement.

**MERRY, FARNEN & RYAN, P.C.**

July 30, 2007
Page 5 of 5

---

Please feel free to call me with any questions.

Very truly yours,

Jeffrey M. Smythe

JMS/hj

cc:  Maria Loffredo
enclosure

## CERTIFICATE OF SERVICE

I, Sean J. Bellew, do hereby certify that on April 11, 2008, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing to the following counsel of record:

Michael L. Sensor                           John S. Spadaro
PERRY & SENSOR                       JOHN SHEEHAN SPADARO, LLC
One Customs House, Suite 560     724 Yorklyn Road, Suite 375
Wilmington, DE 19801                   Hockessin, DE 19707


Dated:  April 11, 2008                    _/s/ Sean J. Bellew_____
                                                      Sean J. Bellew (#4072)
                                                      Cozen O'Connor
                                                      1201 N. Market Street, Suite 1400
                                                      Wilmington, DE  19801
                                                      Telephone:  (302) 295-2000
                                                      Facsimile:  (302) 295-2013